1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

PAUL D. ETIENNE, JOSEPH J. TYSON, THOMAS A. DALY, FRANK R. SCHUSTER, EUSEBIO L. ELIZONDO, GARY F. LAZZERONI, GARY M. ZENDER, ROBERT PEARSON, LUTAKOME NSUBUGA, JESÚS MARISCAL, MICHAEL KELLY,

Plaintiffs,

v.

ROBERT W. FERGUSON, in his official capacity as Governor of Washington, NICHOLAS W. BROWN, in his official capacity as Attorney General of Washington, LEESA MANION, in her official capacity as King County Prosecuting Attorney, LARRY HASKELL, in his official capacity as Spokane County Prosecuting Attorney, JOSEPH BRUSIC, in his official capacity as Yakima County Prosecuting Attorney, RANDY FLYCKT, in his official capacity as Adams County Prosecuting Attorney, CURT LIEDKIE, in his official capacity as Asotin County Prosecuting Attorney, ERIC EISINGER, in his official capacity as Benton County Prosecuting Attorney, ROBERT SEALBY, in his official capacity as Chelan County Prosecuting Attorney, MARK NICHOLS,  in his official capacity as Clallam County Prosecuting Attorney, TONY GOLIK, in his official

Civil Action No._____

**PLAINTIFFS' COMPLAINT**

COMPLAINT                                    - i -

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

Capacity as Clark County Prosecuting Attorney, DALE SLACK, in his official capacity as Columbia County Prosecuting Attorney, RYAN JURVAKAINEN, in his official capacity as Cowlitz County Prosecuting Attorney, GORDON EDGAR, in his official capacity as Douglas County Prosecuting Attorney, MICHAEL GOLDEN, in his official capacity as Ferry County Prosecuting Attorney, SHAWN SANT, in his official capacity as Franklin County Prosecuting Attorney, MATHEW NEWBERG, in his official capacity as Garfield County Prosecuting Attorney, KEVIN McCRAE, in his official capacity as Grant County Prosecuting Attorney, NORMA TILLOTSON, in her official capacity as Grays Harbor County Prosecuting Attorney, GREGORY BANKS, in his official capacity as Island County Prosecuting Attorney, JAMES KENNEDY, in his official capacity as Jefferson County Prosecuting Attorney, CHAD ENRIGHT, in his official capacity as Kitsap County Prosecuting Attorney, GREGORY ZEMPEL, in his official capacity as Kittitas County Prosecuting Attorney, DAVID QUESNEL, in his official capacity as Klickitat County Prosecuting Attorney, JONATHAN MEYER, in his official capacity as Lewis County Prosecuting Attorney, TY ALBERTSON, in his official capacity as Lincoln County Prosecuting Attorney, MICHAEL DORCY, in his official capacity as Mason County Prosecuting Attorney, ALBERT LIN, in his official capacity as Okanogan County Prosecuting Attorney, MICHAEL ROTHMAN, in his official capacity as Pacific County Prosecuting Attorney, DOLLY HUNT, in her official Capacity as Pend Orielle County Prosecuting Attorney, MARY ROBNETT, in her official capacity as Pierce County Prosecuting Attorney, AMY VIRA, in her official capacity as San Juan County Prosecuting Attorney, RICH WEYRICH, in his official Capacity as Skagit County Prosecuting Attorney, ADAM KICK, in his official capacity as Skamania County Prosecuting Attorney, JASON

COMPLAINT

- ii -

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

1  CUMMINGS, in his official capacity as
   Snohomish County Prosecuting Attorney,
2  ERIKA GEORGE, in her official capacity as
   Stevens County Prosecuting Attorney, JON
3  TUNHEIM, in his official capacity as
   Thurston County Prosecuting Attorney, DAN
4  BIGELOW, in his official   capacity as
   Wahkiakum County Prosecuting Attorney,
5  GABE ACOSTA, in his official capacity as
   Walla Walla County Prosecuting Attorney,
6
   ERIC RICHEY, in his official capacity as
7  Whatcom County Prosecuting Attorney, and
   DENIS TRACY, in his official capacity as
8  Whitman County Prosecuting Attorney,
9
                 Defendants.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                          - iii -

1

## TABLE OF CONTENTS

2

**Page**

3    I.    PRELIMINARY STATEMENT ................................................................................. 1

4    II.    PARTIES ................................................................................................................ 7

5    III.    JURISDICTION AND VENUE ............................................................................ 10

6    IV.    FACTS .................................................................................................................. 11

7        **First Cause of Action** ....................................................................................... 28

8        **Second Cause of Action** .................................................................................. 30

9        **Third Cause of Action** ..................................................................................... 31

10        **Fourth Cause of Action** .................................................................................. 32

11        **Fifth Cause of Action** ...................................................................................... 34

12        **Sixth Cause of Action** ..................................................................................... 35

13        **Seventh Cause of Action** ................................................................................ 37

14        **Eighth Cause of Action** ................................................................................... 38

15        **Ninth Cause of Action** ..................................................................................... 39

16    V.    PRAYER FOR RELIEF ....................................................................................... 39

17

18

19

20

21

22

23

24

25

26

27

28

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

Plaintiffs Paul D. Etienne, the Roman Catholic Archbishop of Seattle, Joseph J. Tyson, the Roman Catholic Bishop of Yakima, and Thomas A. Daly, the Roman Catholic Bishop of Spokane, Eusebio L. Elizondo, Auxiliary Bishop of the Archdiocese of Seattle, Frank R. Schuster, Auxiliary Bishop of the Archdiocese of Seattle, Michael Kelly, a priest of the Diocese of Yakima, Gary F. Lazzeroni, a priest of the Archdiocese of Seattle, Jesús Mariscal, a priest of the Diocese of Yakima, Lutakome Nsubuga, a priest of the Diocese of Spokane, Robert Pearson, a priest of the Diocese of Spokane, and Gary M. Zender, a priest of the Archdiocese of Seattle ("Plaintiffs") bring this action to prevent Governor Robert W. Ferguson, Attorney General Nicholas W. Brown, and every County Prosecuting Attorney in the State of Washington (collectively, "Defendants") from violating Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution and Article I, Section 11 of the Washington Constitution, and allege as follows:

## I.    PRELIMINARY STATEMENT

1.     Consistent with the Roman Catholic Church's efforts to eradicate the societal scourge of child abuse, the Roman Catholic Archdiocese of Seattle and the Dioceses of Yakima and Spokane have each adopted and implemented within their respective dioceses policies that go further in the protection of children than the current requirements of Washington law on reporting child abuse and neglect.  Among the many requirements of those policies are the reporting to proper law enforcement agencies or the department of children, youth, and families whenever church personnel—defined to include clergy and lay faithful working for the dioceses, their parishes, schools, or agencies—have reasonable cause to believe child abuse or neglect has occurred.  That is a reporting obligation broader in scope than Washington law currently requires, and includes mandatory reporting when a priest learns about suspected abuse or neglect through non-sacramental counsel. And it is a state-mandated reporting obligation for clergy that the dioceses have publicly supported.  The sole exception to this self-imposed reporting requirement— based on more than 2,000 years of Church doctrine—is information learned by a priest *only* in the confessional and thus protected by the sacramental confessional seal.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

2.      The mandatory reporting policies adopted by the dioceses reflect the reforms that the Catholic Church in the United States has undertaken since 2002 to protect children.  As the John Jay College of Criminology put it in 2011: "No other institution [besides the Catholic Church] has undertaken such a public study of sexual abuse" or urged others to "follow suit."[1]

3.      Yet despite these self-imposed reporting policies—policies that go beyond what Washington law requires—Washington is targeting the Roman Catholic Church in a brazen act of religious discrimination.  Without any basis in law or fact, Washington now puts Roman Catholic priests to an impossible choice: violate 2,000 years of Church teaching and incur automatic excommunication or refuse to comply with Washington law and be subject to imprisonment, fine, and civil liability.  If that were not enough, Washington has abrogated *all* privileges—including the attorney-client privilege for clergy when the information they learn through otherwise privileged communications concerns child abuse or neglect.  Washington has done so at the same time that it *expanded* exemptions from mandatory reporting requirements for certain non-clergy. The object of this law is clear: subject Roman Catholic clergy to dictates of the state.

4.      Putting clergy to the choice between temporal criminal punishment and eternal damnation, interfering with the internal governance and discipline of the Catholic Church, and targeting religion for the abrogation of all privileges, is a patent violation of both the Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution, a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and a violation of Article I, Section 11 of the Washington Constitution.

5.      As taught by the Roman Catholic Church, dying in a state of mortal sin risks eternal damnation to Hell.[2]  But the Catholic Church teaches that, through the sacrament of confession, God "will forgive us our sins and cleanse us from all unrighteousness."[3]  While venial (less

---

[1] Karen J. Terry et al., *The Causes and Context of Sexual Abuse of Minors by Catholic Priests in the United States, 1950-2010*, John Jay Coll. (May 2011), https://www.usccb.org/sites/default/files/issues-and-action/child-and-youth-protection/upload/The-Causes-and-Context-of-Sexual-Abuse-of-Minors-by-Catholic-Priests-in-the-United-States-1950-2010.pdf.
[2] *Catechism of the Catholic Church*, Libreria Editrice Vaticana, Citta del Vaticano (1993) ("Catechism of the Catholic Church") ¶ 1033.
[3] 1 John 1:9.

COMPLAINT                                    - 2 -

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

serious) sins can be forgiven in various ways, after baptism, individual confession of mortal sins to a priest is "the only ordinary means by which a member of the faithful conscious of grave sin is reconciled with God and the Church."[4]  The absolution afforded through confession is thus a continuation of Christ's mission to forgive sins.[5]  After conquering death and before ascending into Heaven, Christ handed that mission to His apostles: "As the Father has sent me, even so I send you. … Receive the Holy Spirit. If you forgive the sins of any, they are forgiven; if you retain the sins of any, they are retained."[6]  This grant of power followed Christ giving to Saint Peter and his successors the keys to the Kingdom of Heaven, with the power to "bind" and to "loose," including with respect to sin.[7]

6.    That confession of sins—one of the seven sacraments of the Roman Catholic Church—is protected by the sacramental seal, which "absolutely forbid[s]" a priest from "betray[ing] in any way a penitent in words or in any manner and for any reason."[8]  So inviolable is the sacramental seal that "[t]he absolute prohibition imposed by the sacramental seal … prevent[s] the priest from speaking of the content of the confession to the penitent himself, outside of the sacrament."[9]  That is because the sacramental seal derives from the very nature of the sacrament itself, instituted by God, and divinely revealed to the Church.[10]

7.    Any priest "who directly violates the sacramental seal incurs a *latae sententiae* excommunication"—i.e., *automatic* excommunication.[11]  The penalty of automatic excommunication is applied to offenses under canon law that threaten or contradict the Church's unity and theological teaching, and include, in addition to violation of the sacramental seal, apostasy, heresy, schism, or desecration of the Eucharist.[12]  And given the threat posed by such

---

[4] Code of Canon Law c. 960 § 1.
[5] Matthew 9:6.
[6] John 20:21-23.
[7] Matthew 16:19.
[8] Code of Canon Law c. 983 § 1.
[9] *Note of the Apostolic Penitentiary on the Importance of the Internal Forum and the Inviolability of the Sacramental Seal*, Vatican § 1, Sacramental Seal (June 29, 2019), https://www.vatican.va/roman_curia/tribunals/apost_penit/documents/rc_trib_appen_pro_20190629_forointerno_en.html.
[10] *Id.*
[11] Code of Canon Law c. 1386 § 1.
[12] *Id.* at cc. 1364, 1370, 1382, 1386.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

conduct to the unity and theological teaching of the Church, a *latae sententiae* excommunication is "reserved to the Apostolic See," meaning that only the Pope can lift it.[13]

8.      On May 2, 2025, Governor Ferguson signed into law Senate Bill 5375, which, beginning July 27, 2025, requires Roman Catholic priests to violate the sacramental seal and report suspected child abuse or neglect of which they learn when disclosed by a penitent in confession, or otherwise face prosecution for a gross misdemeanor carrying penalties of both imprisonment and fines, and possible civil liability.  *See* RCW §§ 26.44.080, 9A.20.020(c)(2).   Despite purporting to justify Senate Bill 5375 as an effort to "protect[] our kids" from "abuse and harm," Senate Bill 5375 does not extend the reporting obligation to *everyone* who suspects potential child abuse or neglect of any kind or learns of suspected abuse or neglect of any kind through a confidential or privileged communication—including, for example, relatives of abused children, spouses of abusive parents, sexual assault advocates,[14] domestic violence advocates,[15] teachers union representatives, and attorneys.  *See* RCW §§ 26.44.030; 5.60.060.  And that is despite the fact that the overwhelming majority of confirmed instances of child abuse and neglect are perpetrated by the victim's parent or the domestic partner of a parent.[16]  Instead, Senate Bill 5375 targets "clergy" specifically, requiring that they alone report information learned in confidential communications that have for centuries been legally protected from governmental intrusion.

9.      As it currently exists, Section 26.44.030(1)(*a*) of the Revised Code of Washington requires certain agents of the state—e.g., law enforcement officers, state licensed psychologists, probation officers, employees of the department of children, youth, and families, etc.—to report

---

[13] *Id.*

[14] A "sexual assault advocate" is "the employee or volunteer from a community sexual assault program or underserved populations provider, victim assistance unit, program, or association, that provides information, medical or legal advocacy, counseling, or support to victims of sexual assault, who is designated by the victim to accompany the victim to the hospital or other health care facility and to proceedings concerning the alleged assault, including police and prosecution interviews and court proceedings."  RCW § 5.60.060(7)(a).

[15]  A "domestic violence advocate" is "an employee or supervised volunteer from a community-based domestic violence program or human services program that provides information, advocacy, counseling, crisis intervention, emergency shelter, or support to victims of domestic violence and who is not employed by, or under the direct supervision of, a law enforcement agency, a prosecutor's office, or the child protective services section of the department of children, youth, and families."  RCW § 5.60.060(8)(a).

[16] Children's Bureau, *2022 Child Maltreatment Report*, U.S. Dep't of Health & Human Serv., 74-75 (2024), https://acf.gov/sites/default/files/documents/cb/cm2022.pdf; Children's Bureau, *2023 Child Maltreatment Report*, U.S. Dep't of Health & Human Serv., 78-79 (2025), https://acf.gov/sites/default/files/documents/cb/cm2023.pdf.

COMPLAINT                                       - 4 -

suspected child abuse or neglect to the "proper law enforcement agency" or the department of children, youth, and families.  Other "persons," including family members, attorneys, and religious clergy, "may" report suspected abuse or neglect but are not required to do so.  *See* RCW § 26.44.030(3).

10.    Senate Bill 5375, however, amended Section 26.44.030(1)(a) to add "***any member of the clergy***" to the list of persons required to report suspected abuse or neglect regardless of whether Roman Catholic priests learned of the potential abuse or neglect when administering the sacrament of confession or through any other privileged communication.  Any other person not specifically delineated in Section 26.44.030(1)(a)—e.g., an aunt or uncle of an abused child— remains *permitted* to make a report but is not required to do so.

11.    Governor Ferguson's May 2, 2025 signing into law of Senate Bill 5375 also means that, beginning July 27, 2025, Roman Catholic and other religious clergy who are supervisors within organizations must report suspected child abuse or neglect when that information is learned through any privileged communication—whether the priest-penitent privilege, the attorney-client privilege, or any other privilege.

12.    As it currently exists, Section 26.44.030(1)(***b***) of the Revised Code of Washington also requires "any person" to report suspected abuse or neglect when, "in his or her official supervisory capacity with a nonprofit or for-profit organization," that person has reason to believe someone "employed by, contracted by, or [who] volunteers with the organization" who "regularly has unsupervised access to a child or children as part of the employment, contract, or voluntary service" has engaged in such abuse or neglect.  Exempted from this requirement, however, is information obtained "solely as a result of a privileged communication"—including, for example, the attorney-client privilege, the spousal privilege, the sexual assault advocate privilege, the domestic violence advocate privilege, and until July 27, 2025, the priest-penitent privilege.  *See* RCW § 5.60.060.

13.    Senate Bill 5375, however, amends Section 26.44.030(1)(b) to expressly exclude from that exemption, for clergy alone, the priest-penitent and any other privileges otherwise

- 5 -                    CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowleylawoffices.com

recognized by the State of Washington: "**_Except for members of the clergy_**, no one shall be required to report under this section when he or she obtains the information solely as a result of a privileged communication as provided in RCW § 5.60.060." Information obtained through privileged communication by any supervisor in an organization *other* than clergy—including, for example, any non-clergy member of a religious non-profit or any member of a non-religious non-profit—remains excluded from the reporting requirement.

14.    If the targeting of religion (i.e., "clergy") generally and the Roman Catholic Church specifically was not evident on the face of Senate Bill 5375, the legislative history makes that plain.  Indeed, the Washington state House and Senate Committee Reports make clear that Senate Bill 5375 expressly takes aim at clergy, and seeks to intrude upon, the sacramental seal.  The Committee Reports also acknowledge the direct conflict between Senate Bill 5375 and the sacramental seal, but assert—in violation of the special solicitude the First Amendment guarantees religious institutions in their governance, doctrine, and discipline—that the Church "can change [its] policies and practices to adapt to this requirement."

15.    The Hobson's choice to which Senate Bill 5375 puts Roman Catholic priests is a blatant intrusion into the free exercise of the Roman Catholic faith in violation of the Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution and Article I, Section 11 of the Washington Constitution.  And the right afforded to the State by Senate Bill 5375 to commandeer for itself confidential religious speech mandated by and that would not exist but for an article of religious faith is also a violation of the Establishment Clause of the First Amendment to the United States Constitution and Article I, Section 11 of the Washington Constitution.

16.    This Action seeks a declaration that Senate Bill 5375 is unconstitutional and to permanently enjoin Defendants from enforcing the unconstitutional amendments to Section 26.44.030 as enacted by Senate Bill 5375.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

## II.    PARTIES

17.    Plaintiff Paul D. Etienne is the Roman Catholic Archbishop of Seattle, which covers Clallam, Clark, Cowlitz, Grays Harbor, Jefferson, King, Kitsap, Lewis, Mason, Pacific, Pierce, San Juan Island, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, and Whatcom Counties.  As a bishop of the Roman Catholic Church, Plaintiff Etienne has the faculties to, and does, hear the sacrament of confession throughout the Archdiocese of Seattle.  Plaintiff Etienne is also required by canon law to ensure that the priests incardinated in his diocese maintain the seal of the confessional.

18.    Plaintiff Joseph J. Tyson is the Roman Catholic Bishop of Yakima, which covers Benton, Chelan, Douglas, Grant, Kittitas, Klickitat, and Yakima Counties.  As a bishop of the Roman Catholic Church, Plaintiff Tyson has the faculties to, and does, hear the sacrament of confession throughout the Diocese of Yakima.  Plaintiff Tyson is also required by canon law to ensure that the priests incardinated in his diocese maintain the seal of the confessional.

19.    Plaintiff Thomas A. Daly is the Roman Catholic Bishop of Spokane, which covers Adams, Asotin, Columbia, Ferry, Franklin, Garfield, Lincoln, Okanogan, Pend Oreille, Spokane, Stevens, Walla Walla, and Whitman Counties.  As a bishop of the Roman Catholic Church, Plaintiff Daly has the faculties to, and does, hear the sacrament of confession throughout the Diocese of Spokane.  Plaintiff Daly is also required by canon law to ensure that the priests incardinated in his diocese maintain the seal of the confessional.

20.    Plaintiff Frank R. Schuster is an Auxiliary Bishop of the Roman Catholic Archdiocese of Seattle, assisting Plaintiff Etienne with the pastoral care and oversight of the Northern, Snohomish, South Seattle, Eastside, and North Seattle deaneries.  As an Auxiliary Bishop, Plaintiff Schuster has the faculties to, and does, hear the sacrament of confession throughout the Archdiocese of Seattle.

21.    Plaintiff Eusebio L. Elizondo is an Auxiliary Bishop of the Roman Catholic Archdiocese of Seattle, assisting Plaintiff Etienne with the pastoral care and oversight of the Northern, Snohomish, South Seattle, Eastside, and North Seattle deaneries.  As an Auxiliary

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

Bishop, Plaintiff Elizondo has the faculties to, and does, hear the sacrament of confession throughout the Archdiocese of Seattle.

22.    Plaintiff Gary F. Lazzeroni is a priest incardinated in the Roman Catholic Archdiocese of Seattle, Vicar General for the Archdiocese, priest moderator of Parish Family #18, which includes St. Joseph and St. Therese Churches in Seattle, and beginning on July 1, 2025, will be pastor of Parish Family #17, which includes Christ Our Hope and Immaculate Conception Churches and St. James Cathedral in Seattle.  As Vicar General, Plaintiff Lazzeroni is responsible for the day-to-day administration of the Archdiocese.  As a priest of the Archdiocese of Seattle, Plaintiff Lazzeroni has the faculties to, and does, hear the sacrament of confession throughout the Archdiocese of Seattle.

23.    Plaintiff Gary M. Zender is a priest incardinated in the Roman Catholic Archdiocese of Seattle, Vicar for Clergy of the Archdiocese, and priest in residence at Parish Family #27, which includes St. Louise de Marilac and St. Madeleine Sophie Churches in Bellevue. As Vicar General for the Archdiocese, Plaintiff Zender is a liaison between Plaintiff Etienne and the Archdiocesan clergy, makes recommendations to Plaintiff Etienne on clergy assignments, and assists Plaintiff Etienne in supporting the well-being of the Archdiocesan clergy.  As a priest of the Archdiocese of Seattle, Plaintiff Zender has the faculties to, and does, hear the sacrament of confession throughout the Archdiocese of Seattle.

24.    Plaintiff Jesús Mariscal is a priest incardinated in the Roman Catholic Diocese of Yakima and parochial vicar of St. Paul Cathedral in Yakima.  As a priest of the Diocese of Yakima, Plaintiff Mariscal has the faculties to, and does, hear the sacrament of confession throughout the Diocese of Yakima.

25.    Plaintiff Michael Kelly is a priest incardinated in the Romand Catholic Diocese of Yakima and parochial vicar of Holy Family Catholic Church in Yakima.  As a priest of the Diocese of Yakima, Plaintiff Kelly has the faculties to, and does, hear the sacrament of confession throughout the Diocese of Yakima.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

26.    Plaintiff Robert Pearson is a priest incardinated in the Roman Catholic Diocese of Spokane and senior priest in residence at The Cathedral of Our Lady of Lourdes in Spokane.  As a priest of the Diocese of Spokane, Plaintiff Pearson has the faculties to, and does, hear the sacrament of confession throughout the Diocese of Spokane.

27.    Plaintiff Lutakome Nsubuga is a priest incardinated in the Roman Catholic Diocese of Spokane and pastor of St. Paul the Apostle Church in Eltopia, St. Vincent Church in Connell, and San Juan Diego Church in Basin City.  As a priest of the Diocese of Spokane, Plaintiff Nsubuga has the faculties to, and does, hear the sacrament of confession throughout the Diocese of Spokane.

28.    Defendant Robert W. Ferguson is and was at all times relevant hereto the elected Governor of the State of Washington and as such can make written request of the Washington Attorney General to investigate violations of the State's criminal laws, including failure to report incidents of child abuse and neglect pursuant to RCW § 26.44.030.  *See* RCW § 43.10.090.

29.    Defendant Nicholas W. Brown is the elected Attorney General of the State of Washington and as such can, upon written request of the Governor of Washington, investigate and, in some instances, prosecute violations of the State's criminal laws, including failure to report incidents of child abuse and neglect pursuant to RCW § 26.44.030.  *See* RCW § 43.10.090.

30.    Defendant Leesa Manion is the prosecuting attorney for King County, Washington and as such can prosecute violations of the State's criminal laws, RCW § 36.27.020(4), including failure to report incidents of child abuse and neglect pursuant to RCW § 26.44.030.

31.    Defendant Larry Haskel is the prosecuting attorney for Spokane County, Washington and as such can prosecute violations of the State's criminal laws, RCW § 36.27.020(4), including failure to report incidents of child abuse and neglect pursuant to RCW § 26.44.030.

32.    Defendant Joseph Brusic is the prosecuting attorney for Yakima County, Washington and as such can prosecute violations of the State's criminal laws, RCW § 36.27.020(4), including failure to report incidents of child abuse and neglect pursuant to RCW § 26.44.030.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowleylawoffices.com

33.     Defendants Randy Flyckt, Curt Liedkie, Eric Eisinger, Robert Sealby, Mark Nichols, Tony Golik, Dale Slack, Ryan Jurvakainen, Gordon Edgar, Michael Golden, Shawn Sant, Matthew Newberg, Kevin McCrae, Norma Tillotson, Gregory Banks, James Kennedy, Chad Enright, Gregory Zempel, David Quesnel, Jonathan Meyer, Ty Albertson, Michael Dorcy, Albert Lin, Michael Rothman, Dolly Hunt, Mary Robnett, Amy Vira, Rich Weyrich, Adam Kick, Jason Cummings, Erika George, Jon Tunheim, Dan Bigelow, Gabe Acosta, Eric Richey, and Denis Tracy are the prosecuting attorneys for Adams, Asotin, Bentin, Chelan, Clallam, Clark, Columbia, Cowlitz, Douglas, Ferry, Franklin, Garfield, Grant, Grays Harbor, Island, Jefferson, Kitsap, Kittitas, Klickitat, Lewis, Lincoln, Mason, Okanogan, Pacific, Pen Orielle, Pierce, San Juan, Skagit, Skamania, Snohomish, Stevens, Thurston, Wahkiakum, Walla Walla, Whatcom, and Whitman Counties of Washington, respectively, and as such can prosecute violations of the State's criminal laws, RCW § 36.27.020(4), including failure to report incidents of child abuse and neglect pursuant to RCW § 26.44.030.  Each of these counties is within one or more of the Roman Catholic Archdiocese of Seattle, the Diocese of Spokane, and the Diocese of Yakima.

34.     Each individual official capacity Defendant listed above is a "person" under 42 U.S.C. § 1983 for purposes of injunctive relief and is therefore sued under *Ex parte Young*, 209 U.S. 123 (1908).  Each Defendants' actions relating to the investigation and prosecution of the criminal laws of the State of Washington are taken under color of state law.

### III.     JURISDICTION AND VENUE

35.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983 because Plaintiffs allege an imminent violation of their rights afforded by the United States Constitution.  It has supplemental jurisdiction over Plaintiffs' state-law claim under 28 U.S.C. § 1367.

36.     The Court may declare the legal rights and obligations of the parties in this action pursuant to 28 U.S.C. § 2201 because the action presents an actual controversy within the Court's jurisdiction.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

37.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b).  Defendants Robert W. Ferguson, Nicholas W. Brown, and Leesa Manion are residents of this district, and all Defendants are residents of the State of Washington.

## IV.     FACTS

### A.     The Catholic Church's Response to the Sexual Abuse Crisis

38.     In 2002, the United States Conference of Catholic Bishops ("USCCB") adopted the *Charter for the Protection of Children and Young People* in direct response to the revelations of clergy sexual abuse within the Church.[17]   The *Charter* provides a range of procedures to address sexual abuse allegations, reconciliation and healing, transparency, accountability, and prevention.

39.     Consistent with the *Charter*, the Church in the United States established the Committee for the Protection of Children and Young People along with its Secretariat of Child and Youth Protection.  The Church also established a National Review Board—an advisory board of male and female lay people designed to help the USCCB prevent the sexual abuse of minors.[18] The USCCB now publishes annually the results of audits of all U.S. dioceses conducted by an independent, outside firm.[19]   Given this comprehensive response to the scourge of sexual abuse, the John Jay College of Criminology unequivocally stated: "No other institution [besides the Catholic Church] has undertaken such a public study of sexual abuse."[20]

40.     The collective data show considerable progress in combating sexual abuse within the Church, with the vast majority of recent credible allegations concerning historical—rather than recent—instances of abuse.[21]

---

[17] *Charter for the Protection of Children and Young People*, U.S. Conf. of Catholic Bishops, https://www.usccb.org/offices/child-and-youth-protection/charter-protection-children-and-young-people (last visited May 28, 2025).
[18] Protection of Children & Young People, U.S. Conf. of Catholic Bishops, https://www.usccb.org/committees/protection-children-young-people (last visited May 28, 2025).
[19] *Audits*, U.S. Conf. of Catholic Bishops, https://www.usccb.org/offices/child-and-youth-protection/audits (last visited May 28, 2025).
[20] Terry, *supra* note 1.
[21] Secretariat of Child and Young Protection et al., *2023 Annual Report on the Implementation of the "Charter for the Protection of Children and Young People,"* 43, U.S. Conf. of Catholic Bishops(May 2014), https://www.usccb.org/resources/2023%20Annual%20Report.pdf.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

41.    The Archdiocese of Seattle and the Dioceses of Spokane and Yakima cooperate fully in the Church's response to combat clergy sexual abuse.  Within the past six years, every one of the three dioceses has received at least one on-site audit.

42.    Consistent with the Church's efforts to combat child abuse, Plaintiffs Paul D. Etienne, Joseph J. Tyson, and Thomas A. Daly have all implemented within their respective dioceses policies consistent with, and broader than, the current child abuse and neglect reporting requirements of Section 26.44.030(1)(a) and (b).[22]

43.    Among the many requirements of those policies include the reporting to proper law enforcement agencies or the Washington department of children, youth, and families whenever Church personnel—defined to include clergy and lay faithful working for the dioceses, their parishes, schools, or agencies—learn of abuse.  Thus, even though they are not required to under Washington law, priests within each diocese are ***required*** by the dioceses to report to proper law enforcement agencies or the department of children, youth, and families suspected child abuse or neglect. The sole exception is if reporting would violate the sacramental seal.

44.    Given the Church's mandatory reporting policies, the Washington State Catholic Conference, on behalf of all three Catholic Dioceses, has also supported legislation that would make that reporting obligation a state-mandated requirement.  That support, however, has been contingent on the protection of the sacramental seal and the constitutional protections afforded the Roman Catholic Church by the United States and Washington State Constitutions.

45.    Moreover, because absolution given by a priest requires true contrition for all confessed sins, priests in each diocese, including all Plaintiffs, to whom are confessed sins of child abuse or neglect by the penitent, counsel the penitent to self-report and obtain the necessary temporal intervention and help.  Priests in each diocese, including all Plaintiffs, who suspect based

---

[22] *See Policy for the Prevention of and Response to Sexual Abuse, Sexual Misconduct, and Sexual Harassment, Archdiocese of Seattle*, Office of Human Resources (rev. Jan. 2018), https://archseattle.org/wp-content/uploads/2021/08/Safe-Environment-Program-Policy-Prevention-Response-Eng-8.31.2021.pdf;
*Administrative Policies/Procedures: Prevention, Education, and Reporting of Abuse*, Diocese of Spokane (Nov. 2021), https://files.ecatholic.com/6397/documents/2021/11/The%20Duty%20to%20Report.pdf?t=1637774089000; *Policy Regarding Sexual Abuse of Minors by Clerics, Men, and Women Religious, Seminarians, Employees and Volunteers*, Diocese of Yakima (Mar. 1, 2010), https://yakimadiocese.org/wp-content/uploads/2015/12/Sexual-Abuse-Policies-2017-English-with-VAC-protocol.pdf.

COMPLAINT                                      - 12 -

on what is disclosed during confession that the penitent is suffering from abuse or neglect, the penitent has engaged in abuse or neglect, or some third party has engaged in abuse or neglect, invite the penitent for counseling outside of the sacrament of confession.  And, should the priest learn information in that non-sacramental counselling providing reasonable cause to believe abuse or neglect has been committed, the priest is obligated to report that suspected abuse or neglect to proper law enforcement agencies or the department of children, youth, and families.

46.     The Church recognizes that even one credible allegation is too many and that there is more work to do.  Yet evidence-based measurements of the Church's response show that the Church's efforts to combat abuse are working.[23]

**B.     The Sacrament of Confession and the Sacramental Seal**

47.     As taught by the Roman Catholic Church, Jesus Christ, the eternal son of God, became incarnate and was crucified on the Cross in atonement for man's sins.  Through baptism, man receives the forgiveness of sins merited by Christ's crucifixion on the Cross, is conformed to the righteousness of God, and receives the gift of eternal life with God.[24]  Upon man's baptism and complete remission of sin, there is no impediment to eternal life with God.[25]

48.     Baptism does not, however, eradicate the temporal consequences of sin—including suffering, illness, death, and an inclination toward sin.  Man, for his temporal life, must wrestle with these temporal effects of sin, including the inclination toward sin.[26]  Should man give in to the inclination to sin and commit particularly grievous sins, man turns away from God.[27]  Absent repentance and God's forgiveness, those grievous sins—i.e., mortal sins—destroy communion with God and with his Church, exclude man from God's Kingdom, and risk consigning man to the eternal death of Hell.[28]

---

[23] Thomas Piante, *Keeping Children Safe in the Catholic Church*, Psychology Today (Apr. 9, 2020), https://www.psychologytoday.com/us/blog/do-the-right-thing/202004/keeping-children-safe-in-the-catholic-church.
[24] Catechism of the Catholic Church ¶¶ 1987-1995.
[25] *Id.* ¶ 1263.
[26] *Id.* ¶ 1264.
[27] *Id.* ¶ 1855.
[28] *Id.* ¶ 1861.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowleylawoffices.com

49.     The sacrament of confession is the only ordinary means by which man receives forgiveness for the commission of mortal sin after baptism.[29]  Confession—also known as the sacrament of reconciliation or the sacrament of penance—requires the penitent to confess his sins, express contrition for those sins, and possess the intention to turn away from sin.[30]  This sacrament is both an act of mercy and an act of Church discipline where the priest acts *in persona Christi* (in the person of Christ).  In this sacrament, the priest "is equally a judge and a physician and has been established by God as a minister of divine justice and mercy."[31]

50.     In the sacrament of confession, the priest is "a minister of the Church," must "adhere faithfully to the doctrine of the magisterium and the norms issued by competent authority," can "pos[e] questions … with prudence and discretion" to determine a penitent's culpability in grave sin, and determine if there is "doubt about the disposition of the penitent."[32]

51.     The priest is also charged to "impose salutary and suitable penances in accord with the quality and number of sins, taking into account the condition of the penitent," and the penitent is "obliged to fulfill" this penance.[33]  If the priest provides the penitent absolution, the penitent is forgiven by God of the sins committed since baptism (or the penitent's most recent confession), is reconciled with God and His Church, and stands, once again, without impediment to eternal life with God.[34]

52.     Although it is the priest that imparts absolution, forgiveness of sins is granted by God alone.[35]  Because he is acting *in persona Christi*, in hearing a penitent's confession, the priest hears the penitent's confession of sins *non ut homo, set ut Deus*—i.e., not as man, but as God.  And when the priest imparts absolution, he does so not as man, but as God.  The penitent's confession is therefore a confession of sins *to God*, so much so that the Catholic Church teaches that a priest

---

[29] Code of Canon Law c. 960 § 1.
[30] *Id.* at c. 959.
[31] *Id.* at c. 978 § 1.
[32] *Id.* at c. 978 § 2; *id.* at cc. 979-980.
[33] *Id.* at c. 981.
[34] Catechism of the Catholic Church ¶ 1462.
[35] *Id.* ¶ 1441.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

"simply 'does not know' what he was told during confession, because he did not listen to [the penitent] as a man but, precisely, in the name of God."[36]

53.    Given this theological understanding of the sacrament, a penitent's confession is protected by the sacramental seal.  The sacramental seal "absolutely forbid[s]" a priest from "betray[ing] in any way a penitent in words or in any manner and for any reason."[37]  The sacramental seal "prevent[s] the priest from speaking of the content of the confession to the penitent himself, outside of the sacrament."[38]  And the sacramental seal binds the priest "to the point that he is forbidden to remember voluntarily the confession and he is obliged to suppress any involuntary recollection of it."[39]  Indeed, so inviolable is the sacramental seal that, "once the sacrament has been celebrated," not even the penitent "ha[s] the power to relieve the [the priest] of the obligation of secrecy."[40]

54.    The sacramental seal is intrinsic to the sacrament itself.  When Jesus Christ gave Saint Peter the keys to the kingdom of Heaven, they came with Christ's power to "bind" and to "loose"—a power that includes adjudicating and forgiving sins.[41]  With that power came the obligation to keep secret confessed sins.  Indeed, Pope St. Leo I emphasized confessional secrecy in the fifth century, and admonished that public confession was "an abuse against the apostolic rules"—i.e., the teaching of Christ's Apostles.[42]  Confessional secrecy was included in Gratian's *Decretum*, the first systematic collection of theological and legal rules in Western law completed around 1140.  And confessional secrecy was codified into canon law by the Fourth Lateran Council in 1215, where it has been ever since.

55.    Priests are obligated to defend the sacramental seal, if necessary, *usque ad sanguinis effusionem*—i.e., through the shedding of blood.  Indeed, history is replete with priests

---

[36] *Note of the Apostolic Penitentiary*, *supra* note 9.
[37] Code of Canon Law c. 983 § 1.
[38] *Note of the Apostolic Penitentiary*, *supra* note 9.
[39] *Id.*
[40] *Id.*
[41] *See* Matthew 16:19; *see also* George Joyce, *Power of the Keys*, *in* Catholic Encyclopedia (8th ed. 1910), https://www.newadvent.org/cathen/08631b.htm.
[42] "It is sufficient that the sins which trouble one's conscience are revealed only to the priests in a secret confession." Letter 168 of Pope St. Leo I, https://www.presbytersproject.ihuw.pl/index.php?id=6&SourceID=1818.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

1  who have been martyred for refusing to violate the sacramental seal: St. John Nepomucene was

2  martyred in 1393 for refusing to divulge to the jealous King of Bohemia the confessed sins of the

3  King's wife; Blessed John Sarkander was martyred in 1620 for refusing during the Thirty Years

4  War to divulge to an anti-Catholic nobleman the confessed sins of a Catholic baron; Fr. Andreas

5  Faulhaber was martyred in 1757 for refusing to disclose to Prussian authorities the confessed sins

6  of an army conscript accused of disloyalty; Fr. Pedro Marieluz Garcés was martyred in 1825 for

7  refusing to disclose to the Marquess of Rodil the confessed sins of Spanish troops sympathetic to

8  Simon Bolívar; St. Mateo Correa Magallanes was martyred in 1927 for refusing to disclose the

9  confessed sins of Cristero soldiers resisting the anti-clerical Mexican government of Plutarco Elías

10 Calles; and Blessed Fernando Olmedo Reguera and Blessed Felipe Císcar Puig were martyred in

11 1936 during the Red Terror of the Spanish Civil War for not divulging the confessed sins of

12 Catholics.  That is not surprising: Any priest "who directly violates the sacramental seal incurs a

13 *latae sententiae* excommunication"—i.e., *automatic* excommunication—risking eternal

14 damnation.[43]

15      56.    Accordingly, the Church regards "[a]ny political action or legislative initiative

16 aimed at 'breaching' the inviolability of the sacramental seal" as not only a violation of civil law

17 religious freedom protections, but, more fundamentally, as "an unacceptable offense against

18 *libertas Ecclesiae*, which does not receive its legitimacy from individual States, but from God."[44]

## C. Civil Recognition of the Priest-Penitent Privilege

20      57.    The sacramental seal has long been respected by civil authorities.

21      58.    In England, courts recognized the inviolability of the sacramental seal at least as

22 early as the Norman Conquest of 1066.  *See Cook v. Carroll*, [1945] Ir. R. 515, 519-21 (High

23 Court).  "This privilege lost its recognition following the Protestant Reformation" and the Crown's

---

[43] Code of Canon Law c. 1386 § 1.

[44] *Note of the Apostolic Penitentiary*, *supra* note 9; *see also* Second Vatican Council, *Dignitatis Humanae* 13 (1965) (The Church's is a "sacred freedom," "so much the property of the Church that to act against it is to act against the will of God. The freedom of the Church is the fundamental principle in what concerns the relations between the Church and governments and the whole civil order.").

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

1    imposition of the discriminatory Penal Laws on Roman Catholics,[45] but, from early on in American

2    history, United States law made the conscious choice to recover it.[46]

3        59.    Indeed, American courts have recognized the legal inviolability of the sacramental

4    seal since at least 1813 when the New York Court of General Sessions refused to compel a Roman

5    Catholic priest to disclose at trial what he learned in confession.[47]  In that case, the court ruled for

6    the priest precisely because an alternative ruling would violate the Church's independent authority

7    over its internal discipline. As the court said, the "ordinances," "ceremonies," and "essentials" of

8    religion "should be protected."[48]  "To decide that the minister shall promulgate what he receives

9    in confession, is to declare that there shall be no penance; and this important branch of the Roman

10   Catholic religion would be thus annihilated."[49]  Indeed, in 1875, the United States Supreme Court

11   observed that "public policy forbids the maintenance of any suit … which would require a

12   disclosure of the confidences of the confessional."  *Totten v. United States*, 92 U.S. 105, 107

13   (1875); *see also Trammel v. United States*, 445 U.S. 40, 51 (1980) (observing the priest-penitent

14   privilege is "rooted in the imperative need for confidence and trust").

15       60.    Beginning in the nineteenth century, numerous American states and territories

16   began protecting the privilege in statute.  In 1828, New York expanded the protection of the priest-

17   penitent privilege beyond just Roman Catholic priests to include any "minister of the gospel, or

18   priest of any denomination whatsoever."  N.Y. Rev. Stat. § 72, pt. 3, ch. VII, art. 8 (1828).  New

19   York's codification of the priest-penitent privilege was subsequently adopted word-for-word by

20

21

22

23

---

[45] The Penal Laws were a series of laws enacted in the sixteenth and seventeenth centuries that restricted Catholic
24   worship, barred Catholics from voting and holding public office, and imposed the death penalty for Catholic priests.
[46] *See* Ronald J. Colombo, *Forgive Us Our Sins: The Inadequacies of the Clergy-Penitent Privilege*, 73 NYU L. Rev.
25   225, 230-31 (1998) (citing John C. Bush & William Harold Tiemann, *The Right to Silence: Privileged Clergy
     Communication and the Law* 111 (3d. ed. 1989)).
[47] *See People v. Phillips*, Court of General Sessions, City of New York (June 14, 1813), *excerpted in Privileged*
26   *Communications to Clergymen*, 1 Cath. Law. 199 (1955).
[48] William Sampson, *The Catholic Question in America*, 8-9 (1813), *excerpted in Privileged Communications to*
27   *Clergymen*, at 207.
[49] *Privileged Communications to Clergymen* at 207; *see also People v. Smith*, N.Y. City Hall Rec. 77 (Ct. Oyer &
28   Term.1817) (recognizing the applicability of the priest-penitent privilege).

COMPLAINT                              - 17 -         CROWLEY LAW OFFICES, P.S.
                                                     600 University Street, Suite 1708 • Seattle, WA 98101
                                                                (206) 209-0456
                                                            www.crowlylawoffices.com

Missouri in 1845, Michigan in 1846, and Wisconsin in 1849.[50]  And New York's codification was adopted, with certain modifications, in California and then Iowa in 1851.[51]

61.     Washington has recognized the priest-penitent privilege since at least 1854,[52] when the Territory of Washington passed a statute providing that a member of the clergy or a priest shall not, without the consent of a person making a confession or sacred confidence, be forced to testify as to any confession or sacred confidence made to him or her in his or her professional character in the course of discipline enjoined by the church.  *See* Washington Code of 1854, § 294(3); *see also* Washington Code of 1881, § 392(3).

62.     Protecting the sacramental seal is not only justified as a matter of the First Amendment's "special solicitude to the rights of religious organizations."  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012). In addition, failing to recognize the sacramental seal would burden what is quintessentially religious speech.  For example, invoking fundamental principles of religious liberty, the New York Court of General Sessions justified refusing to invade the sacramental seal by explaining that:

> It is essential to the free exercise of a religion, that its ordinances should be administered – that its ceremonies as well as its essentials should be protected. The sacraments of a religion are its most important elements. ... Secrecy is of the essence of penance. The sinner will not confess, nor will the priest receive his confession, if the veil of secrecy is removed: To decide that the minister shall promulgate what he receives in confession, is to declare that there shall be no penance; and this important branch of the Roman catholic religion would be thus annihilated.

*People v. Phillips,* Court of General Sessions, City of New York (June 14, 1813), *excerpted in Privileged Communications to Clergymen*.

63.     Likewise, the English jurist Jeremy Bentham, a fierce opponent of privileges generally, argued that the priest-penitent privilege deserves legal recognition.  *See* 7 Jeremy Bentham, Rationale of Judicial Evidence 589-91 (1827).[53]  As he explained, failure to respect the

---

[50] Simon Greenleaf, A Treatise on the Law of Evidence 335 n.5 (5th ed. 1850).
[51] *Id.*
[52] Washington become a state of the United States in November 1889.  Washington become a territory of the United States in March 1853 when the Territory of Oregon was divided.
[53] Bentham was described as "the greatest opponent of privilege." 8 John Henry Wigmore, *Wigmore on Evidence* §2396, at 877 (McNaughton rev. 1961).

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowleylawoffices.com

sacramental seal would mean penitents are "inhibited from the exercise of this essential and indispensable article of their religion" and priests would be pressed to "violate what by them is numbered amongst the most sacred of religious duties." *Id.* at 588. And that "oppressive … persecution" would be to no end, as the "confessorial evidence which is now delivered in secret for a purpose purely religious … would not be so delivered: would be kept back, under the apprehension of its being made use of for a judicial purpose." *Id.* at 587-88.

**D.    Washington State Law Generally Protects Confidential Communications**

64.    Washington state law provides robust legal protection for the confidentiality of a wide array of communications, even when those communications may concern potentially criminal activity.

65.    Washington state law precludes one spouse, or even just a domestic partner, from testifying to the other spouse's or domestic partner's confession to serious crimes. RCW § 5.60.060(1). This spousal privilege applies to a spouse's or domestic partner's confession to rape of a child. *State v. Roach*, 489 P.3d 283 (Wash. Ct. App. 2021). That is because the spousal privilege recognizes the "natural repugnance to having one spouse testify against the other and prevents the testifying spouse from having to choose between perjury, contempt of court, or jeopardizing the marriage." *Id.* at 291 (internal quotation marks omitted).

66.    Under Washington state law, a sexual assault advocate may not, as a general rule, be forced to testify as to any communication made between the victim and the sexual assault advocate. RCW § 5.60.060(7).

67.    Under Washington state law, a domestic violence advocate may not, as a general rule, be forced to testify as to any communication made between the victim and the domestic violence advocate. RCW § 5.60.060(8).

68.    Under Washington state law, a mental health counselor, independent clinical social worker, or licensed marriage and family therapist may not, as a general rule, be forced to testify or even disclose voluntarily any communication made by the client in the course of professional relationship. RCW § 6.50.060(9).

COMPLAINT                                      - 19 -

69.     Under Washington state law, a sponsor of a person in an alcohol or drug addiction fellowship may not, as a general rule, testify in a civil action as to any communication made to the sponsor.  RCW § 6.50.060(10).

70.     Under Washington state law, neither a union member nor a union representative (including a representative of a teacher's union) may, as a general rule, be forced to disclose any communication between the union member and his or her union representative made during the course of the representation.  RCW § 6.50.060(11).

71.     Under Washington state law, a peer supporter may not, as a general rule, be forced to testify as to any communication made to the peer supporter by the peer support services recipient while receiving services.  RCW § 6.50.060(6)(a).

72.     Under Washington state law, an attorney may not, without the consent of his or her client, be forced to testify as to any communication made by the client to the attorney in the course of professional employment.  RCW § 6.50.060(2)(a).

73.     And, as it has done since 1854, Washington law currently continues to provide that a member of the clergy or a priest shall not, without the consent of a person making a confession or sacred confidence, be forced to testify to any confession or sacred confidence made to him or her in the course of discipline enjoined by the church.  RCW § 6.50.060(3).

**E.     Washington's Framework for Reporting Child Abuse and Neglect**

74.     Chapter 26.44 of the Revised Code of Washington imposes a comprehensive legislative framework for the protection of children from abuse and neglect, providing "for the reporting of such cases to the appropriate public authorities" and, "as a result of such reports, protective services shall be made available in an effort to prevent further abuses, and to safeguard the general welfare of such children."  RCW § 26.44.010.

75.     In its current form, Section 26.44.030(1)(*a*) requires a certain, defined number of persons, generally agents of the state or those licensed by the state to perform certain services, to report to the "proper law enforcement agency" or the department of children, youth, and families any child abuse or neglect that the persons have reasonable cause to believe has occurred.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowleylawoffices.com

Mandatory reporters include law enforcement officers, probation officers, state-licensed psychologists, state-registered pharmacists, state-licensed practitioners of the healing arts, and other persons employed by or licensed by the state. *See* RCW § 26.44.030(1)(a); *see also id.* § 26.44.020(21). Other "persons," including religious clergy, family members, lawyers, or any other person who may have reasonable cause to believe that a child has suffered abuse or neglect "may*,*" but are not required to, report suspected abuse or neglect. *See* RCW § 26.44.030(3).

76. Section 26.44.030(1)(***b***) of Chapter 26.44 also requires "any person" to report suspected abuse or neglect to the "proper law enforcement agency" or the department of children, youth, and families when, "in his or her official supervisory capacity with a nonprofit or for-profit organization," that person has reason to believe someone "employed by, contracted by, or [who] volunteers with the organization" who "regularly has unsupervised access to a child or children as part of the employment, contract, or voluntary service" has engaged in such abuse. Exempted from this requirement, however, is information obtained "solely as a result of a privileged communication"—including, for example, the attorney-client privilege, the spousal privilege, the sexual assault advocate privilege, the domestic violence advocate privilege, the mental health counselor privilege, the union representative privilege, the peer supporter privilege, and the priest-penitent privilege. Section 26.44.030(1)(b); *see also supra* paragraphs 64-73 (identifying such privileges). In other words, subject to all available privileges, supervisors are required to report suspected child abuse or neglect by anyone associated with the organization with access to children if they learned about the suspected abuse or neglect in their capacity as a supervisor within the organization.

77. Failure to make a report under either Section 26.44.030(1)(a) or (b) risks criminal prosecution for a gross misdemeanor, carrying a penalty of up to 364 days in prison and a fine of up to $5,000. *See* RCW §§ 26.44.080, 9A.20.020(c)(2). Failure to make a report also carries the possibility of civil liability.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

**F.    Senate Bill 5375 Requires Violating the Sacramental Seal and Deprives Roman Catholic Clergy of Privileges Available to Non-Clergy**

78.    On May 2, 2025, Governor Ferguson signed into law Senate Bill 5375, after its passage by both houses of the Washington Legislature, making two fundamental changes to Section 26.44.030(1)(a) and (b).

79.    *First*, Senate Bill 5375 amends Section 26.44.030(1)(a) to add "***any member of the clergy***" to the list of persons required to report suspected abuse or neglect.  Any other person not specifically delineated in Section 26.44.030(1)(a)—e.g., an aunt or uncle of an abused child—remains *permitted* to make a report but is not required to do so.  No exception is made for abuse or neglect the priest may have learned about in the sacrament of confession or through any other legally recognized privileged communication.

80.    *Second*, Senate Bill 5375 amends Section 26.44.030(1)(b) to expressly preclude members of the clergy—and *only* members of the clergy—from the protections of *any* of the privileges otherwise recognized by Washington law when learning about suspected child abuse or neglect by a member of an organization in which the clergy member provides a supervisory role: "***Except for members of the clergy***, no one shall be required to report under this section when he or she obtains the information solely as a result of a privileged communication as provided in RCW 5.60.060."  Privileged information obtained by anyone in a supervisory role *other* than clergy, or who otherwise do not fall within the scope of Section 26.44.030(1)(a), remains excluded from the reporting requirement.

81.    Because "members of the clergy" (defined to include any ordained Roman Catholic priest) are not afforded the benefit of the privileges otherwise recognized by Washington law, both amendments to Section 26.44.030(1) *necessarily* require Roman Catholic priests in the State of Washington to violate the sacramental seal should any penitent confess conduct giving a priest reasonable cause to believe child abuse or neglect has occurred.  An ordained Roman Catholic priest, including all Plaintiffs, to whom is disclosed by any church member in the sacrament of confession conduct giving the priest reasonable cause to believe child abuse or neglect has occurred is required under Section 26.44.030(1)(a) to report the conduct or face prosecution,

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

imprisonment, or a fine, and possible civil liability.  A priest within each diocese with any supervisory authority over his brother priests, such as Plaintiffs Etienne, Tyson, Daly, Schuster, Elizondo, Lazzeroni, and Zender, and any parish pastor with supervisory authority over a parochial vicar, to whom is disclosed in the sacrament of confession by a fellow priest conduct giving reasonable cause to believe child abuse or neglect has occurred is required under Section 26.44.030(1)(b) to report the conduct or face prosecution, imprisonment, fine, and/or civil liability—regardless of whether it is the penitent priest who engaged in the conduct at issue.

82.    And as if requiring clergy to violate the sacramental seal were not enough, Senate Bill 5375's amendments to Section 26.44.030(1) deprives clergy of the benefit of *any* privilege otherwise recognized by Washington law when clergy having a supervisory role within an organization learn of child abuse or neglect.  For example, if a lay CEO of a secular non-profit learned through an investigation by counsel that one of its volunteers was sexually abusing an underserved child, that CEO is ***not required*** to report the sexual abuse pursuant to Section 26.44.030(1)(b).  However, if a priest who is the CEO of a Roman Catholic non-profit learns through an investigation by counsel that one of its volunteers was sexually abusing an underserved child, that priest is ***required*** to report the sexual abuse pursuant to Section 26.44.030(1)(b).

## G.    Senate Bill 5375 Specifically Targets the Sacramental Seal

83.    It is evident from the face of Senate Bill 5375 that it specifically targets religion—the amendments are directed to, and only to, "members of the clergy."

84.    But it is equally evident that the Washington Legislature and Governor Ferguson knew and specifically contemplated Senate Bill 5375 intruding in particular upon the sacramental seal.  Indeed, Senate Bill 5375 is the culmination of several years of efforts in the Washington Legislature to strengthen child abuse reporting obligations.  Previous versions of legislation mandated that clergy report sexual abuse while at the same time protecting the sacramental seal surrounding confession.  Those protections, however, prevented the legislation from passing.  Proposed amendments to Senate Bill 5375 similarly required clergy to report sexual abuse but

COMPLAINT

- 23 -

protected the sacramental seal.  Those amendments too were rejected.[54]  And in passing and signing Senate Bill 5375, all of the Washington House, Senate, and Governor recognized that Senate Bill 5375 requires violating the sacramental seal.

85.    For example, the House Bill Report makes clear that the House was made aware that "the Catholic Church will excommunicate priests for breaking canon law" by "following this legislation to report child abuse or neglect allegations that were discovered during confession."[55]  The Senate Bill Report makes clear that "[t]he seal of confession is not an excuse" to not report suspected child abuse.[56]  And Governor Ferguson made clear when signing Senate Bill 5375 that violating the sacramental seal did not give him pause: "Not for me. … I'm very familiar with it.  Been to confession, myself."[57]

86.    Moreover, the Legislature justified Senate Bill 5375 by public statements decrying religious practices and asserting a purported need to have religious institutions change these practices—including the sacramental seal.  The Senate Bill Report cites the purported "need to lift the cloak of secrecy," declares that child abuse and neglect "needs to be reported whether you're inside or outside confession," and contends that "[a] church can change cannon [sic] law" to comply.[58]  The House Bill Report similarly reflects testimony that "[r]eligious organizations can change their policies and practices to adapt to this requirement."[59]  Indeed, Senator Noel Frame made clear that religious communities must bend to the state's will: "We can establish our laws, they can have their rules, and, if they are in conflict, … they can change their rules, not insist that we change our state laws."[60]

---

[54] *See, e.g.*, SB 5375, 119th Cong. (House Amend. 950) (2025), https://lawfilesext.leg.wa.gov/biennium/2025-26/Pdf/Amendments/House/5375%20AMH%20WALJ%20WICM%20720.pdf.

[55] House Bill Rep., Senate Committee on Early Learning & Human Services, SB 5375, 4 (as passed by House, Apr. 11, 2025), https://app.leg.wa.gov/billsummary/?BillNumber=5375&Year=2025&Initiative=false.

[56] Sen. Bill Rep., Senate Committee on Human Services, SB 5375, 4 (as passed by Senate, Feb. 28, 2025), https://app.leg.wa.gov/billsummary/?BillNumber=5375&Year=2025&Initiative=false.

[57] Jerry Cornfield, *New law requires clergy in Washington to report child abuse*, Wash. State Standard (May 2, 2025), https://washingtonstatestandard.com/2025/05/02/new-law-requires-clergy-in-washington-to-report-child-abuse/.

[58] SB 5375, *supra* note 56.

[59] SB 5375, *supra* note 55.

[60] Public Hearing of Senate Human Services Committee, TVW (Jan. 28, 2025), https://tvw.org/video/senate-human-services-2025011502/?eventID=2025011502.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

87.     What is worse, the Legislature appeared to accept arguments that the sacramental seal was something that civil law could force the Church to change.  The Senate Bill Report cites incorrect testimony that "[c]onfession was only made private in the 1300's in [response] to a scandal related to priests," the implication being that the sacramental seal cannot be a matter of faith or doctrine.  And witnesses testifying against Senate Bill 5375 were asked to "point to anywhere in the Bible that I need to confess my sins to a priest to be forgiven of those sins," again suggesting that the sacramental seal is something mutable.[61]

88.     Further, despite protestations to the contrary, the Legislature expressly understood that Senate Bill 5375 would intrude upon and suppress the religious liberty afforded by both the United States and Washington Constitutions, and intentionally enacted Senate Bill 5375 to restrict the religious freedom previously afforded religious organizations.  The Senate Bill Report explains that Senate Bill 5375 is specifically "about all the children who have been abused or neglected that we didn't protect in the name of religious freedom."  Senator Frame stated that she could not "stomach any argument about religious freedom being more important than preventing … abuse," that it was "traumatizing to have colleagues … tell me to my face that religious freedom is more important than protecting children," and "[y]ou never put somebody's conscience above the protection of a child."  And the House rejected an amendment to Senate Bill 5375 that would have acknowledged "religious freedoms are protected by the Constitution of the United States" and made clear that "[t]he legislature intends to respect church practices and sacred sacraments, including the sacrament of penance and reconciliation."[62]

89.     Tellingly, despite both the Legislature and Governor Ferguson purporting to justify the intrusion upon the sacramental seal with appeals to protecting children—purportedly "the most important thing,"[63] according to Governor Ferguson—Senate Bill 5375 does nothing to increase reporting obligations for persons other than clergy who currently are not mandatory reporters under Section 26.44.030(1)(a).

---

[61] *Id.*
[62] SB 5375, 119th Cong., *supra* note 54 (rejected amendment that would make clear legislative "intends to respect church practices and sacred sacraments, including the sacrament of penance and reconciliation).
[63] Cornfield, *supra* note 57.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

90.    Parents, domestic partners, family members, and others remain *permissive* reporters of all but the most severe abuse.  And that is despite the vast majority of confirmed child abuse being perpetrated by the victim's parent or domestic partner of a parent: in 2022 and 2023, the last years for which the U.S. Department of Health and Human Services has reported data, more than ***92%*** of confirmed instances of child abuse and neglect in Washington were perpetrated by the victim's parent or domestic partner of a parent.[64]  And it is despite up to 7% of children reporting sibling-on-sibling sexual child abuse.[65]

91.    Similarly, teacher union representatives and teacher spouses remain *permissive* reporters.  And that is despite 11% of high school graduates nationwide reporting educator sexual misconduct during grades K-12,[66] and Washington having the fourth highest rate of sexual violence in schools in the nation.[67]

92.    Worse, the Legislature and Governor Ferguson simultaneously added ***exemptions*** for non-religious persons who are currently mandatory reporters under Section 26.44.030(1)(a).  At the same time the Legislature refused to accommodate the sacramental seal, the Legislature passed and Governor Ferguson signed into law Substitute House Bill 1171, which expressly exempted from the mandatory reporting obligation of Section 26.44.030(1)(a) attorneys at institutions of higher education and others working at their direction—including law students, to whom the attorney-client privilege may not ordinarily extend—when the reportable information "relates to information related to the representation of a client."[68]  And the Legislature expressly rejected amendments to Senate Bill 5375 that would have made clergy mandatory reporters but afforded the sacramental seal the same protection as attorney-client communications.[69]

---

[64] *2022 Child Maltreatment Report*, *supra* note 16, at 74-75; *2023 Child Maltreatment Report*, *supra* note 16, at 78-79.
[65] Peter Yates et al., *Sibling Sexual Abuse: What do we know? What do we need to know? Stage 1 analysis of a 2-stage scoping review*, Child Abuse & Neglect (Apr. 2025), https://www.sciencedirect.com/science/article/pii/S0145213424004666
[66] Elizabeth L. Jeglic et al., *The Nature and Scope of Educator Misconduct in K-12*, 35 Sexual Abuse, 188-213 (May 2, 2022), https://doi.org/10.1177/10790632221096421.
[67] *Errata for 2017–18 Civil Rights Data Collection Sexual Violence in K-12 Schools Issue Brief*, U.S. Dep't of Ed. Office for Civil Rights (2022), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/sexual-violence.pdf.
[68] Sub. H.B. 1171, 2025 Wash. Sess. Laws ch. 192.
[69] SB 5375, 119th Cong., *supra* note 54 (attorney-client communications).

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

93.     Senate Bill 5375 also does nothing to vitiate existing privileges for persons other than clergy who are currently supervisors within organizations and mandatory reporters under Section 26.44.030(1)(b).  Non-clergy supervisors continue to be afforded exemptions when child abuse and neglect is learned about through attorney-client, spousal, domestic partner, or other privileged communications.    That includes non-clergy supervisors within youth sports organizations, youth scouting organizations, and any number of other organizations who regularly come into contact with children.

**H.    Priests Are Committed to Keeping the Sacramental Seal**

94.     Given the intrusion on the sacramental seal and Plaintiffs' sincerely held religious belief in, and sacred obligations to uphold, the Roman Catholic Church's teaching regarding the sacramental seal, the priests serving within the Archdiocese of Seattle, Diocese of Spokane, and Diocese of Yakima, including all Plaintiffs, cannot comply with the amendments to Section 26.44.030 effected by Senate Bill 5375.

95.     By adhering to their sacred obligation to maintain the sacramental seal, Senate Bill 5375 subjects Plaintiffs and the priests of each diocese to the risk of fine, imprisonment, and civil liability.  Indeed, Plaintiffs Etienne, Daly, and Tyson have made clear that priests within the dioceses "are committed to keeping the seal of confession—even to the point of going to jail."[70]

96.     Despite their commitment to adhering to that obligation, Senate Bill 5375 risks chilling the religious exercise of penitents.  Knowing that the inviolability of the sacramental seal is threatened by a temporal legal obligation to report suspected abuse or neglect learned in the confessional, penitents may refuse to confess all their sins in confession or refuse to seek the sacrament of confession at all.  Under either circumstance, the penitent will remain separated from Christ's Church and from God, risking their eternal damnation to Hell.

---

[70] Reverend Thomas A. Daly, *Bishop Daly: On the governor's signing of Senate Bill 5375*, INLAND CATH. (May 2, 2025), https://www.inlandcatholic.com/news/sb5375; *see also* Archbishop Paul D. Etienne, *Clergy: Answerable to God or State*, Archdiocese of Seattle (May 4, 2025), https://archseattle.org/wp-content/uploads/2025/01/Archbishop-on-On-Clergy-Reporting-min.pdf; Bishop Joseph Tyson, *Bishop Response to Signing of Abuse Reporting Law*, Diocese of Yakima (May 5, 2025), https://yakimadiocese.org/2025/05/05/bishop-responds-to-signing-of-abuse-reporting-law/.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

**First Cause of Action**
**Section 26.44.030(1)(a) and (b) as Amended Violates the**
**Free Exercise Clause of the First Amendment to the U.S. Constitution by**
**Burdening Religious Belief and Practice**

97.  Paragraphs 1 through 96 are hereby incorporated as if set forth fully herein.

98.  The First Amendment of the Constitution protects the "free exercise" of religion. Fundamental to this protection is the right to gather and worship.  *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts … [such as the] freedom of worship and assembly.").  The Free Exercise Clause was incorporated against the states in *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

99.  A "bedrock requirement" of the Free Exercise Clause is that "absent a showing that satisfies strict scrutiny," a government law or policy must be generally applicable toward religion. *Fellowship of Christian Athletes ("FCA") v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc); *see also id.* at 686 ("targeting is not required for a government policy to violate the Free Exercise Clause. Instead, favoring comparable secular activity is sufficient."); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) (finding challenged restrictions neither neutral nor generally applicable and applying strict scrutiny).

100.  A policy is not generally applicable toward religion if it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (emphasis in original); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).  Comparability "must be judged against the asserted government interest that justifies the regulation at issue."  *FCA*, 82 F.4th at 689 (internal quotation marks and citation omitted).  Comparability is lacking when, "in practice," the asserted interest results in "selective enforcement favoring comparable secular activities."  *Id.*

101.  Plaintiffs sincerely believe in the teaching of the Roman Catholic Church regarding the inviolability of the sacramental seal.  While Governor Ferguson and some senators have

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowleylawoffices.com

questioned the propriety for the Roman Catholic Church's teaching regarding the sacramental seal, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981).

102.    By enforcing Section 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375 as applied to statements made during Roman Catholic confession, the State of Washington "puts substantial pressure" on Plaintiffs to choose between complying with state law—while violating canon law and being excommunicated—or upholding their sacred obligations and risk going to jail. *Thomas*, 450 U.S. at 718.  This choice pushes Plaintiffs to "modify [their] behavior and to violate [their] beliefs," burdening free exercise. *Id.*

103.    "[A] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546.  "[T]he minimum requirement of neutrality is that a law not discriminate on its face." *Id.* at 533.  Government action is not generally applicable if its requirements substantially underinclude non-religiously motivated conduct that might endanger the same governmental interest that the law is designed to protect. *Id.* at 542–46.

104.    To satisfy the most rigorous of scrutiny, a law burdening religious practice must serve a compelling interest and be narrowly tailored to achieve that end.  *See id.* at 546.  An interest is not compelling for purposes of this test, where the state "fails to enact feasible measures to restrict other conduct producing … harm of the same sort."  *Id.*  And where "proffered objectives are not pursued with respect to analogous non-religious conduct" and "those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree," the law is not narrowly tailored.  *Id.*

105.    Section 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375 is not neutral or generally applicable.  Section 26.44.030(1)(a) of the Revised Code of Washington as amended by Senate Bill 5375 specifically identifies members of the clergy alongside state agents as mandatory reporters of child abuse and neglect but continues to

acknowledge the right of other persons who may have reasonable cause to believe child abuse or neglect has occurred to maintain that information in confidence.    Relatedly, Section 26.44.030(1)(b) of the Revised Code of Washington as amended by Senate Bill 5375 specifically identifies members of the clergy serving in supervisory roles within organizations as persons deprived of the protections of the priest-penitent privilege.    Thus, the law "devalues religious reasons for [confidentiality] by judging them to be of lesser import than nonreligious reasons." *Lukumi*, 508 U.S. at 538-39.

106.    Section 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375, as applied to require violation of the sacramental seal surrounding confession, neither serves a compelling interest nor is pursued through the least restrictive means.

107.    Absent injunctive and declaratory relief against Sections 26.44.030(1)(a) and (b), Plaintiffs have been and will be irreparably harmed.

**<u>Second Cause of Action</u>**
**Section 26.44.030(1)(a) and (b) as Amended Violates the**
**Free Exercise Clause of the First Amendment to the U.S. Constitution by**
**Targeting Religious Belief**

108.    Paragraphs 1 through 107 are hereby incorporated as if set forth fully herein.

109.    The Free Exercise Clause means, among other things, that "a law targeting religious beliefs as such is never permissible." *Lukumi*, 508 U.S. at 533 (citing *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) ("The Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such.")).

110.    A plaintiff may "prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise[s]." In such cases, the Supreme Court has "'set aside'" such laws "without further inquiry." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1. (2022) (quoting *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 639 (2018)).

111.    Here, Washington State enacted this law in a manner hostile to religious beliefs.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowleylawoffices.com

112.    In addition to insisting that the Catholic Church can simply change its 2,000-year-old religious beliefs to comport with Washington State's demands, the Legislature denigrated Plaintiffs' religious beliefs about the confessional seal in the process.  For instance, the Senate Bill Report reflects testimony falsely asserting that "[c]onfession was only made private in the 1300's in [response] to a scandal related to priests."  And witnesses testifying against Senate Bill 5375 were asked to "point to anywhere in the Bible [saying] that I need to confess my sins to a priest to be forgiven of those sins," while Senator Frame said she could not "stomach any argument about religious freedom being more important than preventing … abuse," that it was "traumatizing to have colleagues … tell me to my face that religious freedom is more important than protecting children," and "[y]ou never put somebody's conscience above the protection of a child."[71]

113.    At no point were any of these derogatory comments disavowed.  Instead, at the bill signing, Governor Ferguson invoked his Catholicism to explain why forcing priests to choose between their sacred obligations or prison was not an obstacle to signing Senate Bill 5375 ("Not for me. … I'm very familiar with it. Been to confession, myself.").

114.    Washington State's new law burdens religious exercise and accompanies that burden with "official expressions of hostility" to religion—"in cases like that [the Supreme Court] ha[s] set aside such policies without further inquiry."  *Kennedy*, 597 U.S. at 525 (cleaned up).  It should do so here too.

115.    Absent injunctive and declaratory relief against Sections 26.44.030(1)(a) and (b), Plaintiffs have been and will be irreparably harmed.

**Third Cause of Action**
**Section 26.44.030(1)(a) and (b) as Amended Violates the**
**Free Exercise Clause of the First Amendment to the U.S. Constitution by**
**Discriminatorily Disadvantaging on the Basis of Religion**

116.    Paragraphs 1 through 115 are hereby incorporated as if set forth fully herein.

117.    The Free Exercise Clause of the First Amendment to the U.S. Constitution "protects against laws that impose special disabilities on the basis of … religious status."  *Trinity Lutheran*

---

[71] Public Hearing of Senate Human Services Committee, TVW (Jan. 28, 2025), https://tvw.org/video/senate-human-services-2025011502/?eventID=2025011502; Cornfield, *supra* note 57.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowleylawoffices.com

*Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 461 (2012) (internal quotation marks omitted); *see also McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (plurality) (holding unconstitutional law barring clergy from public office).

118.    By enforcing Section 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375, Defendants will deprive members of the clergy, and religious organizations more generally, of the protections afforded by communication privileges recognized by the State of Washington, when information concerning child abuse or neglect is communicated in those otherwise privileged communications.

119.    Section 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375 is not neutral or generally applicable.  Section 26.44.030(1)(a) of the Revised Code of Washington as amended by Senate Bill 5375 adds clergy to the list of mandatory reporters without the protections of any recognized communications privilege while leaving as permissive reporters entitled to rely upon recognized communications privileges other persons—e.g., attorneys, parents, relatives—who may have reasonable cause to believe child abuse or neglect has occurred.  Section 26.44.030(1)(b) of the Revised Code of Washington as amended by Senate Bill 5375 specifically identifies members of the clergy as the sole class of persons to be deprived of the protections afforded by communication privileges recognized by the State of Washington, when information concerning child abuse or neglect is communicated in those otherwise privileged communications.

120.    Absent injunctive and declaratory relief against Sections 26.44.030(1)(a) and (b), Plaintiffs have been and will be irreparably harmed.

**Fourth Cause of Action**
**Section 26.44.030(1)(a) and (b) as Amended Violates**
**the First Amendment Church Autonomy Doctrine by**
**Intruding on Matters of Church Governance and Discipline**

121.    Paragraphs 1 through 120 are hereby incorporated as if set forth fully herein.

122.    The Free Exercise and Establishment Clauses of the First Amendment of the U.S. Constitution protect for all religions their own autonomy, including "independence in matters of

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowleylawoffices.com

faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020). Those matters of internal government include matters of internal discipline. *See Serbian E. Orthodox Diocese for United States & Canada v. Milivojevich*, 426 U.S. 696, 713 (1976).

123.    The Free Exercise and Establishment Clauses of the First Amendment of the U.S. Constitution guarantee religious institutions a "broad" "sphere" of "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe*, 591 U.S. at 746-47. The broad sphere of autonomy includes churches' authority "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. S. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). Those matters of internal government over which the First Amendment guarantees to churches independence include matters of internal discipline. *See Serbian E. Orthodox Diocese*, 426 U.S. at 713. And that "independence from secular control or manipulation," *Kedroff*, 344 U.S. at 116, prohibits Washington from subjecting Catholic priests to the choice between automatic excommunication or jail simply for exercising what is both an act of mercy and means of Church discipline. It further prohibits the state from seizing control of a religious sacrament of the Church, redefining how it is conducted, and thereby altering the internal discipline of the Church.

124.    By enforcing Sections 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375 as applied to statements made during Roman Catholic confession, Defendants will impermissibly violate the autonomy and independence of the Roman Catholic Church by inserting the State of Washington into matters of Church governance and discipline.

125.    In the confessional, the priest serves as the representative of Christ and the Church and performs both an act of mercy and Church discipline by adjudicating a penitent's confession.

126.    Moreover, when the Holy See or a bishop imposes ecclesiastical punishment on a confessor for violating the seal of the confessional, that is an act of Church discipline.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowleylawoffices.com

127.    The state's interference with these acts of Church governance and discipline are violations of the Church's protected autonomy.

128.    Further, sections 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375 require Roman Catholic clergy to violate the sacramental seal and report what they hear to law enforcement.  This requirement forces a Catholic priest to vitiate an inherent and intrinsic element of the Sacrament of Confession as revealed by God to the Church—and thereby subject the priest to automatic excommunication.

129.    Still further, a criminal prosecution of a priest's alleged failure to make a report of information learned in confession would entangle secular courts in adjudicating the content of a religious sacrament.

130.    Absent injunctive and declaratory relief against Sections 26.44.030(1)(a) and (b), Plaintiffs have been and will be irreparably harmed.

### Fifth Cause of Action
### Section 26.44.030(1)(a) and (b) as Amended Violates
### the First Amendment by Intruding on Ministerial Supervision

131.    Paragraphs 1 through 130 are hereby incorporated as if set forth fully herein.

132.    As a "component" of the church autonomy doctrine, the government is barred from interfering with a church's selection, supervision, and, if necessary, removal of an employee whose religious duties make him or her a "minister."  *Our Lady of Guadalupe*, 591 U.S. at 746.

133.    By enforcing Sections 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375 as applied to statements made during Roman Catholic confession, Defendants will impermissibly interfere in the Catholic Church's relationship with her priests, who are undoubtedly "ministers" for purposes of the First Amendment.

134.    The Holy See and the Bishop Plaintiffs will be prevented from freely exercising supervision over priests hearing confession.

135.    Canon law binds priests to never "betray in any way a penitent in words or in any manner and for any reason."  Canon 983 sec. 1; *see also* Canon 984.  These canons enable the Church's power to supervise her "ministers" in adjudication and application of Church discipline.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

A church's right to supervise its ministers "was recognized to preserve a church's independent authority in such matters." *Our Lady of Guadalupe*, 591 U.S. at 747. "Without that power," a priest complying with Sections 26.44.030(1)(a) and (b) "could contradict the church's tenets and lead the congregation away from the faith." *Id.*

136.    Sections 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375 violate the Plaintiffs' authority guaranteed by the ministerial exception by exposing them to substantial liability and intrusive, entangling investigations over their conduct in confession and how the Church supervises her priests in the carrying out of their "ministerial" duties.

137.    Absent injunctive and declaratory relief against Sections 26.44.030(1)(a) and (b), Plaintiffs have been and will be irreparably harmed.

### Sixth Cause of Action
### Section 26.44.030(1)(a) and (b) as Amended Violates the
### First Amendment Establishment Clause by
### Commandeering Religious Practices for State Purposes

138.    Paragraphs 1 through 137 are hereby incorporated as if set forth fully herein.

139.    The Establishment Clause of the First Amendment of the U.S. Constitution prohibits the "hallmarks of religious establishments the framers sought to prohibit when they adopted." *Kennedy*, 597 U.S. at 537; *see also Hilsenrath on behalf of C.H. v. Sch. Dist. of Chathams*, __ F.4th __, 2025 WL 1289146, at *4 (3d Cir. May 5, 2025) (applying the "hallmarks" test in concluding that religious lesson in a public middle school did not violate the Establishment Clause). Among those hallmarks is a civil government commandeering religious functions for state purposes. As James Madison, the architect of the Religion Clauses in the First Amendment, explained, the state "employ[ing] Religion as an engine of Civil policy" is "an unhallowed perversion of the means of salvation." James Madison, *Memorial and Remonstrance Against Religious Assessments*, 2 The Writings of James Madison 183-91 (G. Hunt ed., 1901); *see also* Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2169, 2205 (2003) ("assignment of what

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

would now be considered important civil functions, especially social welfare functions, to church authorities" an Establishment Clause hallmark).

140.    Sections 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375, as applied to require violation of the sacramental seal surrounding confession, impermissibly requires that Defendants, acting under the color of law, commandeer the Church's sacrament of confession to serve the purposes of the State of Washington.

141.    Statements made by a penitent to a priest in the sacrament of confession is a purely religious act of Church governance and discipline, the sacramental means by which the penitent is reconciled with God and the Church. Such statements would not exist absent the sacrament of confession, divinely instituted by God.  Requiring that Roman Catholic clergy report to the State of Washington the contents of communications created by religious sacrament employs Roman Catholic governance and discipline "as an engine of Civil policy" in an "unhallowed perversion of the means of salvation."  Madison, *Memorial and Remonstrance Against Religious Assessments*, 2 The Writings of James Madison 183-91.  Indeed, in the founding era, Virginia church officials were obliged to "make biennial presentments to the county court of certain misdemeanors," including sexual offenses.  McConnell, *Establishment and Disestablishment*, 44 Wm. & Mary L. Rev. at 2176.  This was "[p]erhaps the most 'governmental' of all duties of church officials in Virginia," *id.*, a clear religious establishment.

142.    The use of a religious practice to further the State's policy goals violates basic constitutional principles prohibiting the excessive entanglement of church and state.  The "delegation" of essential government functions—which would include, as here, the State's commandeering of the sacrament of confession by purporting to strip it of its confidentiality component so as to assist the State in the collection of evidence to satisfy the State's burden in a criminal case premised on child abuse or neglect—to religious entities can result in excessive entanglement.  *See Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 123 (1982) (holding that "delegating a governmental power to religious institutions, inescapably implicates the Establishment Clause," "independent" of the *Lemon* test).  This is true whether that delegation

serves as a benefit to the religious entity—as in *Larkin*, where churches were given authority to veto nearby alcohol sales—or a burden, as here.   "[T]he core rationale underlying the Establishment Clause is preventing 'a fusion of governmental and religious functions.'" *Id.* at 126-127 (quoting *School District of Abington Township v. Schempp*, 374 U.S. 203, 222 (1963)); *cf Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 182 (2012) (the "church shall be free, and shall have its rights undiminished and its liberties unimpaired" (quoting Magna Carta)).

143.   Absent injunctive and declaratory relief against Sections 26.44.030(1)(a) and (b), Plaintiffs have been and will be irreparably harmed.

**Seventh Cause of Action**
**Section 26.44.030(1)(a) and (b) as Amended Violates the**
**First Amendment to the U.S. Constitution by**
**Regulating Expressive Association**

144.   Paragraphs 1 through 143 are hereby incorporated as if set forth fully herein.

145.   The First Amendment protects the right of expressive associations to associate with those who advance their expression and dissociate themselves from those who harm their expression. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000); *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023).  When a government action seeks to "fundamentally alter the [association's] expressive message," that is "in direct violation of the First Amendment."  *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 783 (9th Cir. 2022).

146.   Plaintiffs express the Catholic Church's 2,000-year-old teachings both by what they say and what they do not say, including refusal to divulge anything said during confession.

147.   Senate Bill 5735's plain terms pressure Plaintiffs to choose between imprisonment or disclosure of what was said in confession.  That would "fundamentally alter" the Catholic Church's "expressive message" regarding the confessional seal.  *Green*, 52 F.4th at 783.

148.    Sections 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375, as applied to require violation of the sacramental seal surrounding confession, therefore violate the First Amendment's expressive association doctrine.

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowleylawoffices.com

149.    Absent injunctive and declaratory relief against Sections 26.44.030(1)(a) and (b), Plaintiffs have been and will be irreparably harmed.

**Eighth Cause of Action**
**Section 26.44.030(1)(a) and (b) as Amended Violates the**
**Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution**

150.    Paragraphs 1 through 149 are hereby incorporated as if set forth fully herein.

151.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution protects against governmental targeting of citizens who hold religious office by placing on them legal obligations or disabilities that do not apply to the citizenry at large.  Classifications based on religion are constitutionally-suspect for purposes of the Equal Protection Clause and subject to strict scrutiny, requiring the government to demonstrate that the classification is narrowly tailored to serve a compelling governmental interest.  *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001) ("If the statute employs a suspect class (such as race, religion, or national origin) or burdens the exercise of a constitutional right, then courts must apply strict scrutiny, and ask whether the statute is narrowly tailored to serve a compelling interest.").

152.    Sections 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375, violate, facially and as applied, the Equal Protection Clause by imposing a burden on clergy based on an explicitly religious classification that is not narrowly tailored to serve a compelling government interest.  By its terms, Senate Bill 5375 singles out "clergy"—an inherently religious category—for purposes of imposing an obligation on that class of persons to violate confidences shared by another and report those confidential communications to the government.  Senate Bill 5375 does not extend the reporting obligation to *everyone* who learns of any kind of child abuse or neglect by means of a confidential conversation—including, for example, relatives of abused children, spouses of abusive parents, sexual assault advocates, and attorneys.

153.    Absent injunctive and declaratory relief against Sections 26.44.030(1)(a) and (b), Plaintiffs have been and will be irreparably harmed.

COMPLAINT

- 38 -

**Ninth Cause of Action**
**Enforcement of Section 26.44.030(1)(a) and (b) as Amended Violates**
**Article I, Section 11 of the Washington Constitution**

154.    Paragraphs 1 through 153 are hereby incorporated as if set forth fully herein.

155.    Article I, Section 11 of the Washington Constitution provides both that "[a]bsolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual," and that "no one shall be molested or disturbed in person or property on account of religion," the right to "worship," and the right to "religious freedom." WASH. CONST. Art. I, § 11.

156.    Sections 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375 interfere with and disturb Plaintiffs' absolute freedom of conscience with regard to religious belief and worship, namely with regard their practice of confession. Furthermore, by threatening potential imprisonment, fines, and civil liability for failure to violate the sacramental seal, Sections 26.44.030(1)(a) and (b) of the Revised Code of Washington as amended by Senate Bill 5375 disturb Plaintiffs in their person and property on account of their worship and religious practices.

157.    Absent injunctive and declaratory relief against Sections 26.44.030(1)(a) and (b), Plaintiffs have been and will be irreparably harmed.

**V.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests this Court enter an order:

a.    Declaring that RCW § 26.44.030(1)(a) and (b) as amended by Senate Bill 5375 is facially unconstitutional in violation of the Free Exercise and Establishment Clauses of the First Amendment to the U.S. Constitution;

b.    Declaring that RCW § 26.44.030(1)(a) and (b) as amended by Senate Bill 5375 as applied to statements made during Roman Catholic confession unlawfully burdens Plaintiffs' religious liberty rights under the Free Exercise and Establishment Clauses of the First Amendment to the U.S. Constitution;

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

c.  Declaring that RCW § 26.44.030(1)(a) and (b) as amended by Senate Bill 5375 is both facially and as applied to statements made during Roman Catholic confession will unlawfully violate Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution;

d.  Declaring that RCW § 26.44.030(1)(a) and (b) as amended by Senate Bill 5375 as applied to statements made during Roman Catholic confession will unlawfully burden Plaintiffs' religious free exercise rights in violation of Article I, Section 11 of the Washington Constitution;

e.  Entering a preliminary injunction temporarily enjoining and a permanent injunction permanently enjoining Defendants from initiating criminal investigation or prosecution of Roman Catholic clergy for violations of RCW § 26.44.030(1)(a) and (b) as amended by Senate Bill 5375, as applied to statements made during the Roman Catholic sacrament of confession or otherwise learned through a privileged communication;

f.  Awarding Plaintiffs costs and reasonable attorneys' fees and expenses pursuant to 42 U.S.C. § 1988 and otherwise; and

g.  Granting Plaintiffs all such other and further relief as the Court deems just and proper.

Dated: May 28, 2025                Respectfully submitted,


_/s/ William J. Crowley_____
William J. Crowley
CROWLEY LAW OFFICES, P.S.
600 University Street
Suite 1708
Seattle, WA 98101
Tel: (206) 224-7069
will@crowleylawoffices.com

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowleylawoffices.com

1   Matthew T. Martens (*pro hac vice* forthcoming)
    Donna Farag (*pro hac vice* forthcoming)
2   Zachary Halpern (*pro hac vice* forthcoming)
    WILMER CUTLER PICKERING HALE AND
3       DORR LLP
    2100 Pennsylvania Avenue, NW
4   Washington, DC 20037
    Tel: (202) 663-6000
5   Fax: (202) 663-6363
    matthew.martens@wilmerhale.com
6   donna.farag@wilmerhale.com
    zac.halpern@wilmerhale.com
7

8   Leah M. Fugere (*pro hac vice* forthcoming)
    WILMER CUTLER PICKERING HALE AND
9       DORR LLP
    350 South Grand Avenue
10  Suite 2400
    Los Angeles, CA 90071
11  Tel: (213) 443-5300
    Fax: (213) 443-5400
12  leah.fugere@wilmerhale.com
13

14  Robert Kingsley Smith (*pro hac vice* forthcoming)
    WILMER CUTLER PICKERING HALE AND
15      DORR LLP
    60 State Street
16  Boston, MA 02109
    Tel: (617) 526-6000
17  Fax: (617) 526-5000
    robert.smith@wilmerhale.com
18

19  Mark L. Rienzi (*pro hac vice* forthcoming)
    Eric C. Rassbach (*pro hac vice* forthcoming)
20  William J. Haun (*pro hac vice* forthcoming)
    Laura Wolk Slavis (*pro hac vice* forthcoming)
21  BECKET FUND FOR RELIGIOUS LIBERTY
    1919 Pennsylvania Ave NW, Suite 400
22  Washington, D.C. 20006
    Tel: (202) 955-0095
23  mrienzi@becketfund.org
    erassbach@becketfund.org
24  whaun@becketfund.org
    lslavis@beckfund.org
25

26

27

28

CROWLEY LAW OFFICES, P.S.
600 University Street, Suite 1708 • Seattle, WA 98101
(206) 209-0456
www.crowlylawoffices.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hiram S. Sasser, III (*pro hac vice* forthcoming)
Jeremy Dys (*pro hac vice* forthcoming)
Chris Motz (*pro hac vice* forthcoming)
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, Texas 75075
Tel: (972) 941-4444
Fax: (972) 941-4457
hsasser@firstliberty.org
jdys@firstliberty.org
cmotz@firstliberty.org

*Attorneys for Plaintiffs*

COMPLAINT

- 42 -