1

2

3

4

5

6

7                                      The Honorable David G. Estudillo

8

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

9

PAUL D. ETIENNE, et al.,                    NO. 3:25-cv-05461-DGE

10                    Plaintiffs,            RESPONSE OF DEFENDANTS
                                            ROBERT W. FERGUSON AND
11         v.                                NICHOLAS W. BROWN TO
                                            PLAINTIFFS' MOTION FOR
12   ROBERT W. FERGUSON, et al.,             PRELIMINARY INJUNCTION

13                    Defendants.            NOTE ON MOTION CALENDAR:
                                            July 14, 2025 at 10:00 a.m.
14

15

16

17

18

19

20

21

22

23

24

25

26

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND ................................................................................................... 2

    A.   Child Abuse and Neglect Is a Widespread Societal Ill with Devastating, Lifelong Impacts on Children's Health and Welfare ................................. 2

    B.   Mandatory Reporting Laws Are a Critical Tool in Reducing Child Abuse and Neglect .......................................................................................... 3

    C.   Clergy Are Mandatory Reporters in Most States ....................................... 5

    D.   The Washington Legislature Added Members of the Clergy to the List of Mandatory Reporters to Further Protect Children ................................. 6

    E.   Plaintiffs Seek to Enjoin the Amended Law Before it Takes Effect ........... 7

III.  ARGUMENT ....................................................................................................... 7

    A.   Legal Standard .......................................................................................... 7

    B.   Plaintiffs Have Not Shown a Likelihood of Success on the Merits ........... 7

        1.   Plaintiffs have not established Article III standing or ripeness to challenge SB 5375 before it is enforced ........................................... 7

        2.   SB 5375 does not violate the Free Exercise Clause ........................ 11

            a.   Clergy are treated the same as other professionals uniquely situated to report child abuse .................................. 12

                (1)   A mandated reporter's duty overrides statutory privileges ........... 13

                (2)   Non-professionals, non-mandated reporter supervisors, and higher education attorneys are not comparable to subsection (1)(a) reporters ..................... 15

                (3)   Neither SB 5375's text nor legislative history establishes non-neutrality ................. 18

            b.   The mandatory reporting law is rationally related to legitimate government purposes ...................................... 19

        3.   SB 5375 does not violate the Establishment Clause ....................... 20

        4.   The church autonomy doctrine does not bar the State from imposing requirements on religious institutions ........................... 22

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

i

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

C.   Plaintiffs Have Not Shown a Likelihood of Irreparable Harm ............................... 23

D.   The Equities and Public Interest Weigh in the State's Favor ................................ 24

IV.   CONCLUSION ..................................................................................................... 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

ii

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

# I.    INTRODUCTION

Few problems in our society cause more lasting and pervasive harm than child abuse. To combat this scourge, every state requires certain individuals to report suspected abuse. The overwhelming majority of states include clergy among these mandated reporters, with several states requiring reporting when clergy learn of abuse through a clergy-penitent interaction, such as confession. In 2025, Washington joined these states, imposing the same reporting obligation on clergy that already applied to a range of other trusted professions with routine access to children.

Plaintiffs, all Catholic priests and bishops, do not object to mandatory reporting—indeed, they say that their internal policies already require them to report suspected child abuse. But they filed this preliminary injunction motion because they object to the possibility that they may someday have to report something that they learned through confession. The Court should deny their motion on multiple grounds.

First, Plaintiffs lack standing. In the Ninth Circuit, a plaintiff seeking to challenge a new law before it has been enforced must show "a *genuine* threat of *imminent* prosecution." *Project Veritas v. Schmidt*, 125 F.4th 929, 941 (9th Cir. 2025) (en banc) (citation modified) (quoting *Clark v. City of Seattle*, 899 F.3d 802, 813 (9th Cir. 2018)). Plaintiffs have made no such showing. They do not and cannot allege that the law will imminently require them to report anything learned during confession. Indeed, none of them alleges that they have ever learned anything during confession that they would have had to report under SB 5375. Nor do they explain how SB 5375 will inevitably clash with their faith when several other states have had the same reporting rules for decades.

Even if they had standing, Plaintiffs cannot show a likelihood of success on the merits. As to their Free Exercise claim, they fail to demonstrate that SB 5375 targets their faith or treats them less favorably than others with comparable secular roles. Their Establishment Clause claim fails because SB 5375 neither favors one religion over another nor gives one church a monopoly

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

1

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

on civil law enforcement. And their church autonomy claim fails because SB 5375 in no way entangles the State in internal church decisions.

Plaintiffs also fail the other preliminary injunction requirements. They can show no risk of imminent irreparable harm, and the equities tip sharply against them. The public's interest in preventing child abuse outweighs their hypothetical concern of possible religious conflict. The Court should deny their motion.

## II.    BACKGROUND

### A.    Child Abuse and Neglect Is a Widespread Societal Ill with Devastating, Lifelong Impacts on Children's Health and Welfare

At least one in seven children in the United States suffered child abuse or neglect this past year. Paradis Decl., Ex. 1. Of those, many were victims of sexual abuse, which affects at least one in four girls and one in twenty boys. *Id.*, Ex. 2. Worse, these numbers are likely underestimates, as many cases of child abuse go unreported. *Id.*, Ex. 1. Experts agree that the true incidence is far greater. *Id.*, Ex. 3.

Victims of child abuse suffer severe, irreparable harms to their health and wellbeing. Five American children die every day from child abuse. *Id.*, Exs. 1, 4. Those who survive experience physical consequences such as injuries, sexually transmitted infections, and, later in life, chronic conditions such as heart disease, obesity, and cancer. *Id.*, Exs. 1, 5. They also experience numerous emotional and psychological effects, including depression, anxiety, and posttraumatic stress. *Id.*, Exs. 1, 2, 6.

These harms persist. Abused and neglected children are "at increased risk for experiencing future violence victimization and perpetration, substance abuse, sexually transmitted infections, delayed brain development, lower educational attainment, and limited employment opportunities." *Id.*, Ex. 1. They are also at an increased risk of becoming involved in criminal activity, experiencing teen pregnancy, perpetuating the cycle of abuse on their own

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

2

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

children, and committing suicide. *Id.*, Exs. 2, 5. And they are more likely to die prematurely. *Id.*, Ex. 5.

**B.** **Mandatory Reporting Laws Are a Critical Tool in Reducing Child Abuse and Neglect**

In the mid-1960s, amidst rising public awareness about the pervasiveness of child abuse, all fifty states passed laws related to child abuse reporting. Leonard G. Brown, III, Kevin Gallagher, *Mandatory Reporting of Abuse: A Historical Perspective on the Evolution of States' Current Mandatory Reporting Laws with Review of the Laws in the Commonwealth of Pennsylvania*, 59 Vill. L. Rev. 37, 37 (2013). "Seldom in the nation's history has a specific kind of legislation been enacted so quickly in so many states." Monrad Paulsen, Graham Parker, Lynn Adelman, *Child Abuse Reporting Laws—Some Legislative History*, 34 Geo. Wash. L. Rev. 482, 482 (1965). Widespread enactment was possible because these laws faced virtually no opposition. Monrad G. Paulsen, *The Legal Framework for Child Protection*, 66 Colum. L. Rev. 679, 711 (1966); 34 Geo. Wash. L. Rev. 482, 483 (1965). Their goal was simple: bring an abused child to the attention of the community's legal and social welfare resources and safeguard the child against further abuse. 34 Geo. Wash. L. Rev. 482, 483 (1965); 66 Colum. L. Rev. 679, 711 (1966); Robert E. Shepherd, Jr., *The Abused Child and the Law*, 22 Wash. Lee. L. Rev 182, 194 (1965). To that end, the laws generally required medical practitioners, who possess the skill to recognize abuse, to report cases to authorities for further investigation. 34 Geo. Wash. L. Rev. 482, 483 (1965); 66 Colum. L. Rev. 679, 712 (1966). Some also imposed obligations on other professionals, including teachers, nurses, dentists, and social workers. 66 Colum. L. Rev. 679, 712-13 (1966). In the decades that followed, states broadly expanded their laws by requiring universal mandatory reporting or by imposing the duty on other professionals who have regular access to children. *See* Brian G. Fraser, *A Glance at the Past, a Gaze at the Present, a Glimpse at the Future: A Critical Analysis of the Development of Child Abuse Reporting Statutes*, 54 Chicago-Kent L. Rev. 641, 656-68 (1978); 59 Vill. L. Rev. 37, 42 (2013).

RESP. OF DEFS. ROBERT W. FERGUSON & NICHOLAS W. BROWN TO PLS.' MOT. FOR PRELIM. INJ. NO. 3:25-cv-05461-DGE

3

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

1    These laws have proven critically important in safeguarding against child abuse.

2 Nationally, over four million referrals are made reporting suspected child maltreatment annually.

3 Paradis Decl., Ex. 6 at xiii. In 2023, over two million of these referrals were screened in to

4 become reports. *Id.* Professionals, or people who had contact with the alleged child victim as

5 part of their job, submitted 70.9% of these reports. *Id.* at x. From the reports, over three million

6 children received either an investigation or an alternative response. *Id.* at xiii. As a result, over

7 300,000 victims received post-response services and over 100,000 received foster care services.

8 *Id.*

9    Washington's mandatory reporting law is no different. In general, Washington's law

10 requires various professionals to report to law enforcement or the Department of Children,

11 Youth, and Families (DCYF) when they have reasonable cause to believe that a child has

12 suffered abuse or neglect. RCW § 26.44.030. Among the professionals with this statutory duty

13 are health practitioners, law enforcement officers, school personnel, nurses, social service

14 counselors, psychologists, pharmacists, childcare providers, juvenile probation officers,

15 employees of certain state agencies, and higher education employees. RCW § 26.44.030(1).

16 Additionally, without regard to their professional role, adults living in the same household who

17 are able have a duty to report when they have reasonable cause to believe a child has suffered

18 severe abuse. RCW § 26.44.030(1)(d). The law also provides that "[a]ny other person" with

19 reasonable cause is permitted to make a report. RCW § 26.44.030(3). Once law enforcement and

20 DCYF receive a report, they have a number of statutory obligations, including, when appropriate,

21 to notify the county prosecutor, file a dependency petition, or conduct an investigation. *See, e.g.*,

22 RCW §§ 26.44.030(5), (8), (12)(a).

23    Washington's law has proven a vitally important tool in protecting children. DCYF

24 receives tens of thousands of reports of abuse or neglect each year. In 2024, for example, DCYF

25 received over 160,000 reports, the majority of which came from mandated reporters.

26

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

4

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

1    *See* Paradis Decl., Ex. 7. Of those, DCYF accepted over 60,000 for further assessment. *Id.*, Ex.

2    8. Many of these cases involved serious health concerns or near fatalities. *Id.*, Ex. 9.

3    **C.    Clergy Are Mandatory Reporters in Most States**

4    　　　The majority of states require clergy to report child abuse. Indeed, 30 states and Guam

5    expressly include members of the clergy among those professionals specifically designated as

6    mandated reporters.[1] Another 14 states, D.C., and Puerto Rico have universal mandatory

7    reporting, requiring any person who suspects child abuse to report, which appears to include

8    clergy.[2]

9    　　　While many states preserve, but limit, the clergy-penitent privilege within the context of

10   the duty to report, several states have opted to deny the privilege. Specifically, Oklahoma, Texas,

11   and Guam, all of which require universal mandatory reporting, abrogate *all* privileges.[3] North

12   Carolina and Puerto Rico, which also require universal mandatory reporting, abrogate all

13   privileges except for the attorney-client privilege.[4] And two states requiring universal mandatory

14   reporting (Tennessee and Rhode Island), along with two states expressly making clergy

15

16

17   　　　[1] *See* Ala. Code §26-14-3(a) (2024); Ariz. Rev. Stat. §13-3620(A) (2024); Ark. Code Ann. §12-18-402(b)(29) (2024); Cal. Penal Code §11165.7(a)(32) (2021); Colo. Rev. Stat. §19-3-304(2)(aa)(I) (2024); Conn.

18   Gen. Stat. §17a-101(b)(18) (2022); Ga. Code §19-7-5(g) (2023); Haw. Rev. Stat. §350-1.1(a)(10) (2024); 325 Ill. Comp. Stat. 5/4(a)(9) (2024); La. Child. Code Ann. art. 603(17)(c) (2024); Me. Rev. Stat. tit. 22, §4011-

19   A(1)(a)(27) (2024); Mass. Gen. Laws ch. 119, §21, §51A(a) (2024); Mich. Comp. Laws §722.623(1)(a) (2024); Minn. Stat. §260E.06(a)(2) (2024); Miss. Code Ann. §43-21-353(1) (2024); Mo. Rev. Stat. §§210.115(1),

20   352.400(3) (2024); Mont. Code Ann. §41-3-201(2)(h) (2023); Nev. Rev. Stat. §432B.220(4)(d) (2023); N.H. Rev. Stat. Ann. §169-C:29 (2023); N.M. Stat. Ann. §32A-4-3(A) (2023); N.D. Cent. Code §50-25.1-03(1) (2023); Ohio

21   Rev. Code Ann. §2151.421(A)(4)(c) (2024); Or. Rev. Stat. §§419B.010(1), .005(6)(h) (2023); 23 Pa. Cons. Stat. §6311(a)(6) (2024); S.C. Code Ann. §63-7-310(A) (2024); Utah Code Ann. §62A-4a-403(4) (2024); Vt. Stat.

22   Ann. tit. 33, §4913(a)(12) (2024); Va. Code Ann. §63.2-1509(A)(19) (2024); W. Va. Code §49-2-803(a) (2024); Wis. Stat. §48.981(b)(1); 19 Guam Code Ann. §13201(b).

23   　　　[2] *See* Del. Code Ann. tit. 16, §§903(a) (2023); Fla. Stat. §39.201(1)(a) (2024); Idaho Code §16-1605(1) (2024); Ind. Code §31-33-5-1 (2024); Ky. Rev. Stat. Ann. §620.030(1) (2024); Md. Code Ann., Fam. Law §5-

24   705(a)(1) (2024); Neb. Rev. Stat. §28-711(1) (2023); N.J. Stat. Ann. §9:6-8.10 (2019); N.C. Gen. Stat. § 7B-301(a) (2023); Okla. Stat. tit. 10A, §1-2-101(B)(1) (2022); R.I. Gen. Laws §40-11-3(a); Tenn. Code Ann. §37-1-

25   403(a)(1) (2024); Tex. Fam. Code Ann. §261.101(a) (2024); Wyo. Stat. Ann. §14-3-205(a) (2024); D.C. Code22 §–3020.52(a) (2023); P.R. Laws Ann. tit. 8, §1131.
　　　[3] *See* Okla. Stat. tit. 10A, §1-2-101(B)(4) (2022); Tex. Fam. Code Ann. §261.101(c) (2024); 19 Guam

26   Code Ann. §13201(a).
　　　[4] *See* N.C. Gen. Stat. §7B-310 (2023); P.R. Laws Ann. tit. 8, §1144 (2012).

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE                    5                    ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

mandated reporters (New Hampshire and West Virgina), abrogate the spousal privilege and "professional" privileges but expressly preserve the attorney-client privilege.[5]

### D. The Washington Legislature Added Members of the Clergy to the List of Mandatory Reporters to Further Protect Childre..

Clergy were one of the first professions designated by statute in Washington to report child abuse. *See* 1969 Wash. Sess. Laws, 1st Ex. Sess., ch. 35, §1; 1971 Wash. Sess. Laws, ch. 167, §1 (making reporting mandatory). In 1975, the Legislature removed clergy from the list of mandated reporters. 1975 Wash. Sess. Laws, 1st Ex. Sess., ch. 217, §3. In the same bill, however, the Legislature provided for voluntary reporting by "any other person," broadened the section granting immunity to mandated and voluntary reporters, and specified that reporting would "not be deemed a violation of the confidential communication privilege[s]" in effect at the time for certain professionals, namely, the physician-patient, clergy-penitent, and psychologist-patient privileges. *Id.* §6.

In 2025, after years of debate and increasing revelations of abuse within religious institutions,[6] the Legislature returned clergy to the list of mandated reporters. The prime sponsor of SB 5375 pushed for the legislation after reading about a lawsuit alleging that a Spokane-based Jehovah's Witnesses congregation had covered up child abuse committed by an elder. *See* Dkt. #66-1 p.51. The bill did not target any specific religious institution but instead defined "clergy" as "any regularly licensed, accredited, or ordained minister, priest, rabbi, imam, elder, or similarly situated religious or spiritual leader of any church, religious denomination, religious body, spiritual community, or sect . . . ." SB 5375 §1(18) (2025).

---

[5] *See* Tenn. Code Ann. §37-1-614 (2024); R.I. Gen. Laws §40-11-11; N.H. Rev. Stat. Ann. §169-C:32 (2023); W. Va. Code §49-2-811 (2024).

[6] *See, e.g.*, Dkt. #66-1 p.16 ("Since 2002, the Church in the United States has experienced a crisis without precedent in our times. The sexual abuse of children and young people by some deacons, priests, and bishops, and the way in which these crimes and sins were addressed, has caused enormous pain, anger, and confusion for victims, their families, and the entire Church."); *see also* Paradis Decl., Ex. 10 (detailing allegations that Jehovah's Witnesses covered up child sexual abuse in Washington state for decades).

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

6

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

Enactment of the bill followed days of testimony, including from survivors of childhood abuse. Several had disclosed the abuse to clergy, but it was never reported. *E.g.*, Dkt. #66-1 p.53 at 1:16:15-1:18:35; Paradis Decl., Ex. 11 at 1:56:00-1:57:07. For example, one survivor testified that she was raped by a priest at age seven and later disclosed the abuse in confession, but the priest did not report the abuse to authorities, and she was denied the services she needed. Dkt. #66-1 p.53 at 1:16:36-1:17:18. She testified, "in my case, priest privilege and the seal of confession protected the perpetrator priest who went on for four more decades to rape little girls. The privilege to not report did not help me or other victims. It denied me needed support and services. I carried the weight and secrecy until I was 52." Dkt. #66-1 p.53 at 1:17:18-1:17:48.

**E.    Plaintiffs Seek to Enjoin the Amended Law Before it Takes Effect**

Two months before SB 5375 was set to take effect, and before it was ever enforced, Plaintiffs filed suit seeking to declare RCW § 26.44.030, as amended by SB 5375, unconstitutional. Dkt. #1. They now seek to enjoin enforcement of the statute to the extent it applies to information learned by Catholic clergy through confession.

### III.    ARGUMENT

**A.    Legal Standard**

"A preliminary injunction is an 'extraordinary and drastic remedy,' . . . it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation modified). Plaintiffs must make a "clear showing" that (1) they are likely to succeed on the merits; (2) they would likely suffer irreparable harm absent an injunction; (3) the equities tip in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

**B.    Plaintiffs Have Not Shown a Likelihood of Success on the Merits**

**1.    Plaintiffs have not established Article III standing or ripeness to challenge SB 5375 before it is enforced**

Before examining the merits of Plaintiffs' motion, the Court must first consider the threshold jurisdictional question of standing. *LA All. for Hum. Rts. v. Cnty. of Los Angeles*,

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

7

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

14 F.4th 947, 956 (9th Cir. 2021). To show standing, a plaintiff must demonstrate: (1) a concrete and particularized injury that is actual or imminent; (2) that the injury is fairly traceable to the alleged actions for the defendant; and (3) that the injury will likely be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The Article III ripeness inquiry "is often treated under the rubric of standing," and "in many cases, ripeness coincides squarely with standing's injury in fact prong." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc).

Where, as here, a plaintiff seeks to challenge a law before it has been enforced, they "must demonstrate a genuine threat that the allegedly unconstitutional law is about to be enforced against [them]." *Stoianoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983). "Whether the question is viewed as one of standing or ripeness," the plaintiff must show a "genuine threat of imminent prosecution." *Thomas*, 220 F.3d at 1139; *Project Veritas*, 125 F.4th at 941. "To determine whether a plaintiff has established such a threat, [courts] consider: '[1] whether the plaintiffs have articulated a concrete plan to violate the law in question, [2] whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and [3] the history of past prosecution or enforcement under the challenged statute.'" *Project Veritas*, 125 F.4th at 941 (quoting *Clark*, 899 F.3d at 813).[7] The Ninth Circuit routinely applies this test in First Amendment cases. *See, e.g.*, *Project Veritas*, 125 F. 4th at 941; *Clark*, 899 F.3d at 813; *Thomas*, 220 F.3d at 1139.

Plaintiffs do not challenge the part of the law making them mandated reporters in most contexts. Nor would they have standing to do so—as they acknowledge, they support this

---

[7] The Ninth Circuit has sometimes articulated the test differently, saying that plaintiffs must show (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that the intended future conduct is "arguably . . . proscribed by [the challenged] statute"; and (3) a "substantial" "threat of future enforcement.'" *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (2024) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-64 (2014)). The court has "toggled between these two tests." *Id.* Whichever phrasing this Court uses, the ultimate requirement is the same, as just reiterated by the en banc court: "Where a plaintiff seeks to challenge a statute prior to enforcement, there must be a *genuine* threat of *imminent* prosecution.'" *Schmidt*, 125 F. 4th at 941 (quoting *Clark*, 899 F.3d at 813). And under either formulation of the test, the result is the same here, because Plaintiffs cannot show a genuine threat of imminent prosecution.

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

8

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

1  change, which is consistent with their existing obligations under church policy. Dkt. #1 pp.5, 16.

2  Instead, Plaintiffs challenge SB 5375 only to the extent it requires reporting of information

3  learned via confession. But they cannot show any genuine threat of imminent prosecution based

4  on this concern.

5  Starting with the first prong, Plaintiffs have not alleged a "concrete plan" to violate the

6  law. *See Thomas*, 220 F.3d at 1139. Instead, Plaintiffs simply allege that they take confession,

7  plan to continue to do so, Dkt. ##67-77 p.4, and are willing to face penalties for noncompliance

8  with SB 5375.[8] But this falls far below the type of detailed description of violative conduct found

9  sufficient by the Ninth Circuit in similar pre-enforcement cases. "Even a 'Hobson's choice' must

10  be 'particularized' and 'imminent.'" *Unified Data Servs., LLC v. F.T.C.*, 39 F.4th 1200, 1211

11  (9th Cir. 2022) (quoting *Clark*, 899 F.3d at 812). A plaintiff must assert more than a

12  "hypothetical intent" to violate the law—they must provide some specific, concrete detail, i.e.

13  "when, to whom, where, or under what circumstances." *Id.* (quoting *Lopez v. Candaele*, 630 F.3d

14  775, 787 (9th Cir. 2010)). Plaintiffs have not done so, and therefore have not shown any "actual

15  or imminent, not conjectural or hypothetical" injury. *See Lujan*, 504 U.S. at 560 (citation

16  modified).[9]

17  The Ninth Circuit has acknowledged that in certain cases, a plaintiff may not be able to

18  control when they might violate the law in the future. For example, in bringing a pre-enforcement

19  challenge to a law banning conversion therapy, a therapist could not "control when clients will

20  come to him for help changing their sexual orientation or gender identity[.]" *Tingley v. Ferguson*,

21  47 F.4th 1055, 1068 (9th Cir. 2022). In such cases, the Ninth Circuit has found standing where

22  the plaintiff has instead specified how they have "already violated the law in the past." *Seattle*

23  ---

24  [8] *See* Dkt. ##67 p.7, 68 p.7, 69 p.5, 71 p.5, 72 pp.7-8, 73 p.5, 74 p.5, 75 pp.7-8, 76 p.5, 77 pp.7-8.

25  [9] It would be especially speculative for Plaintiffs to claim that they may have to report in a supervisory capacity given the Archdiocese of Seattle's own recent representation that "there has not been a credible allegation of clergy sexual abuse of a minor or vulnerable adult since 2007 (and prior to that since 1994)," and that "[r]eports of clergy sexual abuse have virtually disappeared over the last several decades." *See* Archdiocese

26  of Seattle, *Protect and Heal – Creating a Safe Environment for All* (Jan. 31, 2025), https://archseattle.org/wp-content/uploads/2025/02/Archdiocese-of-Seattle-A-history-of-action-min.pdf.

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

9

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

*Pacific University v. Ferguson*, 104 F.4th 50, 59 (9th Cir. 2024). For example, the therapist in *Tingley* provided "detail[ed] . . . examples" of "*specific past instances* of working with minors in a way that would violate" the conversion therapy law. 47 F.4th at 1067-68 (emphasis added). Similarly, pharmacists challenging state rules requiring them to sell Plan B "point[ed] to *specific past instances* when they have refused to sell Plan B" as "direct violations of the challenged rules." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1123 (9th Cir. 2009) (emphasis added). And physicians challenging an Idaho law prohibiting referrals to out-of-state abortion services submitted testimony that they had previously made such referrals. *Planned Parenthood Great Nw. v. Labrador*, 122 F.4th 825, 837 (9th Cir. 2024); *see also Matsumoto v. Labrador*, 122 F.4th 787, 797 (9th Cir. 2024) (requiring similar assertions of past conduct). The plaintiffs in these cases provided these details without intruding on their clients' or patients' confidentiality.

Here, by contrast, none of the Plaintiffs' declarations allege that they have ever engaged in conduct that would even arguably violate SB 5375. No Plaintiff alleges that they have ever heard and failed to report information in confession that would arguably trigger the reporting duty under RCW § 26.44.030(1)(a). Nor do they allege that they have ever heard, let alone failed to report, such information from or about a person they supervise within the meaning of RCW § 26.44.030(1)(b). They thus fall far short of showing the "specific past instances" of violative conduct that the Ninth Circuit has found necessary in pre-enforcement First Amendment challenges. *See, e.g.*, *Tingley*, 47 F.4th at 1067-68; *Stormans*, 586 F.3d at 1123.

Turning to the second prong, Plaintiffs have not alleged that any official has made a "specific warning or threat" to initiate proceedings against them under SB 5375. *See Thomas*, 220 F.3d at 1139. The mere existence of penalties under a statute does not suffice where there is no specific threat of enforcement against the plaintiff. *Id.* at 1139-40; *Clark*, 899 F.3d at 813 ("[G]eneralized threats of prosecution do not confer constitutional ripeness.") (quoting *Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1154 (9th Cir. 2017)).

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

10

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

1      As to the final prong, Plaintiffs filed suit before SB 5375 took effect, so there is no history

2   of enforcement. They have not even cited examples from other states with laws like

3   Washington's of clergy being prosecuted for failure to report. In cases like this, where "the

4   'record contains little information as to enforcement or interpretation[,]'" *Cal. Trucking Ass'n v.*

5   *Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (quoting *Wolfson v. Brammer*, 616 F.3d 1045, 1060

6   (9th Cir. 2010)), courts have found standing only where a plaintiff alleged a concrete plan to

7   violate the law or had already engaged in violative actions. *See id.* at 654; *Tingley*, 47 F.4th at

8   1067-69. Plaintiffs have not done so here, and they have failed to show Article III standing or

9   ripeness.

10      **2.**     **SB 5375 does not violate the Free Exercise Clause**

11      The right of free exercise "does not mean that religious institutions enjoy a general

12   immunity from secular laws." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732,

13   746 (2020). Nor does it "relieve an individual of the obligation to comply with a valid and neutral

14   law of general applicability." *Tingley*, 47 F.4th at 1084 (quoting *Emp. Div. v. Smith*, 494 U.S.

15   872, 879 (1990)). Neutral, generally applicable laws are subject to rational basis review even if

16   they burden religious practice. *Id.*

17      The Ninth Circuit recently distilled Supreme Court precedent into "three bedrock

18   requirements of the Free Exercise Clause" that determine whether a government regulation is

19   neutral and generally applicable. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*

20   *Bd. of Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (*FCA*). First, "a purportedly neutral 'generally

21   applicable' policy may not have 'a mechanism for individualized exemptions.'" *Id.* (citation

22   modified) (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)). Second, "the

23   government may not 'treat . . . comparable secular activity more favorably than religious

24   exercise.'" *Id.* (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)). Third, "the government

25   may not act in a manner 'hostile to . . . religious beliefs' or inconsistent with the Free Exercise

26   Clause's bar on even 'subtle departures from neutrality.'" *Id.* (quoting *Masterpiece Cakeshop v.*

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

11

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

*Colo. Civil Rights Comm'n*, 584 U.S. 617, 638 (2018); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993)). The mandatory reporting law at issue here satisfies all three requirements. Plaintiffs do not and cannot argue that the law allows individualized exemptions, and their arguments as to the other two requirements fail.

### a. Clergy are treated the same as other professionals uniquely situated to report child abuse

SB 5375 reintroduces clergy to the list of professionals required by law to report child abuse based on their positions of trust, training, and frequent contact with children. This is consistent with why clergy were first identified as professionals well-positioned to report child abuse in 1969. *See* 1969 Wash. Sess. Laws, 1st Ex. Sess., ch. 35, §1; 1971 Wash. Sess. Laws Ex. Sess., ch. 167, §1. It is likewise consistent with the modern purpose of the reporting law, which is to allow the State's intervention based on "verified information" that a child has been abused or neglected, while "safeguard[ing] against arbitrary, malicious or erroneous information or actions" and avoiding "interference with child-raising practices, . . . which are not proved to be injurious to the child's health, welfare and safety." RCW § 26.44.010; 1975 Wash. Sess. Laws, 1st. Ex. Sess., ch. 217, §1. The Legislature's declaration of purpose and the mandatory reporting law itself evince the State's compelling interest in requiring neutral professionals who are well-situated to identify child abuse to report such information so that it can be verified and, when appropriate, acted upon.

Designating clergy as mandated reporters in RCW § 26.44.030(1)(a) treats them exactly the same as other professions the Legislature has deemed to be uniquely positioned to identify and report suspected child abuse. "[T]he commonality among the class of mandatory reporters is primary and frequent contact with children who might be at risk of abuse." *Beggs v. State, Dep't of Soc. & Health Servs.*, 247 P.3d 421, 426 (Wash. 2011). Plaintiffs cannot reasonably dispute that they fall into this classification. *See, e.g.*, Dkt. #75 ¶¶14-15 (discussing adoption of "*Charter for the Protection of Children and Young People*" in direct response to the revelations

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

12

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

of clergy sexual abuse within the Church), ¶19 ("Catholic priests in the Archdiocese of Seattle are already required to—and do—report child abuse and neglect when learned outside the Sacrament of Confession"), ¶20 (discussing policies requiring reporting suspected child abuse and neglect). RCW § 26.44.030(1)(a) does not pose an unlimited duty to report but instead requires there to be a connection to the reporter's professional identity. *State v. James-Buhl*, 415 P.3d 234, 238 (Wash. 2018). For each of the professions identified in RCW § 26.44.030(1)(a), the obligation is the same: such individuals must report when their professional function gives them "reasonable cause to believe that a child has suffered abuse or neglect." RCW § 26.44.030(1)(a); *James-Buhl*, 415 P.3d at 238.

### (1)    A mandated reporter's duty overrides statutory privileges

The mandatory reporting obligation in RCW § 26.44.030(1)(a), moreover, generally overrides statutory privileges. Contrary to Plaintiffs' argument, there are no other classes of mandated reporters in subsection 1(a) who are excused from their duty to report based on privileged information. First, by their plain language, while many privileges, including the clergy-penitent privilege, preclude *testimony* in certain circumstances, they say nothing of an individual's duty to *report* suspected child abuse to law enforcement or DCYF. *See, e.g.*, RCW §§ 5.60.060(3), (6)(a), (7); *see also Magney v. Truc Pham*, 466 P.3d 1077, 1082 (Wash. 2020) (statutory privileges "must be strictly construed by interpreting the specific words in the statute that the legislature has codified"); *State v. Glenn*, 62 P.3d 921, 924 (Wash. Ct. App. 2003) (in Washington, the "clergy/penitent privilege is a creature of statute, apparently having no root in the common law"). Thus, by their plain language, many testimonial privileges, including the clergy-penitent privilege, simply have no relevance to an individual's duty to report.

Moreover, since 1975, the Legislature has expressly specified that some privileges—including the clergy-penitent privilege—are inapplicable in the context of RCW § 26.44

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

13

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

1   reporting and later related testimony. *See, e.g.*, RCW § 26.44.060(3) ("Conduct conforming with
2   the reporting requirements of this chapter shall not be deemed a violation of the confidential
3   communication privilege of RCW 5.60.060(3) [clergy] and (4) [physician], 18.53.200
4   [optometrist] and 18.83.110 [psychologist]."); RCW § 5.60.060(8)(b) ("this section does not
5   relieve a domestic violence advocate from the requirement to report or cause to be reported an
6   incident under RCW 26.44.030(1) . . . ."), (9)(d) (excepting from prohibition on mental health
7   counselor, social worker, or therapist disclosing privileged information "[a]s required under
8   chapter 26.44 . . . ."), (11)(c) (providing that the union representative privilege "may not interfere
9   with an employee's or union representative's applicable statutory mandatory reporting
10  requirements, including but not limited to duties to report in chapters 26.44 . . . ."). Indeed, good
11  faith reporting and testimony under RCW § 26.44 grants any reporter immunity "from any civil
12  or criminal liability arising out of such" conduct. RCW § 26.44.060(1)(a). Thus, even where a
13  privilege might otherwise apply, the Legislature has repeatedly and expressly provided that the
14  statutory duty of reporting child abuse supersedes any such privilege.

15      Even without express statutory carve outs, Washington courts have consistently
16  concluded that policy reasons underlying Washington's reporting law override statutory
17  privileges. *State v. Warner*, 889 P.2d 479, 486 (Wash. 1995) ("RCW 26.44.030 contains a
18  mandatory reporting provision for cases of child abuse that trumps the statutory privilege.");
19  *State v. Waleczek*, 585 P.2d 797, 799-800 (Wash. 1978) (discussing how interests underlying
20  physician-patient, psychologist-patient, and husband-wife privileges are "subordinated to the
21  overriding and paramount legislative intent to protect children from physical and sexual abuse");
22  *State v. Fagalde*, 539 P.2d 86 (Wash. 1975) (same for physician-patient and psychologist-
23  patient); *C.J.C. v. Corp. of Catholic Bishop of Yakima*, 985 P.2d 262, 271 (Wash. 1999), *as
24  amended* (Sept. 8, 1999) ("Where childhood sexual abuse is at issue, even long established
25  privileges do not apply."); *State v. Hyder*, 244 P.3d 454, 461 (Wash. Ct. App. 2011); *State v.
26  Ackerman*, 953 P.2d 816, 821 (Wash. Ct. App. 1998) ("In furtherance of that policy [reporting

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

14

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

child abuse], RCW 26.44.030 also takes precedence over the counselor-patient privilege."); *In re J.F.*, 37 P.3d 1227, 1234 (Wash. Ct. App. 2001) ("[T]he mandatory reporting requirements of RCW 26.44.030 trump the statutory counselor-patient privilege."). Thus, it is well-established that mandated reporters are not excused from their reporting duty based on the availability of a privilege in other contexts.

### (2)    Non-professionals, non-mandated reporter supervisors, and higher education attorneys are not comparable to subsection (1)(a) reporters

The Washington Legislature's conclusion that some adults, including parents, family members, non-mandated reporter supervisors, and higher education attorneys are subject to different reporting obligations does not render the statute nonneutral or non-generally applicable. None of these individuals are comparable to clergy or the other categories identified in subsection (1)(a).

To trigger strict scrutiny, it is not enough for *some* secular activity to be treated more favorably than religious exercise, the secular activity must be *comparable* to the religious activity. *See Tandon*, 593 U.S. at 62. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* "Comparability is concerned with the risks various activities pose." *Id.*

Here, the State's interest is in protecting children from abuse and ensuring that professionals with frequent and primary contact with children—who are likely to discover and capable of identifying such abuse—are held to their duty to safeguard children. To that end, there is a fundamental difference between requiring professionals with trusted access to children to disclose child abuse and requiring non-professionals, or professionals with infrequent access to children, to do the same. The former category includes individuals who are formally trained to detect child abuse, are tasked with protecting children in institutional settings, have frequent

contact with children, or are likely to receive information about child abuse or observe it firsthand by virtue of their professional role. They serve a critically important function by credibly reporting potential child abuse, thereby allowing the State to take further action to protect the child. This is readily distinguishable from non-professionals, like household or family members, or professionals with infrequent access to children, such as higher education attorneys, who have no specialized training and owe no duty in the context of child welfare.

A closer look at Plaintiffs' alleged comparators demonstrates their material differences. First, parents have stronger legal duties to protect their children than simply reporting suspected abuse. Their failure to take appropriate action to protect their children can, itself, be neglect or abandonment' that could result in loss of constitutionally-recognized parental rights. *See* WAC 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(5) (defining negligent treatment or maltreatment); RCW § 26.44.020(1), (19); *In re J.F.*, 37 P.3d at 1229 (upholding dependency finding against mother who endangered daughter). They need not be identified as mandated reporters because they owe higher duties to protect their children from harm.

Other adults in a household lack the training or expertise to correctly identify abuse and often face complications that professional mandated reporters do not, such as legitimate fears for their own safety. *See, e.g.* Paradis Decl., Ex. 9 ("[A]pproximately 30-60% of families in which either child maltreatment or adult domestic violence is occurring also experience the other form of violence. In short, there is a clear connection between domestic violence and child abuse."). The Legislature therefore appropriately chose to limit their reporting obligation only when capable and only to "severe abuse." RCW § 26.44.030(1)(d). The Legislature's careful delineation of mandated reporters is designed to encourage neutral, safe, reliable reports of child abuse. Plaintiffs' argument seems to be that a mandated reporting law must include everyone—professional or not—or it violates Free Exercise. This cannot be the case.

Second, supervisors of any "nonprofit or for-profit organization" are not comparable. Only supervisors who don't already have reporting obligations under subsection (1)(a) are

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

16

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

1   exempted from the obligation to report privileged communications. *See* RCW § 26.44.030(1)(b)

2   ("Nothing in this subsection (1)(b) shall limit a person's duty to report under (a) of this

3   subsection."). The Legislature appropriately distinguished between the professionals identified

4   in subsection (1)(a)—who are likely to have frequent and direct contact with children at risk of

5   abuse—from those who are reporters merely because they are supervisors of *any* organization

6   and are not necessarily trained or situated to identify suspected abuse. Thus, imposing different

7   obligations on those individuals does not "endanger[]" children "in a similar or greater degree."

8   *Bacon v. Woodward*, 104 F.4th 744, 753 (9th Cir. 2024) (quoting *Lukumi*, 508 U.S. at 543).

9       Third, attorneys are not categorically mandated reporters because they also do not, by

10  virtue of their profession, have frequent or direct access to children or training to identify abuse.

11  Nonetheless, attorneys are required under an independent regulatory scheme to report

12  "information relating to the representation of a client to prevent reasonably certain death or

13  substantial bodily harm[.]" Washington Rules of Professional Conduct (RPC) 1.6(b)(1); *see also*

14  RPC 1.6 Comment 6. This properly balances the "overriding value of life and physical integrity,"

15  *id.*, while acknowledging that, in general, lawyer-client confidentiality is "central to the legal

16  system and the adversary process." *See In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090

17  (9th Cir. 2007) (quoting *United States v. Hodge & Zweig*, 548 F.2d 1347, 1355 (9th Cir. 1977))

18  (citation modified), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S.

19  100 (2009).

20      Attorneys who would otherwise not be mandated reporters but are because of their

21  employment at a higher education institution are likewise different from other mandated

22  reporters. The Legislature added higher education employees after the Penn State abuse

23  revelation to protect children who come onto campus. 2012 Wash. Sess. Laws, ch. 55;

24  Paradis Decl., Ex 14. But attorney faculty overseeing legal clinics are an entirely separate sphere

25  and are not likely to have frequent and direct access to children. The Legislature recognized that

26  the interest originally served by making higher education employees mandated reporters was not

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

17

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

compromised by allowing legal clinics to continue to provide critically needed legal services for underserved communities.

In short, there is no comparable secular treatment that poses the same level of risk as omitting clergy from the reporting law.

### (3) Neither SB 5375's text nor legislative history establishes non-neutrality

The addition of "[e]xcept for members of the clergy" to RCW § 26.44.030(1)(b) also does not render the statute nonneutral or non-generally applicable. Although that clause specifically references clergy, it does not, in effect, impose any obligation on clergy not already imposed on all other mandated reporters.

The very next sentence of the statute makes clear that "[n]othing in [subsection (1)(b)] shall limit a person's duty to report under (a) of this subsection." RCW § 26.44.030(1)(b). Thus, *all* mandated reporters, in both secular and religious institutions, must comply with their reporting obligation and cannot shield themselves if they also serve in a supervisory capacity. This is true even when the information comes solely from a privileged communication, as "*nothing*" limits a mandated reporter's duty to report. RCW § 26.44.030(1)(b).

Because all mandated reporters must comply with the reporting obligation in (1)(a)—even when those individuals also fall within the scope of (1)(b)—the language added to 1(b) by SB 5375 does not treat members of the clergy differently. Rather, it simply reaffirms that clergy are *still* subject to the obligations of (1)(a) like all other mandated reporters.

The legislative history likewise fails to show that the statute is nonneutral. SB 5375 focused on clergy because other comparable professionals are *already* mandated reporters. Rather than demonstrate a lack of neutrality, the history demonstrates legislative intent to protect children and ensure they can rely on trusted adults to report child abuse. The prime sponsor repeatedly reaffirmed this legislative purpose. *See e.g.*, Dkt. #66-1 p.53 at 1:06:10-1:09:47. Paradis Decl., Ex. 12 at 1:30:05-1:30:57; *Id.*, Ex. 11 at 10:45-14:50. Moreover, her statements

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

18

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

must be evaluated in context. Rather than show religious animus, they merely describe how opposing arguments made her feel as a child sexual assault survivor herself. *See id.*, *see also* Dkt. #66-1, Ex. 7 at 1:43:05-1:44:58. And this Court should exercise caution in giving such comments undue weight, as "[s]tray remarks of individual legislators are among the weakest evidence of legislative intent." *Tingley*, 47 F.4th at 1087; *see also id.* ("[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it.") (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 254 (2022)).

### b.  The mandatory reporting law is rationally related to legitimate government purposes

Because the reporting law is neutral and generally applicable, it is subject to rational basis review. The law's inclusion of clergy as mandated reporters easily meets this standard because it is rationally related to the government's legitimate interest in ensuring that professionals well situated to identify abuse are held to their duty to safeguard children. The Legislature has determined that certain professions are better situated to both properly identify child abuse and neutrally report it for further investigation. As demonstrated by clergy's early inclusion as designated reporters in 1969 and in the continued affirmation that clergy reporting does not violate the statutory clergy-penitent privilege, the Legislature has continually recognized clergy's important role in reporting child abuse.

Moreover, the mandatory reporting law is constitutional even if this Court were to apply strict scrutiny. To satisfy strict scrutiny, a statute must be "narrowly tailored to serve compelling state interests." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992). "[P]rotecting the physical and psychological well-being of minors is a compelling government interest." *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 951 (9th Cir. 1997). Plaintiffs do not claim otherwise.

As for tailoring, the Constitution requires laws to be "narrowly tailored, not . . . perfectly tailored." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (citation modified). Here, adding clergy to the mandatory reporter law is narrowly tailored. Like other reporters, clergy are

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

19

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

required to report only when they have reasonable cause to believe that a child has suffered abuse or neglect. They do not have to report any other crime or confidence.

Moreover, the law is not "overbroad or underinclusive in substantial respects." *Lukumi*, 508 U.S. at 546. Professionals with frequent and direct contact with children at risk of abuse are required to report when they have reason to believe abuse has occurred, and none of them have the benefit of a privilege. *See* Section III.B.2.a, *supra*. The law appropriately promotes the reporting of child abuse by those best equipped to identify and report it, thereby increasing the chance that reports of child abuse will be accurate and verifiable. There is no Free Exercise violation.

### 3.    SB 5375 does not violate the Establishment Clause

The Establishment Clause prohibits governments from making any "law respecting an establishment of religion." U.S. Const. amend. 1. Governments "may not exercise a preference for one religious faith over another." *Van Orden v. Perry*, 545 U.S. 677, 709 (2005). The Supreme Court has developed a "historical practices and understandings" approach to Establishment Clause cases, asking whether a challenged provision would comport with what the Founders considered a state establishment of religion. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 510 (2022).

To that end, the Supreme Court has identified six general categories in which Establishment Clause issues arise: (1) religious symbols on government property and religious speech at government events; (2) religious accommodations and exemptions from generally applicable laws; (3) government benefits and tax exemptions for religious organizations; (4) religious expression in public schools; (5) private religious speech in government-regulated public forums; and (6) state interference with internal church affairs. *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 51 n.16 (2019); *see also id.* at 69 (Kavanaugh, J., concurring). SB 5375 does not fall into any of these categories.

To suggest otherwise, Plaintiffs read isolated phrases wildly out of their legal and historical context. Prior to the Founding, several colonies had government-sponsored religions, which bore "telling traits": the government exerted control over the established church's doctrine; mandated attendance in the established church; punished dissenting churches; restricted political participation by dissenters; financially supported the established church; and "used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function." *Shurtleff v. City of Boston*, 596 U.S. 243, 286 (2022) (Kavanaugh, J., concurring); *see also Hilsenrath on behalf of C.H. v. Sch. Dist. of Chathams*, 136 F.4th 484, 491 (3d Cir. 2025).

SB 5375 bears none of these hallmarks. Washington does not use the Catholic Church to carry out civil functions, let alone give it a "monopoly" over any such functions. Plaintiffs cite a law review article discussing how the Church of England in colonial Virginia was inextricably intertwined with the state, with laws prescribing proper forms of worship and punishing those who worshipped outside the established church. Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part i: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2118-19 (2003). This included delegating to the church civil functions, such as social welfare, education, and keeping of public records, and even limiting public office to members of the church. *Id.* at 2169. The delegated civil functions included "prosecution of moral offenses." *Id.* This was one of many hallmarks of the established church—not because it intruded on religious practice, but because it merged the functions of the state with those of the church.

Mandatory reporting laws do not offend the Establishment Clause. Civil law enforcement officers and prosecutors in Washington investigate child abuse allegations, make arrests, and make charging decisions. The duty to *report* information, by contrast, applies to many non-governmental professions having regular contact with children, from psychologists to child-care providers to certain university employees. That duty is not a civic or state function, and there is no cognizable Establishment Clause claim here.

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

21

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

**4.    The church autonomy doctrine does not bar the State from imposing requirements on religious institutions**

Plaintiffs' church autonomy argument misunderstands that doctrine. The doctrine grants limited protection to churches and other religious institutions "to decide matters 'of faith and doctrine' without government intrusion" and to make internal management decisions that are "essential to the institution's central mission[.]" *Our Lady of Guadalupe Sch.*, 591 U.S. at 746. It arises from the recognition that the Religion Clauses collectively "protect[] the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Markel v. Union of Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 802 (9th Cir. 2024) (quoting *Our Lady of Guadalupe Sch.*, 591 U.S. at 737). Therefore, courts may not "determine matters of ecclesiastical cognizance and polity in adjudicating intrachurch disputes." *Gen. Council on Fin. and Admin., United Methodist Church v. Calif. Superior Court*, 439 U.S. 1369, 1372-73 (1978). To rule otherwise would permit the State to "become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs." *Id.*

This case does not ask this Court to rule on intrachurch disputes or decide matters of church governance, faith, or doctrine. The State does not question Plaintiffs' explanation of the Sacrament of Confession or the requirements of canon law, nor does any provision of SB 5375 require a court to determine or interpret religious doctrine or to interfere with church governance.

Plaintiffs' argument is that SB 5375, in requiring reporting of information about child abuse learned through the confessional, burdens the Catholic Church's *application* of religious doctrine. But while this might implicate the Free Exercise Clause, it does not implicate the church autonomy doctrine. If accepted, Plaintiffs' argument would mean that any time a civil law imposes requirements that conflict with any religion, it would pose a church autonomy issue. Adopting that argument would prohibit states from legislating in any number of areas where religions have conflicting beliefs and edicts. That would stretch the bounds of the church

RESP. OF DEFS. ROBERT W. FERGUSON & NICHOLAS W. BROWN TO PLS.' MOT. FOR PRELIM. INJ. NO. 3:25-cv-05461-DGE

22

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

autonomy doctrine far beyond precedent. *See generally* Carl H. Esbeck, *An Extended Essay on Church Autonomy*, The Federalist Society Review vol. 22 (Sept. 29, 2021), https://fedsoc.org/fedsoc-review/an-extended-essay-on-church-autonomy (discussing the boundaries of the church autonomy doctrine and the distinctions between a church autonomy claim and a Free Exercise claim).

In arguing otherwise, Plaintiffs rely on cases applying the ministerial exception, but that doctrine is inapposite here. That doctrine is based on the principle that churches must be able to make internal management decisions "essential to" their "central mission," such that courts may not meddle with a church's "selection of the individuals who play" ministerial roles. *Our Lady of Guadalupe Sch.*, 591 U.S. at 746. This grants churches a limited immunity from employment discrimination lawsuits where the employee in question played a ministerial role. *See id.* at 749-51; *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012).

SB 5375, by contrast, does not implicate these concerns. It does not require the Court to overrule the Catholic Church's selection or removal of its priests, nor its governance structure. While it imposes requirements on clergy that Plaintiffs oppose, the church autonomy doctrine "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe Sch.*, 591 U.S. at 746. Instead, when a religious institution believes its free exercise rights are being burdened by a state law, the proper recourse is a Free Exercise claim. The church autonomy doctrine is not implicated.

## C.    Plaintiffs Have Not Shown a Likelihood of Irreparable Harm

Plaintiffs' motion should also be denied because they have not established that irreparable injury is "likely" in the absence of an injunction. *Winter*, 555 U.S. at 22. A mere "possibility" of harm is not sufficient. *Id.* This showing requires "evidence," not simply "unsupported and conclusory statements." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

RESP. OF DEFS. ROBERT W. FERGUSON & NICHOLAS W. BROWN TO PLS.' MOT. FOR PRELIM. INJ. NO. 3:25-cv-05461-DGE

23

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

Plaintiffs have not shown a likelihood of constitutional injury through the loss of First Amendment freedoms. *Cf. FCA*, 82 F.4th at 694-95. While a loss of First Amendment rights can constitute irreparable injury, *see id.*, Plaintiffs have not shown a likelihood that this will occur. In *FCA*, the defendant school district had already stripped FCA of its official recognition based on its challenged antidiscrimination policy, then denied a subsequent application for recognition. *Id.* at 674-76. Here, in contrast, Plaintiffs' declarations do not establish that substantial harm has occurred or is likely to occur due to SB 5375 as discussed above (Section III.B.1). Moreover, Plaintiffs' claims of harm are belied by the fact that multiple states have decades-old laws similar to Washington's—with clergy as mandated reporters without any privilege—and Plaintiffs notably do not assert those laws have harmed clergy in any of those states. For the same reasons Plaintiffs' allegations are insufficient to show standing, they are also insufficient to establish irreparable harm.

**D.**     **The Equities and Public Interest Weigh in the State's Favor**

The final two *Winter* factors merge when a government official is a defendant. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (citation modified). Yet Plaintiffs seek to enjoin this law before it has even been enforced—despite not showing a likelihood of actual harm, let alone the existence of harms in states with almost-identical statutory schemes. The public interest and balance of the equities therefore weigh against enjoining this democratically-enacted tool in the fight against child abuse.

## IV.     CONCLUSION

Plaintiffs' Motion for Preliminary Injunction should be denied.

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

24

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

1      DATED this 30th day of June 2025.

2                                 The signing attorneys certify that this memorandum contains 8,396 words, in compliance with the Local Civil Rules.

3

4                                 NICHOLAS W. BROWN
Attorney General

5

6                                 */s/ Alicia O. Young*

7                                 ALICIA O. YOUNG, WSBA #35553
KELLY A. PARADIS, WSBA #47175
EMMA GRUNBERG, WSBA #54659

8                                 Deputy Solicitors General
1125 Washington Street SE

9

10                              PO Box 40100
Olympia, WA  98504-0100
360-753-6200

11                              Alicia.Young@atg.wa.gov
Kelly.Paradis@atg.wa.gov

12                              Emma.Grunberg@atg.wa.gov
*Attorneys for Defendant Robert W. Ferguson and Nicholas W. Brown*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

RESP. OF DEFS. ROBERT W.
FERGUSON & NICHOLAS W. BROWN
TO PLS.' MOT. FOR PRELIM. INJ.
NO. 3:25-cv-05461-DGE

25

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200