# EXHIBIT 14



https://mm.nh.gov/files/uploads/doj/remote-docs/20090126-diocese-compliance-report.pdf        July 7, 2025 at 6:01 PM EDT

*PRIVILEGED & CONFIDENTIAL*
ATTORNEY WORK PRODUCT

Assessment of Diocese of
Manchester's Compliance
Program for
The New Hampshire
Attorney General's Office

December 11, 2008

ADVISORY

Prepared by: **KPMG FORENSIC**[SM]

**AUDIT ▪ TAX ▪ ADVISORY**

**CONTENTS**

I.  **Introduction** -------------------------------------------------------------------------------------------------- 3

    A.  *Background* ---------------------------------------------------------------------------------------------- 3

    B.  *Limitations on Liability* -------------------------------------------------------------------------- 4

II.  **Executive Summary** ------------------------------------------------------------------------------- 5

III.  **Methodology** --------------------------------------------------------------------------------------------- 8

    A.  *Overview* --------------------------------------------------------------------------------------------------- 8

IV.  **Assessment of the Diocese of Manchester's Safe Environment Compliance Program** ------------------------ 9

    A.  *Organizational Structure and Oversight* ----------------------------------------------------- 9

        1.  Requirements of the Agreement ------------------------------------------------------------ 9

        2.  Industry/Organizational Guidance -------------------------------------------------------- 9

        3.  Program Overview --------------------------------------------------------------------------- 9

        4.  Findings------------------------------------------------------------------------------------------ 12

        5.  Recommendations for Program Enhancements ----------------------------------------- 15

    B.  *Mandatory Reporting and Response* ------------------------------------------------------------- 16

        1.  Mandatory Reporting ----------------------------------------------------------------------- 16

            a.  Requirements of the Agreement --------------------------------------------------- 16

            b.  Industry/Organizational Guidance ----------------------------------------------- 16

            c.  Program Overview ------------------------------------------------------------------- 16

            d.  Findings --------------------------------------------------------------------------------- 17

            e.  Recommendations for Program Enhancements --------------------------------- 17

        2.  Response to Allegations-------------------------------------------------------------------- 18

            a.  Requirements of the Agreement --------------------------------------------------- 18

            b.  Industry/Organizational Guidance ----------------------------------------------- 18

            c.  Program Overview------------------------------------------------------------------- 18

            d.  Findings --------------------------------------------------------------------------------- 19

            e.  Recommendations for Program Enhancements --------------------------------- 20

    C.  *Program to Prevent the Sexual Abuse of Minors* --------------------------------------------- 21

        1.  Screening of Church Personnel ---------------------------------------------------------- 21

            a.  Requirements of the Agreement --------------------------------------------------- 21

            b.  Industry/Organizational Guidance ----------------------------------------------- 21

            c.  Program Overview------------------------------------------------------------------- 21

            d.  Findings ---------------------------------------------------------------------------------- 25

            e.  Recommendations for Program Enhancements --------------------------------- 34

        2.  Training Personnel, Communications, and Acknowledgements----------------------- 38

            a.  Requirements of the Agreement --------------------------------------------------- 38

            b.  Industry/Organizational Guidance ----------------------------------------------- 38

            c.  Program Overview------------------------------------------------------------------- 38

            d.  Findings --------------------------------------------------------------------------------- 39

            e.  Recommendations for Program Enhancements --------------------------------- 42

**CONTENTS**

*D    Program Documentation* ------------------------------------------------------------------------------------------------- *43*
    1.   Requirements of the Agreement------------------------------------------------------------------------------ 43
    2.   Industry/Organizational Guidance---------------------------------------------------------------------------- 43
    3.   Program Overview ----------------------------------------------------------------------------------------------- 43
    4.   Findings---------------------------------------------------------------------------------------------------------------- 43
    5.   Recommendations ------------------------------------------------------------------------------------------------- 43

*E.   Auditing/Testing of the Program*------------------------------------------------------------------------------- *44*
    1.   Requirements of the Agreement------------------------------------------------------------------------------ 44
    2.   Industry/Organizational Guidance---------------------------------------------------------------------------- 44
    3.   Program Overview ----------------------------------------------------------------------------------------------- 44
    4.   Findings---------------------------------------------------------------------------------------------------------------- 44
    5.   Recommendations for Program Enhancements----------------------------------------------------------- 45

**Appendix A**

Exhibit 1 – KPMG's Compliance Program Methodology for the 2008 Assessment

Exhibit 2 – Diocese of Manchester Code and Policy: *Serving Christ, Serving Others* – Code *of Ministerial Conduct; Promise to Protect, Pledge to Heal* – Policy *for the Protection of Children and Young People* (March 19, 2007)

Exhibit 3 – Diocese of Manchester – Screening and Training Protocol for Church Personnel (July 1, 2008)

Exhibit 4 – Document Review List

Exhibit 5 – KPMG Site Visit Results

Exhibit 6 – Relevant Portions of the *U.S. Sentencing Commission, Federal Sentencing Guidelines* (November 1, 2008)

Exhibit 7 – Diocese of Manchester Action Plan III (April 25, 2008)

Exhibit 8 – Non-Prosecution Agreement (December 2002)

## I. Introduction

### A. Background

The Diocese of Manchester (the Diocese), which was established in 1884, encompasses the entire State of New Hampshire and, according to the Diocesan Web site (http://www.catholicnh.com), currently consists of approximately 105 parishes, 24 diocesan schools, and 2 summer camps. Bishop McCormack, responsible for overseeing the Diocese, was appointed by Pope John Paul II and installed as the ninth Bishop of Manchester on September 21, 1998.

In December 2002, the State of New Hampshire, through its Attorney General (the Attorney General), reached a Non-Prosecution Agreement (the Agreement) with the Diocese relating to allegations of sexual misconduct with minors by priests and Diocesan leaders over a 40-year period. This Agreement established terms and conditions to facilitate the protection of minors and ensure a system of accountability, oversight, transparency, and training.

The terms of the Agreement comprise the basis for the Diocese's Safe Environment (SE) Compliance Program (the Compliance Program or Program). This Program is to include:

(1) The implementation of policies and procedures for preventing, responding to, and reporting allegations of sexual abuse

(2) The provision of safety training regarding the sexual abuse of minors and the reporting requirements for Diocesan personnel

(3) The maintenance of the Office of the Delegate for Sexual Misconduct to handle all allegations of sexual abuse of minors

(4) The retention of all documents and information relating to allegations of sexual abuse by minors until the death of the accused Diocesan personnel

(5) An annual audit regarding compliance with the terms of the Agreement and Diocesan policies.

A copy of the Agreement is attached as **Exhibit 8**.

In November 2003, the Attorney General selected KPMG's Forensic practice to provide assistance with the annual audits provided for in the Agreement. In February 2004, the Diocese sent the Attorney General's Office a draft of a proposed assessment instrument.[1] After resolving the issues raised by the Diocese, the Attorney General retained KPMG on May 4, 2005 to assess the Diocese's compliance with the Agreement.

KPMG has issued three of four planned annual Program assessment reports (KPMG Program Assessment Reports) for the years 2005, 2006, and 2007 on March 13, 2006, January 16, 2007, and January 15, 2008, respectively.

This report covers the development of the Diocese's SE Program over four assessment years. It discusses in detail KPMG's findings and recommendations resulting from KPMG's fourth annual Program assessment, reflecting the Program as it existed from July 2007 through completion of our field work in November 2008.

---

[1] Discussions between the New Hampshire Attorney General's Office and representatives of the Diocese ensued, and the following concerns were expressed by the Diocese: the nature of the personnel selected for interviews, the scope of the assessment for year one given the implementation of new policies for subsequent years, the selection of an outside entity to assist with the assessment, the cost of the assessment and the party responsible for payment, the structure and tone of the final report, and the timing for commencement of assessment procedures.

**B. Limitations on Liability**

KPMG was not engaged to perform an audit, review, or compilation of financial statements or financial information, as those terms are understood and defined by professional guidance promulgated by the American Institute of Certified Public Accountants (AICPA), and accordingly, KPMG expresses no opinion or other form of assurance on financial statements or financial information. Furthermore, KPMG was not engaged to conduct a comparative legal analysis or to provide any legal conclusions, opinions, or advice herein.

In conducting its assessment, KPMG made subjective judgments in a variety of areas relating to legal, regulatory, industry, and organizational standards. These judgments are based on U.S. laws and regulations, and on KPMG's knowledge and experience in understanding relevant guidance presented by leading industry policy groups. There is no guarantee, however, that KPMG's views will concur with those of regulators or law enforcement, and therefore, KPMG makes no representation regarding the same.

During the course of the assessment, KPMG was provided with various documents and explanations. If further documentation or explanations come to light after the issuance of our report, KPMG reserves the right to, but is not obligated to, amend its findings, recommendations, or considerations for enhancement.

This report provides the results of KPMG's independent assessment of the Diocese's Compliance Program as it existed at the time of its assessment. The observations and recommendations of KPMG as presented in this report are based on the procedures performed as described in the Methodology herein, and on the information supplied by the Delegate of Ministerial Conduct, Diocesan and Parish employees, and the analysis of the relevant documents provided at the time of our request. Were KPMG to perform additional procedures, or should the information provided be inaccurate for any reason, it is possible that our assessment and observations would be different.

This report and its exhibits are not intended for general circulation or publication, nor are they to be reproduced or used for any purpose other than that outlined in our engagement letter dated May 4, 2005, without prior written permission from KPMG in each specific instance. KPMG disclaims any responsibility or liability for losses, damages, or costs incurred by anyone as a result of the unauthorized circulation, publication, reproduction, or use of this report or its exhibits contrary to the provisions of this paragraph.

## II. Executive Summary

In 2008, the Diocese of Manchester reached a point of significant accomplishment in its development of a Safe Environment (SE) Program for the protection of minors. Over the last four years the Program has evolved from its early existence as a mere obligatory response to the Agreement, to a fully functional, well staffed, and reasonably effective compliance program. The Program has become a deliberate and strategic mechanism for the screening and training of Diocesan personnel, reporting of allegations, and, ultimately, for the protection of minors.

Moreover, in 2008 KPMG observed a continued and enhanced commitment to cooperation, responsiveness, and openness by members of the Office of Ministerial Conduct (OMC) regarding KPMG's assessment. The SE Program's leaders displayed an improved level of candor in acknowledging the accomplishments of the past four years as well as clearly recognizing specific challenges that still remain. Further, there appeared to be an acceptance that outside perspectives and expertise in governance are essential and must be consulted to achieve the desired state.

As summarized below, this year's notable accomplishments should be recognized and balanced against the challenges the Diocese still must overcome before reaching a point at which it can consider its Program as having completed both its near- and long-term goals. Although some instances of noncompliance still exist, the Program has evolved to a point where such instances can and are, for the most, part being detected.

### Self-Assessment and Remediation

One of the Diocese's most significant accomplishments, since the Program's inception and most notably this year, has been recognizing the need and importance of continual self-assessment (and where necessary, remediation) of the Program and its many components. A key example was noted in response to the Diocese's regular field testing this summer, where the Diocese appropriately identified and responded to challenges relating to noncompliance issues at a camp. In response to the issues identified, the Diocese has taken steps to ensure that by December 2008 a plan will be in place to address the situation, including the hiring of a full-time, paid SE Coordinator for the camp (formerly a part-time volunteer position) who will be responsible for achieving compliance prior to the next summer session.

In addition, the Diocese has recognized the need to assess the current policies, procedures, and protocols in place and to make revisions and/or provide supplements thereto on a continual basis. For example, a key revision of the Screening and Training Protocol this year was the elimination of military clearances as an acceptable substitute for a full criminal record check. In addition, the Diocese enhanced its investigative protocol, which now requires the immediate removal from ministry of an accused individual if the accusation is deemed to have a semblance of truth. The investigative protocol also includes the formalization of a time line for initiating an investigation after receipt of an allegation (i.e., within 72 hours). Further, the Delegate and Associate Delegate have submitted a memorandum of recommendation to the Bishop requesting the development of a procedure to formally document in personnel files decisions relating to the reassignments of priests.

### Enhancements to SE Database

The development of the Diocese's SE Database to identify and track the status of several thousand employees and volunteers is a remarkable achievement from four years ago, when the ability to do so was nonexistent. During this assessment year, the Diocese notably demonstrated its commitment to continually enhancing the SE Database through the addition of enhanced access controls. For example, going forward, an individual's status can no longer be changed to "active" unless all SE requirement fields have been completed. Also, only Administrative Users have the ability to enter information for certain fields (i.e., Criminal Record Release (CRR), *Protecting God's Children* (*PGC*) training), a control designed to prevent an SE Coordinator from inappropriately filling in all fields for the sole purpose of making an individual "active," allowing for a level of checks and balances through the segregation of duties. In response to identified anomalies, the Diocese has retained an outside firm to test the SE Database so that these, too, can be identified and addressed efficiently and systematically.

Further, the Diocese has implemented a series of database exception reports mirroring the specific requirements of the Screening and Training Protocol, designed to monitor compliance. A system for the regular performance of these reports now allows the Diocese to identify and remediate issues of noncompliance on a timely and ongoing basis.

Despite significant additions and enhancements this year, there remain some gaps as well as opportunities for further improvement, as identified in the Findings and Recommendations sections of this report. The Diocese must focus on these areas diligently in order to ensure the ongoing success and sustainability of the Program. Some critical areas for improvement include:

### Communication

An information chasm appears to exist between the Program's reporting and compliance functions which, if not remedied, may undermine the Compliance Coordinator's full effectiveness and ability to understand the true risk environment. Specifically, the Compliance Coordinator needs to be briefed with regard to the details and specifics associated with allegations and resulting investigations. In order to maintain a holistic program, this information must be incorporated into the overall compliance program through both its ongoing risk assessment and monitoring processes.

### Accountability and Enforcement

The Diocese must focus on the enhancement of accountability of Program leaders for the compliance of Diocesan employees and volunteers. Based upon its volunteer structure, the Diocese faces some very unique challenges that it must continually address. In particular, the Diocese is facing challenges in ensuring that volunteers meet the screening and training requirements. KPMG noted specific challenges with groups such as scout volunteers, who are apparently reluctant to comply with Diocesan requirements because they undergo similar screening and training with the Daniel Webster Council. While the Compliance Coordinator is actively working with leaders of the various Diocesan volunteer groups to resolve this issue, noncompliance by these individuals remains a gap and a potential risk to minors. For example, at one site the Compliance Coordinator identified 34 scout volunteers actively working with minors, 18 of whom (52.9 percent) had not completed any SE Program requirements and were not listed in the SE Database at all.

An additional challenge in the area of accountability lies with SE Coordinators who, for the most part, serve in their roles as part-time volunteers, rather than paid employees. For example, the Diocese has been faced with some individuals who are nonresponsive and others who acknowledge they have not read the Program's Code, Policy, or Protocol, despite their compliance roles and responsibilities. While limited in its abilities to hold volunteer SE Coordinators accountable for their roles, the Diocese recognizes this as an area for concern and is evaluating ways to address it. The establishment of a Disciplinary Policy and its observed use this year in certain instances holding these volunteers accountable appears to be gaining momentum and may assist in this regard.

### Program Refinements and Vigilance

Over the Program's four-year evolution, the Diocese has appropriately developed and enhanced many policies, procedures, and controls; however, the Diocese must continue to be vigilant in identifying and addressing gaps to ensure the Program operates effectively. For example, there is still no formal policy for a time frame to identify an individual in the SE Database as "restricted" from working with minors and, as a result, KPMG found it has taken anywhere from 2 to 98 days to input the restriction that would alert other Diocesan entities of such a restriction. A formal policy requiring the *immediate* flagging of an individual as restricted within the SE database (either in response to an allegation or an issue detected during the screening process) is necessary so that those individuals cannot gain access to minors through other Diocesan entities. Further, the Policy should specifically define the term "immediate" so that such time frames are clearly articulated and accountability can be fostered.

In addition to certain policy refinements, there is also a continued need to further define certain Program parameters, such as documentation of an official start date within the SE Database, so that compliance with the Screening and Training Protocol can be accurately monitored and, thus, enforced. Currently, those responsible for enforcement do not have a clear indicator from which to measure compliance and, through discussions with KPMG, have described their uncertainty of these measures.

There are certain SE Program processes that also require refinement. For example, although the Diocese has improved significantly on its policy and implementation around conducting criminal record checks, it must still improve upon the process for conducting out-of-state criminal record checks. KPMG

found that 33 percent of files tested had an indication of out-of-state residence,[2] but file documentation only noted a New Hampshire criminal record check; thus it was unclear whether these individuals, who were working with minors, had undergone out-of-state criminal record checks in accordance with Screening and Training Protocol requirements.

Finally, the Diocese must focus on the need for enhanced access controls within the SE Database, specifically, those designed to prevent an entity from reentering an individual into the SE Database once identified as restricted.  KPMG's testing revealed it is possible to circumvent the controls in place to create a new SE Database entry for an individual who has previously been restricted from ministry, thereby allowing such an individual to work with minors without the OMC's awareness.

Despite these continued challenges, however, the Program's evolution over the past four years has been one of progressive change.  Most notably, the vision for the Program, and specifically the Diocese's role in overseeing the Program, has evolved from an advisory capacity to one of leadership, attempted accountability and enforcement.  The Diocese now demonstrates that it recognizes the need to establish the proper tone at the top as well as monitor for, and enforce, compliance with its policies and procedures.  This recognition will allow for the sustained institutionalization of the Program through furtherance of the established compliance culture throughout the Diocese.

---

[2] Individuals had indicated they lived out-of-state in the previous five years and, thus, were required to undergo an out-of-state criminal record check in accordance with the Screening and Training Protocol.

## III. Methodology

### A. Overview

Consistent with the methodology employed during the three prior annual Program assessments, KPMG's methodology for this assessment again included: 1) evaluating and analyzing Diocesan policies, procedures, standards, and relevant correspondence; 2) conducting site visits and performing testing of documentation there and at the OMC; and 3) interviewing appropriate Diocesan and parish personnel who have responsibility for the Program. The documents analyzed and the practices described to us by Diocesan and Parish personnel are collectively referred to as "the Program" for purposes of this report.

For further details on the scope, level, and context of KPMG's Program Assessment methodology utilized with regard to the 2008 assessment, please refer to **Exhibit 1** attached hereto.

## IV. Assessment of the Diocese of Manchester's Safe Environment Compliance Program

### A. Organizational Structure and Oversight

#### 1. Requirements of the Agreement

In relation to the Diocese's Compliance Program and, more specifically, its organizational structure and oversight, the Agreement requires that the Diocese "maintain [its] existing Office of the Delegate for Sexual Misconduct as an appropriately trained and easily accessible office dedicated to the handling of allegations of sexual abuse of minors."[3]  The Agreement also specifies that the Diocese shall "continue to develop, implement, and revise, as necessary, policies and protocols for preventing, responding to, and ensuring the reporting of allegations of sexual abuse."[4]  Furthermore, the Diocese is required to provide copies of its policies and protocols to the Attorney General on an annual basis, or as otherwise requested by the Attorney General.

#### 2. Industry/Organizational Guidance

The United States Sentencing Commission's Federal Sentencing Guidelines (the Guidelines) provide the most widely accepted guidance for the design and implementation of an effective compliance program.  In establishing an effective compliance program, the current Guidelines emphasize that organizations must not only "exercise due diligence to prevent and detect criminal conduct," but also "otherwise promote an organizational culture that encourages ethical conduct and a commitment to compliance…"[5] the minimal requirements of which are set forth in the Guidelines.[6]

Specifically, the Guidelines require the development of compliance standards and procedures to prevent and detect criminal conduct, which, according to Application Note 1, are further defined to include the establishment of "standards of conduct and internal controls that are reasonably capable of reducing the likelihood of criminal conduct."

Secondly, the Guidelines require the assignment of "overall responsibility to oversee compliance" to a specific "high-level" individual within the organization.  This individual is charged with not only being "knowledgeable about the content and operation of the compliance and ethics program," but also "exercis[ing] reasonable oversight with respect to the implementation and effectiveness" of the Program.[7]  The Guidelines make clear that while operational responsibility may be delegated, overall responsibility for the Program's effectiveness must remain with the high-level individual assigned.[8]

In delegating day-to-day responsibility, the Guidelines require that the individual to whom such responsibility is given (1) report to organizational leadership and the Program's governing authority at least periodically and (2) be given adequate resources, appropriate authority, and direct access to the governing authority or an appropriate subgroup of the governing authority.[9]

#### 3. Program Overview

##### a. Policies and Procedures

Since the Program's inception in 2002, the Diocese has progressed each year in the development, documentation, and implementation of an adequate set of policies and procedures, and has made the necessary enhancements of its SE Program where recommended, as reflected in KPMG's prior Program Assessment Reports.  Since the most recent KPMG Program Assessment Report, the Diocese of Manchester has updated and enhanced several of the Program's key policies and procedures and has developed and implemented several new policies and procedures as detailed below.

---

[3] Agreement at §3

[4] Id.

[5] United States Sentencing Commission, <u>Guidelines Manual</u>, §8B2.1 (November 2008)

[6] Id. at §8B2.1(b)

[7] Id. at §8B2.1(b)(2)(A)

[8] Id. at §8B2.1(b)(2)(B)

[9] Id. at §8B2.1(b)(2)(C)

*Screening and Training Protocol*

In the last year, the Diocese reviewed and revised its Screening and Training Protocol and put a new version into effect on July 1, 2008. The prior Screening and Training Protocol was effective from July 1, 2007 to June 30, 2008. Appropriately, several of the changes made to the Protocol address KPMG's recommendations from prior reports including (1) prohibition of the acceptance of other types of background checks (i.e., military clearances) in lieu of state-provided criminal background checks,[10] and (2) the integration of requirements for "developmentally or cognitively disabled adult volunteers" and "temporary" employed students, for example.[11] Additional detail is provided in the findings below.

Since KPMG's 2007 assessment, the Diocese has also created a "Screening and Training Protocol – Frequently Asked Questions" document, a valuable tool that addressed certain portions of the Protocol in greater detail.

**Compliance Coordinator Policies and Procedures**

The Diocese has continued to document new key policies and procedures applicable to the administration of the Program, including the roles and responsibilities of the OMC that are not specifically covered within the Code and Policy or the revised Screening and Training Protocol. New materials that have enhanced the Program and addressed some previous gaps include:

1) Report Follow-Up Procedures (beta test version, November 2007)

2) EC Week Safe Environment Review Procedures (v 1.0, January 2008)

3) Recent Upgrades to the Online Safe Environment Database (January 2008)

4) SE Review Binder, Tab Divider Filing Instructions (v 1.0, February 2008)

5) OMC File Management Policy (v 1.0, April 2008)

6) SE Review Binder Checklist (v 2.0, June 2008)

7) Directions for Completing the Site Re-Visit Section of the Risk Matrix (v 1.0, July 2008)

8) Best Practices for Safe Environment Coordinators (October 2008)

9) Procedures for Responding to Suspected Illicit Use of Electronic Media – Draft (undated)

10) Site Review Binder Checklist (undated)

11) DOM Version Tracking Spreadsheet (Beta version, June 2008)

The Diocese has also continued to review and update existing policies and procedures as necessary. Updated materials include:

1) Preparation for Site Revisits (v 2.0, July 2007)

2) Sample Interview Questions for Site Visits (v 4.0, July 2007)

3) Report and Reconciliation Log (Beta version 2.0, August 2007)

4) SE Camp Review Procedures (v 2.0, September 2007)

5) SE Review Plan (v 2.0, December 2007)

6) Exit Sheet – Missing Items Form (v 3.0, January 2008)

7) Letter Template to Coordinate Site Visit (v 3.0, January 2008)

8) Test Procedures – Employees (v 2.0, January 2008)

9) Test Procedures – Volunteers (v 2.0, January 2008)

10) How to Check the National Sex Offender Registry (v 3.0, June 2008)

---

[10] KPMG's 2007 Program Assessment Report, Recommendations IV C.1.e.9; pg. 26

[11] Id., Recommendations IV A 5.a.1; pg. 11

11) Verification Form – Schools 2008-2009 (v 2.0, July 2008)

12) SE Review Worksheet (v 5.1, August 2008)

13) Rules of the Diocesan Review Board (v 3.0, October 2008)

### Diocesan Review Board Procedures

During the current assessment year, the Diocesan Review Board (DRB) and the Bishop held a joint meeting to discuss the role of the Board.[12]  At this meeting and at subsequent regularly scheduled DRB meetings, the DRB members offered suggestions on ways in which the DRB's role could be enhanced.  A selected DRB member and the Diocese then worked together to draft each of the following new policies and procedures:

    a.  Diocesan Review Board Compliance Audit Instrument (v 1.0, February 2008)

    b.  Rules of the Diocesan Review Board (v 3.0, July 2008)

KPMG noted there were no changes or updates to the Orientation Manual for new DRB members that was developed in the previous assessment year.

**b.  Organizational Structure and Oversight**

### Bishop

As is appropriate, Bishop McCormack continues to have ultimate responsibility for the Diocese's Compliance Program, but is assisted by various Diocesan offices, each designed to serve a unique role as discussed below.

### Office for Ministerial Conduct

The OMC remains in charge of the day-to-day implementation and administration of the SE Program.  During the past four assessment periods, the OMC has progressively instituted numerous enhancements and has greatly expanded and improved the SE infrastructure.  It has grown from an office staffed with only the Delegate and the Associate Delegate to an office that includes a Compliance Coordinator as well as a full-time SE Assistant.  In addition, the OMC also periodically employs two consultants (a CPA and a Database Administrator) and various other temporary employees on an as-needed basis throughout the year.  Formalized position descriptions define the roles of key employees and assign responsibilities, enhancing accountability.

During the past four years, the OMC has moved from a Program that relied largely on self-reported information to a Program evidenced by actual field visits that are supported by document retention, review, and verification.

As previously noted in 2007, the OMC took the positive step of incorporating a risk-based approach to its Program.  This has helped the OMC continue to focus its efforts and resources in the most efficient and effective manner possible, contributing to the ongoing sustainability of the Program.  The Risk Assessment Matrix that was developed to quantify the risk level associated with each parish and school and to prioritize scheduled revisits continues to be a key tool for identifying areas of both increased risks and areas in need of greater effort and adherence to the Program policies and procedures.

### Diocesan Review Board

The DRB remains an advisory body, appointed by the Bishop of Manchester, and continues to perform the following functions: 1) advise the Bishop in his assessment of the findings of preliminary investigations into allegations of sexual abuse of a minor by Church Personnel; 2) advise the Bishop in his assessment of allegations of sexual exploitation and sexual harassment by Church Personnel; 3) review Diocesan policies for dealing with sexual abuse, exploitations, harassment, and inappropriate conduct involving minors; 4) conduct regular compliance audits of

---

[12] See discussion of this meeting in Section E below.  At the 9/6/07 DRB meeting and the 10/24/07 Safe Environment Council Meetings, both bodies dismissed KPMG's 2006 recommendation that the DRB and the Diocese conduct a joint self-evaluative process to determine whether or not the DRB is sufficiently responsive to the needs of the Diocesan community.  However, KPMG believes that the content of the DRB meeting on 9/6/07 satisfies the goal of the recommendation.

the Office for Ministerial Conduct; and 5) offer input to the Delegate for Ministerial Conduct regarding the background screening of lay applicants, employees, and volunteers.[13]   The Board drafted new rules, which were presented for approval in July 2008.  Its overall mandate remains largely the same as when it was established in 2002; please see **Section IV E** on Auditing/Testing of the Program for additional details.

### Office for Healing and Pastoral Care

The Office for Healing and Pastoral Care continues to provide support to those who report having been sexually abused by church personnel and to the families of those who have been sexually abused by church personnel.[14]   Such support includes: referrals to counseling, spiritual direction, parish consultation, and retreats.

### Pastors, Principals, and Camp Directors

The fourth version of the Screening and Training Protocol (effective 7/1/07), assigned pastors, principals, and camp directors direct responsibility for ensuring that all volunteers, employees, and contractors were in compliance with the SE Screening and Training requirements.  Although SE Coordinators continue to assist these individuals with their responsibilities, ultimate accountability now rests with the pastors, principals, and camp directors.[15]   KPMG noted that the newest draft of the Screening and Training Protocol, which went into effect on 7/1/08, continues to assign this responsibility to these individuals.

### Safe Environment Coordinators

SE Coordinators continue to assist pastors, principals, and camp directors in fulfilling their SE duties, as discussed in the section above.  The SE Coordinators typically manage the day-to-day tasks associated with the SE Program, including distributing and collecting forms for new employees and volunteers, sending completed Criminal Record Release (CRR) forms to the OMC, notifying employees and volunteers of upcoming *Protecting God's Children* (*PGC*) trainings, maintaining records of compliance, and updating the SE Database.

4. **Findings**

   a. **Policies and Procedures**

   1. The new Screening and Training Protocol (July 1, 2008) expands applicability to include athletic coaches and substitute teachers and further defines "regular and continual basis" for working with minors.  The new Screening and Training Protocol also includes specific SE training procedures for developmentally or cognitively disabled adult volunteers and temporary student employment.   These changes to the Protocol address, in part, KPMG's 2007 recommendation (IV A 5.a.1) that screening procedures for athletic coaches, substitute teachers, and developmentally disabled adults (that previously existed outside of the Screening and Training Protocol) be incorporated into the Screening and Training Protocol to ensure that SE Coordinators are familiar with this additional guidance.  Refer to **Section IV C 1 c** below for a detailed description of changes made to the Protocol.

   In 2006, KPMG recommended the Screening and Training Protocol include a timetable for recertification of screening requirements.**[16]**   While the current Screening and Training Protocol requires a National Sex Offender Public Registry (NSOPR) check be reperformed every three years, it does still not include a timetable for recertification for other screening requirements, such as criminal record checks.   KPMG also noted that the 2008 Screening and Training Protocol omits the requirements included in a previously stand-alone version for the protocol on

---

[13] Diocese Child Safety Web site 6/18/08.  http://www.catholicnh.org/about-us/consultative-groups/diocesan-review-board/?search=Diocesan%20Review%20Board

[14] Diocese Child Safety Web site 6/18/08.  http://www.catholicnh.org/child-safety/how-the-diocese-works-to-protect-children/office-for-healing-and-pastoral-care/

[15] Diocese of Manchester Screening and Training Protocol for Church Personnel, effective 7/1/08

[16] KPMG's 2006 Program Assessment Report, Recommendation IV C 1.e.6; pg. 34

one-time overnight chaperones, which required completion of all screening and training requirements, including a criminal records check, prior to participating as an overnight chaperone.

2. The OMC has appropriately continued to develop new policies and procedures relating to the Diocesan site revisits in order to facilitate consistency. This is especially beneficial as several individuals now conduct the reviews, rather than solely the Compliance Coordinator. An overview of the site visit process is included in the SE Review Plan. The Diocese has also appropriately created policies and procedures describing the DRB's role and responsibilities, including its audits of the OMC. These positive steps and the ongoing process of documenting the Diocese's procedures and practices is critical in ensuring the sustainability of the SE Program, going forward.

3. The Diocese has begun development of a system for tracking and communicating best practices in several manners. Best practices that are observed during Diocesan site visits are often highlighted in the SE Reports; these include, for example, effective filing systems and efficient methods for having employees and volunteers complete their SE requirements. In addition, best practices are now communicated on the Diocesan Child Safety Web site, through the Diocesan electronic newsletter as well as informally during site visits. The Diocesan Child Safety Web site also shares the best practices of experienced SE Coordinators.

   In these ways, the Diocese has mostly fulfilled its Action Plan III goal of developing a "mechanism to enhance the current [best practices communication] system in place to accumulate, organize, and communicate the 'best practices' that are identified during site visits." However, KPMG found during its site visit interviews in May and October, that SE Coordinators were not familiar with any formalized system of communicating SE Best Practices and could not describe whether the Diocese had been communicating SE Best Practices to them.

4. The Program has been enhanced through greater oversight and more formal accountability. The Diocese has continued to update the job descriptions of those involved in the SE Program, including the Delegate, the Associate Delegate, the Diocesan Compliance Coordinator, and the SE Assistant, which corresponds with a 2005 recommendation.[17] Current job descriptions detail each position's specific roles and responsibilities under the Program.

   While the Diocese developed the SE Disciplinary Procedures (July 15, 2007 Release 1.0) as a mechanism for enforcement of the Program's mandates, KPMG's 2007 recommendation IV A 5.a.3 noted that these procedures should include specific timetables for disciplinary measures and enforcement actions. In response, site visit tools such as the SE Review Worksheet and the Site Review Binder Checklist were updated to include a specific timetable of 10 days for escalation to the Delegate or Superintendent of Schools after a pastor or principal fails to confirm that certain individuals have been notified that they are ineligible to work with minors until missing requirements are completed. Although the disciplinary policy does not include specific timetables for disciplinary measures or actions that should occur after these 10 days have elapsed, it does specify that the Cabinet Secretary or Superintendent will address the issue with the individual, outline corrective action steps, and establish a time line in which to correct the problem.

5. The Diocese's Procedures for Responding to Suspected Illicit Use of Electronic Media were drafted this year by a Diocesan investigator who has experience working in this area. KPMG noted that these Procedures were developed after the Delegate informed the DRB that Priest 3543 would be returning to service after treatment of his past use of electronic media to view adult pornographic material. The documented procedures are meant to assist Church Personnel in recognizing how computers and electronic devices may be abused to view and/or store illicit material, as well as to provide guidance on securing computer evidence for examination. It defines illicit use and states that no one is permitted to use or possess Internet

---

[17] KPMG's 2005 Program Assessment Report, Recommendation IV A 5.e, pg. 15

pornography via church equipment.[18]   The purpose of this document is to raise awareness among Church Personnel and to facilitate a policy of accountability surrounding these matters.

6.   The Diocese has developed a formal version control system whereby it tracks about 80 Program-related documents.   The system tracks date and version number of Diocesan SE documents in addition to their file type (e.g., Word, PDF, and Excel®) and document type (e.g., Policy, Procedure, Form).   Version control systems are helpful in tracking changes, identifying when documents were published and first put into use, providing users with greater clarity, and supporting an environment of ongoing compliance.   It does not appear, however, that a formal protocol for review and update of this system has been developed.   A tracking spreadsheet was provided in beta version dated June 2008 and does not appear to have been updated since then.   Having a formal protocol in place for management of this system will help to ensure it will continue to successfully serve its purpose.

**b.   Organizational Structure and Oversight**

7.   KPMG found there continues to be evidence of regular oversight and ongoing coordination between the Bishop, the members of the OMC, and Pastors, Principals, Camp Directors, and SE Coordinators with regard to the Program.   For example, as noted above, the Bishop and DRB continue to receive reports from the Compliance Coordinator on a near monthly basis.[19]

8.   The Delegate appropriately recognizes the need for ongoing self-evaluation of the SE Program in order to support its future sustainability and effectiveness.   While there is currently no plan formalized or documented in place to continue the practice of developing annual Action Plans as a method for evaluating and enhancing the Program in the future, the Delegate has acknowledged the value of such a mechanism and has expressed his intent to consider and implement this going forward.

9.   In accordance with its own Action Plan III, the Diocese has enhanced its SE Risk Assessment procedures by developing more detailed instructions for its Risk Assessment Matrix and by creating an annual Site Revisit Summary Report.[20]

The Compliance Coordinator conducts the enterprise-wide Risk Assessment by incorporating site revisit Risk Assessment Matrix results, her own professional judgment, and input from other site reviewers to categorize each entity as Satisfactory, Needs Improvement, or Unsatisfactory.   For those completing the revisit section of the Risk Assessment Matrix, the new instructions provide specific guidance in determining which ratings should be assigned to each entity.   KPMG found that instructions provided for in the underlying risk assessment matrix still leave too considerable an amount of discretion up to the reviewer when deciding what rating should be assigned to each entity.

The Compliance Coordinator also uses the annual Site Revisit Summary Reports to develop a risk-based Site Revisit Plan for the year ahead.   Sites categorized at the end of prior years as Unsatisfactory will be subject to a current year review; also, sites that were categorized as Satisfactory in 2006 a review during the 2008-2009 review year.

The Diocese has further enhanced its SE Risk Assessment procedures by developing tools such as the 2007–2008 Site Revisit Exception Analysis — a statistical analysis in which the error rates of each compliance element was calculated for each entity in addition to an enterprise-wide error rate for the 2007–2008 visits as a whole.

10.   During the 2008 assessment period, the Bishop and the DRB conducted a joint self-evaluative meeting to determine whether the DRB is sufficiently accountable and responsive to the needs of the Diocesan Community.[21]   Based on KPMG's assessment of the minutes of this meeting,

---

[18] Procedures for Responding to Suspected Illicit Use of Electronic Media – Draft (undated)

[19] KPMG noted that there does not appear to be a report for the month of September 2007; however, there does appear to be documentation for all other months.

[20] The Diocese of Manchester, Office for Ministerial Conduct, Safe Environment Review Plan v. 2.0, 12/1/07

[21] This appears to be in response to KPMG's 2006 report recommendation V A 5.h (pg. 18).   While minutes of both DRB and SE Council meetings found this recommendation to be unnecessary, KPMG noted that the content of the DRB's 9/6/07 meeting appears to address it.   It also appeared as a 2006 Diocesan Action Plan II item.

the DRB members' active participation resulted in the formalization of SE Program audit procedures, as well as a revision to the DRB rules (refer to report **Section IV E 4**, Auditing/Testing of the Program, Findings for further details).

11. During the November 2008 interviews at the OMC, it became apparent that a potential communication gap exists around incident reporting between information provided to the Compliance Coordinator and information known by the Delegate.  It appears that the Compliance Coordinator is not privileged to details of investigative matters, including the names of accused priests or the location at which investigative matters are arising.  As a result, the Compliance Coordinator is not receiving information such as reporting or violations trends (e.g., accused priests or outcomes of criminal records check investigations) that might significantly impact the results of an entity's risk assessment.  It is critical that the Compliance Coordinator be aware of all potential violations and reporting matters.  Such information should be integrated into the compliance Program's overall risk assessment.

**5.  Recommendations for Program Enhancements**

   ***a.  Policies and Procedures***

     1.  In its next revision of the Screening and Training Protocol, the Diocese should ensure that it includes the requirement that one-time overnight chaperones complete all screening and training prior to working with minors.

     2.  The Diocese should continue to develop and enhance its Program to share best practices to facilitate their use by Program constituents.  To do this, best practices materials should be inventoried, indexed, and periodically and comprehensively reviewed by both the Compliance Coordinator and other members of the OMC to determine whether items are current or require updating based on new challenges, issues, and/or procedures.

     3.  The Diocese  should continue to enhance the SE Disciplinary Procedures so that they include specific disciplinary measures and enforcement actions that will be taken in response to a pastor's, principal's, or camp director's failure to ensure compliance with the requirements of the Program, up to and including separation from employment, for example.  To further enhance the effectiveness and comprehensiveness of the Disciplinary Policy, the Diocese should consider the inclusion of specific, illustrative examples that might result in disciplinary measures.

     4.  To avoid confusion, forms created and distributed going forward should have unique names, instead of being called "verification forms," so that they are easily identifiable.

**b.  Organizational Structure and Oversight**

     5.  Ongoing self-evaluation of the Program and all of its elements is critical to its future effectiveness and sustainability.  The Diocese should develop a formalized policy and procedure around the annual evaluation of its Program and subsequent development of action plans to implement enhancements.

     6.  KPMG commends the Diocese for developing a Site Revisit Summary Report and accompanying Site Revisit Summary Report guidance.  The Diocese should continue its efforts and continuously work to evaluate and refine its risk assessment protocol and accompanying forms and instructions.  In July 2009, when the matrix is next scheduled to be reviewed and updated, instructions should be further refined so that reviewers are provided with even more explicit rating guidelines.  This will help standardize revisit results and provide a baseline that will enable the OMC to more reliably compare site revisit results from year to year and across entities.  The Diocese should also reevaluate its rating system to determine whether it is effective as adopted.  KPMG suggests defining uniform rating categories based, in part, on numerical findings (e.g., X% of Acknowledgements Outstanding = a 2).  The revised matrix and instructions for use should be structured such that the arbitrary use of undefined ratings is eliminated.  The proper structuring of a successful tool will ensure that its implementation is approached and executed consistently over a sustainable period.

7. The Diocese should ensure the Compliance Coordinator is fully briefed on a regular basis with regard to violations and reporting matters by conducting regularly scheduled, confidential meetings during which the identities of both individuals and entities involved in these matters are discussed. During these meetings, the Delegates and the Compliance Coordinator should also discuss trends such as the rate of return on criminal records checks with negative information, which will facilitate a greater level of awareness and allow for the aggregation and measurement of such data. These measures will allow the Compliance Coordinator to incorporate trends and specific risk factors allowing for a more holistic assessment of all Diocesan entities. This will also be a tool to measure the overall success and will drive quality assurance of the Program and its individual elements.

8. The Diocese should consider ways to potentially enhance the accountability of its SE Coordinators by, for example, providing them with a stipend or compensation, which would allow the Diocese greater leverage to implement and follow through on disciplinary matters. The Diocese might consider a pilot program in which it hires one SE Coordinator to be responsible for the entities in a particular region, testing its effectiveness before implementing such a measure Diocese-wide.

## B. Mandatory Reporting and Response

### 1. Mandatory Reporting

#### a. Requirements of the Agreement

The Agreement mandates that all church personnel serving in the Diocese must follow the mandatory reporting obligations (as set forth in RSA 169-C-:29 to C-:32) whenever they have reason to suspect a minor has been abused or neglected.[22] In addition to the requirements of New Hampshire State Law, church personnel must also report to local law enforcement (either where the incident occurred or where the suspect is currently located) if they have reason to suspect any other Diocesan Personnel has sexually abused a minor, even if the identity of the alleged victim is unknown or if that person is no longer a minor.[23] Further, the Office for Ministerial Conduct must make an immediate oral report to local law enforcement where the suspected abuse may have occurred if it has reason to suspect that an individual was sexually abused as a minor, and the alleged victim is no longer a minor, regardless of whether or not the alleged abuser is named or identified.[24] In addition, the Agreement, as written, requires that all Church Personnel are required personally to make reports directly to the Division for Children, Youth, and Families (DCYF) and local law enforcement.[25]

#### b. Industry/Organizational Guidance

While, as indicated above, the Diocese is required to report allegations of sexual abuse, industry guidelines also encourage organizations to voluntarily report detected misconduct.[26] Furthermore, under the Federal Sentencing Guidelines, such voluntary reporting or disclosure of misconduct or violations is most crucial and considered to have the greatest weight when the misconduct or violation might not have been discovered otherwise.

#### c. Program Overview

The Diocese continues to maintain the OMC as a centralized location for the receipt of calls relating to its Program, including the reporting and reconciliation of allegations regarding the possible sexual abuse of minors by church personnel. Telephone calls to the Office are answered by the Executive Secretary, Delegate for Ministerial Conduct, who immediately transfers callers reporting abuse allegations to the Delegate, Associate Delegate, Office for Healing and Pastoral Care, or another properly trained Diocesan representative. The Diocesan representative receiving the call is then responsible for logging the call and completing a Civil Authority Report Form and for

---

[22] Agreement at §2(a)

[23] Id. at §2(b)

[24] Id. at §2(c)

[25] Id. at §2(a) and §2(b). See discussion of change to Agreement in Section C – Program Overview

[26] United States Sentencing Commission, Guidelines Manual, §5.K.2.16

notifying outside counsel.  The Diocesan attorney is then responsible for the actual notification to the Attorney General's Office about the allegation/report.

KPMG has noted several improvements surrounding the policies, implementation, and documentation of the mandatory reporting requirements over the course of its four assessments. Most notably, the Code and Policy now requires that church personnel immediately and personally report any suspicions of abuse in which the alleged victim is still a minor to DCYF, to local law enforcement, and to the Delegate for Ministerial Conduct.  The Policy also requires church personnel to immediately and personally report any suspicions of abuse in which the alleged victim is no longer a minor to the Delegate for Ministerial Conduct.

Significant improvement has also been noted in the controls surrounding reports.  The Diocese now conducts two reconciliations of its reports to 1) those received by the Office of Healing and Pastoral Care (Internal Reconciliation) and 2) those received by the New Hampshire Attorney General (External Reconciliation) to ensure that all reports are received by the Attorney General's Office.  The Diocese has also reconciled all past reports made subsequent to the date of the Agreement, December 10, 2002.

According to the Diocesan documentation provided, in the one-year period between 7/24/07 and 7/24/08, the Diocese received ten allegations of alleged sexual abuse of a minor reported on 10/12/07, 11/23/07, 12/3/07, 12/3/07, 12/3/07, 3/4/08, 3/13/08, 4/6/08, 4/18/08, 4/29/08.[27]  The incidents reportedly occurred at varying times between 1964 and 2008.  KPMG noted that two of the ten allegations (reported on 10/12/07 and 4/6/08) concerned individuals who were minors at the time of the allegation.  However, upon further Diocesan investigation, both allegations concerning these minors were found to be unsubstantiated.

**d.  Findings**

1.  During visits to five Diocesan sites in 2008, KPMG confirmed that all SE Representatives interviewed knew, at a minimum, to contact the OMC in the event of an allegation.  At these five sites, the SE Representatives were not aware, however, of their responsibility to report incidents of suspicions of abuse directly to local authorities and DCYF, as required by the Policy.

   For example, during site visits, KPMG learned of an instance in which a Pastor was consulted by the parents of a minor, who was allegedly abused outside of a Diocesan setting, for the best way to address their child's needs.  The parents advised the Pastor that the incident had already been reported and, therefore, the Pastor felt he did not have an obligation to report the matter to either the Diocese or DCYF.

   The Pastor's failure to report this suspected abuse would be considered a violation of the Diocesan Policy, which requires adults to follow New Hampshire state law reporting requirements that "any adult" who has suspicions of abuse "must personally report" those suspicions to DCYF.  There are no provisions in this policy for incidents which may have already been reported or for those occurring outside of the Diocese's jurisdiction.  The OMC was unaware of this situation until discussions with KPMG in November; thus, it is not known what, if any, actions were taken in response to this incident.

**e.  Recommendations for Program Enhancements**

1.  The Diocese should continue to raise awareness of its mandatory reporting requirements to all Church Personnel.  While the Policy does allow Church Personnel to seek the advice or assistance of their pastor, principal, or supervisor in cases of possible abuse, it does not relieve that individual of his or her duty to personally report the allegation directly to DCYF. Additionally, the Policy notes that seeking such advice or assistance is only permissible if it does not result in an undue delay in filing a report.

---

[27] KPMG noted that two of the ten allegations involved the same victim, who made allegations against two separate priests in a single report.

## 2. Response to Allegations

### a. Requirements of the Agreement

The Agreement requires that, when the Diocese receives a complaint of sexual abuse, it will ensure that, "upon receipt of an allegation and pending resolution of the allegation, the alleged abuser will be removed from any position in which there is a possibility for contact with minors."[28] In addition, the Agreement provides that once a report has been filed with the proper authorities, the Diocese will cooperate completely in the investigation, supplying any and all information or documents relating to the alleged abuser in its possession.[29]

### b. Industry/Organizational Guidance

The Federal Sentencing Guidelines provide that organizations take corrective action when allegations are substantiated, which typically includes disciplining those who bear responsibility for the offense, remedying the harm caused by misconduct, and taking steps to prevent and detect similar violations in the future. It is also of note that the Guidelines give weight to voluntary disclosures to the government, leaving the potential for a reduction in sanctions for an organization that discloses violations and cooperates with enforcement authorities.

### c. Program Overview

#### *Investigations and Internal Reporting*

The Diocese has developed and implemented a new Investigative Protocol, effective July 2008. This new protocol for investigating allegations of sexual abuse of a minor states that upon receipt of an allegation of sexual abuse of a minor that has a semblance of truth, the Delegate and/or Bishop will "immediately" place the accused on "precautionary leave," pending an investigation.

The new protocol requires that within 72 hours after it is determined that an "ecclesiastical investigation will not interfere with any criminal investigation, the Delegate will initiate an investigation and appoint a trained investigator to gather evidence about the facts and circumstances of the allegations."

During the period from 7/24/07 to 7/24/08, the Diocese received ten allegations relating to the sexual abuse of minors reported on 10/12/07, 11/23/07, 12/3/07, 12/3/07, 12/3/07, 3/4/08, 3/13/08, 4/6/08, 4/18/08, and 4/29/08. Of these ten individuals, one was not placed on administrative leave, as the allegation against him was not found to have a semblance of truth (10/12/07 allegation). Three individuals were placed on precautionary administrative leave pending the outcome of an investigation (see further discussion in finding #2). Of the remaining six, two had previously left ministry (4/18/08 and 4/29/08 allegations) and four were deceased (11/23/07, 12/3/07, 12/3/07, and 12/3/07 allegations).

In addition, during the period under assessment, nine individuals were restricted from ministry. Six of these nine individuals were removed due to various allegations related to other forms of misconduct.[30] The remaining three individuals were found to be ineligible for ministry due to the results of criminal background checks. Two individuals had not yet begun service and were restricted from beginning work. One individual had already begun volunteering as a scout leader, but was subsequently removed.

As discussed above, three individuals were placed on precautionary administrative leave as a result of allegations related to the sexual abuse of minors during the current assessment year (allegations reported on 3/4/08, 3/13/08, 4/6/08). Diocesan investigation of the 3/13/08 allegation regarding the alleged abuse of a high school student in a Massachusetts town in 1969 is currently pending authorization by the Massachusetts and New Hampshire Attorneys General. Internal Diocesan investigations of the other two individuals found that the allegations against them did not

---

[28] Agreement at §2.f

[29] Id. at §2.e

[30] Not all of these allegations appear to involve the sexual abuse of minors; however, due to the nature of the allegations and results of follow up investigations, they have been deemed ineligible to work with minors.

have a semblance of truth. In each instance, the Diocese informed the New Hampshire Attorney General of the results of their investigations and that, in one case, one individual would be returning to service (4/6/08 allegation). KPMG noted that the second individual was retired at the time the allegation was made and remains so now that the investigation has been completed (3/4/08 allegation). The individual implicated in the 3/13/08 allegation will remain on precautionary leave until an internal investigation can be conducted.

### Remedial Actions Against the Accused

The Policy states that if an accusation of sexual abuse of a minor is either admitted to or it is established after an appropriate investigation that even a single act of sexual abuse has occurred, the individual accused will be permanently removed from any ministry. During the period under assessment, no accusations of sexual abuse of a minor were either admitted to or established as the result of Diocesan investigations.

According to the Diocesan documentation provided, in the one-year period between 7/24/07 and 7/24/08, the Diocese received ten allegations of alleged sexual abuse of a minor. However, none of these incidents were reported after the new Investigative Protocol became effective in July 2008.

In addition to the ten allegations discussed above, six individuals were removed from service during the assessment period due to allegations involving other kinds of misconduct. Three other individuals were deemed ineligible for service, during the assessment period, due to the findings from Diocesan screening procedures.

According to the Policy, once an individual is removed from ministry or deemed ineligible for service, the individual is moved to an inactive status. In some cases, but not all, a restriction will also be recorded in the SE Database, which is meant to ensure that a parish without personal knowledge of the restriction will not inadvertently allow a restricted individual to work with minors. There is, however, no written protocol around ensuring that individuals ineligible for ministry are marked with a restriction in the SE database. Further, there is no requirement that individuals on precautionary leave be listed as restricted in the SE Database.

d. **Findings**

### Investigations and Internal Reporting

1. The OMC's Investigative Protocol states that upon receipt of an allegation of sexual abuse of a minor that has a semblance of truth, the Delegate and/or Bishop will "immediately" place the accused on "precautionary leave." This protocol does not yet appear to have been disseminated to the broader group of SE Coordinators and other Diocesan constituents.

2. Appropriately, the Diocese has developed a policy which formalizes the start date of an investigation. According to this policy, the Bishop will initiate an investigation "within 72 hours after it has determined that the ecclesiastical investigation will not interfere with any criminal investigation." This policy does not, however, address KPMG's recommendations to develop protocols for case prioritization. Furthermore, the DRB, during its July 17, 2008 meeting to consider KPMG's 2007 Program Assessment Report recommendations, noted that a requirement to determine whether or not individuals had knowledge of, or should have been aware of, the alleged abuse but failed to report such abuse, "would liken itself to a witch hunt" and, thus, chose not to incorporate this element to its policy.

3. In a memorandum to the Bishop dated June 19, 2008, the Delegate and Associate Delegate proposed to the Bishop that the Vicar for Priest Personnel document his recommendations and the recommendations of the Priest Personnel Board regarding priest assignments in the form of a memorandum to the Bishop. In addition, the memorandum recommended that the documentation be maintained in the file of the priest who is eventually reassigned. The Diocese did not provide any additional documentation of any policy changes that would require the retention of such documentation supporting reassignments. The Diocese informed KPMG that no clergy who have reported allegations of sexual abuse have been transferred or given new assignments during the current period of assessment.

4. During the period under assessment, the Diocesan investigator has conducted investigations to help the DRB determine 1) the credibility of abuse accusations, and 2) whether or not particular

individuals were eligible to work with minors. During one of the second types of investigations, the Diocesan investigator conducted an interview with a scout leader who had been deemed ineligible for ministry due to the results of an unsatisfactory 10/22/07 background check. During the course of this interview, the individual told the Diocesan investigator that he had attended overnight retreats within the past year. According to KPMG's interview with the Associate Delegate, the retreats were non-Diocesan spiritual retreats that did not include the participation of minors. However, within the investigative report, there was no evidence of further investigation or follow up questions as to the nature of these retreats. This demonstrates the importance of clearly documenting all facts and circumstances in investigative reports.

### Response to Allegations

5. KPMG noted that three of the accused individuals who are still living and who have not yet been cleared of the allegations against them are not listed as restricted in the SE Database and thus represent a potential risk to children. Two accused have not been included in the SE Database at all and one has been included, but is not flagged as restricted. According to interviews with the Compliance Coordinator and the Delegates, there is no policy in place to ensure that accused individuals are either included in the database or labeled with a restriction note. It is possible that these individuals could attempt to volunteer at another entity prior to the conclusion of the current investigation. If so, SE Coordinators at that entity will have no indication of the accused's restricted status.

6. KPMG also noted that eight of the nine individuals restricted from ministry during the current assessment period were appropriately reported as inactive within the SE Database and had at least one Database entry in which they had a restriction note. However, one of those nine individuals is listed in the Database, but did not have a restriction note. In addition, there appeared to be duplicate entries for two other individuals, distinguished only by the presence or absence of a middle initial. During interviews with the Diocese, it was confirmed that one instance was, in fact, a duplicate entry of the same individual, while in the other instance, the Diocese was unable to confirm because of limited information available. In each instance one record is flagged as restricted and the other is not. SE Coordinators could potentially enter these individuals in the database by omitting the middle initial and not be aware of their restricted status.

7. KPMG also noted a wide range in the number of days elapsed from the time of the initial notification of removal from service to the time an individual becomes restricted on the SE Database (from 2 to 98 days). On average, it took 25 days from the time of first notification to add a restriction note to the SE Database. The median amount of days from initial notification to restriction was 19 days. According to interviews with the Diocese, there is no written protocol for when or how quickly an individual should be identified as restricted in the SE Database.

8. During interviews with the Diocese, it became apparent that the SE Database restriction note was being applied both for individuals ineligible to work with minors and also to individuals who had been removed from their position for reasons other than misconduct with a minor or a disqualifying criminal record check. The application of the restriction note in anything but the most severe instances (i.e., abuse of a minor or return of a disqualifying criminal records check) may diminish the tool's effectiveness and may ultimately lead to an offender appearing in the Database without the appropriate restriction.

e. **Recommendations for Program Enhancements**

### Investigations and Internal Reporting

1. KPMG recommends that the Bishop approve the Delegate's suggested policy of maintaining documentation that supports the basis for reassigned ministry to prevent the appearance of any improper retaliatory actions or relocations that may be perceived responsive to the identification, reporting, or enforcement of the Program's requirements. The implementation of the procedures noted above regarding the memorandum from the Delegate and Associate Delegate to the Bishop would fulfill this recommendation.

2. KPMG continues to recommend that the investigative protocols be updated to require a determination as to whether other individuals had knowledge of, or should have been aware of, the alleged abuse or policy violation, but failed to report such abuse or violations in accordance with the Code and Policy.

***Response to Allegations***

3. KPMG recommends that the Diocese establish controls to prevent multiple entries for a single individual in the SE Database.

4. The purpose of the restriction note should be to alert all other entities to an individual in the event that they attempt to work or volunteer with minors pending the outcome of an investigation or after an individual is deemed ineligible to work with minors. As such, a protocol should be in place for the appropriate and systematic application of this tool.

   The Diocese should develop a written protocol to ensure that: 1) all accused individuals and individuals removed from ministry are included in the SE Database; and that 2) all accused individuals and individuals removed from ministry have a restriction note applied to their SE Database entry ***immediately*** upon initiation of an investigation into alleged misconduct or upon the determination that an individual should be removed from ministry due to misconduct or receipt of a problematic criminal records check.

5. The Diocese should finalize a written protocol to ensure the SE Database is regularly searched for duplicate entries of individuals as new people are entered. Such a protocol should further include an exercise whereby it searches the SE Database for all individuals who have been removed or restricted from ministry to ensure that 1) their entries are appropriately noted; and 2) that any duplicate entries are identified, flagged, and eventually deleted from the database.

## C. Program to Prevent the Sexual Abuse of Minors

### 1. Screening of Church Personnel

#### a. Requirements of the Agreement

As indicated above, according to its Agreement with the Attorney General, the Diocese shall continue to develop, implement, and revise, as necessary, policies and protocols for preventing, responding to, and ensuring the reporting of allegations of child sexual abuse.[31] As part of its prevention program, the Diocese has adopted specific protocols for screening Church Personnel in an effort to prevent individuals at greater risk for abusive behavior from working with minors.

#### b. Industry/Organizational Guidance

The current Guidelines specifically require an organization to "use reasonable efforts not to include within the substantial authority of the organization any individual whom the organization knew, or should have known through the exercise of due diligence, has engaged in illegal activities or conduct inconsistent with an effective compliance program."[32] The notes further explain that an organization has an obligation to "consider the relatedness of an individual's illegal activities or misconduct to the specific responsibilities such individual is expected to be assigned," as well as to consider the recentness of such activity.[33]

In addition, the United States Conference of Catholic Bishops (USCCB) has issued *Guidelines for Implementation of SE Programs* that specifically require employees/volunteers to undergo criminal history checks, self-disclose allegations of abuse, and undergo a check of references.

#### c. Program Overview

***Screening and Training Protocol***

The Diocese continues to refine and enhance its Screening and Training Protocol. Most recently, KPMG has noted evidence of periodic review and updates, as befits a self-sustaining Program.

---

[31] Agreement at §3

[32] United States Sentencing Commission, Guidelines Manual, §8B2.1(b)(3) (November 2008)

[33] Id. *Application Notes* §4B

The most recent version of the Protocol, which became effective on July 1, 2008, reflects several changes from the previous version, dated July 1, 2007. Among those are:

(1) The extension of the definition of "regular and continual basis" to include "summer school teachers, and vacation Bible school personnel, even if they work with minors less than six times per year."

(2) The expansion of applicability to specifically include "summer school teachers and aides," Diocesan Camp Fatima and Camp Bernadette employees and volunteers who are "18 years old or older on the opening day of the season," and "temporary employees… not required to attend training" but who must complete all other requirements.

(3) The requirement that camp volunteers complete the Diocese of Manchester Camp Screening Form.

(4) An amendment to the contract language that the contractor agrees that "upon request" it will submit documentation demonstrating that the contractor has complied with the screening and training requirements.

(5) The expansion of screening and training responsibilities for pastors, principals, and directors to include distributing the Code and Policy, updating the SE Database, and providing written verification to the OMC upon request.

(6) The requirement that coaches must complete *PGC* training as part of their orientation process within 30 days of beginning coaching. Substitute teachers at Catholic schools must complete the training within three months of beginning their service.

(7) A change in policy as to the acceptance of criminal background checks other than those provided by the state, which previously included military clearances. These documents will no longer be accepted in lieu of criminal background checks.

(8) The addition of procedures for developmentally or cognitively disabled adult volunteers and temporary student employment.

### *Safe Environment Database*

Over the past four years, KPMG has observed the progressive development, enhancement, and evolution of the Diocese's SE Database. In March 2004, the Diocese initially developed a Database that the OMC used to track the screening and training compliance of each member of the Church's Personnel. In December 2006, the Diocese hired a third-party vendor to assist it in the creation of a new Web-based SE Database that SE Coordinators could update at the parish, school, and camp level.[34]

Between April and June 2007, the Diocese provided all schools, parishes, and camps access to the new SE Database on a rolling basis. During that time, the Diocese also distributed an SE Database Users Guide and an SE Reference Guide to all *PGC* Training Personnel and SE Coordinators.

The current database is used by both the Diocese and Diocesan entities to track the screening and training requirements and to verify individual eligibility for ministry with minors. As such, individuals can be categorized in the SE Database as:

**Active:** The person is currently working regularly with minors and is reported as having completed all of the screening and training requirements.

**Pending:** The person may currently work with minors, but is still in the process of completing the Screening and Training requirements. Pending people must complete their requirements within the stated deadlines or must be placed in inactive status.

---

[34]The previous Access safe environment data was merged into the new Web-based database on 4/7/07.

**Inactive:** The person is not currently working in a position with minors and/or is ineligible to work with minors because all of the screening and training requirements have not been completed, or under other circumstances.

The SE Database is also used to identify individuals who are ineligible for ministry or positions working regularly with minors. Restricted individuals are identified by a note within their record; however, "restricted" is not its own category like "active", "pending", and "inactive." An individual whose entry has a restriction note cannot be made active at an entity; if attempted, a note will appear directing the SE Database user to contact the OMC for further information on the individual.

### Diocesan Site Revisits

The Diocese, through its Compliance Coordinator, implemented a protocol requiring all Diocesan camps, schools, and parishes to be visited on at least a triennial basis beginning as of January 2007 consistent with KPMG's 2005 and 2006 Program Assessment Report recommendations.[35] The Diocese prioritized and scheduled the site revisits over three years based on its Risk-Based Plan and Risk Assessment Matrix.

Sixteen site visits were completed during Year 1 of the site revisit program (January 1, 2007 to June 30, 2007). In July 2007, the entities visited were reassessed. Each individual entity was recategorized as "Satisfactory," "Needs Improvement," or "Unsatisfactory" based on the results of the revisit. The list of parishes and schools that had not been revisited during Year 1 was also reviewed in July 2007. Eight entities were recategorized based on the Compliance Coordinator's knowledge and judgment of each entity's compliance, along with other factors.[36]

The entities reviewed in Year 2 (July 1, 2007 to June 30, 2008) consisted of those entities that were categorized as Unsatisfactory and as Needs Improvement, unless they had already been revisited in Year 1. The updated ratings were used to determine which sites to revisit in Year 2. Thirty-six parishes and schools were scheduled for and were visited during Year 2. The Directions for Completing the Site Re-Visit Section of the Risk Matrix states that the revisit portion of the risk matrix is to be completed by the site reviewer following the completion of a site revisit. The directions also state that at the end of each review year, the Compliance Coordinator will draft a report summarizing that year's site visits, any Risk Matrix recategorizations, and the subsequent plan for the next cycle of reviews.

The Compliance Coordinator's site revisit reports, which are titled SE Reports, refer to an SE Review Protocol[37] for parish and school reviews. This protocol is listed in the SE Review Worksheet. This is in accordance with recommendation IV C 1e.1 in KPMG's 2006 Program Assessment Report that a protocol be developed and implemented to track issues identified through the site visits. Examples of the SE Review Worksheets are contained within the SE binders and appear to serve as the reviewer's guide and list of tasks to be performed before, during, and after each site visit. The Worksheets also have an area for the reviewer to record results and applicable action items.

According to the SE Reports, each Diocesan site visit was coordinated in advance. The Compliance Coordinator sends a letter to the entity outlining the procedures for the visit and items the SE Coordinator should prepare.[38] The letter is accompanied by a document containing additional details about the procedures that should be completed prior to the visit, such as a review of the applicable protocols, a review of the online database for accuracy, and the verification and organization of personnel files.[39]

For each site visit, a Compliance Coordinator representative meets with the SE Coordinator and/or the pastor, principal, or director. Consistent with last year's review protocol, according to the SE

---

[35] KPMG 2005 Program Assessment Report recommendations IV C.1.e.1 and IV C.1.e.2; KPMG 2006 Program Assessment Report recommendation IV C 1.e.3

[36] Diocese of Manchester, Site Revisit Plan, Year 2

[37] KPMG was not provided with a document specifically entitled Safe Environment Review Protocol during it last two assessments and understands the protocol to exist by virtue of the Diocese's Safe Environment Review Worksheet, which details site visit procedures.

[38] Diocese of Manchester, letter template from MED to entity to coordinate site visits, Version. 3.0, January 2008

[39] Diocese of Manchester, Preparation for Site Visits, Version 2.0, July 2007

Review Worksheet, the reviewer is to "randomly select 25%, not to exceed 25 names." If there are fewer than five employees or volunteers, all files should be reviewed.[40] The reviewer examines active files for the presence of an Application or Screening Form and an Acknowledgement Form, the dates of which are reconciled to the Diocese's printout from the SE Database. The entity may also choose to retain evidence of, for example, *PGC* Training attendance; if present, the reviewer reconciles these dates against the SE Database as well. The Compliance Coordinator notes any discrepancies and makes the appropriate changes in the database. For the individuals whose files were chosen for review, the reviewer examines documentation of a background check and *PGC* training, which is maintained at the Diocese. The reviewer also examines the pending list and for any person that is listed as overdue, the person's SE file is reviewed at the site for the presence of an Application or Screening Form and an Acknowledgement Form.

Upon completion of the site review process, an "Exit Sheet – Missing Items" form is completed that outlines all identified issues that remain to be resolved in order to achieve compliance with screening and training requirements. The SE representative is required to sign a copy of this list in order to affirm that outstanding items will be promptly resolved.[41] The SE representative also signs to acknowledge that, if the employee or volunteer has not resolved these issues within 30 business days, the individual must be placed in inactive status. Upon exceeding this timetable, the SE representative is required to sign and send a letter to the OMC certifying that the individual has been moved to inactive status and is no longer actively working with minors. The Compliance Coordinator makes a referral to the Delegate if the letter of inactive status is not received within 10 business days after exceeding the initial 30 business day deadline. A letter is then sent from the Delegate to the pastor that the individual has been moved to inactive status and should no longer actively work with minors. The letter requires that the pastor sign and return the letter to the Compliance Coordinator.

In addition to the site revisits described above, the Compliance Coordinator's office also conducts spot checks of Diocesan entities. As of the date of KPMG's assessment, the Compliance Coordinator's office had conducted two spot checks related to Year 2. The Compliance Coordinator's spot check SE Reports indicate that these spot checks are dependent on varying circumstances and that the review procedures are thus adapted to fit the specific circumstances and areas of concern related to each entity. According to the SE Review Plan, the Compliance Coordinator will select two to three entities to visit each year for a random spot check. The visits will be unannounced or scheduled on short notice, and the level of review will be at the discretion of the Compliance Coordinator.[42]

### *Criminal Records Checks*

The Diocese has steadily enhanced its criminal record check policies and procedures over the past four years. The Screening and Training Protocol v. 5.0, effective 7/1/08, provides written documentation on entity and OMC responsibilities and specific guidelines for determining eligibility for ministry depending on the type of criminal record results.

In the 2007 assessment year, the Diocese began to use the OMC as a centralized location for the processing and maintenance of Criminal Record Checks and continues to do so. All records are now required to be processed through the OMC and self-delivery of out-of-state records checks is no longer permitted.[43] In 2007, the Diocese hired a third-party vendor to provide the OMC with national criminal records checks in the event that an individual reported having lived outside of NH within the prior five years. For Massachusetts, a Criminal Offender Record Information (CORI) check is conducted. In 2008, the Diocese has further strengthened its Program by eliminating the acceptance of military clearances and incorporated this change in its 2008 Screening and Training Protocol, in line with KPMG's 2005, 2006, and 2007 Program Assessment Report recommendations.

---

[40] Diocese of Manchester, Safe Environment Review Worksheet, Version 5.0, July 1, 2008

[41] The Diocese of Manchester Exit Sheet – Missing Items form requires that discrepancies be resolved within 10 business days for camps and 30 business days for parishes and schools.

[42] Diocese of Manchester, Safe Environment Review Plan, Version 2.0, December 1, 2007

[43] 2006 Report Recommendation IV.C.1.e.4

The OMC has instituted a weekly reconciliation of all CRRs received from the Parish entities to track whether or not those records have been returned by the State. Unprocessed CRRs are tracked through resolution.

### Applications

The Diocese has phased out the screening forms used in prior years and is now requiring all Church Personnel to complete an application form. The Diocese has created both an employee and a volunteer application, either of which will fulfill the SE requirements, depending on the individual's personnel status. According to the updated Protocol, camp volunteers are required to complete a Diocese of Manchester Camp Screening Form, in lieu of the standard application form.

### National Sex Offender Public Registry Checks

The Diocese has also steadily improved its policies and procedures surrounding NSOPR checks. In 2007 pastors, principals, and camp directors were given the additional responsibility of performing "initial" NSOPR checks on all employees and volunteers. These searches are then repeated at the Diocesan level to ensure completion and proper documentation.

Since the previous assessment, the Diocese has implemented a policy of rechecking NSOPR dates once every three years. The Compliance Coordinator and SE Coordinator Assistant are also now running semiannual reports on the SE Database to identify any NSOPR dates older than a preselected date (this date will be updated with each subsequent test). Temporary employees are then hired to rerun the NSOPR checks on individuals identified as requiring renewal searches. To aide in the consistency and reliability of the searches, in March 2008, the Diocese also drafted instructions for checking the NSOPR database.

In 2007, the Diocese enhanced its documentation of NSOPR checks by requiring that a printout of the NSOPR check be maintained at the Diocese. During the current assessment, the Diocese has purchased a document retention software program called DocStar. Going forward, the Diocese will save all NSOPR results electronically in the DocStar system. The Diocese continues to hire a college student for the summer who is scanning old NSOPR results into the application.

### Independent Contractors

The Screening and Training Protocol requires specific language to be present in contracts with all independent contractors who regularly work with minors. The language includes that the contractor is responsible for conducting all appropriate background checks. The contractor agrees, upon request, to submit to the parish, school, or camp, documentation demonstrating the contractor has complied with these screening and training requirements.[44] As an alternative, the school, parish, or camp may require the contractor undergo the same screening and sexual abuse training requirements applicable to its employees.[45] During site visits, contracts are reviewed to ensure they contain the appropriate language. However, the Diocese has not yet exercised its right to request evidence that independent contractors have, in fact, conducted all appropriate background checks.

**d. Findings**

### Safe Environment Database

1.  The Diocese has continued to improve the database by attempting to implement several new access control mechanisms. For example, there are now controls that are intended to prevent individuals from being entered into the database if they have been flagged as restricted. However, as previously discussed in the Response to Allegations section above, KPMG found at least one instance of an individual listed in the database multiple times and that only one entry associated with the individual was actually marked as restricted. Historically, the Diocese has not been performing any type of duplicate (or near duplicate) name search to ensure that A) all listings for restricted individuals were appropriately flagged or B) that any name variant

---

[44] Screening and Training Protocol (July 2008) at Page 6-7, §4

[45] Id.

entered by an SE Coordinator would result in the appropriate restriction message. Therefore, it does not appear as though this control is effective as designed.

2. Flags indicating that particular individuals are restricted from working with minors are only evident if a user attempts to add a flagged record to their entity. Currently, the SE Database automatically searches existing names in the database (by last name) prior to allowing a user to enter a new record to the database. A list of matching records (individuals) already in the database is then returned. The user then has the option of adding an existing record (individual) to their entity or creating a new record. When testing the database, KPMG noted that restriction flags were only evident if the user actually attempted to add a restricted individual to their entity. However, when the user selected an entry for an individual with a similar name to a restricted individual, there was no indication that further research should be conducted, nor was there any indication that the similarly named individuals in the listing were flagged as restricted. In addition, during testwork, KPMG was able to circumvent the controls preventing restricted individuals from being added to an entity site by creating a new entry for the restricted individual,[46] rather than choosing to add the existing flagged record.

3. The Diocese has contracted with a local CPA firm to conduct limited testing of the SE Database and the integrity of its data to identify issues, such as duplicate names, missing data field information, and erroneous entries that were carried over from the old database. During interviews with the Diocese in November 2008, KPMG was told that these efforts were already underway and that an initial report of findings was in draft form. The Diocese also noted that testing was being done on data integrity only, but not on any of the Database's access controls, such as the ability to add a restricted individual to an entity as an active or pending employee or volunteer.

4. The Diocese's Action Plan II Status Log notes that a "start date" has been added to the SE Database in line with its own 12/31/07 self-imposed Action Plan II deadline; however, KPMG was unable to identify this field in the database assessment and during interviews with OMC staff, they stated that there was no plan in place for development of a "start date." Rather, KPMG found only an "add date," which is the date an individual is added to the SE Database and the date from which SE requirement time lines are measured. The use of this date as a start date may not facilitate adherence to screening and training requirement compliance because an individual may be added to the Database either on or after an actual hire date, depending on an SE Coordinator's particular practices. Because the Screening and Training Protocol defines the "start date" as the date an individual actually begins working with minors, rather than the date they first apply or the date they are added to the database, it is this date that should be used to measure an individual's compliance with pertinent screening and training requirements. KPMG has recommended the institution of a start date for the past two assessment years.

5. The Diocese's database does allow for the identification of a specific "pending date," which is the default date that an individual's status in the database becomes pending. According to the interviews with the Assistant Compliance Coordinator, all new individuals are entered into the database as "pending," but a "pending date" is reset if an individual's status changes to "active" or "inactive" and then back to "pending" again. KPMG noted that an SE Coordinator could change an individual's status to "inactive" and then back to "pending," thereby removing them from the Diocese's "overdue pending" list. In addition, if an individual is made "inactive" due to noncompliance, but then completes all the necessary requirements, there is no way for the Diocese to track total time to completion for the Diocese's audit trail.

6. The SE Database currently does not track the dates that applications were signed, only their locations. In addition, the database records only an individual's most recent NSOPR date. From an auditing perspective, it is important to know the initial completion dates of all SE requirements so that compliance can be monitored and analyzed on an ongoing basis. Continued improvement and sustainability can only be achieved in response to analysis of past performance; tracking initial completion dates allows the Diocese to track the length of time it

---

[46] On 11/6/08, KPMG added an individual, previously identified and recorded in the Safe Environment Database as restricted, to a "test" entity within the Safe Environment Database.

takes individuals to fulfill certain requirements, which could then result in improvements to process, enforcement, and potentially greater overall compliance.[47]

7.  The Diocese has structured its database to appropriately capture an individual's Acknowledgement date at each entity the individual is associated with (when more than one acknowledgement form is available).  This has been done by creating two separate Acknowledgement database fields, one in a table associated with the individual and one in a table associated with the particular entity location.  The Diocese's data-mining reports and input controls rely only on the information provided in the Acknowledgement Date field in the Individual table.  There did not appear to be any controls in place to ensure that the information in the Individual Acknowledgement Field matches the information in at least one of the Location Acknowledgement Fields.  If multiple fields, intended to capture the same data, are not properly reconciled, there is a risk that information will be improperly recorded and the information being used for data-mining and input controls will be inaccurate.  When KPMG tested the database, 3,732 active individuals did not have an Acknowledgement Date in the table associated with Individuals.  All but 41 of these individuals, however, had Acknowledgement date data associated with specific locations.

8.  The Database is used by both individuals at the OMC and SE Coordinators from all Diocesan entities.  OMC users are responsible for tracking an individual's *PGC*, CRR, and NSOPR compliance, while SE Coordinators are responsible for entering an individual's application and Acknowledgement Form information.  *PGC*, CRR, NSOPR, application, and Acknowledgement requirements will be referred to as compliance components.  Users at both the OMC and entity level have the ability to add an individual to the database (by entering the name and compliance component) and to update the individual's status, provided that all database requirements are met for the particular status update.  KPMG noted that multiple user types with similar access privileges could pose a control risk.  For example, there is potential for an SE Coordinator to change an individual from pending to inactive, prior to an OMC user running an "overdue-pending" report.  The OMC does not currently run any database reports to detect intentional circumvention of the "overdue-pending" control.

9.  The SE Database is primarily managed by the SE Assistant and the Diocesan Database Consultant.  Specialized reports requested by the Database Consultant are developed by the third-party developer under contract to the Diocese.  In response to KPMG's 2007 report recommendations, the Database Consultant has developed a Document of Functions, Controls and Report Capacities of the SE Database (v 1.0 September 2008), which describes the database's audit capabilities in addition to certain functions, such as the Overdue Pending function, which automatically identifies if an individual, based on their personnel type, has not met Screening and Training Protocol requirements within the required time frame.  The document also describes the various access controls by level (i.e., general user, Diocesan user, and administration user).

Per KPMG's 2007 report recommendation, the Diocese plans to further improve communication of exceptions by investigating the possibility of automatically generated messages displayed to individual SE Coordinators every time they log onto the SE Database.  According to Action Plan III, this is to be completed by November 30, 2008.  At the time of KPMG's on-site assessment, no documentation was available in this regard.

10.  The Diocese has implemented a control that will not allow an individual's status to be changed to "active" until all SE requirement fields have been populated.  Only the Diocese can enter information for certain fields, which prevents an SE Coordinator from inappropriately filling in all fields for the sole purpose of making and individual "active."[48]  It did not appear, however, as though these controls have been applied retroactively.  The Diocesan policy states that individuals cannot be made active until all of their SE Requirements have been fulfilled;

---

[47] KPMG does, however, recognize the Diocese's efforts to track the most recent NSOPR dates in the database and believes that it should continue tracking this data as well.

[48] Other controls include, but are not necessarily limited to: 1) Individuals cannot be added to the database unless associated with an active parish/school/camp; 2) First Name, Last Name, Job Position, Personnel Type, and Status will soon be required fields (work order has been placed); 3) The "Please Select One" option on all drop down menus in the database is no longer a valid entry for required fields.

however, KPMG found that 43 Individuals listed as active in the database were currently missing at least one of their SE requirements.

In addition to controls not being applied retroactively, there is also a gap in the way the database determines which fields fulfill SE requirements and how data are input into those fields. (See above finding regarding multiple acknowledgement date fields for further clarification). The above number (43) has already accounted for this issue and represents the actual number of active individuals who were missing SE requirements. Were this test to be run using the definition of SE Requirement fulfillment used by the Diocese's current control, 3,740 individuals would be considered active even though not all of the required Safe Environment requirement fields were populated.

11. KPMG noted that the migration of the old Access database to the current Web-based database resulted in the creation of more than the three standard "active," "pending," and "inactive" statuses. In some cases, statuses are "Blank," "NULL," "Deceased," or "Other," etc. The Diocese has begun to mitigate this and other risks. In a document titled SE Online Database Maintenance (2008), a series of mitigating actions is listed, including analysis of NULL status inputs for status, job positions, and personnel type, for example. The document records the total number of exceptions found and the remedial action taken in response, such as deletion of incomplete records, population of missing information and implementation of controls to prevent these issues going forward. According to interviews with the Diocese in November 2008, a local CPA firm has appropriate been retained to conduct testing of the database, which will include these issues in its analysis.

12. There appeared to be multiple instances where existing data in the Database did not accurately reflect the information in the underlying documentation. See KPMG Site Visit Findings below for specific details.

13. During interviews with several employees at the OMC, the Diocese appears to be experiencing a pattern of consistent problems with its SE Database software developer, such as nonresponsiveness to requests for changes to the SE Database, a lack of timeliness for the completion of change requests, and the frequent recurrence of changes to one aspect of the SE Database affecting the functionality of another aspect. The apparent recurrence of these issues is hindering the Diocese's ongoing efforts to implement enhancements the SE Database and is impacting on the proper functionality of the Program overall.

### Diocesan Site Visits

14. The 2007 site visits at the camps occurred on the first day of camp for regular sessions in July and during Exceptional Citizens (EC) Week in mid-August. During these visits, 100 percent of the files were reviewed, which is an excellent practice, especially because the camps present a higher risk area due to the nature of their operation. Files found to be complete were initialed and dated by the reviewer and will not be reviewed in the future; the site visits in future years will focus on new volunteers and employees.

15. According to the new SE Worksheet, a list of inactive individuals from the SE Database is provided to the SE representative for verification of each person's inactive status in accordance with recommendation IV C.1.e.7 of KPMG's 2007 Program Assessment Report. Necessary corrections are made to the SE Database and missing items are added to the Exit Sheet should a person on the inactive list be identified as regularly working with minors, but missing requirements. This helps to ensure that all individuals working with minors are identified and are complying with the screening and training requirements.

Similarly, the list of all employees and volunteers is printed from the SE Database and reviewed. If "blank" statuses exist, the reviewer discusses this with the SE representative, and the SE Database is updated accordingly. This provides for a complete review of the status of individuals since all blank statuses in the database related to a particular site are examined and changed so that they are no longer "blank."

16. SE Coordinators at several parishes have been having difficulties ensuring that scout volunteers, religious education volunteers, and coaches are in compliance with the screening and training requirements. Also, there is a challenge in tracking their participation and

inclusion in the SE Database. These volunteers change frequently and can be difficult to get in touch with since many are not parishioners. At one site, the Compliance Coordinator identified 34 scout volunteers actively working with minors, 18 of whom had not completed any SE Program requirements and were not listed in the SE Database.

During KPMG site visit interviews, SE Representatives acknowledged this challenge and identified the difficulty in relying on scout masters, religious education, and coaching organization leaders to follow up as a contributing factor. The Compliance Coordinator acknowledges this issue and the need for improvement. She has documented her efforts to address and correct the issue with various organization leaders.

The Compliance Coordinator suggested that each organization leader be required to submit a full listing of current volunteers and employees who regularly work with minors to the SE Coordinator annually. Each organization leader would then be required to regularly report any status changes and the names of new personnel to the SE Coordinators.

17. Currently, if an individual returns to volunteering or is rehired, the person's file is not required to be reviewed before changing the individual to active status in the database. According to one SE Report, the Compliance Coordinator recommended this to an SE Coordinator as a best practice.

18. KPMG assessed 29 completed 2008 Diocesan SE Report binders, 2 spot check documents, and 7 in-progress binders. In evaluating the 2008 reports, KPMG noted that it appeared that the site reviewer's sample size may be disproportionate to employee/volunteer population for large entities. This is due to the procedure that the maximum number of files reviewed is 25. For example, the SE Report for twinned parishes in Manchester that had more than 200 volunteers actively working with minors shows that only 25 files (12 percent) were reviewed.[49]

According to the SE Review Worksheet, if an exception rate of greater than 10 percent is found for one element, the site reviewer selects an additional five active files to test only for the specific requirement that has an exception. If additional errors are found, five more files are reviewed in the same manner. If additional errors are still found, the reviewer is instructed to consider looking at all files or instructing the SE Coordinators to do so and scheduling a follow up visit. According to 2007 site visit reports, reviewers have been appropriately following this protocol.

### KPMG Site Visits

On May 20 and 21 and October 20, KPMG conducted visits to five sites, which included a pre-school, an elementary school, a camp, and two parishes. The primary goals of KPMG's site visits were to evaluate whether individuals listed as active in the SE Database had been properly screened and trained in accordance with Diocese's Screening and Training Protocol; to determine whether information in the SE Database corresponds to the information (dates) at the particular site; and whether there was the appropriate backup documentation supporting or evidencing adherence to the Screening and Training Protocol.

KPMG's site visit selection was based on several factors. Two of the sites KPMG visited were visited by the Compliance Coordinator during 2007-08. One site was subject to both a regularly scheduled Diocesan site visit and to a spot check during 2008. Of the remaining two sites KPMG visited, one had been visited during KPMG's first assessment year and one had been visited during each of the four KPMG assessment years.

KPMG followed a process similar to previous years, which included meeting with SE representatives to discuss and to understand their perspective on the Program. A sample selection of SE files was evaluated on-site and, subsequently, KPMG returned to the Diocese to evaluate documentation from the OMC to further test information from the sites and in the SE Database.

19. KPMG found that, overall, the SE Coordinators have a general understanding of the screening and training requirements, good organization of the files, and familiarity with the SE Database.

---

[49] Diocese of Manchester, Safe Environment Review Report, January 7, 2008

However, some SE Coordinators remain unclear about certain details of some SE policies and protocols, specifically with regard to required timetables for completion and recertification of SE Program requirements.

Further, it seems that SE Coordinators are not aware of the new disciplinary policy that was put in place last year. Even after specific questioning, none of the SE Coordinators interviewed identified or described the Diocese's new disciplinary policy, which holds Pastors, Principals and Directors accountable for management, implementation, and compliance with the SE Program and its requirements.[50]

Furthermore, KPMG learned from several SE Coordinators that they have read neither the Code and Policy nor the Screening and Training Protocol. At one site, the SE Coordinator did not recall receiving or reading the July 1, 2008 version of the Screening and Training Protocol. This presents a serious risk for the Diocese and its SE Program. While Principals, Pastors, and Directors are ultimately held accountable for the SE Program by the Diocese, SE Coordinators are responsible for the day-to-day implementation of the Program. It would be difficult for an entity to maintain compliance of its employees and volunteers if the SE Coordinator has not read the current Code, Policy, or Screening and Training Protocol.

20. KPMG evaluated records in 100 files of active employees and volunteers at the various entities, which generally reflected continued adherence to Screening and Training requirements. In total, however, 87 files (87.0 percent) had some type of discrepancy, inaccuracy, exception, or omission. For example:

*Criminal Records Checks*

    a.  Thirty-three of the 100 files tested (33.0 percent) were missing evidence of an out-of-state criminal records check despite having indicated on the employee or volunteer application form that the individual had resided outside New Hampshire in the past five years.[51] While it may be that the results of these checks were misplaced, this result presents a possibility that the out-of-state checks were never completed.

    b.  For one of 100 files tested (1.0 percent) supporting documentation of a completed criminal records check could not be located at the Diocese. This may indicate that the results of the check were lost or that the check was never actually completed.[52]

    c.  For three of the 100 files tested (3.0 percent), the criminal records check dates in the SE Database do not match the dates of documentation retained at the Diocese.

*NSOPR Searches*

    d.  Twenty-eight of the 100 files tested (28.0 percent) contained NSOPR documentation that was inadequate because the search did not run in one or more states. The procedures for conducting NSOPR checks specifies that, if the search fails to return information for a state outside of New England, the check can still be considered complete. Although there was no indication that these 28 individuals were associated with one of the states that failed to return information, this practice presents a significant risk that an individual's sex offender record may be overlooked.

    e.  For 7 of the 100 files tested (7.0 percent), the NSOPR dates in the SE Database did not match the dates on forms filed at the Diocese, a decrease from 16 percent in 2007.

    f.  For six of the 100 files tested (6.0 percent), evidence to support a check of the NSOPR was not located at the Diocese, a decrease from 13 percent in 2007. This

---

[50] In developing the disciplinary policy, the Diocese determined that SE Coordinators would not be held accountable by the Diocese because they are employees and/or volunteers of each parish, school, or camp and, thus, not under the Diocese's direct authority.

[51] This number does not include school employee files indicating out-of-state residences within the last five years. KPMG noted that state law requires evidence of school employee CRRs to be destroyed after 30 days. Therefore, in such cases, KPMG did not deem the absence of out-of-state record checks to be an exception.

[52] KPMG noted that Criminal Record Checks were missing for 11 school volunteers (11.0 percent). NH State Law requires that criminal record checks for school employees be destroyed after 30 days. The Diocese has acknowledged that until 1/1/08 it had also been destroying criminal records for volunteers, which may help explain the absence of these reports.

improvement is reflective of the Diocese's effort in the past two years to document the completion of NSOPR checks for all active employees and volunteers.

*Employee References*

g.  The applications for 23 of 37 employee files (62.7 percent) did not include 3 references, as required by the Screening and Training Protocol.

*Application/Screening Forms and Acknowledgements*

h.  The Compliance Coordinator requires that all entities retain employee or volunteer applications and/or screening forms on-site. For three of the 100 files tested (3.0 percent), neither an application nor a screening form was found at the site, a decrease from 7 percent in 2007. The reason for this may be that, according to one SE Coordinator interview, applications for employment or volunteer work are often kept separate from SE files.

i.  For 8 of the 100 files tested (8.0 percent), the date for receipt of the Acknowledgement Form in the SE Database did not match the files at the site, a decrease from 13 percent in 2007.

PCG *Training*

j.  For 36 of 100 files tested (36.0 percent), the *PGC* training date in the SE Database is more than three years from the date of KPMG's site visit. Recertification of *PGC* training is required once every three years and is currently satisfied by a review of the Renewing Our Promise Refresher Training bulletin; however, the Diocese does not track completion of this recertification in the SE Database.

k.  In one of the 100 files tested (1.0 percent), the *PGC* date in the SE Database does not match the date in Diocesan files (no change from 1 percent in 2007).

These testing results represent some of the limitations and the potential risks that still exist within the SE Program. For each of the Program requirements outlined above, the Diocese is still facing some level of noncompliance and inaccurate recording of information. Certain issues represent a significantly higher risk to minors than others (e.g., a missing criminal record or sex offender registry check compared with a missing Acknowledgement Form), and remediation of those issues should be given priority over others. No matter what the level of risk, however, the overall success of the SE Program and Diocese's protection of minors depends on the attention given to the remediation of each one, and achievement of full compliance going forward.

21.  At each site, KPMG asked SE Program representatives to review a list of inactive employees and volunteers. From those lists, a total of five volunteers who are actively working with minors were identified as improperly appearing on the inactive list; the representatives could not explain why the individuals would be listed in this way. According to the SE Database (as of 4/29/08), the individuals identified had not completed one or more of the following SE Program requirements: CRR, NSOPR, *PGC* training and Acknowledgement Forms.

This finding emphasizes the importance of diligent and continuous testing by the Compliance Coordinator of the SE Database and personnel files, as well as effective and thorough communication with SE Program representatives. This is especially true considering the high risk-level presented by having individuals work without having criminal record or sex offender registry checks completed. KPMG noted that these sites had been the subject of site visits during 2007 and that, although site visit reports indicate that this test was done, these issues were not identified.

22.  As a result of the site visits to the Diocesan camps in June and August 2008, the Compliance Coordinator appropriately informed the Delegate of several significant compliance issues. In response, the Delegate took actions that included further escalation to camp leadership, and a mandate for the development of an action plan to remediate the issues.

At the site visit for the two regular season camps on July 8, 2008, the reviewer reported difficulty finding documents; she found that the camps' filing systems were inconsistent and that

SE forms were filed in several locations.  In addition, 71 items (for 62 people) were missing from files or needed to be corrected.  These items included completion of criminal checks, applications, and Acknowledgement Forms.  Further, the reviewers found that little effort had been given prior to the site reviewer's arrival to review or organize files and that there was a sense that the camp staff expected the reviewers to be a "clean up crew."  In her report, the reviewer recommended that the camp establish a "check-in" procedure that would include a review for all screening and training requirements on the first day that counselors arrive at camp.  The reviewer also recommended that if any counselors were missing items, they should not begin working with minors until those items were completed or corrected.

In addition to the issues at the regular camp season site review, several areas of concern were identified during the EC Week site review on August 18, 2008, the opening day of EC Week. In her summary to the Delegate, the Compliance Coordinator highlighted these issues. The camp staff was unable to provide a definite list of names of those who were present during EC Week; names were provided from memory instead. In addition, the Diocese observed that no one from the camp had accessed the SE Database in advance of, during, or following EC Week to assess which counselors had completed screening and training requirements. Further, the camp staff did not incorporate the Compliance Coordinator's 2007 recommendation that a deadline be established for the submission of CRR forms two weeks prior to the opening of EC Week. Approximately 30 CRRs were provided to the OMC only on the second day of EC Week; therefore, the results of those criminal records checks were not available until after EC Week ended.

Appropriately recognizing the high risk and vulnerability presented by both the regular and the EC Week camp seasons and the importance of having camp counselors screened and trained in a timely manner, the Delegate accepted the issues presented to him by the Compliance Coordinator and further escalated the matter, in writing, to the Secretariat and to the Executive Director of the camps mandating that an action plan for addressing these issues be in place by December 1, 2008.  Furthermore, during an interview with KPMG in November 2008, the Delegate expressed his commitment to hire a new SE Coordinator who will oversee screening and training of the camps.

23. During 2008 visits to the Diocesan camps, site reviewers have begun to follow a practice by which they mark files that have been reviewed and found to be compliant with all SE Program requirements.  During KPMG's visit to a camp in October, a total of 17 files were reviewed, 12 of which (70.6 percent) had been marked as reviewed and compliant during a recent Diocesan site visit, but in which KPMG found some kind of discrepancy, inaccuracy, exception, or omission (see **Exhibit 5** for details).  KPMG's findings included exceptions to the Screening and Training protocols, such as employee files that did not list three references or Diocesan files that did not contain documentation of an out-of-state criminal record check.  This finding further emphasizes the importance of diligent and continuous testing by the site reviewers of employee and volunteer files, especially with regard to all elements of the Screening and Training Protocol requirements.

24. During interviews with KPMG in November, the Compliance Coordinator confirmed that each Diocesan entity has an SE Coordinator assigned to it, which was supported by KPMG's analysis of the records provided.  KPMG recognizes, however, that the staffing of SE Coordinators is a fluid situation, which is subject to periodic turnover and occasional absences, especially because it is a volunteer position.

For example, KPMG learned from one SE Coordinator that she regularly takes a "sabbatical" from her SE Coordinator role at a Diocesan school for several months during the year to focus entirely on her job involving tax preparation.  It was unclear to KPMG what level of coordination and coverage was arranged for that period.  There is currently no protocol in place to address extended (greater than 30 day) absences or vacancies due to turnover.  Such gaps in SE Coordinator coverage pose the risk that new employees or volunteers could begin working with minors during the period before the deadline for completion all screening and training requirements and potentially continue beyond the appropriate time frames without being detected due to an absence or vacancy in the SE Coordinator position.

*Criminal Records Checks*

25. The Diocese has continued to improve its process for the collection of NH state criminal records checks. According to KPMG's SE Database assessment, every year has seen improvements in that both the number of CRRs completed after the 30-day requirement decreased and the average number of days those CRRs were outstanding also decreased. However, KPMG's May 2008 assessment identified 48 individuals listed as pending, and thus potentially working with minors[53] despite the fact that their criminal records checks are overdue.[54]

The Diocese explained that of the 48 individuals, seven represented erroneous entries to the SE Database that need to be deleted. Two individuals are "grandfathered" and are not required to undergo screening because they began working prior to May 1, 2006. According to a Diocesan SE Database listing as of November 19, 2008, 28 of the remaining 39 had completed the CRR requirement; however, 7 individuals still had no CRR check and were still listed as pending, and thus potentially working with minors. The Diocese did not provide current status information to KPMG with regard to the final four individuals; thus, it is unclear whether they have completed the missing requirement and whether they are currently working with minors.

26. The OMC has also continued its policy requiring national criminal records checks through a third-party provider (or CORI checks for past MA residents) on any individual who has reported an out-of-state residence within the last five years. However, there are no policies in place to ensure that all states an individual has lived in have been reported.

Based on KPMG's site visit sampling, it appeared as though 33 of the 100 (33.0 percent) selected individuals have reportedly lived outside of NH in the past five years but do not have an out-of-state record check on file at the OMC.[55]

*Applications*

27. KPMG assessed the new application forms and found that the volunteer application appropriately mirrored many of the important fields in the old screening forms, including a question regarding states the volunteer has lived in over the past five years. However, it did not appear that the most recent version of the employee application asks for this information.

During site visits, SE Coordinators told KPMG that they were able to determine an employee's residence history based upon work history. However, SE Coordinators also told KPMG that there was no set policy or procedure for notifying the OMC when an individual resided outside of the state. Since the OMC, and not the individual entities, are responsible for conducting out-of-state criminal records checks, this disconnect creates a high risk of unidentified out-of-state residents and a strong potential for subsequent lack of appropriate screening.

28. The Diocesan employment applications require job applicants to provide three references, per the 2008 Screening and Training Protocol. While it appeared that the majority of applications KPMG assessed did list the required references, KPMG found no documentation indicating whether or not these references had been checked. In addition, many applications do not include references, but rather refer to an associated resume. This resume was not consistently available for assessment.

29. There did not appear to be a consistent method for collecting date of birth information for employees or volunteers. During site visits conducted this year, KPMG was often unable to identify the date of birth for an individual, because this information is not requested on either the employee or the volunteer applications. Without a consistent method for collecting this

---

[53] KPMG defines currently working with minors as SE Database status of either "active" or "pending."

[54] KPMG is using the database "add date" as a start date, because of the potential issues with the "pending date" discussed in the database section. If the "pending date" is used as a start date, rather than the "add date" then 32 individuals are currently overdue for their CRR completion.

[55] KPMG noted that this figure does not include the files of school employees who have resided out-of-state within the last five years, as the Diocese is required to destroy evidence of school employee CRR's within 30 days of receipt.

information, there is a potential that minors will not be identified for screening and training once they have turned 18 years of age.

### National Sex Offender Public Registry Checks

30. KPMG commends the Diocese for documenting instructions to temporary employees running the updated NSOPR checks. However, KPMG noted that the instructions provided did not appear to result in optimal NSOPR checks. For example, in the event that the NSOPR Web site cannot return results from a particular state, the instructions are to "proceed as normal" if the state is outside of New England, regardless of the individual's reported past residences. In addition, there are many exceptions for which results should be set aside (e.g., a state that is temporarily unavailable or a sex offender hit where a date of birth is unavailable), but the instructions do not include the follow up procedures necessary.

31. During an assessment of the SE Database in May 2008, 33 individuals were identified as active or pending, and thus potentially working with minors,[56] despite the fact that their NSOPR checks were overdue.[57] The Diocese explained that of the 33 individuals, five represented erroneous entries to the SE Database that need to be deleted. According to a Diocesan SE Database listing as of November 19, 2008, 21 of the remaining 28 had completed the NSOPR requirement; however, 5 individuals still had no NSOPR check and were still listed as pending, and thus potentially working with minors. The Diocese did not provide current status information to KPMG with regard to the final two individuals; thus, it is unclear whether they have completed the missing requirement and whether they are currently working with minors.

### Independent Contractors

32. In accordance with recommendation IV C 1e.11 in KPMG's 2006 Program Assessment Report, the Compliance Coordinator sent out verification forms in September 2007 for each school to return about whether the schools had independent contractors that were regularly working with minors. If so, the Compliance Coordinator requested a copy of the contract. The Compliance Coordinator also reviewed the contracts for camps as part of her site visits.

KPMG found evidence that the Compliance Coordinator has sent Diocesan sites reminders to include the appropriate independent contractor screening language for those independent contractors who regularly work with minors. However, the reminders are targeted at the schools and camps, not the parishes. According to the Compliance Coordinator, there are no independent contractors at parishes that regularly work with minors.

33. Diocesan sites are not required to keep documentation that contractors have complied with the screening and training requirements. However, the Screening and Training Protocol and the standard contract language states that the independent contractor must submit such documentation upon request. KPMG noted that currently there are no testing procedures in place to verify that this documentation is, in fact, available upon request and no such requests have been made. If the independent contractors cannot produce the required documentation, they should no longer be able to regularly work with minors, until such evidence of compliance is provided.

### e. Recommendations for Program Enhancements

### Safe Environment Database

1. The SE Database has evolved to become a powerful tool but still requires enhancement of some important controls. For instance, the Diocese should institute controls surrounding the restriction of individuals to ensure that multiple database entries are flagged and that any reasonable name variation entered by an SE Coordinator will trigger the appropriate restriction message, requiring proactive clearance from the OMC.

---

[56] KPMG defines currently working with minors as SE Database status of either "active" or "pending."

[57] KPMG is using the database "add date" as a start date, because of the potential issues with the "pending date" discussed in the database section. If the "pending date" is used as a start date, rather than the "add date" then 25 individuals are currently overdue for their NSOPR completion.

Also, the ability to change an individual's status to pending or active should be restricted to OMC personnel. This will prevent an individual SE Coordinator from inappropriately altering the status of an employee or volunteer to manipulate the individual's "pending date" and, ultimately, the state of that individual's compliance. Before instituting such a control, the Diocese should consider running a report to assess whether or not it appears any entities had previously been taking advantage of this lax control.

2. The Diocese should define parameters in the SE Database to track both the date an individual is added to the SE Database (i.e., add date) *and* the date an individual actually begins working with minors (i.e., start date) in order to accurately measure compliance. Further, it should track the initial dates of compliance with all SE requirements, as well as any subsequent updates, as appropriate (e.g., updated NSOPR checks), in order to measure the ongoing effectiveness of the Program.

3. The Diocese should continue its effort to regularly and thoroughly reconcile the SE Database against the personnel files of each Diocesan entity, taking special care to ensure that all those currently working with minors are included in the database, are listed with the appropriate designation, and have completed all Program requirements. Further, the Diocese should continue to regularly test the validity of data in the database and should develop procedures and a schedule for doing so in a timely manner. This includes reconciling multiple fields intended to capture similar information to ensure that the information in the secondary fields are accurately reflected in the master field.

The Diocese should also ensure that, in scrubbing its database, it is doing so in a way that all control modifications are applied on both an ongoing and a retroactive basis. Individuals with missing requirements should not continue to be classified as active because they were input into the database before controls took effect.

Finally, the Diocese should continuously evaluate whether third-party services upon which it relies, such as its SE Database software developer, are providing those services effectively and accurately. The database is designed to be a primary tool in monitoring compliance, so it is imperative that its underlying data be accurate and thus reliable. As such, each of these measures is critical in ensuring the effectiveness of this valuable tool.

### *Diocesan Site Visits*

4. The Diocese should continue giving consideration for the enhancement of the camp screening and training procedures. Similarly, the system for conducting site visits to the camps should be enhanced to include, for instance, a review on the first day of the preseason special needs camp to verify that those employees and volunteers are in compliance with the screening and training requirements *before* the special needs session takes place.

Further, the Diocese should consider enhancing the Screening and Training Protocol for all camp season employees and volunteers to require completion of at least a criminal records check and an NSOPR check *before* the first day they begin to work with minors. This measure would seek to mitigate the risk that an individual unfit to work with minors is actually doing so and would take into account the two to three week period required to complete a criminal record check. The Diocese and Camp Directors can achieve this goal by encouraging applicants to download CRR forms from the camp Web site and submitting them in the weeks prior to the start of the camp season.

5. The Delegate and Compliance Coordinator should continue their work with leaders of organizations, such as the Daniel Webster Council, the CYO Office and Religious Education, to solicit their committed cooperation in the process of ensuring that all active volunteers and employees are in the SE Database and have completed all Program requirements. The cooperation of these entities is crucial in ensuring the continued success of the Program and compliance with its requirements.

KPMG recommends that the Compliance Coordinator continue to work with the Diocese to formally implement her suggestions that each ministry head (i.e., leaders of the CYO, scout, and religious education programs) be required to submit a full listing of current volunteers and employees who regularly work with minors to the SE Coordinator annually and be required to

regularly report any status changes and the names of new personnel to the SE Coordinators on an ongoing basis.

6.  If an inactive individual returns to volunteering or is rehired, the Diocese should require that the SE Coordinator review that person's file and communicate the results to the Diocese *before* the individual's status is changed back to active in the SE Database by the OMC.

7.  The Compliance Coordinator should consider taking certain measures to enhance the site visit review process. For instance, to ensure an adequate and appropriate level of testing at each site, the sample size should be proportionate to the entity's employee and volunteer population, and be adopted in accordance with the particular risks of that entity. In other words, higher-risk entities should require a larger test population. Also, the Diocese should eliminate any maximum number of files reviewed from its protocol that would limit the scope of review and the potential for identifying compliance issues, such as the current maximum of 25 files.

    In addition to these enhancements, the Compliance Coordinator should expand upon the existing site visit protocol of performing additional testing when an exception rate of greater than 10 percent is found. Rather than being limited to additional testing for only the one element with high exception rates, the reviewer should conduct additional tests for *all* requirements. High exception rates in one area can be indicative of problems in other areas. Here, too, the number of files tested should be based on the population and the risks of that entity rather than being a set number of five files.

### KPMG Site Visits

8.  Through discussions with KPMG, it is apparent that SE Representatives continued to experience some misunderstanding of key SE timetables, policies and protocols. Also, several SE Coordinators admit to not having read either the Screening and Training Protocol or the Code and Policy. While the Diocese is limited in its authority over part-time volunteer SE Coordinators, these individuals remain central to the effective screening and training of Diocesan personnel. Their commitment to and knowledge of the Screening and Training Protocol and Code and Policy requirements is vital to the overall success of the Program and compliance with its requirements.

    As such, the Diocese should consider developing a reliable system of accountability of the Program's SE Coordinators. An example of such system would be development of a Coordinator-specific acknowledgement form, which would include a statement confirming the Coordinator *has read and understood* the Screening and Training Protocol and the Code and Policy. To further confirm this, the form would have Protocol and/or Code and Policy related questions, the answers to which would confirm that the Coordinator has actually read the documents.

9.  The Diocese should consider developing a written protocol detailing the Diocese's responsibilities in response SE Coordinator turnover and the circumstances in which SE Coordinators may not be available to perform their duties for extended periods due to personal or professional responsibilities outside the Diocese. As part of this protocol, the Diocese should consider including a provision holding SE Coordinators responsible for notifying the Diocese of any planned absence exceeding, for example, 30 days, which would allow the Compliance Coordinator to coordinate supplemental coverage in a timely manner. This protocol would support the Diocese in its responsibility to ensure that each Diocesan entity has an SE Coordinator assigned to it and that if a gap in coverage occurs it can be promptly addressed.

### Criminal Records Checks

10. While KPMG commends the Diocese for requiring National Criminal Records checks (or CORI checks for MA residents) for individuals with out-of-state residences, the current procedure should be improved so that it does not rely on individuals to self-report their past states of residence. One of the traits of child predators is their proclivity to deceive. By intentionally omitting any past states in which offenses could have occurred, the sex offender could avoid

further screening.  The Diocese should eliminate the risk of self-reporting by running national criminal record checks on all potential employees and volunteers.[58]

11. The Diocese should continue running exception reports and following up with SE Coordinators to ensure that all individuals working with minors have been properly screened and are in compliance with the Diocese Program mandates.  The protocol for CRR exception reports should specify that personnel who are identified as having exceeded their requirement deadlines should be removed from their positions working with minors *immediately*.

### Applications

12. Unless the Diocese begins conducting national criminal record checks for all personnel (per the recommendation above), the Diocesan Employment Applications should be amended to specifically request the states the individual resided in for the past five years.  Work history is not an adequate determination of residence.  Many people work in one state and live in a bordering state.  Also, employees may not list all past employment if such listings are too numerous or potentially irrelevant to the job being applied for.

Further, the Diocese should consider maintaining applications at the OMC or formalizing a procedure for identifying employees and volunteers with out-of-state residence histories.  If the OMC is unaware of an individual's residential history, appropriate record checks, per the Screening and Training Protocol, will not be run and the Diocese will be at risk of allowing a potentially ineligible individual to work with minors.

Finally, the Diocese should consider augmenting both its employee and its volunteer applications so that they plainly require the individual's date of birth, which is often required as an identifier to determine when potential CRR and NSOPR hits actually relate to the individual at hand.

13. The Diocese should document the process of conducting reference checks to verify their completion.  In addition, if portions of the application form refer to other documents, those documents, or copies of those documents should be maintained with the application in order to ensure completeness.

### National Sex Offender Public Registry Checks

14. NSOPR checks should include all states in order to properly mitigate the risk of failing to detect and identify child-sex offenders.  The Diocese should amend its instructions to reflect the need to check *all* states for National Sex Offenders.  Currently, the Diocese seems to be operating under the assumption that it is unlikely for a sex offender to move to NH from a state outside of New England.  However, we currently live in a highly mobile society and this type of assumption is unfounded and can leave children at risk.  The Diocese should also augment its policy to reflect appropriate follow up procedures when temps identify an issue requiring additional due diligence (e.g., what procedures should the OMC follow if a state inside New England is currently unavailable at the time of the NSOPR check?).

15. The Diocese should continue to run exception reports and follow up with SE Coordinators to ensure that all individuals working with minors have been properly screened.  The protocol for NSOPR exception reports should specify that personnel who are identified as have exceeded their requirement deadlines should be removed from their positions working with minors *immediately*.

### Independent Contractors

16. The Diocese should inquire if any independent contractors at parishes regularly work with minors and verify that the contracts contain the appropriate language if applicable.  According to the Site Visit Protocol, testing for this only occurs at schools and camps.  Independent contractors that regularly work with minors at parishes should be tracked by the Diocese, along with those that work at schools and camps.

---

[58] According to KPMG research, the Diocese's third-party vendor currently offers a national screening package specifically tailored to child-centered nonprofits relying primarily on volunteer service.

17. As part of the site visits conducted each year, the Compliance Coordinator should consider requesting the documentation demonstrating the independent contractor has complied with the screening and training requirements. This could be done for a sample of Diocesan sites that have independent contractors that regularly work with minors to verify that the appropriate background checks are being conducted by the contractors.

## 2. Training Personnel, Communications, and Acknowledgements

### a. Requirements of the Agreement

Pursuant to its Agreement with the Attorney General, the Diocese agreed to "continue to provide, and to revise as needed, its ongoing safety training program regarding the sexual abuse of minors and the reporting requirements for all Diocesan Personnel who have any contact with minors." In addition, the Diocese agreed that all Church Personnel who had "any contact with minors" would sign an acknowledgement that they had read and understood their reporting obligations (i.e., that they were "personally required to make the report directly to DCYF or local law enforcement"). In addition, all Diocesan Personnel should also acknowledge that they had read and understood the Diocesan Policy and "have received specialized instruction" on it.

### b. Industry/Organizational Guidance

The Guidelines have been enhanced from their original requirement for "effective communication to all levels of employees" by incorporating the specific requirement that such communication include the provision of compliance and ethics training to all organizational levels, including all high-level personnel, employees, and agents. It further provides that the obligation to provide such communication and training is ongoing, requiring periodic updates.[59]

### c. Program Overview

#### (1) Training of Church Personnel

##### Protecting God's Children Training

In accordance with both the Agreement and the Guidelines, the Diocese's Code and Policy require all Church Personnel who regularly work with minors to receive instruction on the mandatory reporting requirements.[60] Employees and coaches are required to undergo such training as part of the orientation process or within 30 days of beginning to work with minors, while substitute teachers and volunteers who work with minors are given three months in which to participate in the class.[61]

The *PGC* training requirement can be satisfied by attending a *PGC* training or a Praesidium *Called to Protect* training in another diocese, according to the 2008 Screening and Training Protocol.[62] Certificates of attendance must be submitted to the Diocese as proof of participation.

##### PGC Refresher Training

According to the Screening and Training Protocol, all Church Personnel who regularly work with minors must undergo ongoing or refresher training on child sexual abuse once every three years. Such training may include a self-test or assessment component.[63]

The Diocese utilized the online VIRTUS training program as the refresher training until December 2006. The Diocese has since developed Renewing Our Promise Training Bulletin, a *PGC* refresher bulletin that reviews the material covered at the *PGC* training. The four-page bulletin contains information regarding the prevention and response to incidents of sexual abuse; examples include a list of warning signs, guidelines for expressing affection, and the

---

[59] United States Sentencing Commission, <u>Guidelines Manual</u>, §8B2.1(b)(4) (November 2008)

[60] Diocese of Manchester Code of Ministerial Conduct (March 19,2007) at Page 6, §III.A

[61] Id. at Page 7, §III.B

[62] Screening and Training Protocol (July 2008) at Page 9, §8

[63] Policy at Page Page 4, §III.C

contact information for several resources including the Office of Healing and Pastoral Care. A Renewing Our Promise 2 Training Bulletin 2008 was developed as a second edition and includes steps to protect God's children, how to help a victim of abuse, boundary recommendations, Internet safety tips, and preventing and addressing harassment.

The first Renewing Our Promise Training Bulletin was distributed along with a copy of the revised Code and Policy to all entity employees and volunteers during the spring of 2007. The second edition of the bulletin was distributed during the summer of 2008. The refresher training bulletin is also distributed to new employees and volunteers along with the Code and Policy.

### (2) Communication

The Policy states that the Diocese will follow a program of regular and ongoing communications to increase awareness and understanding of the problem of child sexual abuse. Communications will include information about the problem of sexual abuse of minors; the means of reporting actual or suspected abuse and communicating allegations; and the services available to those who have been abused and to their families.[64] Supervisors, managers, personnel managers, and/or directors should periodically review with Church personnel the standards, policies, and reporting procedures. Pastors must periodically remind the parishioners about provisions contained in the Policy by including them in Church bulletins or other means deemed to be appropriate.[65]

In 2005, the Diocese of Manchester developed a Communications Policy, which addresses policies and procedures that comply with the spirit of the *Charter for the Protection of Children and Young People, the Essential Norms,* and the *Statement of Episcopal Commitment.*[66] This document describes the methods of communication for increasing awareness and understanding of the problem of child sexual abuse. Examples include distributing the Code and Policy*,* dedicating a section of the Diocesan Web site to child safety, and circulating related information in parish bulletins.

### (3) Acknowledgments

In accordance with the terms of the Agreement, the Policy also requires that all Church Personnel who regularly work with minors, and clerics assigned to ministry and who serve in supply ministry, must receive instruction on the Diocese's mandatory reporting requirements and must sign an Acknowledgement Form stating that they have read and understood those requirements.[67]

### d.  Findings

### *Training of Church Personnel*

1.  Appropriately, both the Bishop and the Delegate noted that they recognize the importance of keeping training and education programs current. During discussions with KPMG, they described their current reevaluation of the present training programs, some of which were developed several years ago, to ensure that they are designed to meet today's environment. For example, the Diocese is currently searching for a new program to replace the *PGC* training program. According to interviews with the Diocese, several different programs have been considered and the Diocese is also considering partnering with a company that will develop a training program specifically for the Diocese of Manchester.

2.  The OMC is still accepting verification forms as proof of attendance for *PGC* training. The verification form is signed by a witness to verify his/her attendance. This practice is an example of self-reporting.[68] According to the Compliance Coordinator's Camp Site Visit Report, training

---

[64] Code at Page 6, §III.A

[65] Id. at Page 10, §II.A

[66] Diocese of Manchester, *Communications Policy*, October 2005, Version 1

[67] Policy at Page 4, §III.A

[68] Diocese of Manchester, *Policy Regarding Individuals Who Attended* PGC *Training for Whom No Training Attendance List Exists*, Version 2.0, April, 2007

attendance lists do not exist for some of the camp session conducted from 2002 to 2005. The SE Coordinator provided the Compliance Coordinator with a verification form and a list of those he remembered had taken the training. The verification form serves as proof of attendance.

On June 19, 2008, the SE Council met to review and consider recommendations from KPMG's 2007 Program Assessment Report. With regard to *PGC* training sessions having taken place in the previous three years, for which there is no proof of attendance, the Council concluded that the Compliance Coordinator should have the authority to accept written verification of attendance by a pastor, SEC, training, principal or other reliable source. For sessions having taken place more than three years before, the SE Council noted that individual should be required to retake the training.

3. During its June 19, 2008 meeting to review and consider KPMG's 2007 Program Assessment Report recommendations, the SE Council decided that, contrary to KPMG's recommendation, the current refresher training is appropriate and that the Council would not recommend incorporating a tool to measure the training effectiveness, such as a quiz to verify comprehension.

4. Employees and volunteers find it challenging to travel to the *PGC* training sessions and SE representatives are concerned about the ability of their employees and volunteers to meet the Screening and Training Protocol training timetables, according to interviews conducted during KPMG's site visits. Often, if a local training cannot be attended, the individual must travel up to an hour to attend the next available workshop. According to discussions with SE representatives, this has discouraged individuals from attending the *PGC* training sessions and may have decreased compliance with the training requirements. During interviews with KPMG, some SE representatives suggested that the Diocese either train more instructors or develop a schedule to ensure a *PGC* training session occurs in each deanery at least once per month.

5. The *Protecting God's Children* 2007 Training Effectiveness Report compiled the results of 1,306 evaluations from *PGC* workshops conducted from 5/15/07 to 9/15/07. The evaluation was developed and analyzed by a Sociology Professor at St. Anselm College. According to the Report, 92.6 percent of respondents agreed or strongly agreed that adults who work with children should be obligated to attend the training, and 98.6 percent of respondents agreed or strongly agreed that they believe it is an obligation to report suspicions of child abuse to the proper authorities. The overwhelming majority of participants of *PGC* training (94.5 percent) believe that they have benefited from the workshop.

6. Those who work in the Office for Ministerial Conduct are keeping abreast on current issues related to the SE Program. The Delegate has attended various conferences and meetings, including a workshop on clerical sexual abuse of minors, a seminar on child pornography, and a Vicars for Clergy Conference. The Compliance Coordinator has also attended numerous trainings, including a national audit workshop sponsored by the U.S. Conference of Catholic Bishops, *Calls to Action: Powering Prevention* training, a course on delegation skills, a victim service providers meeting, and defender data recovery training.

*Communication*

7. While the Diocese does have a communications policy regarding increasing awareness and understanding of the problem of child sexual abuse, it has not developed a formal communications protocol and annual communication plan. For example, there is no schedule for how often or when the Compliance Coordinator should remind SE Coordinators of certain requirements.

To her credit, communication between the Compliance Coordinator and the SE Coordinators appeared to be ongoing. The Compliance Coordinator communicates important information by sending all SE Coordinators an e-mail or memorandum. However, a protocol would foster sustainability in the event that roles change, accountability, and greater communication among all critical parties and/or entities.

8. The Diocese replaced the SE Newsletter with eNews, a biweekly e-mail newsletter containing information on all Diocesan events and program updates to the Web site. According to the Compliance Coordinator, all SE Coordinators are on a list to receive the eNews bulletin

regularly. In addition, any individual can sign up on the Diocesan Web site to receive eNews. The archive of past eNews additions are available on the Web site as well. A quick link to the eNews page is posted on the Diocesan homepage.

Articles, notices, announcements, and other information about the safe environment matters are posted in the SE section of eNews.[69] Examples of articles provided include "Best Practice: Timeline Checklists for Coordinators," "Hazing: What is it? What should be done about it?" and "What parents can do to protect young people." The e-mail contains links related to the SE Program, such as important deadlines for SE Coordinators and the *PGC* training schedule. While it appeared that eNews and the Diocesan Web site have become primary vehicles of communication of SE matters, it should be noted that the Compliance Coordinator does continue to send hard copy communications to SE Coordinators on very important matters, such as changes to forms and reminders about screening and training requirements.

The SE section makes up a small segment of the entire eNews bulletin and may be overlooked. Over three editions of eNews, the link to the "Important Deadlines & Updates for SE Coordinators" page was clicked 39 times. According to a list provided by the Diocese, there were 159 SE Coordinators as of April 2008. A majority of the SE Coordinators are not clicking on this link through eNews. During an interview with the Compliance Coordinator, she agreed that the eNews bulletin is voluminous and that SE Coordinators may not be taking time to read it. Therefore, eNews may not be as effective at conveying SE Program information as having a separate SE communications dedicated exclusively to this topic.

9. On an individual basis, parishes and schools publish and distribute information to their parishioners relating to the Diocesan SE Program. All parishes and schools are asked to display child safety posters, distribute the Code and Policy and reporting information cards, and publish SE information in the bulletins, such as the *PGC* training schedule.

10. The Diocese has continued to make significant updates to the Child Safety section of its Web site, specific examples of which can be found at the Diocesan Web site http://www.catholicnh.org/child-safety/. Highlights of the Child Safety Web site include links to information about training and compliance programs and resources for parents, children, and SE Coordinators. This use of the Diocesan Web site greatly facilitates accessibility and ongoing communication as well as increases transparency not only to the Church community, but also to the general public.

April was Child Abuse Prevention Month and the Diocese homepage featured the child safety campaign throughout the entire month. Each week, the main feature was changed to reflect a new item related to Child Abuse Prevention Month. From 3/31/08 to 5/4/08, the homepage received 12,424 page views. These types of initiatives help to increase public awareness of the problem of child sexual abuse.

Some church entities have their own Web sites that contain links to child safety information. For the convenience of individuals planning to work or volunteer, some entities also post the requisite forms online, such as the criminal records release form. The Director of EC Week at the camps set up a specific Web site from which volunteers can download the files they need to complete. The Web site serves as an excellent resource for distributing SE information and forms.

11. A survey was conducted at the Fourth Annual SE Conference in March 2008 regarding communication, the database, and site reviews. The survey was also posted to the Database Message Board. Thirty-two people responded at the Conference and eleven people online. A majority found the overall impression of communication regarding upcoming events, deadlines, changes to procedures and forms was excellent, which demonstrates improvement since the Compliance Coordinator's May 2006 survey where a large number of responses from SE Coordinators claimed there was a general lack of communication and misunderstanding regarding screening and training requirements.

[69] Diocese of Manchester, Memo from Diane Murphy Quinlan and Mary Ellen D'Intino to the Safe Environment Council and Safe dated March 18, 2008

*Acknowledgements*

12. During KPMG's site visits, it was noted that SE Coordinators did not have a uniform standard for collecting Acknowledgement Forms.  Some collected them each time an individual began working or volunteering in a new capacity, others collected a new form each time the Code and Policy was updated, some only required a single Acknowledgement Form and did not collect new forms after Code and Policy updates.  If Acknowledgement Forms are not collected with the release of each new Code and Policy, there will be no way to ensure that Diocesan Personnel have read and are familiar with any policy changes.

**e.  Recommendations for Program Enhancements**

*Training of Church Personnel*

1. The Diocese should continue evaluating alternative substitutes for its current *PGC* training program and should ultimately implement a program to address several limitations that both the Diocese and KPMG have recognized.  Key to implementing a new program should be the requirement that all Diocesan personnel complete the training and that a sustainable method be in place to track completion, specifically within the SE Database.  In selecting its new training program, the Diocese should consider its plan for training recertification once every three years.

   In considering a new *PGC* training program, the Diocese should weigh various accessibility options, such as offering the training both in-person and online.  Online or video-based training could serve as an alternative for individuals who are unable to attend a *PGC* training session within a reasonable distance from their home and within the time frames set out by the Screening and Training Protocol.

   Finally, the Diocese should strongly consider choosing a program that includes a method for measuring training effectiveness, such as a Web-based quiz, to verify each individual's comprehension of the program's concepts, especially if training is presented online or in a video.  Such an expectation will facilitate the effectiveness of the training and will introduce an important element of accountability.

*Communication*

2. Throughout the life of the SE Program, the Diocese should continually assess its communication protocols and consider areas for improvement.  For instance, formulating the protocol to have appropriate flows of information and timetables will foster greater accountability and allow the Diocese to keep its communication current and levels of awareness high.  An annual communications plan would document specifically how, when, and what communication will occur throughout the year.  A written protocol will allow for future sustainability when the time comes for leadership roles to change.

   As an enhancement to existing Diocesan communications, the Compliance Coordinator should consider supplementing the eNews bulletin with regular mass distribution of an SE-specific e-mail communication directed to Pastors, Principals, Directors, and SE Coordinators.  This would help address the issue concerning those that may not be thoroughly reviewing the eNews bulletin.

   Further, as a leading practice, the Diocese should recommend that parishes and schools feature information and materials regarding child safety and the SE Program on their individual Web sites.  Access to SE forms online will improve the efficiency of the Program and raise awareness.

**D   Program Documentation**

**1.   Requirements of the Agreement**

The Agreement stipulates that the Diocese retain all documents and information relating to any allegations of sexual abuse of minors for the life of the accused.

**2.   Industry/Organizational Guidance**

Although the Guidelines do not specifically address documentation requirements, industry practice would support the Diocese maintenance of any and all documentation supporting its compliance with the Agreement at least for the period of required audits.

**3.   Program Overview**

The Policy continues to require that all records regarding sexual abuse must be maintained for the life of the accused, or the longest period of time permitted by Church and civil law, whichever is longer.  It further stipulates that such records must be kept in a format that facilitates their availability to Church Personnel with a legitimate need to know about the allegations.[70]

The Policy also requires that the Diocese maintain a unified Clergy personnel documentation system for use when assigning clerics to ministry.  The record of each cleric will begin once they have entered seminary or preparation for the diaconate and be maintained for "a period of time established by Church law."  In addition, and as described above, the Policy calls for a central records database for all Church Personnel,[71] enabling the Diocese to monitor its compliance with screening and training requirements, and helping parishes to identify whether or not applicants previously employed by other parishes are in good standing.

**4.   Findings**

a.   The Diocese currently maintains a protocol for the regular reconciliation of the SE Database to all assigned Priests, Deacons, and Seminarians that serve in the Diocese.  As noted above, however, the Diocese does not currently have a policy regarding the documentation of clergy reassignments, although the Delegate has recommended implementation of this policy to the Bishop.  While not required by the Agreement, this is an industry-leading practice that is critical to the success and sustainability of the Program, specifically with regard to the documentation of allegations of sexual abuse of minors.

b.   As outlined above, the Diocese has developed a functional SE Database for tracking compliance with Program requirements.  Some limitations still exist, as described in section IV.C.1.d above; for example, KPMG found that documentation in the SE Database does not consistently agree with files at the sites or at the Diocese.  KPMG recognizes, however, the continued efforts of the Compliance Coordinator and the Diocese to identify and resolve these issues, as well as an effort to proactively identify additional areas for improvement.

c.   The Diocese formalized a new file maintenance protocol in April 2008 that describes how Diocesan personnel files should be organized and cross-referenced to another.  This should allow Personnel files to be organized so that those which involve allegations of sexual abuse of a minor can be easily distinguished from others.

**5.   Recommendations**

a.   KPMG continues to recommend that the Bishop accept the Delegate's recommendation to put in place protocols that would uphold a sustainable framework for the tracking and documentation of clergy activity, including the movement of priests to parishes within the Diocese and the formalization of an investigation timetable.

b.   The Diocese should consider centralizing its filing system by retaining copies of all Program requirement documentation (i.e., applications, Acknowledgement Forms, *PGC*, CRR, and NSOPR results) at the OMC to mitigate the risks of missing Program requirements and inaccuracy of data.  This practice would also ensure that, for example, the Diocese reviews the applications for

---

[70] *Policy* at Page 10, §I

[71] Id. at Page 10, §II.B

individuals who have lived out-of-state and that the appropriate criminal background checks are done. Moreover, this will strengthen the Diocese's practice of reconciling files to the SE Database, reducing the potential for inaccuracies, and will facilitate the process of regular testing.

c. As noted above, the Diocese should continue to thoroughly monitor development and integrity of its SE Database and the information contained therein for limitations and areas for improvement. Success and sustainability of the Program and its tools relies considerably the Diocese's commitment to consistently evaluate its Programs, policies, and performance in order to keep up with evolving Program needs and technical advances.

## E. Auditing/Testing of the Program

### 1. Requirements of the Agreement

The Agreement requires the Diocese to submit to an annual compliance audit to be performed by the Attorney General for a period of five years ending December 31, 2007. The audit may include the inspection of records and the interview of Diocesan Personnel.

### 2. Industry/Organizational Guidance

According to the Guidelines, an organization shall take reasonable steps a) to ensure that the organization's compliance and ethics program is followed, including monitoring and auditing to detect criminal conduct, and b) to evaluate periodically the effectiveness of the organization's compliance and ethics program.[72]

In addition, the Guidelines also stipulate that an organization's compliance and ethics program shall be promoted and enforced consistently throughout the organization through appropriate incentives to perform in accordance with the compliance and ethics program as well as appropriate disciplinary measures for engaging in criminal conduct and for failing to take reasonable steps to prevent or detect criminal conduct.[73] Thus, the Guidelines articulate "both a duty to promote proper conduct... as well as a duty to sanction improper conduct."[74]

### 3. Program Overview

The Policy continues to require the DRB, or selected outside consultants hired by the DRB, to conduct regular compliance audits of the OMC for compliance with the Policy and report the results to the Christian Faithful. The Policy notes that any consultants utilized by the DRB should have the competence, skills, and experience that would be helpful in assisting the DRB in its review and monitoring.

During the period under assessment, the Board continued to refine its "audit" policy. At a September 2007 meeting, during which the Board and the Bishop discussed the role of the DRB, the Board decided that it would create a framework for its reviews, provide for annualized discussions, and decide which areas to review on an annual basis.

As a result of this meeting and others, a new version of the DRB Rules was finalized October 2008. The rules, developed by the Associate Delegate and a member of the DRB, require the DRB to conduct a review of the OMC for compliance with the Policy, applicable Church law, and applicable state law at least once every two years and report their findings to the Bishop. The new rules reiterate that the Board has the authority to utilize consultants in its efforts.

### 4. Findings

a. The Diocese currently undergoes regular audits by the United States Conference of Catholic Bishops (USCCB). Although the Agreement does not specifically require the Diocese to have a comprehensive audit plan in addition to this, the DRB has recognized the importance of developing one, as evidenced by recommendation from its own 2006 audit and subsequent discussions. Such a plan, which should specify the makeup of the audit team, its independence, staffing, resources, timetables, testing, and reporting, has yet to be developed.

---

[72] United States Sentencing Commission, Guidelines Manual, §8B2.1(b)(5) (November 2008)

[73] Id. at §8B2.1(b)(6)

[74] Id. at §8B2.1(b)(6)(B)

## Diocese of Manchester

b. To its credit, the DRB has created a "Compliance Audit Instrument 2007 v. 1.0" with the assistance of Diocesan consultant Steve Boivin, CPA. However, this instrument contains only two test procedures and appeared to be more of an audit tool than an audit policy. KPMG also noted that these two test procedures address some of the procedures related to the handling of allegations but did not appear to test screening or training compliance.

c. According to the DRB Rules updated in October 2008, the Board shall report its findings to the Bishop of Manchester. This is not in compliance with the Mandate set forth in the Code and Policy, which requires that the Board make a public report to the Christian Faithful. In addition, this does not address the recommendations of either the DRB or KPMG's 2006 Program assessments, which noted the audits should be conducted by a subcommittee of the DRB that is "wholly independent from the Program's operation or execution." Further, KPMG noted that during a September 2007 meeting in which the audit procedures were discussed, meeting minutes show that the Bishop informed the DRB that their role "was to provide advice to him. Reports from the DRB should therefore be directed to him (and not directly to the Christian faithful)."

d. On March 13, 2008, the Board was told that an audit instrument had been finalized and that a DRB member had been asked to assist in completing the audit. As of October 23, 2008, the audit report was still being finalized. The DRB "opted to forego an additional agreed-upon procedures audit by Howe, Riley and Howe" in 2007; therefore, if the DRB does not conclude its own audit by the end of the current program year, it appeared that it could be out of compliance with its own rules.

e. Board members have actively participated in meetings discussing the Board and its role. KPMG noted that in September, discussions members agreed that they "would prefer an annual 'review' or 'verification' as opposed to a formal audit." However, the DRB rules provide for an audit to be conducted at least once every *two* years. While KPMG commends the DRB for its active involvement, the biannual frequency is not in line with the DRB's own 2006 Audit Recommendations, KPMG Recommendations, or the DRB's September 2007 suggestions.[75]

## 5. Recommendations for Program Enhancements

a. KPMG continues to recommend that the Diocese develop its own comprehensive plan to have a continuing independent annual audit of the Program, to be led by a subcommittee of the DRB that is wholly independent from the Program's operation or execution.

b. KPMG continues to recommend that the DRB conduct (or require its independent auditors to conduct) more extensive assessments of its systems, not predicated by advanced notice, to help ensure that it is in full compliance with its Code and Policy, its own Action Plans, and the previously mentioned leading industry standards. The current test procedures in the "Compliance Audit Instrument 2007 v 1.0," requiring a quarterly review of Attorney General reconciliations and reviews of any priest transfers, do not seem to adequately assess the OMC's overall compliance with its policy.

c. The DRB should be provided with ample time to conduct an audit, and timetables should be developed to ensure that audits are completed and results are provided in a timely fashion. Additionally, if the DRB elects to use its own members, rather than external consultants, to perform its audits, it should ensure that those members have the competence, skills, and experience that would be helpful in conducting such a review.

---

[75] In the 9/6/07 DRB minutes, Board members stated that they would prefer an annual 'review' or 'verification' as opposed to a formal audit. The Board would create the framework, annualize discussions, and decide which areas to review on an annual basis.

© 2008 KPMG LLP, a U.S. limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative.
All rights reserved. Printed in the U.S.A. KPMG and the KPMG logo are registered trademarks of KPMG International a Swiss cooperative.
KPMG Forensic is a service mark of KPMG International.

# EXHIBIT 1

KPMG, LLP                                                                                          Privileged and Confidential
Discussion Draft                                                                                       Attorney Client Privilege

2008 KPMG Program Assessment Report
Appendix A, Exhibit 1 – KPMG Compliance Program Assessment Methodology

As noted in the body of this report, consistent with the methodology employed during the 2005, 2006, and 2007 program assessments, KPMG's methodology for this assessment included: a) evaluating and analyzing diocesan policies, procedures, standards, and relevant correspondence, b) conducting site visits and performing testing of documentation there and at the OMC, and c) interviewing appropriate diocesan and parish personnel who have responsibility over the Program. The documents analyzed and the practices described to us by diocesan and parish personnel are collectively referred to as "the Program" for purposes of this report.

1.  Scope of Assessment

    a. Documents Reviewed

        As part of its assessment KPMG evaluated the Diocese's *Code & Policy*, *Serving Christ, Serving Others - Code of Ministerial Conduct*; *Promise to Protect, Pledge to Heal - Policy for the Protection of Children and Young People*; and the Diocese of Manchester recently revised (July 1 2008) Screening and Training Protocol for Church Personnel. Both documents are attached as **Exhibits 2** and **3**. A list of additional documents evaluated by KPMG and considered to be a part of the Diocese's Program is also attached as **Exhibit 4.**[1]

        KPMG also performed limited and subjective testing on a judgmental basis at the Diocese, two parishes, a diocesan high school, diocesan elementary school, and one of the two diocesan summer camps. The results of this testing are provided for in the relevant sections of this report. Sample testing results are attached as **Exhibit 5.**

    b. Site Visits and Testing

        KPMG visited five Diocese of Manchester sites, which included a high school, an elementary school, a camp, and two parishes. The site visits involved meeting with the Safe Environment Coordinators, Safe Environment representatives or assistants, Pastors, school administrators, or Camp Director, evaluation of the current SE Database for the site of Active and Pending personnel and an evaluation of corresponding documentation in SE Environment personnel files on a selected test basis. KPMG also returned to the Diocese subsequent to the site visits to evaluate documentation at the OMC to further validate what was listed at the sites and in the SE Database on a sample test basis.

    c. Interviews Conducted

        KPMG had discussions with Diocesan and Parish personnel, including the following:

        *   Most Reverend John B. McCormack, Bishop of Manchester

        *   Father Edward Arsenault, Delegate to the Office for Ministerial Conduct

        *   Diane Murphy-Quinlan, Associate Delegate to the Office for Ministerial Conduct

        *   Mary Ellen D'Intino, Diocesan Compliance Coordinator

        *   Eve Mongeau, SE Assistant

        *   Walter Slozack, Diocesan Consultant (SE Database)

        *   Ernie Picken, SE Coordinator, Holy Angel's Preschool, Plaistow

        *   Fr. Bary Belliveau, Pastor, St. Kathryn's Parish, Hudson

        *   Cindy LaCasce, SE Coordinator, St. Mary School, Claremont

        *   Karen McCusker, Secretary, St. Mary School, Claremont

        *   Michael Drumm, Director of Marketing and SE Coordinator, Camp Fatima

        *   Fr. Marc Drouin Pastor, St. Michael's Parish, Exeter

        *   Anthony Pasi, SE Coordinator, St. Michael's Parish, Exeter

---

[1] It should be noted that KPMG was only permitted to review documentation on diocesan property and did not retain copies of any documents reviewed, with the exception of those attached hereto as Exhibits or publicly available via the Diocese's Web site.

KPMG, LLP
Discussion Draft

Privileged and Confidential
Attorney Client Privilege

2008 KPMG Program Assessment Report
Appendix A, Exhibit 1 – KPMG Compliance Program Assessment Methodology

During the course of the assessment, KPMG also spoke with the following personnel at the New Hampshire Attorney General's Office:

- Will Delker, Senior Assistant New Hampshire Attorney General

- Kristin Spath, Associate New Hampshire Attorney General

- Karen Huntress, Assistant New Hampshire Attorney General

2.  Levels of Assessment

KPMG, in its findings, considered the Agreement's requirements and those of the Diocese's Program to be more important than industry leading standards. Both the completeness and quality of the policies and procedures as well as their implementation were considered.

The KPMG assessment standards should not be interpreted as assurance that a regulator, judicial officer, law enforcement body, or any other third party might assess the Program herein in a similar fashion.

3.  Context of the Assessment

In performing its previous assessments and evaluating the design of the Diocese's Compliance Program, KPMG referenced several outside organizations or sources that provide sample guidance as to the definition of an effective compliance program. These included the United States Conference of Catholic Bishops' (USCCB) own principles and policies, which offer a baseline standard for the diocesan policies as well as an approach for conducting a compliance review and the organizational guidelines set forth by the United States Sentencing Commission in its Federal Sentencing Guidelines.

United States Conference of Catholic Bishops

As noted in KPMG's previous reports, in response to the growing number of sexual abuse allegations in dioceses nationwide, the USCCB approved a *Charter for the Protection of Children and Young People* (the Charter) on June 14, 2002. This document provided a framework of policies and procedures relating to sexual abuse allegations and a response thereto. The Charter focused on the following four principles:

(1)  To promote healing and reconciliation with victims/survivors of sexual abuse of minors

(2)  To guarantee an effective response to allegations of sexual abuse of minors

(3)  To ensure the accountability of its procedures

(4)  To protect the faithful in the future.[2]

The 17 articles contained within the Charter address individual issues such as counseling, the establishment of a mechanism to respond to allegations of abuse of minors, the creation of a national office for Child and Youth Protection, a Review Board providing an annual report on each diocese, and the formation of preventative programs.

Following the approval of the Charter, the USCCB issued the *Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons* (the Essential Norms). The Essential Norms sought to ensure that each diocese in the United States had procedures in place for responding to allegations of sexual abuse of minors. The Essential Norms directed each diocese to:

(1)  Have a written policy on sexual abuse

(2)  Appoint a competent person to coordinate assistance

(3)  Establish a review board to consult with the bishop

(4)  Conduct investigations into allegations

(5)  Remove priests or deacons when abuse is discovered

(6)  Comply with all civil authorities and investigations.[3]

---

[2] United States Conference of Catholic Bishops, *Charter for the Protection of Children and Young People (Revised Edition)*, 2002

KPMG, LLP                                                                                          Privileged and Confidential
Discussion Draft                                                                                      Attorney Client Privilege

2008 KPMG Program Assessment Report
Appendix A, Exhibit 1 – KPMG Compliance Program Assessment Methodology

The Essential Norms became the law of the dioceses and eparchies of the United States on December 8, 2002 through a Decree of Recognition by the Holy See.

<u>United States Sentencing Commission</u>

The United States Sentencing Commission's Federal Sentencing Guidelines (the Guidelines) provide the most widely accepted guidance for an effective compliance program. According to the Guidelines' Application Notes, the definition of "organization" includes corporations, partnerships, associations, joint-stock companies, unions, trusts, pension funds, unincorporated organizations, government and political subdivisions thereof, and *nonprofit organizations*.[4] Given this consideration, arguments have been made that these standards should apply to the entities such as Catholic dioceses.[5]

The principles behind the Guidelines' model are important to understand because they have created: (i) a judicial framework that rewards responsible, self-governing companies; (ii) a sound model that companies can follow for managing ethical business conduct; and (iii) a standard that is influencing regulatory enforcement policies, criminal prosecutions, and director and officer liability in civil litigation.

As originally adopted, the Guidelines stated that for an organization's compliance program to be creditworthy, the program must, "at a minimum," include seven categories of activity:

(1) Compliance standards and procedures reasonably capable of reducing the prospect of criminal activity

(2) Oversight by high level personnel

(3) Due care in delegating substantial discretionary authority

(4) Effective communication to all levels of employees

(5) Reasonable steps to achieve compliance, which include systems for monitoring, auditing, and reporting suspected wrongdoing without fear of reprisal

(6) Consistent enforcement of compliance standards, including disciplinary mechanisms

(7) Reasonable steps to respond to and prevent further similar offenses upon detection of a violation.[6]

Revisions to the Guidelines last year responded to numerous high-profile instances of misconduct as well as additional learning and development in the compliance field, have strengthened these criteria through the following structural safeguards: the promotion of a culture of compliance; active participation of the board and senior management; effective training and communications; monitoring, ongoing evaluation, and adherence to controls and program requirements; well-publicized mechanisms to report violations, with protections in place for confidentiality and non-retaliation; disciplinary action for program violations and program modification to prevent similar future violations; and ongoing risk assessments.

KPMG's approach continued to seek to determine whether basic initiatives with respect to each of those categories are present in the Diocese's Compliance Program. It is important to note that the Guidelines also have an overarching requirement, namely that an organization exercise "due diligence" to ensure that its program "generally will be effective."

Therefore, KPMG's approach goes beyond compiling an inventory of basic activities and incorporates practices that companies with relatively mature compliance programs have generally found to correlate with effective compliance management.

However, there remain are no "hard and fast" rules in this regard, and no single approach is necessarily appropriate for every organization. Thus, as with prior years, KPMG has taken into consideration the Diocese's particular needs and operating environment in assessing the design of its Compliance Program.

---

[3] United States Conference of Catholic Bishops, *Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons*, 2002

[4] United States Sentencing Commission, <u>Guidelines Manual</u>, at §8A1.1, *Commentary* (Nov. 2008) (emphasis added)

[5] Herbert I. Zinn, "The Saga of the Catholic Archdiocese of Boston: To Which Higher Authority Does Your Organization Report," Practicing Law Institute's Corporate Compliance Seminar, 2002, Page 4

[6] Paula Desio, "An Overview of the United States Sentencing Commission and the Organizational Guidelines," United States Sentencing Commission, Page 2

KPMG, LLP                                                                    Privileged and Confidential
Discussion Draft                                                              Attorney Client Privilege

2008 KPMG Program Assessment Report
Appendix A, Exhibit 1 – KPMG Compliance Program Assessment Methodology

KPMG's 2008 Program Assessment focused not only on the above industry guidance, but also an assessment of enhancements and modifications to the Diocese Compliance Program since KPMG's 2005, 2006 and 2007 Program Assessment Reports. Thus, this report considers the Diocese's implementation of the April 28, 2008 Diocese of Manchester Action Plan III (Action Plan III) **Exhibit 7** which was developed to provide a comprehensive response to the recommendations contained in the 2007 KPMG Program Assessment Report.

# EXHIBIT 2

**Diocese of Manchester**

# Code & Policy



**EFFECTIVE DATE: MARCH 19, 2007**



## Serving Christ, Serving Others
*Code of Ministerial Conduct*

## Promise to Protect, Pledge to Heal
*Policy for the Protection of Children and Young People*

# Diocese of Manchester
# Serving Christ, Serving Others
# Code of Ministerial Conduct

## Table Of Contents

Introductory Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Mission Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Applicability and General Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
I.    Applicability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
II.   General Definitions for the Purpose of this Code . . . . . . . . . . . . . . . . . . .3

General Priciples of Ethics and Integrity in Ministry . . . . . . . . . . . . . . . . . . .3
I.    Standards for Ethical and Moral Behavior . . . . . . . . . . . . . . . . . . . . . . . . .3
II.   Standards for Integrity in Ministry . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
III.  Standards for Working with Minors . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
IV.   Standards for Spiritual and Pastoral Counseling Relationships . . . . . . .8

Violations of the Code of Ministerial Conduct . . . . . . . . . . . . . . . . . . . . . . . .9
I.    Reporting Incidents, Allegations, and Concerns . . . . . . . . . . . . . . . . . . .9
II.   Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
III.  Investigating Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
IV.   Disciplinary Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
V.    Pastoral Care and Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10



January 2007

Dear Sisters and Brothers in Christ,

As a Catholic community, we take comfort that we share in the mission of Christ on Earth. We hold ourselves to the standard of being truly Christian so that we may reflect Christ's love for all we meet and serve. To assist us in our work, we have established common practices to remind us what the Church expects of us as her ministers.

*Serving Christ, Serving Others: Code of Ministerial Conduct* is our code: a clear expression of what is expected, what is required, and what is unacceptable. Because we continue to develop as servants of Christ, so, too, our Code must develop in order that it remain an effective tool for us. A thorough review of the Code that was first adopted in 2004 has just been completed.

I take this occasion to express my appreciation to the members of the Diocesan Review Board who reviewed the 2004 version of the Code and offered revisions. I also am grateful to the members of the Safe Environment Council, the Pastoral Council, and the Presbyteral Council for their review and suggested revisions to the Code. Finally, to the many laity, religious and clergy who reviewed drafts of this work to ensure that it is effective and relevant to our ministry in the Lord, I offer my heartfelt thanks.

May God bless you and our work together on behalf of the people of God.

Sincerely in our Lord,

+ John B. McCormack

Bishop of Manchester

# Diocese of Manchester
# Mission Statement

We are the Catholic Church of New Hampshire, a portion of God's people rich in our tradition and in our diversity, striving in faith for fullness of life.

In communion with the Bishop of Rome and the Church throughout the world, our mission is to witness to the Good News of Our Lord Jesus Christ in the power of the Holy Spirit by

- Worshiping God in Word and Sacrament,
- Proclaiming and sharing our Faith,
- Promoting holiness of life through continuing conversion,
- Serving human needs, especially those of the poor and the oppressed,
- Forming Christian communities on the family, parish and diocesan levels,
- Fostering reconciliation and harmony among the people of our diocese, our state, our nation, and our planet.

Faithful to the constant teaching of the Church, we also pledge to collaborate with all peoples, especially with other Christian Churches and with Jewish communities, as we devote ourselves to being thankful, responsible stewards of God's gracious and bountiful gifts.  While we journey in Faith, we anticipate with joy the day when Christ will come again and everything will be complete in God's love.

## APPLICABILITY AND GENERAL DEFINITIONS

### I.   Applicability

This Code of Ministerial Conduct applies to all church personnel employed or engaged in ministry for the Diocese of Manchester, its parishes, schools, institutions, and agencies. Because of the grave responsibilities associated with their work and positions, bishops, priests, and deacons are held to higher standards of behavior than other church personnel. Thus, bishops, priests, and deacons not only are required to comply with the standards of behavior included in this Code, they are also expected to avoid even the appearance of impropriety both inside and outside the scope of their ministry.

In addition to this *Serving Christ, Serving Others: Code of Ministerial Conduct* ("Code"), the Diocese requires that church personnel comply with the diocesan *Promise to Protect, Pledge to Heal Policy for the Protection of Children and Young People* ("Policy"). The Code is intended to provide a broader context in which to view ministerial relationships by church personnel in the Diocese of Manchester, while the Policy is solely focused on preventing, investigating, and remedying sexual abuse of minors.

Responsibility for adhering to this Code rests with the individual. Church personnel who disregard this Code will be subject to appropriate disciplinary action.

### II.   General Definitions for the Purposes of This Code

**A.   Church Personnel:**  The following are included in the definition of "church personnel":

1.   Clerics (bishops, priests, and deacons) who are incardinated in the Diocese of Manchester or who are granted authority (faculties) to exercise ministry therein. Some faculties are granted by Church law itself and others are granted by the Bishop of Manchester.

2.   Members of religious institutes (women and men religious) assigned to ministry in the Diocese, its parishes, Catholic schools, institutions, or agencies.

3.   Lay employees and volunteers, including

a.   Seminarians assigned to pastoral work in the Diocese of Manchester; seminarians seeking incardination in this Diocese; and those men enrolled in the Permanent Diaconate Formation Program;

b.   All paid personnel, whether employed in areas of ministry or other kinds of services by the Diocese, its parishes, Catholic schools, institutions, or other agencies;

c.   All volunteers.  A volunteer is any person who performs a Church-related service without promise or expectation of monetary compensation on a regular and continual basis, including but not limited to catechists, coaches, youth ministers, lectors, ushers, Boy Scout leaders, Catholic Youth Organization volunteers, day care volunteers, volunteer camp counselors, members of a parish pastoral council, members of a parish finance council, children or youth choir directors, and parish outreach workers.  A regular and continual basis means at least two times per month for three months or six times per year.

**B.   Code:** The term "Code" refers to this *Serving Christ, Serving Others: Code of Ministerial Conduct.*

**C.   Heads of Church Institutions:** "Heads of Church Institutions" are individuals who are responsible for the pastoral administration of diocesan parishes, Catholic schools, or institutions.  Examples of Heads of Church Institutions are bishops (and their delegates), pastors and principals.

## GENERAL PRINCIPLES OF ETHICS AND INTEGRITY IN MINISTRY

### I.   Standards for Ethical and Moral Behavior

Fundamental to the pastoral mission of the Diocese of Manchester for all church personnel is to exhibit the highest ethical standards and personal integrity at all times.

Beyond the obvious standards for correct moral behavior in Sacred Scripture and the Tradition of the Church (i.e., the Ten Commandments, the Beatitudes, the Catechism of the Catholic Church), church personnel are required to

A.   act or behave in a manner consistent with accepted Catholic standards of moral or ethical conduct;

B.   act in a manner consistent with civil law and Church law;

C.   comply with diocesan standards, policies, and instructions, including this Code;

D. avoid situations that might be perceived as formally rejecting the teachings of the Catholic Church and the Christian way of life or promoting causes in direct conflict with the teachings of the Catholic Church;

E. act in a manner consistent with a commitment to maintain a celibate and/or chaste lifestyle;

F. refrain from abusing alcohol or drugs; and

G. engage in conduct that has a positive impact on the reputation of the Diocese and its parishes, schools, institutions, and agencies.

## II. Standards for Integrity in Ministry

### A. Prevention of Harassment including Sexual Harassment [1]

> Every human person is created in the image and likeness of God. The dignity of the human person is such that we ought to treat others as children of God and as we would want to be treated ourselves. Harassment of any type obviously violates the dignity of the person who is harassed, but it also contributes to the overall deterioration of the human dignity owed to every person in society.

Church personnel shall thus be mindful of the following:

1. Church personnel must not engage in physical, psychological, written, or verbal intimidation or harassment of any person at any time, particularly those served and other church personnel.

2. Church personnel must not engage in sexual harassment or any inappropriate behavior of a sexual nature toward other church personnel, parishioners, or others.

3. Church personnel must not discriminate against any individual on the basis of race, color, national origin, gender, religion, sexual orientation, age, physical or mental disability, pregnancy, or military or veteran status, except where such status is a legitimate qualification in accordance with civil and Church law.

4. While it is not possible to list all behavior that is considered to be harassment or sexually inappropriate, prohibited conduct includes, but is not limited to

   • slurs, epithets, derogatory comments;
   • unwelcome jokes, comments, and teasing of an offensive nature;
   • inappropriate physical contact or gestures;
   • sexual advances;
   • displaying written materials, pictures, or other items that are offensive or sexually suggestive;
   • viewing sexually suggestive or inappropriate written materials, websites, electronic mail messages, or other items while on Church property or while performing duties or engaging in ministry for the Church;
   • other conduct that has the purpose or effect of unreasonably interfering with an individual's performance at work or creates an intimidating, hostile, or offensive working environment.

5. Harassment can occur as a result of a single severe incident or a pattern of conduct that results in the creation of a hostile, offensive, or intimidating work environment. Harassment can be indirect and can take place even when the offender does not intend to offend, intimidate, or otherwise do harm. Whether conduct is considered to be harassment is based, in part, on whether a reasonable person under the circumstances would view the conduct as creating a hostile, offensive, or intimidating work environment.

6. Church personnel are required to report harassment, including sexual harassment, in accordance with the reporting policy contained in this Code. Church personnel are prohibited from retaliating against individuals who make good faith reports of harassment.

---

[1] The term "sexual harassment" means unwelcome sexual advances, requests for sexual favors, and other verbal, physical, and nonphysical conduct of a sexual nature between adults when (1) submission to such conduct is made explicitly or implicitly a term or condition of employment; (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting that individual or for awarding or withholding a favorable employment opportunity, evaluation, or assistance; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's performance at work, or creates an intimidating, hostile, or offensive work environment.

B.  Prevention of Sexual Exploitation[2]

> The understanding of the human person in the Roman Catholic tradition calls everyone to live a life of faithful chastity that views human sexuality in light of the Gospel.  Faithful married life, consecrated religious life, and celibacy for some deacons and all priests and bishops are each examples of a commitment to chastity that reflect the understanding that human sexuality is a gift from God.  Human sexuality is exclusively oriented to the communion of a husband and wife that reflects the unity of the life of God and results in the creation of new life in the procreation of children.
>
> The promotion of this understanding of the human person is part of what the Church teaches.  Therefore, the expression of human sexual attraction through sexual intimacy between persons who minister in the Diocese of Manchester and those whom they serve is never appropriate.

Church personnel shall thus be mindful of the following:

1.  Church personnel must not engage in sexual intimacies with anyone other than their legitimate spouse.  This prohibition would include, but not be limited to, anyone to whom church personnel are ministering or supervising; anyone who is particularly vulnerable to manipulation because of a physical or mental disability; and anyone who does not have equal power or perceived power in the relationship.  For example, a principal may not have a sexual relationship with a teacher in that school if the two are not married to one another.

2.  For the purpose of this policy, the term "sexual intimacies" means sexual contact of any kind (consensual or otherwise) as well as sexually explicit conversations not related to the legitimate duties of church personnel, such as the transmission of the teachings of the Church in a legitimate catechetical ministry.  An example of legitimate discussions that refer to sexual intimacies is the preparation of couples engaged to be married that is administered by church personnel.

C.  Prevention of Conflicts of Interest

> Persons who seek the service of the Lord in the Church ought to be able to do so without any doubt of whose interests church personnel serve.  Even the appearance of a conflict of interest by church personnel must be avoided so that persons who seek the Lord in our midst know that in addition to Christ, they are the ones whom church personnel seek to serve.

Church personnel shall thus be mindful of the following:

1.  Church personnel should avoid placing themselves in a position that might present a conflict of interest because the existence or the appearance of a conflict of interest can call into question one's integrity and professional conduct.

2.  The potential for a conflict of interest exists in many circumstances.  Examples of such situations and behavior by church personnel include, but are not limited to, conducting private business or other dealings with the Church or any of its members; accepting substantial (non-token) gifts for services or favors; employing or engaging in transactions with one's friends or relatives; soliciting personal loans or requests for financial assistance from parish members, vendors, or employees; acting with partiality toward employees or church members; or violating a confidence of another for personal gain.

3.  A conflict of interest may exist when church personnel give family and/or friends unlimited access to church facilities or resources when they are not available to other parishioners.  Parish employees and the family members or friends of a priest shall not be provided a residence on parish property without the explicit written permission of the bishop. This blanket prohibition does not apply to a visit or a brief stay.

4.  A conflict of interest may also exist in ministerial relationships.  Church personnel must establish clear, appropriate boundaries with anyone with whom they have a business, professional, personal, familial, or social relationship.

---

[2]  The term "sexual exploitation" means any contact of a sexual nature between an adult and another receiving pastoral care and sexual activity between adults with unequal power or perceived power (e.g., a priest and parishioner; a principal and a teacher).  Sexual exploitation also includes sexual activity between an adult and a "vulnerable individual," defined as a person who has reached eighteen years of age and who is particularly susceptible to manipulation because of a mental or physical disability.

## D. Confidentiality

> Persons who seek the service of the Lord in the Church expect church personnel to do so with a desire to serve the truth and their needs. Confidentiality in the discourse of ministry must serve the truth. Ministerial confidentiality requires church personnel to be vigilant in keeping persons' confidence while, at the same time, not digressing to keeping secrets that might allow harm to come to anyone.

Church personnel shall thus be mindful of the following:

1. Many people who come to the Church for help expect that church personnel will refrain from disclosing personal and sensitive information they share with church personnel. Church personnel therefore should maintain their confidentiality, except as required by law or as set forth in the paragraphs below.

2. Church personnel must comply with all reporting requirements mandated by New Hampshire law and the Diocese of Manchester *Promise to Protect, Pledge to Heal* Policy regarding the reporting of sexual abuse of a minor.

3. In accordance with Church law, the sacramental seal of confession is inviolable, and it is absolutely forbidden for a confessor to betray the confidence of a penitent in any way, for any reason. This is applicable whether the penitent is living or dead. Violation of the sacramental seal of confession is considered to be a grave delict (a serious crime) against church law.[3]

4. Information obtained in the course of counseling sessions shall be confidential, except for compelling professional reasons, as required by law, or as required by the reporting requirements for sexual abuse contained in the *Promise to Protect, Pledge to Heal* Policy. Church personnel are also bound to safeguard the confidentiality of any notes, files, or computer records pertaining to professional contact with individuals to the extent consistent with the obligation to report abuse or prevent harm.

5. If, during the course of counseling, church personnel become aware that there is clear and imminent danger to the counselee or to others, church personnel must disclose the information necessary to protect the parties involved and to prevent harm. If feasible, church personnel should inform the counselee about the disclosure and the potential consequences.

6. With the exception of knowledge gained during the Sacrament of Penance, knowledge that arises from professional contact may be used in teaching, delivering homilies, or other public presentations only when effective measures have been taken to safeguard both the individual's identity and the confidentiality of the disclosures. Good pastoral judgment is of the utmost importance.

## III. Standards for Working with Minors[4]

### A. Appropriate Conduct with Minors

1. Church personnel must be aware of their own vulnerability and that of any minor with whom they are working. Church personnel should avoid situations where they are alone with a minor. When it is not feasible to have another individual present, such as when counseling or teaching a minor, church personnel must meet with the minor in as public a place as possible, such as a room with the door open or with a clear window in the door.

2. Church personnel are prohibited from speaking to minors in a way that is or could be construed by any observer as being harsh, threatening, intimidating, shaming, derogatory, demeaning, or humiliating. Church personnel are expected to refrain from using profane language in the presence of minors and must never use any discipline that frightens or humiliates children and youth. Church personnel are prohibited from using physical discipline, including but not limited to spanking, slapping, hitting, or any other physical force. If a minor exhibits uncontrollable or unusual behavior, the church worker should notify the appropriate supervisor and a parent or guardian of the minor.

3. Church personnel must not use or supply alcohol (excepting sacramental wine in Mass) and/or illegal drugs when working with minors or while participating in a youth activity. Moreover, church personnel must not be under the influence of alcohol or impairing drugs (including prescription medication not used as directed) while working with minors.

---

[3] 1983 Code of Canon Law, c. 1388. The inviolability of the sacramental secrecy also extends to those who deliberately, accidentally, or in any other way come to a knowledge of sins from confession, and individuals who violate the sacramental seal may be "punished with a just penalty, not excluding excommunication." 1983 Code of Canon Law, cc. 984, 1388.

[4] "Minors" are individuals who have not yet reached their eighteenth birthday.

4. Church personnel must not provide any sexually explicit, inappropriate, or offensive material to minors. Church personnel are prohibited from possessing or viewing any sexually-oriented or morally inappropriate printed materials (magazines, cards, videos, films, clothing, etc.) on church property or in the presence of minors. Church personnel are also prohibited from viewing sexually-oriented or morally inappropriate websites or viewing or sending such electronic mail messages on church property or in the presence of minors.

5. Church personnel are prohibited from engaging in any sexually-oriented conversations with minors whether orally, in writing, or electronically. However, it is expected that from time to time, youth ministry and educational lessons and discussions for teenagers may address human sexuality issues related to dating and sex. Moreover, it is expected that minors may raise issues relating to sexuality during counseling sessions. Lessons and counseling must convey to youth the Church's teaching on these topics. If youth have further questions not answered or addressed, they should be referred to their parents or guardians for clarification or counseling. In addition, church personnel are prohibited from discussing their own sexual orientation, activities, practices, or history with minors.

**B. Appropriate Boundaries**

1. Physical contact with minors beyond a handshake or a "high-five" can be misconstrued both by minors and adults, and should not occur except under appropriate public circumstances. The following are examples (not an exclusive list) of behavior in which church personnel should never engage with minors: inappropriate or lengthy embraces; kisses on the mouth; holding minors over five years old on the lap; intentionally touching bottoms, chests, legs, or genital areas; showing affection while in an isolated location; wrestling or giving piggyback rides; giving massages; or paying compliments that relate to physique or body development.

2. Church personnel must not go on overnight trips with minors other than their own relatives unless another adult is present. They must not share beds with minors other than their own children nor share sleeping quarters with minors except when necessary and when another adult is present. Church

personnel must not provide overnight accommodations in rectories or other personal residences for minors other than minors with a close familial relationship or when minors are accompanied by a parent or legal guardian. This does not include situations that a reasonable person would view as acceptable, such as sleepovers between friends who are minors.

3. Church personnel should never be nude in the presence of minors in their care and should avoid situations where minors are nude while in their care. If monitoring is necessary, two or more adults should be present at all times. Changing and showering facilities or arrangements for adults should be separate from facilities or arrangements for minors.

**C. Supervision of Programs Involving Minors**

1. Parents are encouraged to be a part of any and all services and programs in which their children are involved in the Diocese of Manchester. Parents may contact their child's school or parish in order to make arrangements to observe programs or activities in which their children are involved.

2. At the close of services or activities, church personnel should release minors in their care only to parents, legal guardians, or other persons designated by parents or legal guardians. In the event that church personnel are uncertain of the propriety of releasing a minor, they should immediately locate or contact their supervisor before releasing the child.

3. Church personnel must be over the age of twenty-five in order to be eligible to provide occasional transportation for minors. Minors should never be transported without written permission from a parent or guardian. Church personnel should transport minors directly to their destination, and no unauthorized stops should be made. Church personnel must require all minors to wear seatbelts or, when appropriate, be strapped into car seats.

IV. Standards for Spiritual and
Pastoral Counseling Relationships[5]

A. Respecting the Rights and Welfare of
Those Counseled

> Persons who seek the Lord in the Church ought to be confident that the spiritual and pastoral counseling that is offered to them is presented in a manner that conforms to Sacred Scripture and the teaching Tradition of the Church. Church personnel must be committed to transmitting the truth in a manner that respects the rights and welfare of those served.

Church personnel shall thus be mindful of the following:

1. Church personnel who conduct counseling for families, individuals, or groups must respect their individual rights and work to advance the welfare of each person.

2. Church personnel are expected to avoid situations and conduct in which they do (in fact or appearance) take advantage of anyone to whom they are providing services in order to further their personal, religious, political, or business interests.

3. Church personnel shall not overstep their competence in counseling situations and shall refer to other professionals when appropriate. The professional boundaries for church personnel are dictated by their training and/or certification from a recognized professional association of peers or licensure from the State of New Hampshire.

B. Maintaining Appropriate Boundaries

> Persons who seek the Lord in the Church ought to be confident that the church personnel who serve them know the appropriate boundaries in a ministerial relationship. Sometimes, church personnel need to explain and even articulate these boundaries to persons who seek help from the Church but who may not themselves know what constitutes an appropriate boundary.

Church personnel shall thus be mindful of the following:

1. Church personnel shall set, communicate, and maintain clear, appropriate boundaries in all counseling and counseling-related relationships.

2. Church personnel must never engage in sexual intimacies with those they counsel. This includes consensual sexual contact, forced sexual contact, and sexually explicit conversations not related to counseling issues.

3. Church personnel shall not engage in sexual intimacies with counselee's relatives, friends, or other individuals close to the counselee. Church personnel should presume that a potential for exploitation or harm exists in such intimate relationships.

4. Physical contact with the counselee can be misconstrued. Great care should be taken in any physical contact beyond a handshake.

5. Sessions should be conducted in appropriate settings at appropriate times and should not be held at places or times that would tend to cause confusion about the nature of the relationship for the counselee. No sessions should be conducted in private living quarters. Church personnel should keep a log of the times and places of sessions with each counselee.

---

[5] The standards set forth in this Code are minimum requirements for church personnel. Some professional counselors and therapists may be required to comply with additional behavioral directives and codes of ethics.

# VIOLATIONS OF THE CODE OF MINISTERIAL CONDUCT

## I.    Reporting Incidents, Allegations, and Concerns

An environment of personal integrity in ministry requires that a culture of accountability among church personnel be established and maintained in a spirit of understanding that our individual conduct reflects the intention of the entire Church.

Some reporting requirements are required by civil and church law, especially when church personnel believe that a minor is at risk of abuse.  Other reporting requirements are required by this Code and seek to build a culture of accountability.

A culture of accountability also requires that reports of inappropriate behavior be investigated in a manner in which the dignity of the person who makes the report, the person who is accused of inappropriate behavior, and the person who may have been harmed are all treated fairly and justly. The administration of discipline for violations of this Code are oriented to care for the person(s) who may have been harmed, to repair any damage done to any person or the Church herself, and to correct the behavior of the person who may have violated the Code.  Some violations can only be adequately corrected by the removal of a person found to have so harmed another person or the Church that their presence in ministry is harmful to the common good and the good of the Church.

**A.    Reporting Requirements of Church Personnel.**  The Diocese is dedicated to taking steps to ensure that the Church is a safe and welcoming environment for all people and that it is free from harassment and intimidation. Every member of the Church community must participate actively in the protection of minors as well as others who minister or worship in our Church.  Church personnel therefore have an affirmative duty to report observations of violations of this Code.  **If Church personnel suspect that a minor has been subjected to abuse, they must comply with the reporting requirements under New Hampshire law and the Diocese of Manchester** *Promise to Protect, Pledge to Heal* **Policy.** [6]

**B.    Reporting Procedures.**  Reports of unethical behavior or other violations of the Code may be made to any one of the following:

1.    the Head of the Church Institution where the conduct took place;

2.    the Delegate for Ministerial Conduct at (603) 669-3100; or

3.    the Delegate for Ministerial Conduct or the Bishop at 153 Ash Street, P.O. Box 310, Manchester, NH 03105-0310.  All written reports should state specifics.

**C.    Requirements of Heads of Church Institutions.**  If a violation of the Code by a cleric is reported to the Head of a Church Institution, this individual must promptly gather additional information about the nature of the concern and immediately contact the Delegate for Ministerial Conduct for consultation.  If the Head of a Church Institution becomes aware of an allegation of sexual exploitation, sexual harassment, harassment, or inappropriate conduct of a sexual nature involving a minor by Church personnel,[7] the institution head must make a report to the Delegate for Ministerial Conduct for consultation.[8]

## II.    Retaliation

**A.    Retaliation Prohibited.**  The policy of the Diocese is to encourage individuals to make reports in accordance with this Code.  As a result, individuals who make reports in accordance with this Code will not be subjected to retaliation for making the reports.

**B.    Reporting Retaliation.**  Church personnel who believe that they have been subjected to retaliation for making reports under this Code should report the matter to the Delegate for Ministerial Conduct by telephone at (603) 669-3100 or should submit a specific letter to the Delegate for Ministerial Conduct or the Bishop at 153 Ash Street, P.O. Box 310, Manchester, NH  03105.

## III.    Investigating Concerns

**A.    Conducting the Investigation.**  All reports of violations of this Code will be taken seriously whether or not complaints are submitted in accordance with the reporting procedures contained in this Code.  Investigations into allegations of unethical behavior or violations of this Code will be conducted thoroughly and expeditiously, with objectivity, fairness, and justice as well as with due regard for the privacy and reputations of all involved.  Canon law and

---

[6]  The Diocese of Manchester *Promise to Protect, Pledge to Heal: Policy for the Protection of Children and Young People* can be found on the Child Safety page of the Diocese of Manchester website: www.catholicchurchnh.org.

[7]  "Inappropriate conduct of a sexual nature involving a minor" means inappropriate sexual conduct or  violations of this Code that relate to interactions with minors and that do not rise to the level of suspected abuse.  Examples of such inappropriate behavior include, but are not limited to, discussing one's own sexual orientation, sexual activities, or sexual history with minors and showing minors sexually explicit, inappropriate, or offensive printed materials.

[8]  As stated above, if church personnel (including Heads of Church Institutions) suspect that a minor has been subjected to abuse, they must comply with the reporting requirements under New Hampshire law and the *Promise to Protect, Pledge to Heal* Policy.

any protocols developed by the diocese for addressing allegations of Code violations against church personnel will be followed in every case that they are applicable.

**B.    Administrative or Precautionary Leave.**  In certain instances, a person accused of violating the Code may be placed on administrative or precautionary leave while the investigation is pending. The fact that an accused has been placed on administrative or precautionary leave should in no way be interpreted as a presumption of guilt or wrongdoing.

## IV.   Disciplinary Action

Church personnel who engage in unethical behavior or otherwise fail to abide by the standards contained in this Code will be subjected to appropriate remedial and/or disciplinary action, up to and including appropriate canonical penalties for clergy and termination of employment or volunteer ministry with the Church.  The action taken will be just and in proportion to the seriousness of the violation and will depend upon a number of factors, including but not limited to disciplinary record, the type, circumstances, and severity of the offense, and position with the Church.  If the offense does not include sexual abuse of a minor,[9]  the action taken could include return to ministry under certain conditions, including compliance with a treatment and/or monitoring plan, or reassignment to ministry other than ministry at a parish or ministry involving family life.   Records regarding sexual exploitation by clerics will be maintained for the longest period of time permitted by Church law and will be considered by the Bishop and his advisors in making ministerial assignments.

## V.   Pastoral Care and Support

**A.   Individuals Subjected to Unethical Behavior.**  The Diocese will extend appropriate pastoral care to those directly affected by allegations of unethical behavior or other violations of the standards in this Code by church personnel. Where appropriate, the Director of the Office for Healing and Pastoral Care will coordinate pastoral care and counseling, spiritual assistance, and other social services for those subjected to unethical behavior by church personnel and will listen with patience and compassion to their experiences and concerns.

**B.   Individuals Accused of Unethical Behavior.**  The Delegate for Ministerial Conduct will coordinate any appropriate pastoral care and counseling, spiritual assistance, and other social services for church personnel accused of unethical behavior.

**C.   Communities Affected by Allegations.**  The Diocese will extend appropriate pastoral care to the parishes, schools, or institutions directly affected by allegations of unethical behavior by church personnel.  When an individual is placed on or requests administrative or precautionary leave as a result of an allegation, the Delegate will consult the leadership of the parish, school, or institution to determine what the appropriate pastoral response of the Diocese should be and whether additional public notification is appropriate.  The response and any notification must protect the rights of the accused and the confidentiality of the complainant.

---

[9] The *Promise to Protect, Pledge to Heal* Policy can be found on the Diocese of Manchester website (www.catholicchurchnh.org) on the Child Safety page.

# Diocese of Manchester
# Promise to Protect, Pledge to Heal
# Policy for the Protection of Children and Young People

## Table Of Contents

Introductory Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Preamble . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

**Applicability and General Definitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
I.     Applicability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
II.    General Definitions for the Purpose of this Policy . . . . . . . . . . . . . . . .2

**Prevention** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
I.     Screening of Church Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
II.    Assignments of Priests and Deacons . . . . . . . . . . . . . . . . . . . . . . . . . .3
III.   Training of Church Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
IV.    Independent Contractors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
V.     Roles and Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

**Intervention** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
I.     Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
II.    Pastoral Care and Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

**Remediation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
I.     Allegations Found to Be True . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
II.    Unfounded Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
III.   Settlement Agreements with Complainants . . . . . . . . . . . . . . . . . . . . .8

**Reporting of Incidents Allegations and Concerns** . . . . . . . . . . . . . . . . . . . .9
I.     Reporting Sexual Abuse and Neglect of Minors . . . . . . . . . . . . . . . . .9
II.    Reporting Noncompliance in Policy Administration . . . . . . . . . . . . . .9
III.   Prohibiting Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

**Documentation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
I.     Records Regarding Sexual Abuse . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
II.    Unified Personnel Documentation Systems . . . . . . . . . . . . . . . . . . . .10

**Communications** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
I.     General Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
II.    Policy Distribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
III.   Public Announcements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

**Measuring Progress and Accountability** . . . . . . . . . . . . . . . . . . . . . . . . . . .11
I.     General Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
II.    Compliance Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12



January 2007

Dear Sisters and Brothers in Christ,

The protection of children and young people is the work of the whole Church. As bishop, I have worked with many members of the laity and clergy to establish policies and practices that ensure we work together to create and maintain a safe environment for the people we serve.

Our current policy, the result of a collaboration of professionals, lay men and women, priests and religious women, has served our community well since it became effective on March 19, 2004. Like all good things, however, this policy and the practices that flow from it are ever evolving. Recently we conducted a thorough review and evaluation of *Promise to Protect, Pledge to Heal: The Protection of Children and Young People: Policy and Procedures*. After receiving input from the public and those whom the policy affects, the Diocesan Review Board took the initiative to review the policy and made a number of suggested improvements.

I am pleased to approve the revisions and to make the revised policy effective on March 19, 2007. Like the original policy, it sets forth the standards for protecting minors in the care of the Church, requires that suspicion and reports of child sexual abuse be taken seriously and be reported to the appropriate civil authorities, and ensures that due civil and canonical legal processes be followed for church personnel accused of sexual abuse of a minor.

As a community, I pray that we will continue to work together to fulfill the promises and pledges we made to be faithful to the Lord forever. I ask you to join me in continuous prayer for the healing of those who have been harmed by sexual abuse. May the Lord watch over them and us and may He give us the strength, wisdom and judgment to be ever steadfast in the protection of all people.

Sincerely in our Lord,

Bishop of Manchester

PREAMBLE

Child sexual abuse is a horrible sin and crime in our Church and society. It is a matter of the gravest concern for our Diocese. The objectives of this policy are to prevent child sexual abuse in our Church before it occurs, respond with compassion and respect to those who report that they have been abused by church personnel, ensure due process and respect for the rights of those who have been accused of sexual abuse, provide for cooperation with the civil authorities, and address allegations of child sexual abuse openly.

In addition to this *Promise to Protect, Pledge to Heal: Policy for the Protection of Children and Young People* ("Policy"), the Diocese requires that church personnel comply with the diocesan *Serving Christ, Serving Others: Code of Ministerial Conduct* ("Code") which sets forth additional standards of behavior for all who minister in the Church. The Code is intended to provide a broader context in which to view ministerial relationships by church personnel in the Diocese of Manchester, while the Policy is solely focused on preventing, investigating, and remedying sexual abuse of minors.

Responsibility for adhering to this Policy rests with the individual. Church personnel who disregard this Policy will be subject to appropriate disciplinary action.

APPLICABILITY AND GENERAL DEFINITIONS

**I. Applicability**

This Policy applies to all who are engaged in ministry either by assignment, employment, or as a volunteer for the Diocese of Manchester or its parishes, schools, institutions, and agencies. The Policy applies to "church personnel," and where appropriate, applicants to become "church personnel" and independent contractors of the diocese.

**II. General Definitions for the Purposes of This Policy**

**A. Accused:** The term "accused" means anyone accused of sexual abuse of a minor.

**B. Adult:** "Adults" are individuals who have reached their eighteenth birthday.

**C. Church Law:** The term "church law" means the *1983 Code of Canon Law*,[1] the *motu proprio* of Pope John Paul II, *Sacramentorum Sanctitatis Tutela* ("SST"),[2] the *Essential*

*Norms for Diocesan and Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons* ("*Essential Norms*"),[3] as well as other particular law of dioceses in the United States, and particular law of the Diocese of Manchester.

**D. Church Personnel:** The following are included in the definition of church personnel:

1. Clerics (bishops, priests, and deacons) who are either incardinated in or granted faculties in the Diocese of Manchester.

2. Members of religious institutes, including all women and men religious assigned to ministry in the Diocese, its parishes, Catholic schools, institutions, or agencies.

3. Lay employees and volunteers who are adults, including

   a. Seminarians assigned to pastoral work in the Diocese of Manchester; seminarians seeking incardination in this Diocese; and those men enrolled in the Permanent Diaconate Formation Program;

   b. Paid personnel, whether employed in areas of ministry or other kinds of services by the Diocese, its parishes, Catholic schools, institutions, or other agencies.

   c. Volunteers. A volunteer is any person who performs a Church-related service without promise or expectation of monetary compensation on a regular and continual basis, including but not limited to catechists, coaches, youth ministers, lectors, ushers, Boy Scout leaders, Catholic Youth Organization volunteers, day care volunteers, volunteer camp counselors, children or youth choir directors, mercy meal volunteers, and parish outreach workers. A "regular and continual basis" means at least two times per month for three months or at least six times per year.

**E. Complainant:** The term "complainant" refers to an individual who reports having been sexually abused as a minor. The term also includes a person who has registered a complaint on behalf of the complainant.

---

[1] The 1983 Code of Canon Law is the codification of church law for the Latin Rite of the Roman Catholic Church.

[2] Pope John Paul II, *Sacramentorum Sanctitatis Tutela*, April 30, 2001.

[3] The *Essential Norms* were first approved by the United States Conference of Catholic Bishops on December 8, 2002. Revisions to the *Essential Norms* were granted recognitio by the Holy See and promulgated as particular law for the United States on May 5, 2006.

F. **Heads of Church Institutions:** "Heads of Church Institutions" are individuals who are responsible for the pastoral administration of diocesan parishes, Catholic schools, or institutions. Examples of Heads of Church Institutions are bishops (and their delegates), pastors and principals.

G. **Minors:** "Minors" are individuals who have not yet reached their eighteenth birthday.

H. **Policy:** The term "Policy" refers to this *Promise to Protect, Pledge to Heal: Policy for the Protection of Children and Young People*.

I. **Regularly:** Church personnel are considered to "regularly" work with minors when they work with minors at least two times per month for three months or at least six times per year.

J. **Work with Minors:** The following are considered to work with minors: catechetical leaders (facilitators, coordinators, directors); catechists and religious education aides; pastoral associates and ministers; youth ministers; day care/after school care employees and volunteers; chaperones for overnight trips; youth or family choir directors; Catholic Youth Organization volunteers (including coaches); altar server coordinators/trainers; leaders and volunteers of Scout troops and other youth organizations sponsored by the parish; all employees in Catholic schools, regardless of responsibility (including substitute and student teachers); volunteers in Catholic schools who serve as *in loco parentis* caregivers (such as coaches and chaperones on overnight trips) or who regularly volunteer (but not including school board members unless the members also regularly work with minors at the school); all employees and volunteers in the diocesan camps, regardless of responsibility (but not including the members of the board of directors for the camps unless the members also regularly work with minors at the camp).

K. **Sexual Abuse:** The term "sexual abuse" is contact of a sexual nature that occurs between a minor and an adult.[4] This term includes contact, activity, or interactions with a minor that is meant to arouse or gratify the sexual desires of the adult. "Sexual abuse" can occur whether or not this sexual activity involves explicit force, whether or not it involves genital or physical contact, whether or not it is initiated by the minor, and whether or not there is discernible harmful outcome. "Sexual abuse" includes any act constituting sexual abuse under New Hampshire law[5] and is a grave delict (a serious crime) against the Sixth Commandment under the *1983 Code of Canon Law* and *the Essential Norms*.[6]

## PREVENTION

### I. Screening of Church Personnel

Church personnel who regularly work with minors and clerics assigned to ministry by the diocesan bishop and clerics who serve in supply ministry in the Diocese of Manchester must undergo background checks, based on the levels of risk for child abuse in the church positions they fill. The standards for screening of church personnel are contained in the <u>Diocese of Manchester Screening and Training Protocol for Church Personnel</u>.[7]

### II. Assignments of Priests and Deacons

A. **Ministerial Assignments.** In accordance with Church law, the Bishop of Manchester is required by Church law to assign all deacons and priests in the Diocese of Manchester. All assignments of priests and deacons are subject to a recommendation process that will consider, among other things, how confident the Christian faithful would be in each assignment. The Bishop of Manchester relies upon the advice of the Priest Personnel Board and the Vicar for Clergy in making pastoral assignments of priests. A Permanent Deacon Personnel Board advises the Bishop on the assignment of permanent deacons.

In addition to the advice noted above, the Bishop of Manchester considers the complete records of priests and deacons, including but not limited to records of formational assessment, psychological evaluations, and other information regarding his suitability for a particular ministerial assignment.

The Delegate for Ministerial Conduct shall provide the people who assist the Bishop in reviewing and recommending candidates for ministerial assignment with a report that indicates whether the priest or deacon has been accused of sexual abuse, and if applicable, sets

---

4 The term "sexual abuse" would not include contact of a sexual nature between a minor and an adult who are married to one another.

5 The New Hampshire Child Protection Act, RSA 169-C:3, provides that "sexual abuse" means the following activities under circumstances which indicate that the child's health or welfare is harmed or threatened with harm: the employment, use, persuasion, inducement, enticement, or coercion of any child to engage in, or having a child assist any other person to engage in, any sexually explicit conduct or any simulation of such conduct for the purpose of producing any visual depiction of such conduct; or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children. With respect to the definition of sexual abuse, the term 'child' or 'children' means any individual who is under the age of 18 years."

6 See footnotes 2 and 3; 1983 Code of Canon Law, c. 1395; *Essential Norms*, norm 9.

7 The *Diocese of Manchester Screening and Training Protocol for Church Personnel* can be found on the website for the Diocese of Manchester under child safety: www.catholicchurchnh.org.

forth the recommendation of the Diocesan Review Board to the Bishop of Manchester that pertains to the priest or deacon.

B. **Transfers for Residence.** Before a priest or deacon can be transferred for residence to the Diocese from another diocese or religious province, the Diocese shall seek from that diocese or religious province any and all information concerning any accusations of sexual abuse of a minor and any other information indicating that the priest or deacon has been or may be a danger to children or young people.

III. **Training of Church Personnel**

A. **Instruction on Mandatory Reporting Requirements.** Church personnel who regularly work with minors and clerics assigned to ministry by the diocesan bishop and clerics who serve in supply ministry[8] must receive instruction on the mandatory reporting requirements for church personnel and must sign an acknowledgement that they have received such instruction and agree to abide by the requirements.

B. **Initial Training.** Clerics and members of religious institutes assigned to parish, school, or institutional ministry and employees and volunteers who regularly work with minors are required to undergo training that addresses appropriate boundaries in ministry; signs and symptoms of sexual abuse in minors; policies and practices for the prevention of sexual abuse by church personnel; policies and procedures for reporting allegations of sexual abuse; and methods of responding appropriately to disclosures of abuse. Employees are required to undergo training as part of their orientation process. Volunteers are required to undergo training as soon as practicable but not later than three months after beginning their volunteer service. Training must be conducted by qualified, knowledgeable professionals.

C. **Ongoing Training.** All church personnel who regularly work with minors must undergo ongoing or refresher training on child sexual abuse at least once every three years. Such training may include a self-test or assessment component.

IV. **Independent Contractors**

Diocesan parishes, schools, or institutions that retain independent contractors who regularly work with minors (cafeteria workers, instructors, and maintenance personnel in

schools) must obtain written assurance that the independent contractors have undergone background screening and will comply with the reporting obligations for sexual abuse of minors under New Hampshire law and diocesan policy or must require that the independent contractors undergo the same screening as would be required of an employee in the parish, school, or institution.

V. **Roles and Responsibilities**

A. **Role of the Diocesan Bishop**

1. General. The diocesan bishop is responsible for teaching, sanctifying, and governing the Roman Catholic Church in New Hampshire. The bishop shall be responsible for enforcing the Policy and other related policies as particular law of the Diocese of Manchester.

2. Matters Involving Sexual Abuse of Minors. The Bishop shall reach out to those who have been sexually abused as minors by anyone serving the Church in ministry, employment, or a volunteer position, whether the sexual abuse was recent or occurred many years ago. The Bishop will be as open as possible with the people in parishes and communities about instances of sexual abuse of minors, with respect always for the privacy and the reputation of the individuals involved. The Bishop shall be personally committed to the pastoral and spiritual care and emotional well-being of those who have been sexually abused and of their families. The Bishop shall work with parents, civil authorities, educators, and various organizations in the community to make and maintain the safest environment for minors.

3. Revisions to the Policy. Before adopting revisions to the Policy, the Bishop will consult with the Council of Priests and the Diocesan Pastoral Council. When appropriate, the Bishop or his designee may also consult with the Safe Environment Council, the Diocesan Review Board, and the Safe Environment Coordinators.

B. **Role of the Diocesan Review Board**

1. Composition of the Diocesan Review Board. The Diocesan Review Board shall be constituted in accordance with Church law. The Review Board shall be composed of persons of outstanding

---

[8] "Supply ministry" means ministry as a substitute or fill-in where the priest is not assigned by the bishop. For example, a retired priest who celebrates Mass at parishes for pastors who are ill or on vacation serves in "supply ministry."

integrity and good judgment. The majority of the Review Board members shall be lay persons who are in full communion with the Church and are not in the employ of the Diocese; but at least one member must be a priest who is an experienced and respected pastor of the Diocese, and at least one member should have particular expertise in the treatment of the sexual abuse of minors. The members are appointed for a term of five years, which can be renewed. Initial appointments are arranged so that terms are staggered. The Promoter of Justice for the Diocese shall be invited to attend and participate in the meetings of the Diocesan Review Board.[9] The Diocesan Review Board shall meet as often as necessary to carry out its responsibilities.

2. Responsibilities. The Diocesan Review Board makes recommendations for the Bishop's consideration in discharging his responsibilities with respect to matters involving allegations of sexual abuse of minors by church personnel. The functions of the Diocesan Review Board are these:

   a. to advise the Bishop in his assessment of the findings of preliminary investigations into allegations of sexual abuse of a minor; that is, the portion of the penal process in which the Bishop determines the probable nature of the allegation;[10]

   b. to advise the Bishop in his assessment of allegations of sexual abuse, sexual exploitation, and sexual harassment by clerics, lay employees, and volunteers, up to and including recommending appropriate disciplinary action;

   c. to review the diocesan policies for dealing with sexual abuse of minors, sexual exploitation, sexual harassment, and inappropriate conduct involving minors at least once every four years and recommend to the Bishop any changes to the policies;

   d. on a regular basis, to conduct a compliance review of the Office for Ministerial Conduct regarding compliance with this Policy and applicable church law and state law and to subsequently make a regular public report to the Christian faithful regarding the compliance review and the work of the Office for Ministerial Conduct; and

   e. to offer advice on all aspects of cases involving sexual abuse, sexual exploitation, and sexual harassment, whether retrospectively or prospectively, including, but not limited to, providing input to the Delegate for Ministerial Conduct regarding the background screening of lay applicants, employees, or volunteers.

3. Assistance in Reviewing and Monitoring Effectiveness of Policy. The Diocesan Review Board shall have the authority to utilize consultants in reviewing and monitoring the operation and effectiveness of the policy and in conducting the compliance audit. Consultants utilized by the Diocesan Review Board should have the competence, skills, and experience that would be helpful in assisting the Diocesan Review Board in its review and monitoring.

C. Role of the Office for Ministerial Conduct

1. Composition. The Office for Ministerial Conduct shall be staffed by appropriately-trained individuals who are easily accessible and dedicated to the handling of allegations of sexual abuse, sexual exploitation, sexual harassment, and inappropriate conduct involving minors. The bishop shall appoint a Delegate for Ministerial Conduct who shall be assisted by lay person(s), preferably parent(s), who have competence in fields such as, but not limited to, the practice of law, law enforcement, psychiatry, psychology, counseling, and social work.

2. Responsibilities. The Office for Ministerial Conduct shall administer this Policy and all relevant diocesan policies on sexual abuse, sexual exploitation, sexual harassment, and inappropriate conduct of a sexual nature involving minors. The Delegate is responsible for ensuring that the pastors, principals, directors of diocesan institutions, clerics, and diocesan administration employees comply with the Policy. Other duties include, but are not limited to these:

   a. reporting suspected sexual abuse of minors to the appropriate civil authorities in accordance with the law and this Policy;

   b. conducting investigations into allegations of sexual abuse, sexual exploitation, sexual harassment, and inappropriate conduct involving minors;

---

[9] The Promoter of Justice is a canon lawyer appointed by the diocesan bishop who acts as a protector of church law and safeguards canonical procedures prescribed in canon law by recommending to the diocesan bishop the prosecution of infractions against church law.
[10] 1983 Code of Canon Law, c. 1718.

c. coordinating the pastoral care of those who are accused of having committed sexual abuse or sexual exploitation;

d. when appropriate, working with the Bishop to take steps to restore the reputation and the good name of an individual accused of having committed sexual abuse; and

e. developing and coordinating programs designed to prevent sexual abuse, sexual exploitation, sexual harassment, and inappropriate conduct involving minors in the Church.

**D. Role of Director, Office for Healing and Pastoral Care**

1. Composition. The Bishop shall appoint a Director of the Office for Healing and Pastoral Care who must have competence in the practice of psychiatry, psychology, counseling, or social work. The Director should be a lay person, preferably a parent, and preferably in full communion with the Catholic Church.

2. Responsibilities. The Director shall be responsible for offering pastoral support, outreach, and professional assistance to persons who report having been sexually abused, to their family members, and to parishes, schools, and other diocesan institutions affected by complaints of child abuse. The pastoral support offered by the Director includes referrals for pastoral counseling, spiritual direction, parish consultation, and retreats. The Director also is responsible for reporting suspected sexual abuse of minors to the appropriate civil authorities in accordance with the law and this Policy.

**E. Role of Church Personnel.** Church personnel are responsible for knowing and adhering to this Policy. Church personnel with questions about whether a particular situation or course of conduct would violate this Policy are responsible for obtaining the answers by consulting this Policy, their supervisors, or the Delegate for Ministerial Conduct.

**F. Roles of Heads of Church Institutions** Pastors, principals, and other Heads of Church Institutions are persons in whom others have confidence and trust. Pastors, principals, and other Heads of Church institutions ought to be the principal models for life in ministry and must promote and encourage a culture of

accountability and safety in the exercise of ministry, including adherence to this Policy and the spirit of this Policy. As supervisors of church personnel, Heads of Church Institutions are responsible for meeting the standards set forth in the Policy, ensuring that the Policy is implemented in their parish, school, or institution, and taking steps to ensure that church personnel under their supervision comply with the Policy.

**G. Role of the Compliance Coordinator.** The Diocesan Compliance Coordinator is responsible for assisting in the implementation and ongoing oversight of diocesan policies, including, but not limited to the *Promise to Protect, Pledge to Heal* Policy, in the parishes, Catholic schools and other institutions of the Diocese, including the diocesan central administration. The Diocesan Compliance Coordinator reports to the diocesan bishop and is supervised by the Delegate for Ministerial Conduct.

**H. Roles of the Safe Environment Council and Coordinators**

1. Safe Environment Council. The Safe Environment Council shall consist of one representative from each deanery recommended by the Dean and appointed by the Bishop to a three-year term to assist and advise the Office for Ministerial Conduct in matters associated with the Policy. The Council shall meet as frequently as necessary to accomplish its duties. Members of the Council shall be available to respond to the needs and questions of Safe Environment Coordinators in the parishes and schools located in their deaneries.

2. Safe Environment Coordinators. The pastor of each parish and the principal of each school shall appoint a Safe Environment Coordinator to assist the pastor and the principal in matters associated with the Policy including, but not limited to, scheduling training sessions on sexual abuse and sexual harassment matters, coordinating the distribution of materials for parents on child sexual abuse, and assisting in the background screening process.

## INTERVENTION

**I. Investigation**

**A. Initiating an Investigation.** The Diocese takes all allegations of sexual abuse seriously, whether the Office for Ministerial Conduct becomes aware of the allegations

of sexual abuse through a direct, formal complaint or by some other means. The Diocese will report allegations to the civil authorities in accordance with the reporting procedures contained in this Policy. The Diocese will also conduct a timely investigation into the allegations. When the Bishop of Manchester deems an allegation of sexual abuse of a minor to have a semblance of truth, the accused will be placed on precautionary leave pending the outcome of the investigation.

B. **Trained Investigators.** Internal investigations must be conducted by individuals appropriately trained to conduct such investigations.

C. **Rights of the Complainant and Accused.** The rights of the complainant and the accused will be protected throughout the investigation process.

D. **Compliance with Church Law and the *Essential Norms.*** In matters involving allegations of sexual abuse of minors by clerics (deacons, priests, and bishops), the definitions and processes provided for in the *1983 Code of Canon Law, the Essential Norms,* other particular law for the dioceses of the United States, and particular law of the Diocese of Manchester must be strictly observed. Clerics accused of sexual abuse are encouraged to retain the assistance of civil and canonical counsel and are entitled to a canonical advocate in certain canonical processes.

II. **Pastoral Care and Support**

A. **Care of the Complainant.** The primary concern of the Diocese with regard to complainants and their families is to assist them in healing and reconciliation which comes from the Lord Jesus. The Diocese will demonstrate a sincere commitment to their spiritual and emotional well-being. The Director of the Office for Healing and Pastoral Care will coordinate pastoral care and counseling, spiritual assistance, and other social services for complainants and their families, whether the alleged abuse was recent or occurred many years in the past, and will listen with patience and compassion to their experiences and concerns. When appropriate, the Director will make available counseling resources independent from the Church.

B. **Care of the Accused.** The Diocese will provide spiritual and pastoral care to those accused of sexual abuse of a minor and will demonstrate a sincere commitment to

their spiritual and emotional well-being. The Delegate for Ministerial Conduct will coordinate pastoral care and counseling, spiritual assistance, and other social services for the accused and the family of the accused. When appropriate, the Delegate will make available counseling resources independent from the Church.

C. **Support for Communities Affected by Allegations.** The Diocese recognizes that entire communities are affected by allegations of sexual abuse, particularly when the accused is a priest, deacon, or member of a religious institute. The Diocese will extend particular pastoral care (as appropriate) to the parishes, schools, or institutions directly affected by allegations of sexual abuse. When an individual is placed on administrative leave as a result of an allegation of sexual abuse, the Delegate will consult the leadership of the parish, school, or institution to determine the appropriate pastoral response of the Diocese. The response must protect the rights of the accused and the confidentiality of the complainant.

REMEDIATION

I. **Allegations Found to Be True**[11]

The Church affords an accused person every opportunity for conversion of heart and forgiveness through the Sacrament of Penance and other pastoral means. However, the Church also acknowledges that one needs to do penance for one's sins, that consequences exist for wrongful actions, and that the safety of children requires certain measures to be taken even after there is forgiveness. If an accusation of sexual abuse of a minor is either admitted to or is established after an appropriate investigation in accordance with Church law and the protocols established by the Diocese, the following will pertain:

A. **Clerics**[12]

   1. Permanent Removal from Ministry. In the event of even a single act of sexual abuse of a minor while a cleric, the cleric found guilty will be permanently removed from ministry. The cleric will be offered appropriate professional assistance for his own healing and well-being as well as for the prevention of further abusive conduct.

   2. Compliance with Church Law. In every case, the processes provided for in Church law must be

---

[11] Allegations found to be true are those that are valid, proven with "moral certitude."

[12] Specific aspects of Church law apply to any report of the sexual abuse of a minor by a deacon or priest. Please refer to notes 4 and 5 above.

observed, and the various provisions of Church law must be considered. These provisions may include a request by the cleric for dispensation from the obligations of Holy Orders and the loss of the clerical state, or a request by the bishop for dismissal from the clerical state even without the consent of the cleric. For the sake of due process, the accused shall be encouraged to retain the assistance of civil and canonical counsel.

3. Clerics Not Dismissed from the Clerical State. If the penalty of dismissal from the clerical state has not been applied (e.g., for reasons of advanced age or infirmity), the accused shall be required to lead a life of prayer and penance. He will not be permitted to celebrate Mass publicly, to wear clerical garb, or to present himself publicly as a priest or deacon.

4. Transfer for Ministerial Assignment to or Residence in Another Diocese. The Diocese will not permit any priest or deacon incardinated in the Diocese known to have committed an act of sexual abuse to be transferred for ministerial assignment to another diocese/eparchy, or to an institute of consecrated life, society of apostolic life, or personal prelature. The Diocese will not permit such a priest or deacon to be transferred for residence without having forwarded in a confidential manner to the local bishop/eparch and religious ordinary (if applicable) of the proposed place of residence any and all information indicating that he has been or may be a danger to children or youth.[13]

5. Notifications. Notifications about the outcome of the canonical proceedings should be made to the cleric, complainant, and the communities affected by the allegations at an appropriate time and in an appropriate manner with consideration for the privacy of the complainant and the rights of the cleric found to have engaged in sexual abuse of a minor.

B. **Members of Religious Institutes and Lay Employees and Volunteers**

1. Permanent Removal from Ministry. In the event of even a single act of sexual abuse of a minor, the member of a religious institute or lay employee or volunteer will be permanently removed from ministry, employment, or service in the Diocese.

2. Notifications. Notifications about the outcome of the investigation should be made to the accused, complainant, and the communities affected by the allegations at an appropriate time and in an appropriate manner with consideration for the privacy of the complainant and the rights of the member of a religious institute or lay employee or volunteer found to have engaged in sexual abuse of a minor.

II. **Unfounded Allegations**[14]

Where an accusation of sexual abuse of a minor is determined to be unfounded, the following will apply:

A. **Restoration of Good Name.** The Diocese will take appropriate steps to restore the good name of the accused as soon as possible.

B. **Notifications.** Notifications about the outcome of the investigation or canonical proceedings should be made to the accused, complainant, and the communities affected by the allegations at an appropriate time and in an appropriate manner with consideration for the privacy of the complainant and the rights of the accused. The Diocese will also continue to offer the complainant and the accused pastoral care, as appropriate.

C. **Authority of Heads of Church Institutions.** An allegation determined to be unfounded following the internal investigation by the Diocese does not prevent Heads of Church Institutions from exercising their administrative authority with respect to the accused, so long as the exercise of that authority is consistent with Church law and applicable employment and volunteer policies and practices.

III. **Settlement Agreements with Complainants**

A. **Confidentiality.** The Diocese will not bind complainants to a condition of confidentiality or nondisclosure or encourage or otherwise attempt to convince a complainant to request confidentiality as part of an agreement to provide services, support, or treatment, or in settlement of financial claims involving allegations of sexual abuse of minors.

B. **Disclosure of Settlement Amount.** The Diocese will include on financial statements to be made public the total amounts of money expended by the Diocese in

---

[13] Essential Norms, Norm 12.
[14] The term "unfounded" for the purposes of this Policy means untrue; that is, either proven to be not true or unable to be proven true.

connection with financial settlements entered into between the Diocese and all complainants and any amounts contributed by companies that provide insurance coverage to the Diocese. In making such financial disclosures, the Diocese will comply with provisions requested by complainants that their identities and the specific amount of the individual settlements be kept confidential.

## REPORTING OF INCIDENTS, ALLEGATIONS, AND CONCERNS

### I.  Reporting Sexual Abuse and Neglect of Minors

A.  **Reporting Requirements of Adults under New Hampshire Law.** In accordance with New Hampshire law, any adult who has reason to suspect that a minor has been abused or neglected must personally report the suspicions to the Division for Children, Youth and Families ("DCYF") at (800) 894-5533.

B.  **Reporting Requirements of Church Personnel.**[15] Church personnel who have reason to suspect that a minor has been sexually abused by other church personnel have additional reporting obligations. When the alleged victim is a minor, in addition to reporting to DCYF, church personnel must immediately personally report the suspicion to local law enforcement and to the Delegate for Ministerial Conduct at (603) 669-3100. When the alleged victim no longer is a minor, church personnel must immediately personally report the suspicion to the Delegate for Ministerial Conduct at (603) 669-3100. Church personnel may seek the advice or assistance of their pastor, principal, or supervisor if doing so does not unduly delay the report.

C.  **Reporting Requirements of the Office for Ministerial Conduct.** The Office for Ministerial Conduct will follow the reporting requirements for all church personnel. In addition, whenever it has reason to suspect that a minor has been sexually abused by church personnel, the Office for Ministerial Conduct immediately will make a report to the New Hampshire Attorney General's office.

D.  **Notice to Complainants.** The Office for Ministerial Conduct will notify those who make reports of sexual abuse to the Office for Ministerial Conduct that their allegations will be reported to DCYF (if the complainant is under the age of eighteen) and law enforcement (the Attorney General's office).

E.  **Cooperation with Civil Authorities.** Church personnel must cooperate with civil authorities in connection with investigations into allegations of sexual abuse.

F.  **Failure to Comply.** Church personnel who fail to comply with the reporting procedure required by law and/or contained in this Policy will be subject to disciplinary action, up to and including appropriate canonical penalties for priests and deacons, and up to and including termination from employment or from volunteer ministry with the Church for other church personnel.

### II.  Reporting Noncompliance in Policy Administration

A. **Noncompliance by Heads of Church Institutions or the Delegate for Ministerial Conduct.** Whenever church personnel believe that the Head of a Church Institution or the Delegate for Ministerial Conduct has failed to enforce this Policy, church personnel should first attempt to resolve the matter with the Head of the Church Institution or the Delegate for Ministerial Conduct. Complaints about the Head of a Church Institution that have not been resolved at the institutional level should be reported to the Delegate for Ministerial Conduct at (603) 669-3100. Complaints about the Delegate for Ministerial Conduct should be reported to the Diocesan Bishop at (603) 669-3100.

B.  **Noncompliance by the Diocesan Bishop.** If church personnel believe that the Diocesan Bishop may have violated or failed to enforce this Policy, church personnel should first attempt to resolve the matter by notifying the Diocesan Bishop at (603) 669-3100. Individuals with complaints that have not been resolved after addressing the matter with the Diocesan Bishop may report the matter to the metropolitan Archbishop of Boston or the Apostolic Nuncio of the Holy See.[16] This aspect of the Policy conforms to *A Statement of Episcopal Commitment* by the United States Conference of Catholic Bishops.[17]

### III.  Prohibiting Retaliation

A.  **Retaliation Prohibited.** The policy of the Diocese is to encourage individuals to make reports in accordance with this Policy. As a result, individuals who make good faith reports in accordance with this Policy will not be subjected to retaliation for making the reports.

---

[15] The reporting requirements of church personnel are greater than those required by New Hampshire law and are consistent with the requirements contained in the December 10, 2002, agreement between the State of New Hampshire and the Diocese of Manchester.

[16] The Apostolic Nuncio to the United States represents the Holy Father both to the hierarchy and the Church of a particular nation and to that nation's civil government. The Apostolic Nuncio can be reached at the Embassy of the Holy See, 3339 Massachusetts Ave., N.W., Washington, D.C., 20008; (202) 333-7121. A metropolitan archbishop is head of an episcopal province, which is a grouping of dioceses. The metropolitan archbishop for the Diocese of Manchester is the Archbishop of Boston, 2101 Commonwealth Ave., Boston, MA, 02135-3192; (617) 782-2544.

[17] *A Statement of Episcopal Commitment*, U.S. Conference of Catholic Bishops, June 3, 2003.

B. **Reporting Retaliation.** Church personnel who believe that they have been subjected to retaliation for making reports under this Policy should report the matter to the Delegate for Ministerial Conduct by telephone at (603) 669-3100 or should submit a specific letter to the Delegate for Ministerial Conduct or the Bishop at 153 Ash Street, P.O. Box 310, Manchester, NH 03105.

## DOCUMENTATION

I. **Records Regarding Sexual Abuse.**

All records regarding sexual abuse of minors will be maintained for the life of the accused, or the longest period of time permitted by Church and civil law, whichever is longer. Records regarding allegations of sexual abuse must be kept in a format that facilitates their availability to church personnel with a legitimate need to know about the allegations subject to the discretion of the Bishop of Manchester under appropriate Church and civil law.

II. **Unified Personnel Documentation Systems**

A. **Use of Unified Clergy Personnel Documentation Systems.** The Diocese shall continue to maintain unified clergy personnel documentation systems to enable those responsible for assigning clergy to consider the full record of each cleric in the making of ministerial assignments. The record of each cleric shall commence upon entering seminary or preparation for the diaconate and continue to be maintained for the period of time established by Church law.

B. **Safe Environment Database.** The Diocese shall establish and maintain a database containing certain information regarding church personnel to enable the Diocese to audit compliance with the screening and training requirements contained in this Policy and to enable parishes to determine whether applicants previously employed by other parishes were in good standing. Access to this database shall be restricted to those parish, school, and diocesan representatives responsible for screening and only as necessary to fulfill their responsibilities.

## COMMUNICATIONS

I. **General Principles**

A. **Policies and Procedures.** The Diocese of Manchester shall institute and follow communications procedures that assist the Diocese in fulfilling its mission and that foster mutually beneficial relationships among all those in the Church in New Hampshire, as well as other communities in the state, including the general media. In all communications, the Diocese shall adhere to a standard of openness, honesty, and candidness.

B. **Sexual Abuse of Minors.** The Diocese will deal as openly as possible with members of the community while respecting the privacy and reputation of the individuals involved. The Diocese will be sensitive in assisting and supporting parish communities directly affected by ministerial misconduct involving minors. The Diocese will follow a program of regular and ongoing communications to increase awareness and understanding of the problem of child sexual abuse. Communications will include information about the problem of child sexual abuse of minors; the means of reporting actual or suspected abuse and communicating allegations; and the services available to those who have been abused and to their families.

C. **The Diocesan Website.** The Diocesan website will include a section dedicated to child safety that will contain, among other things, the Policy and other information about the problem and prevention of child sexual abuse.

II. **Policy Distribution**

A. **Distribution to Church Personnel.** The Policy shall be distributed to all church personnel who regularly work with minors and all clerics assigned to ministry by the diocesan bishop and all clerics who serve in supply ministry. Those church personnel shall be required to acknowledge (either in writing or other verifiable web-based program) receipt of the Policy and their obligation to read and abide by the provisions contained in the Policy. Supervisors, managers, personnel managers, and/or directors should periodically review with church personnel who regularly work with minors the standards, policies, and reporting procedures contained in this Policy.

B. **Availability of Policy to the Christian Faithful and the Public.** The Policy will be available to the communities of all diocesan parishes, schools, and institutions and to the public in print and on the diocesan website (www.catholicchurchnh.org).

III. **Public Announcements**

A. **Mandatory Reporting Requirements of Church Personnel.** Pastors must periodically remind parishioners about applicable provisions contained in the

Policy by including them in parish bulletins or other means deemed to be pastorally appropriate for the dissemination of such important pastoral announcements. Of particular note is the need for the regular publication of the mandatory reporting requirements under state law and this Policy. The Diocese will use a wide variety of means as part of an ongoing effort to inform clergy and laity how to report either abuse or allegations against church personnel.

B. **Informing of the Process of Making a Complaint of Sexual Abuse.** The Diocese shall develop a communications plan to remind the public about the procedures for making complaints of sexual abuse and other violations of the Policy. Means of communication may include, but are not limited to, the following:

1. distributing printed materials with reporting and contact information to parishes, schools, and other institutions of the Diocese;

2. requesting that pastors publish information in weekly church bulletins;

3. including reporting and contact information in relevant news releases;

4. posting regularly on the diocesan website reporting and contact information; and

5. distributing reporting and contact information at appropriate diocesan and parish functions.

C. **Services Available to Those Who Have Been Abused and to Their Families.** Through the Director, Office for Healing and Pastoral Care, the Diocese offers advocacy, access to counseling, support, and assistance to victims, survivors, and families of child sexual abuse. The means of communicating this information include, but are not limited to, the following:

1. displaying contact information prominently on the diocesan website;

2. requesting that pastors publish information in weekly church bulletins;

3. distributing reporting and contact information at appropriate Diocesan and parish functions;

4. distributing information through members of the civil and legal communities; and

5. distributing news releases with reporting and contact information.

D. **Allegations of Sexual Abuse by Church Personnel.**

1. Precautionary Leave. If a priest or other person in the employment of the diocese is placed on precautionary leave during an investigation, the Diocese may report that the person is on precautionary leave to the parish, ministry, or place of employment of the individual. The Diocese will respond to media inquiries by stating that the individual is on administrative or precautionary leave pending the conclusion of the investigation and the canonical process. The Diocese may also disclose the general nature of the investigation process and the particular restrictions that pertain to a person on precautionary leave.

2. The Conclusion of the Investigation. At the conclusion of an investigation, canonical trial, or administrative process, the Diocese will notify the complainant of the results of the investigative and canonical process, including any restrictions on ministry. Notifications to the complainant and to communities affected by the allegations will be made at an appropriate time and in an appropriate manner with consideration for the privacy of the complainant and the rights of the cleric accused of engaging in sexual abuse of a minor. When an individual is acquitted following an investigation and the allegation was made public, the Diocese will consult with the accused cleric before determining what announcements that it will make and what steps it will take to restore the individual to ministry, work, or service. The Diocese will assist in restoring the good reputation to the individual at an appropriate time and as soon as possible.

MEASURING PROGRESS AND ACCOUNTABILITY

I. **General Principles**

In order to restore the trust and confidence of victims, parishioners, Catholics, and the public at large in the Church's ability to prevent child abuse and identify and heal those who have been abused, the Diocese of Manchester will be accountable for its efforts and performance in these matters. The Diocese shall evaluate the effectiveness of its child protection efforts at regular intervals to determine whether it is meeting the needs of the Church, the faith community, and the victims and their families in the most effective and responsive ways possible.

## II. Compliance Audit

The Diocesan Review Board will conduct a regular compliance audit of the Office for Ministerial Conduct regarding compliance with this Policy and will subsequently make a public report to the Christian faithful regarding the compliance audit and the work of the Office for Ministerial Conduct.

In conducting the audit, the Diocesan Review Board may consult with, among others, the members of the Diocesan Safe Environment Council.  The Diocesan Review Board has the authority to use consultants in reviewing and monitoring the operation and effectiveness of the policy and in conducting the compliance audit.

## III. Policy Review

At least once every four years, the Diocesan Review Board will review the *Promise to Protect, Pledge to Heal* Policy and recommend to the Bishop any changes to the policies.  In conducting the review, the Diocesan Review Board may consult with, among others, the members of the Diocesan Safe Environment Council.

REQUIRED FOR CHURCH PERSONNEL WHO REGULARLY WORK
WITH MINORS AND CLERICS ASSIGNED BY THE DIOCESAN BISHOP
OR WHO SERVE IN SUPPLY MINISTRY

Submission of this document is not required by church personnel who previously signed an
acknowledgement that they have received instruction on the mandatory reporting
requirements for church personnel and agree to abide by them.

## ACKNOWLEDGEMENT

Please read the following statements and sign below to indicate your receipt and acknowledgment of this Diocese of Manchester *Serving Christ, Serving Others Code of Ministerial Conduct* (the "Code") and the *Promise to Protect, Pledge to Heal Policy for the Protection of Children and Young People* (the "Policy"). If you are an employee or volunteer, please return the signed document to your supervisor. If you are a cleric, please return the signed document to the Delegate for Ministerial Conduct.

- I have received and have reviewed a copy of the Code and Policy. I understand that it is my obligation to abide by the provisions contained in the Code and Policy.

- I understand that I am responsible for complying with the reporting requirements contained in the Policy, including, but not limited to, the reporting requirements for suspected abuse of a minor. I have received instruction on these requirements. I agree to report suspected abuse of a minor in accordance with the law and the reporting procedures contained in the Policy.

- I understand that the Diocese of Manchester may change, modify, and/or revise any part of the Code or Policy at any time but that the Diocese will notify church personnel of any changes to the Code or Policy as soon as possible. I also understand that the Code and Policy are not contracts, and they do not grant any rights to continued employment, ministry, or volunteer service.

Signature: _____

Name (please print clearly): _____

Home Address: _____

Home Tel. No.: _____

Parish/School/Institution and Town:_____

Position: _____

Date: _____

# EXHIBIT 3

# DIOCESE OF MANCHESTER

# <u>Screening and Training Protocol for Church Personnel</u>

## Effective July 1, 2008

# DIOCESE OF MANCHESTER
## Screening and Training Protocol for Church Personnel

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

APPLICABILITY ..................................................................................................1

    "Volunteer" ......................................................................................................1

    "Clergy" ...........................................................................................................2

    "Regularly Work With Minors" ....................................................................2

    "Employees in Diocesan Administration" ...................................................3

    "Seminarians" .................................................................................................3

    "Candidates for the Permanent Diaconate" ...............................................3

SCREENING AND TRAINING REQUIREMENTS ........................................3

    Clergy and Seminarians ................................................................................3

    Employees ........................................................................................................4

    Volunteers who Regularly Work with Minors ...........................................6

    Independent Contractors ...............................................................................6

BACKGROUND SCREENING AND TRAINING RESPONSIBILITIES .................7

    Pastors, Principals and Diocesan Camp Directors ...................................7

    Office for Ministerial Conduct ......................................................................7

SPECIAL CONSIDERATIONS .........................................................................8

    Parish Volunteers ...........................................................................................8

    Undocumented Volunteers .............................................................................8

    State Criminal Records Checks (Other than New Hampshire) .................8

    Minors Engaged In Ministry .........................................................................8

    Deadline/Update .............................................................................................8

    Criminal Records Checks Conducted Prior to March 19, 2004 ...............9

    Title I and other Public School Teachers and Personnel in Catholic Schools ...............9

    *Protecting God's Children* Training and Praesidium *Called to Protect* Training in Another Diocese .................9

    Refresher or Ongoing Training .....................................................................9

    Developmentally or Cognitively Disabled Adult Volunteers ....................9

    Temporary Student Employment ................................................................10

    Contributions Towards Youth Athletic Teams .........................................10

ANALYSIS OF SCREENING/CRIMINAL RECORD RESULTS ............10

**Sex Offender Registry Checks**........................................................................................**10**

**Applications and Screening Forms** ................................................................................**10**

**Criminal Records**............................................................................................................**11**

**Process for Criminal Records and Applications and Screening Forms**.....................**11**

**Safe Environment Database/Notification** ......................................................................**14**

## CONFIDENTIALITY OF RECORDS .............................................................**14**

**Background Check Documentation** ................................................................................**14**

**Confidentiality of Information** .......................................................................................**14**

# DIOCESE OF MANCHESTER
## Screening and Training Protocol for Church Personnel

### Effective July 1, 2008[1]

## INTRODUCTION

The whole of the Christian faithful in the Church are responsible for promoting a culture of care and concern and a safe environment for all, and in particular for children and young persons (minors). This screening protocol was developed to contribute to the ongoing promotion of a culture of common accountability and a safe environment for all children and young persons.

The development of a formal structure for the screening of all church personnel has been principally motivated by the commitment of the Diocese to contribute to and provide structures to ensure a safe environment for all children and youth who participate in activities sponsored by the Church. This screening protocol therefore is focused on screening those who regularly work with minors in their ministry, particularly those who serve as *in loco parentis* (in place of parent) caretakers. However, all bishops, priests, deacons, and seminarians of the Diocese of Manchester are also subject to background screening, regardless of whether they work directly with minors. The Bishop of Manchester, pastors, Catholic school principals, and institutional directors assume particular responsibilities for ensuring that persons who regularly work with minors in the Church in New Hampshire comply with this screening protocol.

## APPLICABILITY

Because of the nature of their positions, clergy assigned to ministry by the diocesan bishop in the Diocese as well as those who serve in supply ministry[2] in the Diocese are subject to these screening requirements.  In addition, all those who serve as employees in diocesan administration and all employees and volunteers who regularly work with minors (those under the age of 18) are subject to background screening.  Individuals under the age of 18 are not subject to this screening protocol.

      1.     "Volunteer."  An individual is considered to be a "volunteer" within the meaning of this screening protocol if the individual performs a Church-related service

---

[1] This Screening and Training Protocol replaces and supersedes the Screening and Training Protocol made effective on July 1, 2007. This Protocol applies to clerics, seminarians, employees, and volunteers hired or beginning their ministry after July 1, 2008. Those hired or who began their ministry before July 1, 2008, and who regularly work with minors as defined in this protocol must comply with the screening requirements that were in place at the time.

[2] "Supply ministry" means ministry as a substitute or fill-in where the priest is not assigned by the bishop. For example, a retired priest who celebrates Mass at a parish for a pastor who is ill or on vacation serves in "supply ministry."

without promise or expectation of monetary compensation on a regular and continual basis. A "regular and continual basis" for the purpose of this screening protocol means at least two times per month for three months or at least six times per year. It also includes volunteer chaperones for overnight trips supervising minors, summer school teachers, and all vacation Bible school personnel, even if they work with minors less than six times per year.

2.    "Clergy."    "Clergy" subject to this screening protocol include the following:

a.  Priests and deacons incardinated in the Diocese of Manchester who are assigned to pastoral ministry in the Diocese of Manchester by the diocesan bishop.
b.  Priests who are members of religious institutes or who are incardinated in other dioceses and deacons incardinated in other dioceses who are assigned to pastoral ministry in the Diocese of Manchester by the diocesan bishop.
c.  Priests who are engaged in part-time or supply ministry in parishes in the Diocese of Manchester.

3.    "Regularly Work with Minors."    Employees and volunteers who serve in an *in loco parentis* (in place of parent) capacity or otherwise supervise minors are considered to "regularly work with minors" for the purposes of this screening protocol. The following positions are considered to "regularly work with minors:"

Parish Employees and Volunteers
Catechetical leaders (facilitators, coordinators, directors)
Catechists and religious education aides
Vacation Bible School teachers and aides
Pastoral associates and ministers
Youth ministers
Day Care/After School Care employees and volunteers
Chaperones for overnight trips involving minors
Youth or Family Choir Directors
Catholic Youth Organization volunteers (including coaches)
Altar server coordinators/trainers
Leaders and volunteers of Boy Scout troops and youth organizations sponsored by the parish

Diocesan Catholic school employees and volunteers
All employees and volunteers in Catholics schools, regardless of responsibility. This includes, but is not limited to, substitute and student teachers, summer school teachers and aides, and chaperones for overnight trips. This does not include school board members unless the members also regularly work with minors in the school.

<u>Diocesan Camp Fatima and Camp Bernadette Employees and Volunteers</u>
All employees and volunteers in the diocesan camps who are 18 years old or older on the opening day of the season, regardless of responsibility. This does not include the members of the board of directors for the camps unless the members also regularly work with minors at the camp.

4.    <u>"Employees in Diocesan Administration."</u> "Employees in diocesan administration" include individuals employed by the Diocese of Manchester to work in the diocesan administration building or the Tribunal. Evening maintenance staff and temporary employees are included in this category but are not required to attend training.

5.    <u>"Seminarians."</u> "Seminarians" means men who are sponsored by the Diocese of Manchester to study for the priesthood in a seminary and who have completed at least their first year of study. The screening and training requirements must be completed before they are assigned to pastoral work in the Diocese of Manchester.

6.    <u>"Candidates for the Permanent Diaconate."</u> "Candidates for the Permanent Diaconate" means men who are sponsored by the Diocese of Manchester to study for the permanent diaconate and who have completed at least their first year of study. The screening and training requirements must be completed before they are assigned to pastoral work in the Diocese of Manchester.

<div align="center">

## <u>SCREENING AND TRAINING REQUIREMENTS</u>

</div>

The following are the minimum screening standards and training requirements for the various personnel categories. The diocesan administration, parishes, Catholic schools, and other institutions have discretion to implement additional background checks. For example, a motor vehicle record check may be required of all church personnel who drive as part of their assignment.

These standards are subject to ongoing review and change; any amendments will be approved by the Bishop of Manchester in accordance with church and civil law.

1.    <u>Clergy and Seminarians</u>

This category includes all clergy, all seminarians, and all candidates for the permanent diaconate as defined above. Clergy, seminarians, and candidates for the permanent diaconate are subject to thorough background screening, extensive interviews, reference checking, and psychological examinations prior to acceptance for ecclesiastical studies or ordination. However, in addition to the thorough screening required of priests and deacons, clergy, seminarians, and candidates for the permanent diaconate must undergo or complete the following:

a.    *Screening Form for Clerics, Religious and Persons in Ecclesiastical Studies*

b. State Criminal Records Check (every state in which the individual has resided in the past five (5) years)[3] or J1 Work VISA if not a resident of the United States

c. Check of the National Sex Offender Registry[4]

d. Acknowledgement Form for *Promise to Protect, Pledge to Heal* Policy and *Serving Christ, Serving Others* Code of Ministerial Conduct

e. Attendance at a *Protecting God's Children* or Praesidium *Called to Protect* workshop

f. At least once every three (3) years, participation in refresher training on sexual abuse awareness and reporting (*Renewing Our Promise* training bulletin)

2. <u>Employees</u>

a. <u>Diocesan Administration Employees and Parish Employees who Regularly Work with Minors</u>

This category includes all diocesan administration employees and parish employees who regularly work with minors as defined above. Diocesan administration employees and parish employees who regularly work with minors must undergo or complete the following:

i. *Diocese of Manchester Employment Application*

ii. State Criminal Records Check (every state in which the individual has resided in the past five (5) years) or J1 Work VISA if not a resident of the United States.

iii. Check of the National Sex Offender Registry (www.nsopr.gov)

iv. References check (3 references)

v. Face-to-face interview

vi. Acknowledgement Form for *Promise to Protect, Pledge to Heal* Policy and *Serving Christ, Serving Others* Code of Ministerial Conduct

vii. Attendance at a *Protecting God's Children* or Praesidium *Called to Protect workshop*

viii. At least once every three (3) years, participation in refresher training on sexual abuse awareness and reporting (*Renewing Our Promise* Training bulletin).

---

[3] The procedure for obtaining out-of-state criminal records checks is discussed more fully below.

[4] The National Sex Offender Registry is found on the US Department of Justice website: <u>www.nsopr.gov</u>. The procedure for conducting the National Sex Offender Registry check and all other screening checks can be obtained from the Diocese of Manchester Safe Environment Compliance Coordinator (603-669-3100).

    b.  <u>Diocesan Catholic School Employees</u>

This category includes all diocesan Catholic school employees.    Diocesan Catholic school employees must undergo or complete the following:

    i.    *Employment Application*[5]
    ii.   State Criminal Records Check (every state in which the individual has resided in the past five (5) years) or J1 Work VISA if not a resident of the United States
    iii.  FBI Fingerprint Check
    iv.  Check of the National Sex Offender Registry (www.nsopr.gov)
    v.   References check (3 references)
    vi.  Face-to-face interview
    vii.  Acknowledgement Form for *Promise to Protect, Pledge to Heal* Policy and *Serving Christ, Serving Others* Code of Ministerial Conduct
    viii. Attendance at a *Protecting God's Children* or Praesidium *Called to Protect* workshop
    ix.  At least once every three (3) years, participation in refresher training on sexual abuse awareness and reporting (*Renewing Our Promise* Training bulletin).

    c.  <u>Diocesan Camp Employees</u>

This category includes all employees of Camp Fatima and Camp Bernadette.  Diocesan camp employees must undergo or complete the following:

    i.    *Diocese of Manchester Camp Employment Application*
    ii.   State Criminal Records Check (every state in which the individual has resided in the past five (5) years) or J1 Work VISA if not a resident of the United States
    iii.  Check of the National Sex Offender Registry (www.nsopr.gov)
    iv.  References check (3 references)
    v.   Face-to-face interview (whenever possible)
    vi.  Acknowledgement Form for *Promise to Protect, Pledge to Heal* Policy and *Serving Christ, Serving Others* Code of Ministerial Conduct
    vii.  Attendance at a *Protecting God's Children* or Praesidium *Called to Protect* workshop
    viii. At least once every three (3) years, participation in refresher training on sexual abuse awareness and reporting (*Renewing Our Promise* Training bulletin).

---

[5] The particular employment application depends upon the position for which the individual applies (e.g., Principal, Faculty, or Staff).

### 3. Volunteers who Regularly Work with Minors

This category includes all volunteers in parishes who regularly work with minors as well as all volunteers in Catholic schools and diocesan camps. Individuals in this category must undergo or complete the following:

    i. *Diocese of Manchester Volunteer Application*[6] *(*camp volunteers complete the *Diocese of Manchester Camp Screening Form)*

    ii. State Criminal Records Check (every state in which the individual has resided in the past five (5) years) or J1 Work VISA if not a resident of the United States.

    iii. Check of the National Sex Offender Registry (www.nsopr.gov)

    iv. Acknowledgement Form for *Promise to Protect, Pledge to Heal* Policy

    v. Attendance at a *Protecting God's Children* or Praesidium *Called to Protect workshop*

    vi. At least once every three (3) years, participation in refresher training on sexual abuse awareness and reporting (*Renewing Our Promise* Training bulletin).

### 4. Independent Contractors

Some diocesan schools, camps, and parishes may utilize independent contractors who regularly work with minors (more than two times per month for at least three months or six times per year) as cafeteria workers, maintenance personnel, or instructors. Those diocesan schools, camps, and parishes that utilize such independent contractors must include the following language in all contracts with independent contractors that will regularly work with minors:

> The [*Contractor*] agrees that it will not assign to work in [*the parish, school, or camp*] any person who has ever been convicted of any of the following crimes that would disqualify them from working in a school under New Hampshire law: capital murder, first degree murder, second degree murder, manslaughter, aggravated felonious sexual assault, felonious sexual assault, sexual assault, kidnapping, incest, endangering the welfare of a minor or incompetent, indecent exposure or lewdness in the presence of a minor, prostitution, child pornography, computer pornography, and child exploitation. The [*Contractor*] is responsible for conducting all appropriate background checks. The [*Contractor*] agrees that all person(s) it assigns to [*the parish, school, or camp*] will comply with and observe all applicable rules and regulations concerning conduct that [*the parish, school, or camp*] imposes on its employees, including but

---

[6] Note that parish volunteers who have not been registered in the parish for at least six (6) months must provide a letter of reference from their previous pastor. See Special Considerations (below).

not limited to, reporting suspected child abuse in accordance with New Hampshire law. The [*Contractor*] agrees that upon request, it will submit to [*the parish, school, or camp*] documentation demonstrating that [*Contractor*] has complied with these screening and training requirements.

As an alternative, the school, parish, or camp may require that the contractor undergo the same screening and sexual abuse training requirements applicable to its employees.

## BACKGROUND SCREENING AND TRAINING RESPONSIBILITIES

1.    <u>Pastors, Principals, and Diocesan Camp Directors:</u>  Pastors,    principals, and diocesan camp directors are responsible to ensure that all employees and volunteers subject to this background screening and training protocol comply with this protocol and are responsible for ensuring that contracts with independent contractors subject to this protocol include the required language.  The safe environment coordinators assigned by the pastors and principals may assist the pastors and principals with their responsibilities. Among other duties, pastors, principals, and directors are responsible for the following:

a.    Distribute to employees and volunteers subject to this protocol the *Serving Christ, Serving Others* Code of Ministerial Conduct and *Promise to Protect, Pledge to Heal* Policy and the necessary screening and acknowledgement forms;

b.    Send completed criminal records forms to the Office for Ministerial Conduct;

c.    Forward to the Office for Ministerial Conduct any completed Employment and Volunteer applications that indicate that the applicants have criminal records or were found to have sexually abused a minor;

d.    Conduct initial check of the National Sex Offender Registry for employees and volunteers subject to this protocol.

e.    Schedule *Protecting God's Children* training for employees and volunteers and/or notify them of the availability of and necessity for attending such training;

f.    Ensure that employees and volunteers subject to this protocol have attended *Protecting God's Children* or *Called to Protect* training and have completed refresher sexual abuse awareness training; and

g.    Maintain records of compliance with this protocol, update the safe environment database, and provide written verification to the Office for Ministerial Conduct upon request.

2.    <u>Office for Ministerial Conduct:</u>    The staff of the Office for Ministerial Conduct is responsible to ensure that all clerics and diocesan administration employees subject to this background screening protocol comply with this protocol.  In addition, the Office for Ministerial Conduct is responsible for, among other things, the following:

a.    Assist in processing all state criminal records checks in accordance with this protocol;

b.    Review and process any employment or volunteer applications in accordance with this protocol;

c.    Update the safe environment database;

d.    Conduct National Sex Offender Registry checks on all church personnel subject to this protocol and print the results. Repeat checks of the sex offender registry for active personnel once every 3 years; and

e.    Oversee and enforce compliance with this protocol by the parishes, schools, and diocesan camps.

## SPECIAL CONSIDERATIONS

1.    <u>Parish Volunteers</u>:  Individuals who have not been registered with their parish for at least six (6) months must obtain a letter of reference from the pastor of their former parish or a supervisor of the former parish, if the individual was in ministry in that parish.  If the individual has been a member of the current parish for at least six months but failed to formally register, the individual may obtain the letter of reference from his or her current pastor.

2.    <u>Undocumented Volunteers</u>:  Some volunteers may be reluctant to undergo a criminal record check or a sex offender registry check because they do not have permission to live or work in the United States. If the volunteers are unwilling or unable to undergo these criminal records checks, they will not be eligible for ministry regularly working with minors.

3.    <u>State Criminal Records Checks (Other than New Hampshire)</u>:  Individuals who reside (or in the last five years have resided) in a state or states other than New Hampshire must undergo a criminal records check in that state(s). For Massachusetts, a CORI is conducted. For all other states, a background check is conducted through an online service.  The staff of the Office for Ministerial Conduct may require additional background checks, as necessary. The necessary forms can be obtained from the Office for Ministerial Conduct.

4.    <u>Minors Engaged In Ministry</u>:  Minors involved in ministry with other minors are not required to complete screening forms or attend *Protecting God's Children* training.  Minors involved in ministry with other minors must be directly supervised by employees or volunteers who have completed the screening and training requirements for those who regularly work with minors.

5.    <u>Deadline/Update</u>:  Paid personnel and volunteers subject to the screening requirements contained in this protocol must complete all requirements within thirty (30) days of hire or beginning volunteer service. Failure to complete these requirements within thirty days will render them ineligible for service until the requirements are fulfilled.  All individuals subject to the screening requirements contained in this protocol are required to update the information contained on the screening or applications forms and are required to update their criminal history information within fourteen (14) days of

any change.  Thus, a volunteer arrested for or convicted of a crime after his or her application or criminal records check to the Diocese must report the arrest or conviction to the pastor, principal, or the Delegate for Ministerial Conduct within 14 days of the arrest or if not arrested, within 14 days of the conviction.  With respect to sexual abuse awareness training, employees and coaches must complete the *Protecting God's Children* training as part of their orientation process (within 30 days of beginning employment/coaching), while volunteers and substitute teachers at Catholic schools must complete the training within 3 months of beginning their service.

      6.     <u>Criminal Records Checks Conducted Prior to March 19, 2004</u>:  Prior to March 19, 2004, some parishes in the Diocese of Manchester required that employees and/or volunteers undergo criminal records checks.  The results of those criminal records checks may be maintained by those parishes and are not required to be forwarded to the Office for Ministerial Conduct.  However, the parishes must report to the Diocese the dates on which the criminal record checks took place.

      7.     <u>Title I and other Public School Teachers and Personnel in Catholic Schools</u>:[7]  Title I teachers and other personnel assigned by the public schools to work with students in Catholic schools are not considered to be Church personnel and therefore are not subject to the screening and training requirements of this protocol.

      8.     <u>*Protecting God's Children* Training and Praesidium *Called to Protect* Training in Another Diocese</u>:  Individuals required under this protocol and diocesan policy to attend *Protecting God's Children* training can satisfy this training requirement by attending a VIRTUS *Protecting God's Children* training session or a Praesidium *Called to Protect* training session in a diocese, eparchy, or religious institute other than the Diocese of Manchester if they submit to the Diocese, parish, school, or camp certificates of attendance and review the Diocese of Manchester Mandatory Reporting Requirements for Church personnel with the pastor, principal, director, safe environment coordinator, or Office for Ministerial Conduct staff.

      9.     <u>Refresher or Ongoing Training</u>:  Individuals required under this protocol and diocesan policy to undergo refresher or ongoing sexual abuse awareness training must do so within three (3) years of attending *Protecting God's Children* training. The refresher training currently in use by the Diocese of Manchester is the *Renewing Our Promise* Training Bulletin.

      10.    <u>Developmentally or Cognitively Disabled Adult Volunteers</u>: Developmentally or cognitively disabled adults occasionally serve as employees and volunteers at parishes and schools.  At the discretion of the principal or pastor, developmentally or cognitively disabled adults who are cognitively and socially limited to the extent that they continue to function as a minor are eligible to volunteer, but they must not supervise minors. For example, adults with developmental or cognitive

---

[7] Public school personnel undergo criminal records checks and FBI fingerprint checks in accordance with New Hampshire law, RSA 189:13-a.

disabilities may act as altar servers or aides in religious education classrooms, but they should never serve in a supervisory capacity over minors. Because developmentally and cognitively disabled adults do not supervise minors, they are not required to complete the safe environment screening or training requirements.

11.    Temporary Student Employment:    Some parishes and diocesan schools hire high school or college students as temporary (usually summer) employees who perform duties which do not require them to supervise minors. Examples of these jobs include maintenance work and lawn care. Students who are hired to perform temporary work in positions in which they do not supervise minors are not required to undergo safe environment screening and training. This is applicable even if some of the students are minors and some are adults, unless the adult students are in positions where they are expected to supervise the minors. However, all minors who perform temporary work must be supervised by at least one adult who has undergone safe environment screening and training.

12.    Contributions Towards Youth Athletic Teams:    From time to time, diocesan schools, parishes or camps may consider contributing money to community youth athletic organizations (such as Little League baseball or softball) to "sponsor" a team. The sponsorship is limited to the donation of the sponsorship fee and naming of the team. "Sponsorship" in these organizations generally means that the school, parish, or camp is listed as a sponsor on billboards or on team shirts or team names, but that the school, parish, or camp is not involved in choosing the coaches, does not offer use of its facilities to the team, and is not considered to be a school, parish, or camp activity.  Accordingly, the adults who participate as coaches or other volunteers in the youth athletic organizations are not "church personnel" and are not required to comply with the diocesan screening and training requirements.

## ANALYSIS OF SCREENING/CRIMINAL RECORD RESULTS

1.    Sex Offender Registry checks:    Any individual identified through the national registry or through any state or federal sex offender registry as a registered sex offender is ineligible for ministry in the Diocese of Manchester.

2.    Applications and Screening Forms:

Completed screening forms and applications that indicate that applicants have criminal records or have been found to have sexually abused a minor must be forwarded to the Office for Ministerial Conduct.  The staff of the Office for Ministerial Conduct will review the forms to determine the category below into which the offense(s) fall and process the forms accordingly.

3.    <u>Criminal Records</u>:

Criminal records checks are initiated at the parish, school, camp, or diocesan level. For New Hampshire criminal checks, the notarized criminal records check authorization forms are sent by the appropriate entity (parish, school, camp, diocesan office) to the Office for Ministerial Conduct for processing. The authorization forms should clearly indicate which forms pertain to employees and which forms pertain to volunteers. As discussed above, the criminal record authorization forms for all other states can be obtained by contacting the Office for Ministerial Conduct. For Massachusetts, a CORI form is used. For all other states, a background check is completed through an online service. The Massachusetts and the online background check service forms do not require notarization but must be completed by the individual and forwarded by the entity (parish, school, camp, diocesan office) to the Office for Ministerial Conduct for processing. The parishes, schools, and camps will be required to reimburse the Diocese for the cost of the criminal records checks.

If the criminal records check indicates "no record found," the Office for Ministerial Conduct will send confirmation of same to the appropriate entity (parish, school camp, diocesan office). Criminal records checks that indicate that the applicant has a criminal record should be processed as set forth below.

4.    <u>Process for Criminal Records and Applications and Screening Forms</u>: When the screening form, application, or criminal records check indicates that the applicant has a criminal record or was found to have sexually abused a minor, the staff of the Office for Ministerial Conduct will determine the category (A through D below) into which the offense(s) falls.

a.    <u>Category A</u>:

Individuals convicted of a crime that would prohibit them from working in a school under New Hampshire law (RSA 189:13-a) are automatically disqualified from being assigned, employed or engaged as a volunteer for the diocese, its parishes, or its schools. Thus, individuals convicted of the following crimes may not be employed or volunteer for the Diocese or its parishes or schools: capital murder, first degree murder, second degree murder, manslaughter, aggravated felonious sexual assault, felonious sexual assault, sexual assault, kidnapping, incest, endangering the welfare of a child or incompetent, indecent exposure or lewdness in the presence of a child under 16 years old, prostitution, child pornography, computer pornography, and child exploitation.

Further, unless the individuals were juveniles at the time of the offense, the following convictions within twenty (20) years of employment or volunteer service will automatically disqualify an individual from working with minors: drug trafficking, drugs sales, illegal drug manufacturing, and assault resulting in serious bodily injury to another person.

The staff of the Office for Ministerial Conduct will notify the pastor, principal, or director (as appropriate) in writing that the applicant is not eligible for ministry in any position regularly working with minors. The pastor, principal, or director is then responsible for ensuring that the applicant is not permitted to engage in ministry regularly working with minors.

b.    <u>Category B</u>:

An applicant convicted of a felony or three (3) or more misdemeanors involving moral turpitude other than those listed in Category A, including but not limited to theft, perjury, assault, and drug-related crimes, may be disqualified from regularly working with minors in the Church.

The staff of the Office for Ministerial Conduct will refer the matter for assessment to an investigator with a law enforcement or human resources background to determine whether the individual poses a safety issue for minors at the school or parish. The investigator will review the record and job position and where appropriate, contact the applicant, pastor, principal, and/or camp director. In order to be considered for ministry, individuals in this category must provide a written reference from the pastor, principal, or director attesting to the character of the applicant. The investigator will then develop a written recommendation as to whether the individual should be considered eligible for ministry regularly working with minors and forward it to the Office for Ministerial Conduct for review. The Delegate for Ministerial Conduct will present the investigator's recommendation as well as the Delegate's recommendation to the Diocesan Review Board. The Diocesan Review Board will consider the results and make a recommendation to the diocesan bishop regarding whether the individual poses a safety issue for minors at the school or parish. The Bishop of Manchester will make the final decision as to eligibility for ministry. In making its recommendation, the Diocesan Review Board will consider, among other factors, the nature of the crime or offense, the number and nature of the convictions, the date(s) when the incident(s) occurred, the age of the applicant at the time of the offense(s), and the relationship between the crime or offense and the position sought.

If the Delegate's or the Diocesan Review Board's recommendation is that the individual be deemed ineligible or restricted from ministry, the staff of the Office for Ministerial Conduct will contact the subject of the criminal records check to give him or her the opportunity to provide any information he or she deems relevant to the inquiry, including a recommendation from the pastor or principal.

Once the diocesan bishop's decision is made, the staff of the Office for Ministerial Conduct will notify the pastor, principal, or director (as appropriate) as to whether the applicant is eligible for ministry. If the applicant is determined to be ineligible for ministry, the pastor, principal, or director is then responsible for ensuring that the applicant is not permitted to engage in ministry regularly working with minors.

c.    Category C:

An applicant convicted within ten (10) years of the application of fewer than three (3) misdemeanors involving moral turpitude, including possession of illegal drugs and assault may be eligible for ministry regularly working with minors.

The staff of the Office for Ministerial Conduct will refer the matter for assessment to an investigator with a law enforcement or human resources background to determine whether the individual poses a safety issue for minors at the school or parish. The investigator will review the record and job position and where appropriate, contact the applicant, pastor, principal, and/or camp director. The investigator will then develop a written recommendation as to whether the individual should be considered eligible for ministry regularly working with minors and forward it to the Office for Ministerial Conduct for review. The Delegate for Ministerial Conduct will present the investigator's recommendation as well as the Delegate's recommendation to the Diocesan Review Board. The Diocesan Review Board will consider the results and make a recommendation to the diocesan bishop as to whether the individual poses a safety issue for minors at the school or parish. The Bishop of Manchester will make the final decision as to eligibility for ministry. In making its recommendation, the Diocesan Review Board will consider, among other factors, the nature of the crime or offense, the date when the incident occurred, the age of the applicant at the time of the offense, and the relationship between the crime or offense and the position sought.

If the Delegate's or the Diocesan Review Board's recommendation is that the individual be deemed ineligible or restricted from ministry, the staff of the Office for Ministerial Conduct will contact the subject of the criminal records check to give him or her the opportunity to provide any information he or she deems relevant to the inquiry, including a recommendation from the pastor or principal.

Once the Bishop of Manchester's decision is made, the staff of the Office for Ministerial Conduct will notify the pastor, principal, or director (as appropriate) as to whether the applicant is eligible for ministry. If the applicant is determined to be ineligible for ministry, the pastor, principal,

or director is then responsible for ensuring that the applicant is not permitted to engage in ministry regularly working with minors.

    d.    <u>Category D</u>:

An applicant convicted of fewer than three (3) misdemeanors more than ten (10) years before the application (other than the offenses in Category A) or convicted of a violation will not be deemed ineligible for ministry regularly working with minors based on the misdemeanor alone.  The staff of the Office for Ministerial Conduct will notify the pastor, principal, or director (as appropriate) that the criminal record review did not deem the applicant ineligible for ministry regularly working with minors.

    5.    <u>Safe Environment Database/Notification</u>:  After the appropriate process discussed above is completed, the staff of the Office for Ministerial Conduct will enter in the safe environment database one of the following designations with respect to that cleric, employee, volunteer, or applicant:  eligible; ineligible; or restricted.  The staff of the Office for Ministerial Conduct will also send a letter to the pastor, principal, or director (as appropriate), notifying him or her of the designation.  If the designation is "restricted," the letter will indicate what restrictions on ministry have been imposed.[8]

## <u>CONFIDENTIALITY OF RECORDS</u>

    1.    <u>Background Check Documentation</u>.  Parishes, schools, camps, and the diocesan administration must maintain applications, screening forms, and other personnel records in locked files with access limited only to those with a legitimate need to know.

    2.    <u>Confidentiality of Information</u>.  Parish, school, and diocesan personnel who have access to personnel information are required to maintain confidentiality and are prohibited from disclosing personnel information to individuals without a legitimate need to know.[9]

---

[8] Examples of "restrictions" include prohibitions on working with money or having any responsibility over finances, and requiring annual criminal records checks.

[9] Pastors, principals, safe environment coordinators, and the Office for Ministerial Conduct are permitted to share a list of "eligible" individuals with those responsible for hiring and assigning volunteers in parishes, schools, camps, and the diocesan administration without running afoul of this provision.

# EXHIBIT 4

KPMG, LLP                                                                    Privileged and Confidential
Discussion Draft                                                                Attorney Client Privilege

2008 KPMG Program Assessment Report
Appendix A, Exhibit 4 - Document Review List

**A. General Safe Environment  Program Documents**
- Action Plan II; Action Plan III

**B. Organizational Structure and Oversight**
- List of all diocesan parishes active since July 24, 2007
- List of all diocesan schools active since July 24, 2007
- List of all diocesan camps active since July 24, 2007
- New Hampshire Catholic Directory - 2008
- Position Descriptions for: the Diocesan Compliance Coordinator; the Delegate for Ministerial Conduct ;the Associate Delegate for Ministerial Conduct (existing description and draft of updated description); the Safe Environment Assistant, the Administrative Assistant to the Chancellor
- DOM Rules of Diocesan Review Board

**Documentation reflecting potential revisions to Diocesan policy and procedures**
- Minutes of 2 Safe Environment Council meetings that have occurred since 7/24/07
- Minutes of 9 Diocesan Review Board meetings that have occurred since 7/24/07
- 6-page draft of Diocesan Review Board Rules dated July 2008.
- Best Practices for Safe Environment Coordinators (website)
- Best Practices for Safe Environment Coordinators (updated version to be published on Web in October)
- List of documents and versions
- DOM Protocols for Responding to Allegations of Sexual Abuse of a Minor by a Priest or Deacon
- DOM Protocols for Addressing Allegations of Sexual Abuse by Members of Religious Institutes and Lay People
- DOM Investigative Protocol for Allegations of Sexual Abuse of Minors
- DOM Statement of Rights and Obligations of Person Accused of Sexual Misconduct
- Trauma Recovery Pilot Program Proposal
- Written response to request #12: All information documenting or containing information related to the decision that Confirmation mentors are not covered by the SE Program requirements
- Site visit summary sheet
- Safe Environment Council Input re: KPMG assessment, 1/15/08
- Diocesan Review Board Input re: KPMG assessment, 1/15/08
- Informational packet from ScreeningOne

**Evidence of the Bishop's reviews/approvals of Child Safety Program modifications**
- Memorandums prepared by the Compliance Coordinator to the Bishop, the DRB, and Steve Boivin with comments from the Bishop written in

**Policies and Procedures**
- Diocese of Manchester Diocese of Manchester Code & Policy, *Serving Christ, Serving Others - Code of Ministerial Conduct* and the *Promise to Protect, Pledge to Heal – Policy for the Protection of Children and Young People,* effective March 19, 2007 (*Code and Policy*)
    - Code and Policy in Spanish
    - Code and Policy summaries in Vietnamese and Portuguese
- Diocese of Manchester Screening and Training Protocol for Church Personnel (July 1, 2007)
- Office for Ministerial Conduct Report and Reconciliation Log Start Date August 2007
- "Report Follow-up Procedures Beta Test Version November 2007"
- "Diocese of Manchester Office for Ministerial Conduct Safe Environment Review Procedure for Camp Fatima and Camp Bernadette v.2 September 2007"
- "Test Procedures - Volunteers" v 2.0 January 2008**
- "Test Procedures - Employees" v 2.0 January 2008**
- "Safe Environment Database Reconciliation Procedure -- Priests" March 2007
- "Safe Environment Database Reconciliation Procedure -- Seminarians" undated
- "Safe Environment Database Reconciliation Procedure -- Permanent Deacons" March 2007

KPMG, LLP                                                                    Privileged and Confidential
Discussion Draft                                                              Attorney Client Privilege

2008 KPMG Program Assessment Report
Appendix A, Exhibit 4 - Document Review List

- "Safe Environment Database Reconciliation -- Protecting God's Children Trainers" undated
- "Safe Environment Database Reconciliation Procedure -- Diocesan Administration Employees" June 2007
- Diocese of Manchester Communications Policy (10/05)
- Binder with listing of "best practices": sections separated by cover sheet with description of best practice and method of distribution (ex. SEC Manual; sent to all SECs Fall 2006)
- Office For Ministerial Conduct - File management Policy version 1.0 June 2005 2 pages
- Office For Ministerial Conduct - Filing Protocol  Version 1.0 April 2008 1 page
- "Office for Ministerial Conduct Safe Environment Disciplinary Procedures" July 15, 2007 Release 1.0
- 2 page procedure for reconciliation of Safe Environment Coordinators.

**Policies and Procedures relating to the Compliance Coordinator role and responsibilities**
- Safe Environment Review Plan
- Screening and Training Protocol for Substitute Teachers (2006)
- Screening and Training Protocol for Athletic Coaches (V 2.0 Revised July 2007)
- Screening and Training Protocol for Church Personnel (7/1/07)
- Safe Environment Coordinator Manuals for Schools and Parishes (2007)

**Risk based approach**
- Directions for Completing the Site Re-visit Section of Risk Matrix

**Documents regarding the "Safe Environment Disciplinary Procedures"**
- Safe Environment Disciplinary Procedures (6/15/07)
- Written warnings issued to two principals as a result of non-compliance issues:
    - two people who coached during the 2006-2007 even though they were ineligible
    - lack of responsiveness by the principal (SEC hasn't been trained; not registering for the database)
- Action Plan III, Item 3: The Delegates for Ministerial Conduct will develop a mechanism, including a timetable, to enhance the effectiveness of the Safe Environment Disciplinary Procedures to avoid any possible oversight of disciplinary measures.  To be completed on or before September 30, 2008.
- 5/2/07 email from MED to MP
- 5/29/07 email from MED to MP
- 6/7/07 letter MED to MP
- 6/22/07 - email from CLC to MED
- 6/28/07  email from CLC to EM
- 6/29/07 - email EM to CLC.
- 7/16/07 email EM to CLC.
- 11/6/07 - memo Mary Moran, Superintendent to MP.

**Background check procedures**
- Disk labeled "SOR Checks 4/7-4/11/08 Rechecks done by temps" Disk of three folders of screen prints showing Sex Offender Registry Checks that were completed with no "hits" during the period 4/7/08-4/11/08 34.3 MB
- Volunteer application (v 1.0, 6/06) and DOM employment application (v3.0 5/06)
- Verification Form - Schools 2008-2009 (1p, v 2.0, July 2008)
- Procedures Relating to Retention and Destruction of NH Criminal Records Checks Forms Fingerprinting Results, version 1.0, 9/08

**C.  Mandatory Reporting and Response to Allegations**
- Investigative Protocol for Allegations of Sexual Abuse of Minors (May 1, 2006)
- Procedures for Responding to Suspected Illicit Use of Electronic Media (draft)
- Spreadsheet summarizing 9 allegations received from 11/27/07 to 4/29/08 and related records
- July to Sept - Internal rec and report to AG - 2 rpts
- Oct to Dec - Internal rec and report to AG - 4 rpts
- Jan to Mar - Internal rec and report to AG - 2 rpts

KPMG, LLP                                                                                     Privileged and Confidential
Discussion Draft                                                                              Attorney Client Privilege

2008 KPMG Program Assessment Report
Appendix A, Exhibit 4 - Document Review List

- Spreadsheet summarizing 9 people determined not to be fit for service since July 1, 2007, removed from service, or placed on 'restricted ministry' .  Related records including letters, meeting minutes, CRR results, and an investigative report
- Investigative reports for Accused 5287, 4000, and 5279
- Reports (of allegations of sexual abuse of minors for the current assessment year) made by the Diocese of Manchester to Office of Attorney General
- SE DB audit report for M Millard
- SE DB audit report for M A Millard
- SE DB screen shot for R Bouchard
- SE Database screen shots for Fr. G and audit trail showing that restriction flag was added to file 3/5/08.
- DRB minutes from 11/14/08 in which the Delegate's recommendation with regard to the allegations against 8257 are discussed.


## D.  Program to Prevent the Sexual Abuse of Minors

### Safe Environment Database

- CD labeled SE Database as of 4/29/08
- Report schedule entitled "Report and Reconciliation Log," which is a schedule for running reports from the Safe Environment Database.
- Report Follow-Up Procedures document (Beta Test version, 11/07)
- Report Tracking Log, which has been used for approximately 2 months to track completion of reports and follow-up and is being used as a basis for any revisions that may need to be made to the beta test version of the Report Schedule and affiliated follow-up procedures.
- Directions for temps to check the National Sex Offender Registry
- Testing results and affiliated workpapers contained in the following binders: Overdue Pendings-August 2007, Overdue Pendings November 2007, Overdue Pendings (February 2008 overdue criminal records checks), Coaches, Scouts, Diocesan Database Users, Sex Offender Registry Date Not Current
- Safe Environment Online Database section in SE Coordinator Manual for Parishes (2007) and Safe Environment Online Database section in SE Coordinator Manual for Schools (2007).  Both sections are identical and include:
  - "Recent Upgrades to the Online Safe Environment Database Effective January 2008"
  - "Safe Environment Database Reference Guide" (undated)
  - "Diocese of Manchester Safe Environment Database User Guide Effective 8/24/07 v.1.3"
- Transmittal Memo to SE Coordinators from DQ dated 8/27/07 noting inclusion of Safe Environment Coordinator Manual binder
- An undated letter from MED to SECs announcing upgrades
- 9/10/07 Unaddressed Letter from MED and EM inviting anyone interested in database instruction to a training session on 9/26/07
- 9/10/07 Unaddressed Letter from MED and EM inviting representatives from parishes that have not yet logged on to the database to a training session on 9/26/07
- Undated "Diocese of Manchester Safe Environment Online Database" PowerPoint Presentation
- Excerpt from unspecified SE Newsletter (prior to 3/8/08) with a Safe Environment Database FAQ
- Lists Query Titles #1 - #34 and each query's purpose; screenshot of database showing 34 total Queries. Seven example queries were provided.
- Report Query and Report Results for: "Individuals whose status has changed from Active or Pending to Inactive since 7/24/07 Data as of 4/28/07 02:16pm"
- Unlabeled table showing what appears to be a listing of individuals who have been labeled as restricted as of 7/24/07.
- "Working Documents": undated query labeled "Individuals_with_no_entity (2)"; undated query labeled "Dates_Greater_Than_Today"; undated "NSOPR Checklist" with note saying "emailed/called all schools 4/18/08"
- "Overdue Pendings August 2007" binder; "Overdue Pendings November 2007" binder; "Reports -- Overdue Pendings" Binder -- title page labeled "Overdue Pendings Feb 2008 No CRR"; "Reports -- SOR Date Not Current"; "Reports -- Database User/Entity Frequency"; "Reports -- Coaches"; "Reports -- Scouts"

KPMG, LLP                                                                              Privileged and Confidential
Discussion Draft                                                                          Attorney Client Privilege

2008 KPMG Program Assessment Report
Appendix A, Exhibit 4 - Document Review List

- 24 Safe Environment Database Reconciliation memos, spanning 1/19/07 to 3/31/08
- 7 pp document containing the audit log number and user name for 363 individuals
- SE Database printout for "Plaistow - St. Luke the Evangelist/Holy Angels Parish" Active Employees and Volunteers. 21 individuals are have note "Pre-School" in the Notes field.
- Safe Environment Database Application - Document of Functions, Controls and Report Capacities of the Safe Environment Database (v 1.0)
- Safe Environment Database User Guide (v 1.3)
- DOM Project Request for Automatic Notification of Over-Due Pending Employees/Volunteers
- Safe Environment Online Database Maintenance 2008
- Sample letters that were sent to all SECs in September 2007 regarding SE Database training
- A document for recent upgrades to the database (folder 16.2)
- Test Parish SE Database Log-in and password for KPMG

**Criminal records**
- Reconciliation log for all NH criminal checks sent to the Diocese and to the State of NH since 7/24/07

**Site Visits**
- Site Revisit Summary Report-Year 1, July 2007, 3pp
- Site Revisit Plan: Year 2, (2007/2008), July 2007, 3 pp
- Exception Analysis-2008 Review Year, Draft Work Document, 10pp
- 13 Documents: "site revisit protocols, procedures and all documents used for safe environment revisits. Includes a draft procedure for the EC Week site review."
  1. Site visit coordination letter template from MED to site "v 3, January 2008," 2pp
  2. "Preparation for Site Revisits, v 2.0, July 2007" Instructions for site personnel in anticipation of a site visit, 1p
  3. "Form 1 - *Exit Sheet - List of Missing Items*, v 2.0, July 2007," 3 pp: Letter to be signed by site pastor/princ/director, SEC, Reviewer to acknowledge that employees/volunteers are missing SE items; 2pp form for listing each individual and missing item.
  4. Site Review Exit Sheet; "Form 1-*Exit Shet-List of Missing Items*, v 3.0, Jan 2008' 3pp; similar to #4 above; handwritten note: "ver 3.0, we haven't really used this yet b/c I've been using up the old copies."
  5. Diocese of Manchester, Office for Ministerial Conduct, Safe Envt Review Worksheet; v 4.0 (7/07) 10pp;
  6. Diocese of Manchester, Office for Ministerial Conduct, Sample Interview Questions; v 4.0 (July 2007) 4pp;
  7. Diocese of Manchester, Office for Ministerial Conduct, Site Review Binder Checklist; **no date/version**, 1p; form to list the entity name, date of review, follow-up date (30 business days); date of report; letter to pastor/principal; receipt of evidence of inactive status; report sent
  8. Safe Envt Review Binder, Tab Divider Filing Instructions, v 1.0, Feb 2008, 5pp. Instructions for how to assemble the site review binder.
  9. Test Procedures-employees-#2.doc; v 2.0, Jan 08, 1p
  10. Test Procedures-volunteers-#1.doc; v 2.0, Jan 08, 1p
  11. DOM OMC SE Review Procedure for Camp Fatima and Camp Bernadette, v 2.0, Sept '07, 3pp.
  12. EC Week Safe Envt Review Procedures, v 1.0, Jan '08, 2pp, DRAFT. MED Note: "This is a Draft; I didn't finish it yet"
  13. DOM OMC SE Review Checklist, Audit Instrument-Checklist, Not a Required Document, March '08, 3pp. MED Note: "This is an optional work document and a draft for Year 3"
- 1p screen shot of DOM's "Site Review Tracking Log 9.07.xls" Spreadsheet appears to have several tabs, each marked for a different phase of site review cycles, (i.e. I.1(06-07), I.2(07-08), I.3(08-09), II.1(09-10), II.2(10-11), II.3(11-12)) - "showing that the log has been plotted our for 9 years... the schedules for years beyond Cycle I, Year 3 have not yet been determined"
- Printout of spreadsheet "Site Review Tracking Log Cycle I (2006-2009), Year 2 (2007-08)." [1p, no version/date] Contains names of 36 "unsatisfactory" or "needs improvement" schools and parishes. Fields: Notes, Entity, Location, Contact, Date Called, Confirm Letter Sent, Review Date, Review Complete, Report Issued, Results. Results field contains secondary categorizations of each entity; some showing improvement to satisfactory, others showing same categorization or move from only U to NI;

2008 KPMG Program Assessment Report
Appendix A, Exhibit 4 - Document Review List

notations for each entity that does not have secondary categorization of Satisfactory indicating site will be revisited during first year of Cycle 2 or that a spot check will be conducted during Year 3. Some fields are not populated, such as the report issued or review complete field.

- Printout of spreadsheet "Site Review Tracking Log, Cycle I (2006-2009), Year 3 (2008-09)." [3pp, no version/date] This appears to be the list of entities that was rated Satisfactory during the initial site visits in 2006. Contains names of 83 schools and parishes. Fields for some have been populated to indicate that a call was placed to the parish to schedule a visit during Spring/Summer 2008. Other fields indicate that a site was rated as Satisfactory in previous years and, therefore, will not be reviewed until Year 4 or 5.
- Spot check reports for Saint Mary School, Claremont (11/16/07, 2pp) and St. Anthony Parish, Sanbornville twinned w/ St Joseph Parish, Center Ossipee (1/11/08, 1p)
- 27 Site Review Binders
- Binders for: Camp Bernadette/Fatima, Camp Fatima EC Week, Holy Trinity School – Laconia, Francis of Assissi – Litchfield, St. Charles Borromeo – Meredith, St. Katharine Drexel – Alton, St. Joseph – Laconia, Sacred Heart – Laconia, Our Lady of the Mountains - N. Conway, Our Lady of Mercy - Merrimack
- Spot check of Follow-Up Review to St. Patrick School in Jaffrey, 8/15/08
- Site Review Tracking Log
- Copies of 24 "initial notification letters that were sent to pastors and principals of sites that were to be visited during Year 2." Letters all dated 9/11/07 and advise the entity they should anticipate a call to schedule site visit review "within next few months."
- Site Review Tracking Log - updated to include some Year 3 site visits
  Site Review binder Checklist (v 2.0, June 2008)
- DOM Preparation for Site Visits version 3.0, 7/08
- Test Procedures - Volunteers, version 2.1, 7/08
- Test Procedures - Employees, version 2.1, 7/08
- 9/4/08 memo FE to St Mary Elizabeth Whalen

**Independent Contractors**
- List of 51contractors (individuals and companies) and the parishes where they are contracted

**Training**
- Information pertaining to the Promise to Protect Seminar on Child Pornography, 2008 Audit Workshop, Vicars for Clergy Conference, Promoting a Safe Environment Diocesan Conference (sponsored by the Diocese of Manchester), Defender Clergy Discovery and Forensic Services, Meeting of Diocesan Victim Service Providers, Calls to Action: Powering Prevention, and Delegation Skills at UNH.
- Documentation regarding the Fourth Annual Safe Environment Conference, *Renewing our Promise* Refresher Bulletin, an agenda from the Catechetical Leader Workshop held in September 2007, monthly Compliance Coordinator Reports that contain a section for trainings and orientations provided by the CC (folder 43), and records of PGC training sessions (folder 33).
- Attendance Records from PGC sessions August 2007 - April 2008
- Survey results and summaries of St. Anselm tabulations of 1,306 survey responses.
- Renewing our Promise 2 Training Bulletin

**Communications**
- Copies of multiple Communications relating to "April, Child Abuse Prevention Month"
- e-newsletters
- Monthly reminders to SECs regarding updates to the SE database from 9/27/07 to 4/1/08 (Reminders also published in e-newsletters, SE newsletters, and message board)
- Various correspondence between the Compliance Coordinator and/or Safe Environment Assistant and parish Safe Environment Coordinators regarding database quarterly updates for January 2008 and April 2008
- Safe Environment Newsletter: Winter 2008
- Correspondence between the Compliance Coordinator and parishes, schools, and camps not contained in the other folders, including emails regarding verification forms for the USCCB auditors, new entries to the database, resources for April Child Abuse Prevention Month, e-newsletters, pending athletic coaches,

KPMG, LLP
Discussion Draft

Privileged and Confidential
Attorney Client Privilege

2008 KPMG Program Assessment Report
Appendix A, Exhibit 4 - Document Review List

Diocese of Manchester Catholic Schools Annual Reports, CORI forms, invitation to live database training session, and CRR response letters; "Being Friends, Being Safe, Being Catholic" coloring book

- Responses from a survey that was distributed in paper form (and later posted to message board) to all participants at the Fourth Annual Safe Environment Conference
- 11/6/07 Letter to Myra Peck from Mary E. Moran, CC: Diane Quinlan providing a written warning for lack of responsiveness to the CC and SE Program
- 11/7/08 [sic] Letter to Jean Barker from Mary Moran providing a written warning for allowing ineligible individuals to coach
- 9/27/07 Email from EM to To Parish Safe Environment Coordinators CC: MED reminding Coordinators to review the SE Coordinator Manual.
- CD Titled "Keeping our Promise to Protect"  Includes: Brochure; Bulletin Announcements; Liturgy Guide; Articles; Posters; Prayer Cards 92.4MB
- 3/31/08 Press Release: Catholic Dioceses Promoting Child Abuse Awareness Month
- 3/25/08 Memo to Principals, cc: SE Coordinators From DQ and MED Re: Resources for April: Child Abuse Prevention Month
- 3/24/08 Memo to Pastors, cc: SE Coordinators From DQ and MED Re: Resources for April: Child Abuse Prevention Month
- 3/18/08 Memo to Safe Environment Council and SE Coordinators From DQ, MED, EM RE 2008 Safe Environment Conference
- Diocese of Manchester Renewing Our Promise Training Bulletin
- Agenda for "New and Nearly New Catechetical Leaders and Youth Ministers Orientation Workshop September 10, 2007" noting the presentation of Safe Environment Training and Education
- Agendas of 24 meetings between Diane Quinlan and Mary Ellen D'Intino from 7/24/07 to 4/18/08
- Memo listing 2 new SECs
- Copy of letter from Brian Quirk to NHAG dated 7/21/06 referencing enclosed reconciliation reports that the Diocese prepared to insure that all reports of secual abuse of a minor by Church personnel that are received by the Diocese have been forwardeed to the AG's office.
- Email sent to all schools reminding everyone of contract language from MED on 5/9/08.
- A Jan-Mar 2008 Report Reconciliation signed by the NH AG and email correspondence between Quirk and AG notifying the AG of initial reports.
- Two letters from schools at which the "grandfathered" staff are employed, one from Principal the other from Teacher In Charge, attesting to their employment prior to 5/1/06
- Memo from Rev Arsenault and Ms. Quinlan to Bishop dated 6/19/08 re:Recommendations for STP, documentation of priest assignments, and verification of PGC training
- Letter from Baker Newman & Noyes, and attached Proposal re: extraction and validation services for Safe Environment Database
- Email from Rev Arsenault and Ms. Quinlan to Mr. Slozak datred 7/10/08
- Email between Mr. Drumm and Ms. D'Intino re: alternative screening to Visa, 5/23/08
- Email from Ms. D'Intino from 5/29/08 soliciting input on alternative screening to Visa and numerous responses
- Letter from Ms. D'Intino to Safe Environment Coordinators dated 6/10/08 with instructions as to how to check NSO database, SOR and CORI
- Letter dated Jun 10, 2008 to SECs from MED re: changes to CORI form and reference to new SORC instructions, enclosed with letter
- Being Friends, Being Safe, Being Catholic coloring book December 2008-April 2010
- DOM OMC Memo to Principals and Catechetical Leaders from Ms. Quinlan and Ms. D'Intino re: Circles of Care and NetSmartz; Attacked NetSmartz Workshop CD
- eNews reports - Number of page views on the homepage from 3/31/08-5/4/08, 1 p; Report listing the number of click throughs from links on Safe Environment related to topics in eNews for editions 5 through 8, 2 p; Report listing the number of page views of SE related topics from 4/2/08 to 5/14/08, 2 p

## E. Program Documentation

- Listing of Safe Environment Program Coordinators across the country (Compliance Coordinator and Associate Delegate are participants).

KPMG, LLP
Discussion Draft

Privileged and Confidential
Attorney Client Privilege

2008 KPMG Program Assessment Report
Appendix A, Exhibit 4 - Document Review List

- "Safe Environment Coordinators" -- listing includes location, entity, first name & last name.
- "School Independent Contractor Agreements 2007-2008" binder
- "Site Review- Diocesan Camps- Camp Bernadette/Camp Fatima" binder, which contains copies of contracts between camps and independent contractors who regularly work with minors
- Screen prints of communications posted on the Safe Environment Message Board from 12/1/07 to 4/18/08
- 1-inch binder labeled Diocesan Review Board Orientation Manual, September 6, 2007
- DOM Screening and Training Protocol 7/1/08
- DOM SEC Manual - Parishes
- STP FAQ
- Volunteer Application
- Non-teaching Staff Employment Application
- Teacher Application Form

**Diocesan Documents relating to the Child Safety Program**
- Camp Screening Form (revised 10/07)
- "Safe Environment Policies" binder: Code and Policy, policy for summer employment at diocesan schools, policy for developmentally and/or cognitive disabled adults, policy for individuals who attended PGC for which no training attendance list exists, policy regarding contributions towards youth athletic teams, Diocesan Administration Position Descriptions
- "Safe Environment Procedures" binder: Report Follow-up Procedures, database directions, Review Procedures for Camps, Screening and Training Protocol, S&TP for Coaches and Substitute Teachers, SE Review Plan, SE Review Worksheet, Risk Assessment Matrix, directions for the fingerprint card, Database Reconciliation Procedures

**Evidence supporting implementation of policies and protocols**
- Copies of background screening and training documentation regarding clergy and diocesan employees who began ministry or were hired after 07/24/07, which consists of 8 clergy, 1 employee re-hire, and 9 employees.
- Compliance Coordinator work plan for E-News communications through the end of 2008 (folder 18)
- Binder of verifications indicating that Parish staff have received and implemented the following programs between 7/1/06 and 6/30/07: Circles of Care Personal Safety Curriculum; Protecting God's Children training for adults; Serving Christ, Serving Others Code of Ministerial Conduct and Promise to Protect, Pledge to Heal Policy for the Protection of Children and Young People (effective March 19, 2007); Renewing Our Promise Refresher Training Bulletin
- Action Plan II monitoring document with timing and completion columns
- List of Deacons, Seminarians, and Reverends with SOR and NSOPR dates marked "to be destroyed after audit"
- List of inactive individuals by City/Entity
- List of individuals with no screening/training confirmation recorded and deleted from database
- List of individuals with "undetermined" personnel type
- Several latters to parishes and schools dated 10/7/08 stating that certain individuals are not eligible to work with minors until missing items are completed
- List of individuals with overdue items as of 9/30/08
- List of individuals with overdue items as of 8/21/08
- Several letters to parishes and schools dated 9/3/08 stating that certain individuals have outstanding items
- Letters requesting annual SEC documentation from parishes
- List of logon information
- DOM OMC Safe Environment Database Reconciliations
- Emails from Ms. D'Intino re: Scouts and coaches
- CYO Coaches SE Database Analysis dated 3/18/08
- Memorandum to follow-up Fourth Annual Safe Environment Conference
- Agenda for SE Council Meeting June 19, 2008 with related materials attached.

KPMG, LLP                                                                               Privileged and Confidential
Discussion Draft                                                                       Attorney Client Privilege

2008 KPMG Program Assessment Report
Appendix A, Exhibit 4 - Document Review List


**Compliance Coordinator's Monthly Reports**
- 9 Monthly Compliance Reports issued from the Compliance Coordinator to Bishop McCormack and the DRB between 07/24/07 and 3/31/08 (folder 43)


**F.  Auditing/ Testing of the Program**
- Report of the Gavin Group related to the 2007 USCCB audit of compliance with the *Charter for the Protection of Children and Young People*
- Audit instructions for the 2007 USCCB audit
- Copy of the review procedures the DRB is performing in their current review of the Office of Ministerial Conduct
- Narrative response [to document request # 29] in addition to PGC docs for two individuals
- DRB and SE Council input regarding the 2007 KPMG Report (2 2-pg memos, not dated)
- Email from Ms. Quinlan to Mary Kessler re: 2008 Compliance Audit Responses
- 2008 Compliance Audit
- 2008 Additional Actions for the Protection of Children
- Exception analysis spreadsheet for 2007-8
- List of individuals with pending status
- DOM Diocesan Review Board Compliance Audit Instrument 2007
- Draft DRB Audit Report 2007 (received upon additional request on 10/23)

# EXHIBIT 5

# 2008 KPMG SITE VISIT RESULTS

| NUMBER | ENTITY | EMP/VOL/CLERGY | REF? | OTHER STATE? (APP) | EXC 1 | EXC 2 | SITE DATE (SCREENG) | OTHER STATE? (SCREENG) | SE DB DATE (ACK) | SITE DATE (ACK) | EXC 3 | EXC 4 | SE DB DATE (NSOPR) | DOM DATE (NSOPR) | STATE NOT COVERED? | EXC 5 | EXC 6 | EXC 7 | SE DB DATE (PGC) | DOM DATE (PGC) | EXC 8 | EXC 9 | EXC 10 | SE DB DATE (CRR) | DOM DATE (CRR) | OUT OF STATE CHK PERFORMED? | EXC 11 | EXC 12 | EXC 13 | EXC 14 | MARKED FOR YEAR 2 VISIT (CAMPS)? | EXCEPTIONS? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CAMP | E | Y | Y | | | 6/28/2008 | Y | N/A | N/A | | | 6/28/2008 | NF | N | | | X | 6/28/08 | 6/28/2008 | | | | 8/1/2008 | 8/1/2008 | Y | | | | | N | Y |
| 2 | | E | Y | N | | | N/A | N/A | 7/9/2007 | 7/9/2007 | | | 7/18/2007 | 7/9/2008 | N | | | X | 7/9/2007 | 7/9/2007 | | | | 7/16/2007 | 7/16/2007 | N | | X | | | N | Y |
| 3 | | V | N | N | | X | N/A | N/A | 6/24/2005 | 6/25/2005 | | X | 7/9/2008 | 7/9/2008 | N | | | | 6/25/2005 | 6/25/2005 | | X | | 3/28/2006 | 3/28/2006 | Y | | | | | N | Y |
| 4 | | E | N | N | | X | N/A | N/A | 7/1/2008 | 7/1/2008 | | | 6/28/2008 | 6/28/2008 | N | | | | 5/20/2007 | 5/20/2007 | X | | | 7/3/2008 | 7/3/2008 | N | | | X | | Y | Y |
| 5 | | V | N | Y | | | N/A | N/A | 6/21/2008 | 6/21/2008 | | | 6/24/2008 | NF | N | | | X | 6/22/2002 | 7/3/2008 | X | X | | 7/17/2008 | 7/21/2008 | Y | | | X | | Y | Y |
| 6 | | V | NF | N | | X | 7/4/2005 | N | N/A | N/A | | | 7/9/2008 | 7/9/2008 | N | | | | 6/28/2003 | 6/28/2003 | X | | | 7/12/2005 | 7/12/2005 | N | | | X | | Y | Y |
| 7 | | E | NF | N | N | | 6/2/2004 | N | 6/19/2004 | 6/19/2004 | | | 7/9/2008 | 7/9/2008 | N | | | | 6/22/2002 | 6/22/2002 | X | | | 7/25/2005 | 7/25/2005 | Y | | | X | | Y | Y |
| 8 | | V | N | Y | | | 6/16/2007 | N | 6/16/2007 | 6/16/2007 | | | 6/29/2007 | 6/29/2007 | N | | | | 6/18/2005 | 6/18/2005 | X | | | 7/25/2005 | 7/25/2005 | Y | | | X | | Y | Y |
| 9 | | E | 6/27/2008 | N | | X | N/A | N/A | 6/16/2007 | 6/16/2007 | | | 7/1/2008 | 7/1/2008 | N | | | | 6/21/2008 | 6/21/2008 | X | | | 6/27/2008 | 6/27/2008 | N | | X | | | Y | Y |
| 10 | | V | NF | N | N | | 7/14/2005 | N | 7/14/2005 | 7/14/2005 | | | 7/9/2008 | 7/9/2008 | N | | | | 7/14/2005 | 7/14/2005 | X | | | 7/26/2005 | 7/26/2005 | N | | | | | Y | Y |
| 11 | | V | NF | N | N | | 6/24/2006 | N | 6/24/2006 | 6/24/2006 | | | 7/9/2008 | 7/9/2008 | N | | | | 6/24/2006 | 6/24/2006 | | | | 7/10/2006 | 7/10/2006 | Y | | | | | Y | N |
| 12 | | E | NF | N | N | X | 6/23/2007 | N | 6/23/2007 | 6/23/2007 | | | 6/29/2007 | 6/29/2007 | N | | | | 6/23/2007 | 6/23/2007 | | | | 6/30/2008 | 6/30/2008 | Y | | | X | | Y | Y |
| 13 | | E | NF | N | N | X | 7/9/2007 | N | 7/9/2007 | 7/9/2007 | | | 7/9/2008 | 7/9/2008 | N | | | | 7/9/2007 | 7/9/2007 | | | | 6/24/2007 | 6/24/2007 | Y | | | | | Y | Y |
| 14 | | E | NF | N | N | X | 6/23/2007 | N | 6/23/2007 | 6/23/2007 | | | 7/9/2008 | 7/9/2008 | N | | | | 6/23/2007 | 6/23/2007 | | | | 6/19/2007 | 6/19/2007 | Y | | | X | | Y | Y |
| 15 | | E | NF | N | N | X | 6/24/2006 | N | 6/24/2006 | 6/24/2006 | | | 6/29/2007 | 6/29/2007 | N | | | | 6/24/2006 | 6/24/2006 | | | | 6/23/2006 | 6/23/2006 | N | | | | | Y | Y |
| 16 | | E | 6/18/2007 | N | N | | N/A | N/A | 6/18/2007 | 6/18/2007 | | | 6/29/2007 | 6/29/2007 | N | | | | 5/20/2007 | 5/20/2007 | X | | | 6/15/2007 | 6/15/2007 | Y | | X | | | Y | Y |
| 17 | | E | 6/12/2007 | N | N | | N/A | N/A | 6/23/2007 | 6/23/2007 | | | 7/9/2008 | 7/9/2008 | N | | | | 6/23/2007 | 6/23/2007 | | | | 6/30/2008 | 6/30/2008 | N | | | | | Y | Y |
| 18 | PARISH 1 | E | NF | N | N | X | 8/20/2004 | N | 5/2/2007 | 5/2/2007 | | X | 4/10/2007 | 4/10/2007 | Y | X | | | 5/1/2002 | 5/1/2002 | X | | | 6/30/2004 | 6/30/2004 | N | | | | | N/A | Y |
| 19 | | E | ND | Y | Y | | N/A | N/A | 6/21/2005 | 6/21/2005 | | | 4/10/2007 | 4/10/2007 | N | | | | 2/6/2006 | 2/6/2006 | | | | 7/26/2006 | 7/26/2006 | N | | | | | N/A | N/A |
| 20 | | E | ND | N | N | X | 3/6/2005 | N | 3/6/2005 | 3/6/2005 | | | 1/4/2008 | 1/4/2008 | N | | | | 2/6/2006 | 2/6/2006 | | | | 2/16/2006 | 2/16/2006 | N | | | | | N/A | Y |
| 21 | | E | 9/18/2007 | N | N | X | N/A | N/A | 9/24/2005 | 9/24/2005 | | | 10/9/2007 | NF | N | | | X | 10/3/2007 | 10/3/2007 | | | | 10/5/2007 | 10/5/2007 | N | | X | | | N/A | Y |
| 22 | | V | ND | N | N | | 9/6/2007 | N | 9/6/2007 | 9/6/2007 | | | 3/28/2007 | 3/29/2007 | N | | | | 10/11/2007 | 10/11/2007 | | | | 9/11/2007 | 9/11/2007 | N | | X | | | N/A | Y |
| 23 | | V | ND | N | N | | 9/20/2004 | N | 9/20/2004 | 9/20/2004 | | | 1/3/2008 | 1/3/2008 | Y | X | | | 1/20/2003 | 10/20/2003 | X | | | 10/13/2004 | 10/13/2004 | N | | | X | | N/A | Y |
| 24 | | V | 9/18/2007 | N | N | | N/A | N/A | 9/18/2007 | 9/18/2007 | | | 10/3/2007 | 10/3/2007 | N | | | | 10/16/2007 | 10/16/2007 | | | | 9/28/2007 | 9/28/2007 | N | | X | | | N/A | Y |
| 25 | | V | 9/20/2007 | N | N | | N/A | N/A | 9/20/2007 | 9/20/2007 | | | 10/3/2007 | 10/3/2007 | N | | | | 1/31/2008 | 1/31/2008 | | | | 10/5/2007 | 10/5/2007 | N | | X | | | N/A | Y |
| 26 | | V | 2/12/2008 | N | N | | 9/8/2006 | N | 9/8/2006 | 9/8/2006 | | | 4/8/2008 | 4/8/2008 | N | | | | 9/6/2006 | 9/6/2006 | | | | 11/1/2006 | 11/1/2006 | N | | X | | | N/A | Y |
| 27 | | V | 9/19/2007 | N | N | | N/A | N/A | 9/19/2007 | 9/19/2007 | | | 10/9/2007 | 10/9/2007 | N | | | | 10/13/2007 | 10/13/2007 | | | | 10/5/2007 | 10/5/2007 | N | | X | | | N/A | Y |
| 28 | | E | NF | N | N | X | 9/14/2004 | N | 9/18/2007 | 9/18/2007 | | | 4/10/2007 | 4/10/2007 | Y | X | | | 11/3/2004 | 11/3/2004 | X | | | 9/14/2004 | 9/14/2004 | N | | | X | | N/A | Y |
| 29 | | V | 9/18/2007 | N | N | | N/A | N/A | 9/18/2007 | 9/18/2007 | | | 10/2/2007 | 10/2/2007 | N | | | | 1/31/2008 | 1/31/2008 | | | | 9/28/2007 | 9/28/2007 | N | | X | | | N/A | Y |
| 30 | | V | 2/14/2007 | N | N | | N/A | N/A | 8/14/2006 | 8/14/2006 | | | 4/8/2008 | 4/8/2008 | N | | | | 10/25/2005 | 10/25/2005 | | | | 11/2/2005 | 11/2/2005 | N | | X | | | N/A | Y |
| 31 | | E | 8/29/2007 | N | N | | N/A | N/A | 8/29/2007 | 8/29/2007 | | | 9/24/2007 | NF | N | | | X | 8/29/2007 | 8/29/2007 | | | | 9/21/2007 | 9/21/2007 | N | | X | | | N/A | Y |
| 32 | | E | 8/29/2007 | N | N | | N/A | N/A | 8/29/2007 | 8/29/2007 | | | 9/24/2007 | 9/24/2007 | N | | | | 8/29/2007 | 8/29/2007 | | | | 9/21/2007 | 9/21/2007 | N | | X | | | N/A | Y |
| 33 | | V | 2/10/2007 | N | N | | N/A | N/A | 10/10/2006 | 10/10/2006 | | | 3/28/2007 | NF | N | | | X | 10/11/2006 | 10/11/2006 | | | | 10/5/2006 | 10/5/2006 | N | | X | | | N/A | Y |
| 34 | | V | 9/18/2007 | N | N | | N/A | N/A | 9/18/2007 | 9/18/2007 | | | 10/3/2007 | 10/3/2007 | Y | X | | | 10/13/2007 | 10/13/2007 | | | | 9/28/2007 | 9/28/2007 | N | | X | | | N/A | Y |
| 35 | | V | NF | N | N | | 9/14/2004 | N | 9/14/2004 | 9/14/2004 | | | 4/10/2008 | 4/10/2008 | Y | X | | | 3/13/2005 | 3/13/2005 | X | | | 9/14/2006 | 9/14/2006 | N | | | | | N/A | Y |
| 36 | | V | NF | N | N | | 9/14/2004 | N | 9/14/2004 | 9/14/2004 | | | 4/10/2008 | 4/10/2008 | Y | X | | | 9/19/2004 | 9/19/2004 | X | | | 11/2/2005 | 11/2/2005 | N | | | | | N/A | Y |
| 37 | | V | 5/5/2008 | N | Y | | N/A | N/A | 10/30/2007 | 10/30/2007 | | | 1/15/2008 | 1/15/2008 | Y | X | | | 10/23/2007 | 10/23/2007 | | | | 1/17/2008 | 1/17/2008 | N | | | | | N/A | Y |
| 38 | | V | NF | N | N | | 9/14/2004 | N | 9/24/2005 | 4/15/2007 | | X | 4/7/2008 | 4/7/2008 | N | | | | 8/12/2004 | 8/12/2004 | X | | | 11/2/2005 | 11/2/2005 | N | | | X | | N/A | Y |
| 39 | | E | ND | N | Y | | N/A | N/A | 9/20/2005 | 9/20/2005 | | | 4/11/2008 | 4/11/2008 | Y | X | | | 11/3/2004 | 11/3/2004 | X | | | 9/14/2004 | NF | N | X | X | | | N/A | Y |
| 40 | | V | NF | N | N | | N/A | N/A | 9/20/2005 | 9/20/2005 | | | 4/10/2008 | 4/10/2008 | N | | | | 11/2/2005 | 11/2/2005 | | | | 11/2/2005 | 11/2/2005 | N | | | | | N/A | N |
| 41 | | E | 2/14/2008 | N | N | | N/A | N/A | 9/24/2007 | 9/24/2007 | | | 10/3/2007 | 10/3/2007 | N | | | | 9/24/2007 | 9/24/2007 | | | | 9/28/2007 | 9/28/2007 | N | | X | | | N/A | Y |
| 42 | PARISH 2 | E | NF | N | N | X | 7/16/2008 | N | 7/16/2007 | 7/16/2007 | | | 8/3/2007 | 8/3/2007 | N | | | | 9/6/2007 | 9/6/2007 | | | | 7/31/2007 | 7/31/2007 | N | | | | | N/A | Y |
| 43 | | V | NF | N | N | | 9/8/2004 | N | 9/8/2004 | 9/8/2004 | | | 4/7/2008 | 4/7/2008 | N | | | | 9/16/2004 | 9/16/2004 | X | | | 9/30/2004 | 9/30/2004 | N | | | | | N/A | Y |
| 44 | | V | NF | N | N | | 9/2/2004 | N | 9/2/2004 | 9/11/2004 | | X | 4/7/2008 | 4/7/2008 | N | | | | 9/16/2004 | 9/16/2004 | X | | | 9/30/2004 | 9/30/2004 | N | | | | | N/A | Y |
| 45 | | V | 9/10/2007 | N | N | | 10/25/2006 | N | 8/23/2006 | 8/23/2006 | | | 3/10/2008 | 3/10/2008 | N | | | | 9/6/2007 | 9/6/2007 | | | | 10/5/2007 | 10/5/2007 | N | | X | | | N/A | Y |
| 46 | | V | NF | N | N | | 10/25/2006 | N | 9/20/2004 | 9/20/2004 | | | 3/10/2008 | 3/10/2008 | N | | | | 9/21/2006 | 9/21/2006 | | | | 3/7/2008 | 3/7/2008 | N | | | | | N/A | N |
| 47 | | V | NF | N | N | | 9/20/2004 | N | 9/20/2004 | 9/20/2004 | | | 3/29/2007 | 3/29/2007 | N | | | | 10/27/2002 | 10/27/2002 | X | | | 9/30/2004 | 9/30/2004 | N | | | | | N/A | Y |
| 48 | | V | NF | N | Y | | 9/16/2004 | N | 9/16/2004 | 9/16/2004 | | | 3/28/2007 | 3/28/2007 | N | | | | 9/16/2004 | 9/16/2004 | X | | | 9/30/2004 | 9/30/2004 | N | | X | | | N/A | Y |
| 49 | | V | NF | N | N | | 9/10/2007 | N | 9/10/2007 | 9/10/2007 | | | 9/24/2007 | 9/24/2007 | Y | X | | | 9/6/2007 | 9/6/2007 | | | | 9/22/2007 | 9/22/2007 | N | | | | | N/A | Y |
| 50 | | V | NF | N | N | | 1/12/2006 | N | 1/12/2006 | 1/12/2006 | | | 3/28/2007 | 3/28/2007 | N | | | | 3/28/2007 | 3/28/2007 | | | | 8/26/2005 | 8/26/2005 | N | | | | | N/A | N |
| 51 | | E | 9/18/2007 | N | N | | N/A | N/A | 9/18/2007 | NF | N | X | 10/9/2007 | 10/9/2007 | N | | | | 9/18/2007 | 9/18/2007 | | | | 10/5/2007 | 10/5/2007 | N | | X | | | N/A | Y |
| 52 | | E | 9/12/2007 | N | N | | N/A | N/A | 9/12/2007 | 9/12/2007 | | | 10/9/2007 | 10/9/2007 | N | | | | 9/6/2007 | 9/6/2007 | | | | 10/5/2007 | 10/5/2007 | N | | X | | | N/A | Y |
| 53 | | V | 9/20/2007 | N | N | | N/A | N/A | 9/20/2007 | 9/20/2007 | | | 10/9/2007 | 4/7/2008 | N | | | X | 10/11/2006 | 10/11/2006 | | | | 12/11/2007 | 10/11/2007 | N | | X | X | | N/A | Y |
| 54 | | V | 10/11/2008 | N | N | | N/A | N/A | 11/26/2007 | 11/26/2007 | | | 12/13/2007 | 12/13/2007 | N | | | | 10/11/2006 | 10/11/2006 | | | | 12/11/2007 | 10/11/2007 | N | | X | X | | N/A | Y |
| 55 | | V | NF | N | N | | 8/31/2006 | N | 10/10/2006 | 10/10/2006 | | | 4/7/2008 | 4/7/2008 | N | | | | 11/5/2003 | 11/5/2003 | X | | | 10/26/2006 | 10/26/2006 | N | | | | | N/A | Y |
| 56 | | V | NF | N | N | | 11/11/2004 | N | 11/11/2004 | 11/11/2004 | | | 4/8/2008 | 4/8/2008 | N | | | | 10/16/2001 | 10/16/2001 | X | | | 1/2/2004 | 1/2/2004 | N | | | | | N/A | Y |
| 57 | | V | NF | N | N | | 9/2/2004 | N | 9/2/2004 | 9/2/2004 | | | 4/8/2008 | 4/8/2008 | N | | | | 9/22/2004 | 9/22/2004 | X | | | 9/30/2004 | 9/30/2004 | N | | | | | N/A | Y |
| 58 | | V | NF | N | N | | 1/12/2006 | N | 1/12/2006 | 1/12/2006 | | | 4/8/2008 | 4/8/2008 | N | | | | 1/12/2006 | 1/12/2006 | | | | 2/16/2006 | 2/16/2006 | N | | | | | N/A | N |
| 59 | | V | NF | N | N | | 9/16/2004 | N | 9/16/2004 | 9/16/2004 | | | 4/8/2008 | 4/8/2008 | N | | | | 9/16/2004 | 9/16/2004 | X | | | 9/30/2004 | 9/30/2004 | N | | | | | N/A | Y |
| 60 | | V | NF | N | N | | 10/10/2006 | N | 10/10/2006 | 10/10/2006 | | | 4/10/2008 | 4/10/2008 | N | | | | 10/12/2006 | 10/12/2006 | | | | 10/26/2006 | 10/26/2006 | N | | | | | N/A | N |
| 61 | | V | NF | N | N | | 10/3/2006 | N | 10/3/2006 | 10/3/2006 | | | 3/26/2007 | 3/26/2007 | N | | | | 6/19/2006 | 6/19/2006 | | | | 10/26/2006 | 10/26/2006 | N | | | | | N/A | N |
| 62 | | V | NF | N | N | X | 7/31/2006 | N | N/A | N/A | | | 4/23/2007 | 4/23/2007 | N | | | | 8/10/2006 | 8/10/2006 | | | | 10/26/2006 | 10/26/2006 | N | | | X | | N/A | Y |
| 63 | | V | 10/10/2006 | N | N | | 10/10/2006 | N | 10/10/2006 | 10/10/2006 | | | 3/28/2007 | 3/28/2007 | N | | | | 10/10/2006 | 10/10/2006 | | | | 10/10/2006 | 10/10/2006 | N | | | | | N/A | N |
| 64 | | V | NF | N | N | | 9/8/2004 | N | 9/8/2004 | 9/8/2004 | | | 3/26/2007 | 3/26/2007 | Y | X | | | 9/16/2004 | 9/16/2004 | X | | | 9/8/2004 | 9/8/2004 | N | | | | | N/A | Y |
| 65 | | V | NF | N | N | | 9/8/2004 | N | 9/8/2004 | 9/8/2004 | | | 3/26/2007 | 3/26/2007 | Y | X | | | 9/20/2004 | 9/20/2004 | X | | | 9/30/2004 | 9/30/2004 | N | | | | | N/A | Y |
| 66 | SCHOOL | E | 8/30/2007 | Y | N | | N/A | N/A | 11/9/2005 | 11/9/2005 | | | 10/26/2007 | 10/26/2007 | Y | X | | | 9/20/2007 | 9/20/2007 | | | | 10/22/2007 | 10/22/2007 | X | | | | | N/A | Y |
| 67 | | E | 8/30/2007 | Y | N | | N/A | N/A | 11/9/2005 | 11/9/2005 | | | 3/30/2007 | 3/30/2007 | Y | X | | | 11/9/2005 | 11/9/2005 | | | | 1/24/2005 | 1/24/2005 | N | | X | | | N/A | Y |
| 68 | | V | 5/6/2008 | N | N | | N/A | X | 5/6/2008 | | X | | 10/17/2007 | 10/17/2007 | Y | X | | | 5/6/2008 | 5/6/2008 | | | | 10/15/2007 | 10/15/2007 | N | | X | | | N/A | Y |
| 69 | | E | 5/24/2007 | Y | N | | N/A | N/A | 6/7/2007 | 6/7/2007 | | | 6/12/2007 | 6/12/2007 | Y | X | | | 6/7/2007 | 6/7/2007 | | | | 11/27/2007 | 11/27/2007 | N | | X | | | N/A | Y |
| 70 | | E | 5/22/2007 | Y | N | | N/A | N/A | 6/7/2007 | 6/7/2007 | | | 4/10/2008 | 4/10/2008 | Y | X | | | 5/1/2002 | 5/1/2002 | X | | | 1/24/2005 | 1/24/2005 | N | | X | | | N/A | Y |
| 71 | | E | 5/18/2006 | Y | N | | N/A | N/A | 8/2/2006 | 8/2/2006 | | | 4/10/2008 | 4/10/2008 | Y | X | | | 5/1/2002 | 5/1/2002 | X | | | 1/24/2005 | 1/24/2005 | N | | X | | | N/A | Y |
| 72 | | E | 5/16/2007 | N | N | | N/A | N/A | 6/7/2007 | 6/7/2007 | | X | 6/12/2007 | 6/12/2007 | Y | X | | | 6/7/2007 | 6/7/2007 | | | | 6/7/2007 | 6/7/2007 | N | | X | | | N/A | Y |

KPMG LLP
DISCUSSION DRAFT

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

## 2008 KPMG SITE VISIT RESULTS

| NUMBER | ENTITY | EMP/VOL/CLERGY | APP SITE DATE | REF? | APP OTHER STATE? | EXC 1 | EXC 2 | SCR SITE DATE | SCR OTHER STATE? | ACK 08 DB DATE | ACK SITE DATE | EXC 3 | EXC 4 | NSOPR 08 DB DATE | NSOPR DOM DATE | STATE NOT COVERED? | EXC 5 | EXC 6 | EXC 7 | PGC 08 DB DATE | PGC DOM DATE | EXC 8 | EXC 9 | EXC 10 | CRR 08 DB DATE | CRR DOM DATE | OUT OF STATE CHK? | EXC 11 | EXC 12 | EXC 13 | EXC 14 | MARKED YR2 | EXCEPTIONS? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 73 | | E | 9/5/2007 | Y | Y | | | N/A | N/A | 9/18/2007 | 9/18/2007 | | | 10/10/2007 | 10/10/2007 | N | X | | | 9/17/2007 | 9/17/2007 | | | | 9/28/2007 | N/A | N/A | | | | | N/A | Y |
| 74 | | E | ND | Y | Y | | | N/A | N/A | 12/8/2006 | 10/6/2005 | | X | 4/7/2008 | 4/7/2008 | N | | | | 10/8/2005 | 10/8/2005 | | | | 12/22/2005 | N/A | N/A | | | | | N/A | Y |
| 75 | | V | 10/1/2007 | N | N | | | N/A | N/A | 4/23/2005 | 4/23/2005 | | | 10/30/2007 | 10/30/2007 | N | | | | 11/30/2001 | 11/30/2001 | X | | | 10/22/2007 | N/A | N | | | | | N/A | Y |
| 76 | | V | NF | N | N | | X | 6/15/2004 | N | 2/11/2005 | 2/11/2005 | | | 4/4/2007 | 3/30/2007 | N | | | X | 10/18/2001 | 10/18/2001 | X | | | 7/9/2004 | N/A | N | | | | | N/A | Y |
| 77 | | E | 6/8/2004 | Y | | | | N/A | N/A | 7/14/2004 | 7/14/2004 | | | 4/8/2008 | 4/8/2008 | Y | X | | | 9/29/2004 | 9/29/2004 | X | | | 8/30/2004 | N/A | N | | | | | N/A | Y |
| 78 | | E | 8/18/2006 | Y | | | | N/A | N/A | 9/13/2006 | 9/13/2006 | | | 3/27/2007 | 3/27/2007 | Y | X | | | 9/21/2006 | 9/21/2006 | | | | 10/6/2006 | N/A | N | | | | | N/A | Y |
| 79 | | E | 1/24/2007 | N | N | | | N/A | N/A | 1/29/2008 | 1/29/2008 | | | 2/14/2008 | 2/14/2008 | N | | | | 4/7/2008 | 4/7/2008 | | | | 2/15/2008 | N/A | N | | | | | N/A | N |
| 80 | | E | NF | N | N | | X | 8/4/2006 | | 8/4/2006 | 8/4/2006 | | | 3/30/2007 | 3/30/2007 | N | | | | 9/18/2006 | 9/18/2006 | | | | 9/27/2006 | N/A | N | | | | | N/A | Y |
| 81 | | E | 6/9/2007 | N | | | X | | | 10/5/2004 | 1/5/2004 | | | 10/10/2007 | 10/10/2007 | Y | X | | | 9/17/2007 | 9/17/2007 | | | | 9/28/2007 | N/A | N | | | | | N/A | Y |
| 82 | | E | NF | N | | | X | | | 9/24/2007 | 9/24/2007 | | | 10/10/2007 | 10/10/2007 | Y | X | | | 9/17/2007 | 9/17/2007 | | | | 9/28/2007 | N/A | N | | | | | N/A | Y |
| 83 | | E | 8/15/2007 | N | Y | | X | | | 8/28/2007 | 4/24/2007 | | X | 10/10/2007 | 10/10/2007 | Y | X | | | 5/26/2005 | 5/26/2005 | | | | 9/28/2007 | N/A | N | | | | | N/A | Y |
| 84 | | E | ND | N | N | | | N/A | N/A | 9/21/2007 | 9/21/2007 | | | 10/3/2007 | 10/10/2007 | Y | X | | X | 9/17/2007 | 9/17/2007 | | | | 9/28/2007 | N/A | N | | | | | N/A | Y |
| 85 | SCHOOL 2 | E | NF | N | | X | X | NF | | 12/12/2006 | 12/12/2006 | | | 3/30/2007 | 3/30/2007 | Y | X | | | 1/26/2006 | 1/26/2006 | | | | 12/16/2005 | N/A | N | | | | | N/A | Y |
| 86 | | E | 10/1/2007 | Y | N | | | N/A | N/A | 1/28/2004 | 1/28/2005 | | X | 3/28/2007 | NF | N | | X | | 10/23/2003 | 10/23/2003 | X | | | 1/2/2004 | N/A | N | | | | | N/A | Y |
| 87 | | V | 8/1/2005 | Y | | | | N/A | N/A | 12/6/2004 | 12/6/2004 | | | 3/29/2007 | 3/29/2007 | N | | | | 12/5/2004 | 12/5/2004 | X | | | 2/23/2006 | N/A | N/A | | | | | N/A | Y |
| 88 | | V | 1/9/2008 | N | N | | | N/A | N/A | 1/16/2006 | 1/16/2006 | | | 1/28/2008 | 1/28/2008 | Y | X | | | 11/27/2007 | 11/27/2007 | | | | 1/25/2008 | N/A | N | | | | | N/A | Y |
| 89 | | V | 2/20/2008 | Y | N | | | N/A | N/A | 2/25/2008 | 2/25/2008 | | | 3/10/2008 | 3/10/2008 | Y | X | | | 4/7/2008 | 4/7/2008 | | | | 3/7/2008 | N/A | N | | | | | N/A | Y |
| 90 | | V | NF | N | | | X | 9/29/2004 | | 9/29/2004 | 9/29/2004 | | | 4/22/2008 | 3/26/2007 | Y | X | | X | 9/29/2004 | 9/29/2004 | | | | 8/28/2004 | N/A | N | | | | | N/A | Y |
| 91 | | V | 8/24/2006 | Y | | | | N/A | N/A | 8/24/2006 | 8/24/2006 | | | 4/10/2008 | 4/10/2008 | N | | | | 9/18/2006 | 9/18/2006 | | | | 9/27/2006 | N/A | N | | | | | N/A | Y |
| 92 | | V | NF | N | N | | | 6/30/2004 | N | 4/13/2005 | 4/13/2005 | | | 4/10/2007 | 4/10/2007 | Y | X | | | 10/18/2001 | 10/18/2001 | X | | | 7/9/2004 | N/A | N | | | | | N/A | Y |
| 93 | | V | 2/22/2008 | Y | N | | | N/A | N/A | 2/22/2008 | 2/22/2008 | | | 3/10/2008 | 3/10/2008 | Y | X | | | 2/29/2004 | 2/29/2004 | | | | 3/7/2008 | N/A | N | | | | | N/A | Y |
| 94 | | E | 12/13/2007 | N | N | X | X | N/A | N/A | 12/13/2007 | 12/13/2007 | | | 3/28/2008 | 1/3/2008 | N | | | X | 11/27/2007 | 11/27/2007 | | | | 3/28/2008 | N/A | N | | | | | N/A | Y |
| 95 | | E | 5/24/2007 | N | N | X | X | N/A | N/A | 4/5/2005 | 4/5/2005 | | | 3/30/2007 | 3/30/2007 | N | | | | 10/18/2001 | 10/18/2001 | X | | | 8/24/2001 | N/A | N | | | | | N/A | Y |
| 96 | | V | NF | N | Y | | X | NF | | 5/20/2006 | 5/20/2006 | | | 4/7/2008 | 4/7/2008 | N | | | | 10/6/2006 | 10/6/2006 | | | | 5/30/2006 | N/A | N/A | | | | | N/A | N |
| 97 | | V | 2/19/2007 | N | | | | N/A | N/A | 2/19/2007 | 2/19/2007 | | | 4/9/2008 | 4/9/2008 | N | | | | 1/3/2007 | 1/3/2007 | | | | 3/22/2007 | N/A | N | | | | | N/A | N |
| 98 | | V | NF | N | | | X | | | 4/28/2006 | 4/28/2006 | | | 3/29/2007 | 3/29/2007 | N | | | | 3/30/2006 | 3/30/2006 | | | | 5/11/2006 | N/A | N | | | | | N/A | Y |
| 99 | | V | 4/30/2007 | N | N | | | N/A | N/A | 4/30/2007 | 4/30/2007 | | | 3/3/2008 | 3/3/2008 | N | | | | 3/30/2006 | 3/30/2006 | | | | 2/29/2008 | N/A | N | | | | | N/A | Y |
| 100 | | V | NF | N | N | | | 3/6/2006 | | 3/6/2006 | 3/6/2006 | | | 4/23/2007 | 4/23/2007 | N | | | | 10/27/2002 | 10/27/2002 | X | | | 11/9/2006 | N/A | N | | | | | N/A | Y |
| **Totals** | | | | | | 17 | 3 | 23 | | | | 2 | 8 | | | | 28 | 6 | 7 | | | 36 | 1 | 0 | | | | 1 | 33 | 3 | 12 | | 87 |
| **%** | | | | | | 17.00% | 3.00% | 62.16% | | | | 2.00% | 8.00% | | | | 28.00% | 6.00% | 7.00% | | | 36.00% | 1.00% | 0.00% | | | | 1.00% | 33.00% | 3.00% | 70.59% | | 87.00% |

| 37 | TOTAL EMPLOYEES |
|---|---|
| 63 | TOTAL VOLUNTEERS |

| | |
|---|---|
| X | Exception |
| Y | Yes |
| N | No |
| NF | Element not found |
| ND | Element found, but not dated |
| N/A | Not applicable or element not tested |

| | |
|---|---|
| **SE DATABASE DATE** | KPMG used SE Database dates obtained from the Diocese provided SE Database data as of 4/29/08. KPMG notes that site visits occurred subsequent to 4/29/08. It is expected that the SE Database continue to be updated subsequent to KPMG's acquisition of the data. In instances in which KPMG noted a discrepancy between SE Database data as of 4/29/08 and the supporting documentation, KPMG examined subsequent SE Database reports, also provided by the Diocese, and updated SE Database dates in the above table, as necessary. |
| **APPLICATION & SCREENING FORM** | KPMG tested whether SE files at sites contained either an Application or a Screening Form. KPMG took note of which forms indicated a previous out-of-state residence. KPMG also noted which employee forms contained 3 references. Where a Application Form was found in the file, KPMG did not test for a Screening Form. |
| EXCEPTION 1 | NO APPLICATION AND/OR SCREENING FORM AT SITE |
| EXCEPTION 2 | NO REFERENCES ON EMPLOYEE APPLICATIONS |
| **ACKNOWLEDGE-MENT FORM** | KPMG tested whether SE files at sites contained an Acknowledgement Form. |
| EXCEPTION 3 | NO ACKNOWLEDGEMENT FORM IN FILE AT DIOCESAN SITE |
| EXCEPTION 4 | ACKNOWLEDGEMENT FORM DATE DISCREPANCY BETWEEN DOCUMENT AND SE DATABASE |
| **NSOPR** | KPMG tested whether files at the Diocese Office of Ministerial Conduct or Safe Environment Office had record of an National Sex Offender Public Registry (NSOPR) check. KPMG took note of documents that were inadequate either because the search failed in one or more state or because the record was not stamped with to verify that a "hit" was false. |
| EXCEPTION 5 | NSOPR DOCUMENTATION INADEQUATE BECAUSE STATE(S) NOT COVERED OR NO STAMP FOR FALSE HIT |
| EXCEPTION 6 | NSOPR DOCUMENTATION NOT FOUND AT DIOCESE |
| EXCEPTION 7 | NSOPR DATE DISCREPANCY BETWEEN DOCUMENT AND SE DATABASE |
| **PGC** | KPMG tested whether files at the Diocese Office of Ministerial Conduct or Safe Environment Office had a record of attendance at a Protecting God's Children (PGC) training. KPMG took note of instances where it appears in the SE Database that PGC training occurred more than 3 years ago. |
| EXCEPTION 8 | DATE OF PGC TRAINING IS >3 YRS FROM KPMG SITE VISIT DATE |
| EXCEPTION 9 | PGC DATE DISCREPANCY BETWEEN DIOCESE AND SE DATABASE |
| EXCEPTION 10 | NO PGC DOCUMENT AT DIOCESE |
| **CRR** | KPMG tested whether files at the Diocese Office of Ministerial Conduct or Safe Environment Office had record of a completed criminal record check. KPMG took note of files which did not have indication of an out-of-state check, despite Application or Screening Form indicating out-of-state residence in the previous 5 years. |
| EXCEPTION 11 | NO CRR DOCUMENT AT DIOCESE |
| EXCEPTION 12 | NO OUT OF STATE CRR DOCUMENT IN DIOCESAN RECORDS (NOT APPLICABLE AT SCHOOLS) |
| EXCEPTION 13 | CRR DATE DISCREPANCY BETWEEN DIOCESAN RECORDS AND SE DATABASE |
| **DOM CAMP SITE VISIT** | KPMG took note of files that were stamped as having been reviewed during a Diocesan site visit in July 2008. |
| EXCEPTION 14 | EXCEPTIONS IDENTIFIED BY KPMG, BUT NOT NOTED DURING DOM SITE VISIT (JULY 2008) |

# EXHIBIT 6

<div style="border: 2px solid black; text-align: center;">

**Appendix A**
**Exhibit - 6**

</div>

## 2.    EFFECTIVE COMPLIANCE AND ETHICS PROGRAM

Historical Note: Effective November 1, 2004 (see Appendix C, amendment 673).

### §8B2.1.    Effective Compliance and Ethics Program

(a)    To have an effective compliance and ethics program, for purposes of subsection (f) of §8C2.5 (Culpability Score) and subsection (c)(1) of §8D1.4 (Recommended Conditions of Probation - Organizations), an organization shall—

    (1)    exercise due diligence to prevent and detect criminal conduct; and

    (2)    otherwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law.

        Such compliance and ethics program shall be reasonably designed, implemented, and enforced so that the program is generally effective in preventing and detecting criminal conduct. The failure to prevent or detect the instant offense does not necessarily mean that the program is not generally effective in preventing and detecting criminal conduct.

(b)    Due diligence and the promotion of an organizational culture that encourages ethical conduct and a commitment to compliance with the law within the meaning of subsection (a) minimally require the following:

    (1)    The organization shall establish standards and procedures to prevent and detect criminal conduct.

    (2)    (A)    The organization's governing authority shall be knowledgeable about the content and operation of the compliance and ethics program and shall exercise reasonable oversight with respect to the implementation and effectiveness of the compliance and ethics program.

(B)    High-level personnel of the organization shall ensure that the organization has an effective compliance and ethics program, as described in this guideline. Specific individual(s) within high-level personnel shall be assigned overall responsibility for the compliance and ethics program.

(C)    Specific individual(s) within the organization shall be delegated day-to-day operational responsibility for the compliance and ethics program. Individual(s) with operational responsibility shall report periodically to high-level personnel and, as appropriate, to the governing authority, or an appropriate subgroup of the governing authority, on the effectiveness of the compliance and ethics program. To carry out such operational responsibility, such individual(s) shall be given adequate resources, appropriate authority, and direct access to the governing authority or an appropriate subgroup of the governing authority.

(3)    The organization shall use reasonable efforts not to include within the substantial authority personnel of the organization any individual whom the organization knew, or should have known through the exercise of due diligence, has engaged in illegal activities or other conduct inconsistent with an effective compliance and ethics program.

(4)    (A)    The organization shall take reasonable steps to communicate periodically and in a practical manner its standards and procedures, and other aspects of the compliance and ethics program, to the individuals referred to in subdivision (B) by conducting effective training programs and otherwise disseminating information appropriate to such individuals' respective roles and responsibilities.

(B)    The individuals referred to in subdivision (A) are the members of the governing authority, high-level personnel, substantial authority personnel, the organization's employees, and, as appropriate, the organization's agents.

(5)    The organization shall take reasonable steps—

(A)    to ensure that the organization's compliance and ethics program is followed, including monitoring and auditing to detect criminal conduct;

(B)    to evaluate periodically the effectiveness of the organization's compliance and ethics program; and

(C) to have and publicize a system, which may include mechanisms that allow for anonymity or confidentiality, whereby the organization's employees and agents may report or seek guidance regarding potential or actual criminal conduct without fear of retaliation.

(6) The organization's compliance and ethics program shall be promoted and enforced consistently throughout the organization through (A) appropriate incentives to perform in accordance with the compliance and ethics program; and (B) appropriate disciplinary measures for engaging in criminal and for failing to take reasonable steps to prevent or detect criminal conduct.

(7) After criminal conduct has been detected, the organization shall take reasonable steps to respond appropriately to the criminal conduct and to prevent further similar criminal conduct, including making any necessary modifications to the organization's compliance and ethics program.

(c) In implementing subsection (b), the organization shall periodically assess the risk of criminal conduct and shall take appropriate steps to design, implement, or modify each requirement set forth in subsection (b) to reduce the risk of criminal conduct identified through this process.

*Commentary*

*Application Notes:*

1. *Definitions.*—For purposes of this guideline:

    "Compliance and ethics program" means a program designed to prevent and detect criminal conduct.

    "Governing authority" means the (A) the Board of Directors; or (B) if the organization does not have a Board of Directors, the highest-level governing body of the organization.

    "High-level personnel of the organization" and "substantial authority personnel" have the meaning given those terms in the Commentary to §8A1.2 (Application Instructions - Organizations).

    "Standards and procedures" means standards of conduct and internal controls that are reasonably capable of reducing the likelihood of criminal conduct.

2. *Factors to Consider in Meeting Requirements of this Guideline.*—

(A)   *In General.*—Each of the requirements set forth in this guideline shall be met by an organization; however, in determining what specific actions are necessary to meet those requirements, factors that shall be considered include: (i) applicable industry practice or the standards called for by any applicable governmental regulation; (ii) the size of the organization; and (iii) similar misconduct.

(B)   *Applicable Governmental Regulation and Industry Practice.*—An organization's failure to incorporate and follow applicable industry practice or the standards called for by any applicable governmental regulation weighs against a finding of an effective compliance and ethics program.

(C)   *The Size of the Organization.*—

      (i)    In General.—The formality and scope of actions that an organization shall take to meet the requirements of this guideline, including the necessary features of the organization's standards and procedures, depend on the size of the organization.

      (ii)   *Large Organizations.*—A large organization generally shall devote more formal operations and greater resources in meeting the requirements of this guideline than shall a small organization. As appropriate, a large organization should encourage small organizations (especially those that have, or seek to have, a business relationship with the large organization) to implement effective compliance and ethics programs.

      (iii)  *Small Organizations.*—In meeting the requirements of this guideline, small organizations shall demonstrate the same degree of commitment to ethical conduct and compliance with the law as large organizations. However, a small organization may meet the requirements of this guideline with less formality and fewer resources than would be expected of large organizations. In appropriate circumstances, reliance on existing resources and simple systems can demonstrate a degree of commitment that, for a large organization, would only be demonstrated through more formally planned and implemented systems.

             Examples of the informality and use of fewer resources with which a small organization may meet the requirements of this guideline include the following: (I) the governing authority's discharge of its responsibility for oversight of the compliance and ethics program by directly managing the organization's compliance and ethics efforts; (II) training employees through informal staff meetings, and monitoring through regular "walk-arounds" or continuous observation while managing the organization; (III) using available personnel, rather than employing separate staff, to carry out the compliance and ethics program; and (IV) modeling its own compliance and ethics program on existing, well-regarded

*compliance and ethics programs and best practices of other similar organizations.*

    (D)   *Recurrence of Similar Misconduct.—Recurrence of similar misconduct creates doubt regarding whether the organization took reasonable steps to meet the requirements of this guideline. For purposes of this subdivision, "similar misconduct" has the meaning given that term in the Commentary to §8A1.2 (Application Instructions - Organizations).*

    3.   *Application of Subsection (b)(2).—High-level personnel and substantial authority personnel of the organization shall be knowledgeable about the content and operation of the compliance and ethics program, shall perform their assigned duties consistent with the exercise of due diligence, and shall promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law.*

    *If the specific individual(s) assigned overall responsibility for the compliance and ethics program does not have day-to-day operational responsibility for the program, then the individual(s) with day-to-day operational responsibility for the program typically should, no*

    *less than annually, give the governing authority or an appropriate subgroup thereof information on the implementation and effectiveness of the compliance and ethics program.*

    4.   *Application of Subsection (b)(3).—*

    (A)   *Consistency with Other Law.—Nothing in subsection (b)(3) is intended to require conduct inconsistent with any Federal, State, or local law, including any law governing employment or hiring practices.*

    (B)   *Implementation.—In implementing subsection (b)(3), the organization shall hire and promote individuals so as to ensure that all individuals within the high-level personnel and substantial authority personnel of the organization will perform their assigned duties in a manner consistent with the exercise of due diligence and the promotion of an organizational culture that encourages ethical conduct and a commitment to compliance with the law under subsection (a). With respect to the hiring or promotion of such individuals, an organization shall consider the relatedness of the individual's illegal activities and other misconduct (i.e., other conduct inconsistent with an effective compliance and ethics program) to the specific responsibilities the individual is anticipated to be assigned and other factors such as: (i) the recency of the individual's illegal activities and other misconduct; and (ii) whether the individual has engaged in other such illegal activities and such misconduct.*

    5.   *Application of Subsection (b)(6).—Adequate discipline of individuals responsible for an offense is a necessary component of enforcement; however, the form of discipline that will be appropriate will be case specific.*

6.    <u>*Application of Subsection (c)*</u>.—*To meet the requirements of subsection (c), an organization shall:*

(A)    *Assess periodically the risk that criminal conduct will occur, including assessing the following:*

(i)    *The nature and seriousness of such criminal conduct.*

(ii)    *The likelihood that certain criminal conduct may occur because of the nature of the organization's business. If, because of the nature of an organization's business, there is a substantial risk that certain types of criminal conduct may occur, the organization shall take reasonable steps to prevent and detect that type of criminal conduct. For example, an organization that, due to the nature of its business, employs sales personnel who have flexibility to set prices shall establish standards and procedures designed to prevent and detect price-fixing. An organization that, due to the nature of its business, employs sales personnel who have flexibility to represent the material characteristics of a product shall establish standards and procedures designed to prevent and detect fraud.*

(iii)    *The prior history of the organization. The prior history of an organization may indicate types of criminal conduct that it shall take actions to prevent and detect.*

(B)    *Prioritize periodically, as appropriate, the actions taken pursuant to any requirement set forth in subsection (b), in order to focus on preventing and detecting the criminal conduct identified under subdivision (A) of this note as most serious, and most likely, to occur.*

(C)    *Modify, as appropriate, the actions taken pursuant to any requirement set forth in subsection (b) to reduce the risk of criminal conduct identified under subdivision (A) of this note as most serious, and most likely, to occur.*

<u>*Background*</u>: *This section sets forth the requirements for an effective compliance and ethics program. This section responds to section 805(a)(2)(5) of the Sarbanes-Oxley Act of 2002, Public Law 107–204, which directed the Commission to review and amend, as appropriate, the guidelines and related policy statements to ensure that the guidelines that apply to organizations in this chapter "are sufficient to deter and punish organizational criminal misconduct."*

*The requirements set forth in this guideline are intended to achieve reasonable prevention and detection of criminal conduct for which the organization would be vicariously liable. The prior diligence of an organization in seeking to prevent and detect criminal conduct has a direct bearing on the appropriate penalties and probation terms for the organization if it is convicted and sentenced for a criminal offense.*

# EXHIBIT 7

# DIOCESE OF MANCHESTER
# ACTION PLAN III

April 25, 2008

**Objective:**   To continue to develop sustainable policies and procedures for the Diocese of Manchester in accordance with Church and state law in order to advance the protection of children and young people.

*This Action Plan ("Action Plan III") addresses certain recommendations contained in the KPMG report dated January 15, 2008. The headings of each section reference the headings contained in KPMG's January 15, 2008, report. In developing the Action Plan and its timeline, consideration was given to ongoing scheduling between the Compliance Coordinator and the pastors, principals, directors, and safe environment coordinators.*

## Organizational Structure and Oversight

1. The Delegates for Ministerial Conduct will incorporate into the *Screening and Training Protocol* (July 1, 2007) the specific supplemental screening protocols referenced by KMPG in its January 15, 2008 report. **To be completed on or before July 1, 2008.**

2. The Delegates for Ministerial Conduct will develop a mechanism to enhance the current system in place to accumulate, organize, and communicate the "best practices" that are identified during site revisits to facilitate other parishes, schools, and camps in the continued development of a sustainable safe environment program. **To be completed on or before July 1, 2008.**

3. The Delegates for Ministerial Conduct will develop a mechanism, including a timetable, to enhance the effectiveness of the <u>Safe Environment Disciplinary Procedures</u> to avoid any possible oversight of disciplinary measures. **To be completed on or before September 30, 2008.**

4. The Compliance Coordinator will review current policy, procedures, protocols and other program documents that are currently utilized as part of the Safe Environment Program to ensure that all the current documents contain dates and version numbers. A system will be established to ensure that future changes to such documents will contain updated effective dates and version numbers. In addition, certain documents that did not contain date and version numbers, as identified by KPMG in its January 15, 2008 report, will be incorporated into the *Screening and Training Protocol* as noted in number 1 above. **To be completed on or before September 30, 2008.**

5. The Compliance Coordinator will prepare additional instructions for the use of the site revisit section of the "Risk Assessment Matrix" to ensure the consistent application and interpretation of the results. **To be completed on or before July 1, 2008.**

## DIOCESE OF MANCHESTER
## ACTION PLAN III

April 25, 2008

### Response to Allegations

6. The Delegates for Ministerial Conduct will consult with the Diocesan Review Board and the investigator regarding the Policy and the current investigative protocol and will consider all proposed revisions that could improve the effectiveness of the current process. Proposed amendments will be presented to Bishop McCormack with a recommendation from the Delegates for Ministerial Conduct and the Diocesan Review Board. **To be completed on or before August 15, 2008.**

7. The Delegates for Ministerial Conduct will propose to Bishop McCormack that the recommendation of the Vicar for Priest Personnel and the Priest Personnel Board regarding the assignment of a priest be documented. **To be completed on or before July 1, 2008.**

### Program to Prevent the Sexual Abuse of Minors

8. The Delegates for Ministerial Conduct will direct the diocesan Database Manager to develop a comprehensive manual that identifies and documents the various functions, controls and report capabilities of the Safe Environment Database. **To be completed on or before September 30, 2008.**

9. The Delegates for Ministerial Conduct will direct the diocesan Database Manager to study the concept of a data testing procedure to verify the accuracy of the data in the Safe Environment Database and to present them with a report on the study. **To be completed on or before September 30, 2008.**

10. The Delegates for Ministerial Conduct will direct the diocesan Database Manager to develop a plan to implement the automatic notification of the various safe environment coordinators and/or the various principal users of the safe environment database when safe environment requirements, as identified, require immediate attention. **To be completed on or before November 30, 2008.**

11. The Compliance Coordinator will modify the "Safe Environment Review Worksheet" to incorporate an additional step to review "Inactive" listings during the site revisits and document the results. **To be completed on or before July 1, 2008.**

12. The Delegates for Ministerial Conduct will propose to Bishop McCormack that military clearances and background checks no longer be accepted in lieu of state or online criminal background checks **effective July 1, 2008.** The Delegates for Ministerial Conduct and the Compliance Coordinator will study a more optimal method for background screening of international citizens other than evidence of a VISA and will consult with the Safe

## DIOCESE OF MANCHESTER
## ACTION PLAN III

April 25, 2008

Environment Council regarding this matter. **To be completed on or before September 30, 2008.**

13. The Delegates for Ministerial Conduct will consult with the Safe Environment Council regarding the ongoing use of online background checks and whether and under what circumstances to require additional screening.  **To be completed on or before September 30, 2008.**

14. The Compliance Coordinator will develop procedures for the consistent documentation of National Sex Offender Registry check results, including instances when certain states are not available or partial name matches require further review. **To be completed on or before July 1, 2008.**

**Training Personnel, Communications, and Acknowledgments**

15. The Delegates for Ministerial Conduct will consult with the Safe Environment Council, review the *Screening and Training Protocol* (July 1, 2007), and will propose that all *Protecting God's Children* training subsequent to a specified date must be evidenced by attendance sheets maintained at the Office for Ministerial Conduct. **To be completed on or before July 1, 2008.**

16. The Delegates for Ministerial Conduct will consult with the Safe Environment Council to consider the development of a mechanism to measure the effectiveness of the *PGC* Refresher training. **To be completed on or before September 30, 2008.**

**Auditing/Testing of the Program**

17. In accordance with the *Promise to Protect, Pledge to Heal* Policy, the Diocesan Review Board will continue to consider appropriate reviews and/or audits of the Office for Ministerial Conduct and/or any other diocesan locations in accordance with diocesan policy. In conducting such reviews and/or audits, the Diocesan Review Board will continue to have the authority to use outside consultants.  The Diocesan Review Board will provide a report based on such reviews and/or audits to Bishop McCormack. **Ongoing from Action Plan I and II.**

18. The Delegates for Ministerial Conduct will review the results of the UNH survey included in the 2007 KPMG review with the Diocesan Review Board and the Safe Environment Council. **To be completed on or before September 30, 2008.**

# EXHIBIT 8

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                                               SUPERIOR COURT
Northern District

IN RE GRAND JURY PROCEEDINGS

No. 02-S-1154

<u>AGREEMENT</u>

NOW COMES the State of New Hampshire, by and through counsel, the Office of the Attorney General and the Roman Catholic Bishop of Manchester, a corporation sole (the "Diocese of Manchester") and hereby respectfully submit the following Agreement for filing with the Hillsborough County Superior Court, Northern District to conclude the above-captioned matter.

WHEREAS, beginning in February, 2002, the State of New Hampshire commenced a criminal investigation into the conduct of the Diocese of Manchester and its officials regarding the manner in which the Diocese responded to allegations that some of its priests had engaged in sexual misconduct with minors over a period of forty years;

WHEREAS, the Attorney General's stated interests in commencing a criminal investigation involved determining whether the Diocese itself or any of its agents committed any crimes in connection with the handling of sexual abuse incidents by clergy;

WHEREAS, the Attorney General's stated interests in commencing a criminal investigation of the conduct of the Diocese of Manchester also included the referral to the various county attorneys for investigation and potential prosecution of individual priests who were alleged to have engaged in illegal sexual conduct with minors;

WHEREAS, the Hillsborough County Grand Jury, sitting in the Northern District, initiated an investigation into these matters;

WHEREAS, as a result of the Grand Jury inquiry, and with the cooperation of the Diocese of Manchester, thousands of pages of documents were produced for inspection by the Office of the Attorney General and the Grand Jury;

WHEREAS, pursuant to the powers of the Grand Jury, several witnesses testified regarding their knowledge of these matters;

WHEREAS, the Attorney General convened an investigative task force to pursue leads and gather evidence based on the documents and testimony provided to the Grand Jury;

WHEREAS, as a result of its investigation, the Office of the Attorney General has indicated its intention to seek indictments based on the New Hampshire child endangerment statute, RSA 639:3, I, against the Diocese of Manchester regarding this matter;

WHEREAS, in light of the documents produced, the testimony obtained, and the nature of the elements which are required to be proved to establish a criminal violation of the New Hampshire child endangerment statute, RSA 639:3, I, the Diocese acknowledges that the State has evidence likely to sustain a conviction of a charge under RSA 639:3, I, against the Diocese.

NOW THEREFORE, the State and the Diocese of Manchester agree to resolve this matter without a criminal proceeding in accordance with the terms and conditions set forth below. Such a resolution accomplishes the following goals: (1) it will protect victims from the necessity of testifying in a criminal trial; (2) it will establish terms and conditions that will facilitate the protection of children to a greater extent than a criminal conviction and sentence; and (3) it will ensure a system of accountability, oversight, transparency, and training.

1.  No Prosecution

    In consideration for the promises made herein by the Diocese of Manchester, the Attorney General has agreed not to charge, seek an indictment against, or prosecute the Diocese of Manchester, a corporation sole, or its individual agents, regarding the past handling of allegations of sexual abuse of minors by clergy. This Agreement is without prejudice to the State of New Hampshire's ability to indict and prosecute individual clergy for sexual abuse of minors as permitted by law. The Diocese of Manchester acknowledges that certain decisions made by it about the assignment to ministry of priests who had abused minors in the past resulted in other minors being victimized. Accordingly, the Diocese of Manchester has published and is implementing a policy that no person who is known to have abused a child will either continue or ever be placed in ministry.

2.  Reporting Allegations of Sexual Abuse

    a) As required by New Hampshire law, whenever any priest, deacon, member of a religious institute or any other church personnel serving the Diocese in ministry, employment or a volunteer position (hereinafter "Diocesan Personnel") has reason to suspect that a minor has been abused or neglected as defined in RSA 169-C:3, II & XIX, which includes sexual abuse as defined by RSA 169-C:3, XXVII-a, and the victim is a minor at the time suspicion is formed, the individual shall comply with the mandatory reporting obligations set forth in RSA 169-C:29 to C-:32 (the "Reporting Obligations").

    b) In addition to the requirements of New Hampshire law, whenever any Diocesan Personnel has reason to suspect that any other Diocesan Personnel has sexually abused a minor, the individual who suspects shall make an immediate report to local law enforcement where the incident occurred or where the suspect is currently located. Such report shall be made in a manner consistent with the Reporting Obligations regardless of whether the individual who suspects the abuse knows the identity of the alleged victim regardless of whether the alleged victim is currently a minor.

c) In addition to the requirements of New Hampshire law, whenever the Office of the Delegate for Sexual Misconduct has reason to suspect that a minor has been sexually abused as defined in RSA 169-C:3, XXVII-a and the alleged victim is no longer a minor at the time the suspicion is formed, the Office shall make an immediate oral report in a manner consistent with the Reporting Obligations to the local law enforcement where the suspected abuse may have occurred regardless of whether an alleged abuser is named or identified.

d) All Diocesan Personnel who have any contact with minors shall sign an acknowledgement that they understand the reporting requirements described above, and that they are required personally to make the report directly to DCYF or local law enforcement.  Additionally, such Diocesan Personnel shall acknowledge that they have read the Diocesan Policy described in paragraph 3 below, that they understand said Policy, that they have received specialized instruction on said Policy, and that they agree to comply with the provisions of said Policy.

e) Upon making the report to law enforcement and/or DCYF, the Diocese shall cooperate fully with law enforcement and/or DCYF.  Upon request, the Diocese shall provide law enforcement and/or DCYF with any and all information and documents in its possession relating to the alleged abuser.

f) Upon receipt of an allegation of sexual abuse, the Diocese will ensure that, pending the resolution of the allegations, the alleged abuser will be removed from any position in which there is the possibility for contact with minors.

3.  <u>Diocesan Training</u>

The Diocese of Manchester shall maintain the existing Office of the Delegate for Sexual Misconduct as an appropriately-trained and easily accessible office dedicated to the handling of allegations of sexual abuse of minors.  The Diocese shall continue to develop, implement and revise as necessary policies and protocols for preventing, responding to, and ensuring the reporting of allegations of child sexual abuse.  In addition, the Diocese of Manchester agrees to continue to provide, and to revise as needed, its on-going safety training program regarding the sexual abuse of minors and the reporting requirements for all Diocesan Personnel who have any contact with minors.  The Diocese of Manchester agrees to continue to provide to the Office of the Attorney General copies of its policies and protocols for review and comment on an annual basis pursuant to paragraph 4 or as otherwise requested by the Office of the Attorney General.

4.  <u>Annual Audit</u>
The Diocese of Manchester shall retain all documents and information relating to allegations of sexual abuse of minors until the death of the Diocesan Personnel accused. For a period of five years ending December 31, 2007, the Diocese of Manchester agrees to submit to an annual audit to be performed by the Office of the Attorney General regarding compliance by the Diocese of Manchester with the terms of this Agreement and Diocesan policies.  The audit may include, without limitation, the inspection of

records and the interview of Diocesan Personnel.

5. <u>Public Disclosure of Agreement</u>

The Parties agree that this Agreement is a public document and further the Parties are free to hold separate and distinct public announcements of this Agreement and to supply supplemental information and to respond to questions posed by the press or members of the public except as prohibited by any laws governing the confidentiality of records or information and subject further to the provisions of paragraph 6 below.

6. <u>Attorney General Investigative Report and Release of Investigative Material</u>
The Diocese of Manchester acknowledges that the Office of the Attorney General will issue, at some time in the future, a report on the scope and results of the investigation, which it has conducted since February, 2002, regarding the manner in which the Diocese responded to past clergy sexual abuse of minors (the "Report"). The Diocese of Manchester also acknowledges that the Office of the Attorney General intends to make public its own investigative file (the "Investigative File"). In order to provide the public an opportunity to evaluate and to understand the process and the information involved in this investigation, the Diocese agrees to waive Grand Jury confidentiality to allow publication of Diocesan documents obtained by the Office of the Attorney General from the Diocese pursuant to Grand Jury subpoenas (the "Documents"). The Office of the Attorney General will take all reasonable steps to ensure the confidentiality of the identity of the victims in the Report, the release of the Investigative File, and the disclosure of the Documents. The Office of the Attorney General will not disclose any mental health or other medical records, except that the Office of the Attorney General reserves the right to quote or cite in its Report those portions of such records that illustrate the information that the Diocese had and its response to information regarding sexual abuse of minors by clergy. The Office of the Attorney General will provide the Diocese with a copy of its Report, the Investigative File, and the Documents which the Office of the Attorney General intends to release to the public no later than ten business days prior to the release of the Report, Investigative File, and/or Documents. To the extent the Diocese has a dispute as to the quotation or citation of any portion of the medical and mental health records obtained from the Diocese pursuant to Grand Jury subpoena, the Diocese may file a motion in Hillsborough County Superior Court for adjudication of that matter. The Office of the Attorney General will not release a Report containing the disputed quotation or citation to a medical or mental health record before the dispute is resolved. To the extent the Diocese has concern that the release of the Documents will infringe upon the privacy interests of Diocesan Personnel, an accused priest, or a third party, the Diocese may present those concerns to the Office of the Attorney General before the Documents are released. The Office of the Attorney General will consider the concerns of the Diocese prior to releasing the Report and/or Documents. However, with the exception of medical and mental health records, the Office of the Attorney General retains sole discretion regarding the information and/or Documents that it intends to release to the public. If the Diocese intends to release its own report or documents in response to the Report from the Office of the Attorney General, it shall provide the Office of the Attorney General with a copy of its report

and/or documents no later than five business days before the Office of the Attorney General's disclosure.

7. <u>Amendment and Term of Agreement</u>
The Parties agree that this Agreement can be amended by a writing executed by a duly authorized representative of the Office of the Attorney General and the Diocese of Manchester upon filing the same with the Court in the above-captioned matter. The Parties agree that on or before December 31, 2007, the Office of the Attorney General will request the Hillsborough County Superior Court to hold a status conference to address whether any of the terms of this Agreement need to be revised or amended.

8. <u>Superior Court Enforcement</u>

The Parties agree to submit any dispute regarding the interpretation, compliance with, and enforcement of this Agreement to the Hillsborough County Superior Court, Northern District. The Parties further agree that the breach of any material term or condition of this Agreement by one Party shall constitute a separate and sufficient basis for the other Party to seek injunctive or other equitable relief.

NEW HAMPSHIRE ATTORNEY GENERAL

DATED: 12/10/02                    By: <u>/s/ Philip T. McLaughlin</u>

DIOCESE OF MANCHESTER

DATED: 12/9/02                    By: <u>/s/ + John B. McCormack, D.D.</u>
                                 Roman Catholic Bishop of Manchester,
                                  a corporation sole

Approved by:                    <u>/s/ Carol Ann Conboy</u>
                                 Presiding Justice

DATED: 12/10/02