# Exhibit 16

The Honorable Michael Scott
Noted for Hearing: May 22, 2024
Oral Argument Requested

**STATE OF WASHINGTON**
**KING COUNTY SUPERIOR COURT**

In re the Petition to Enforce the Investigative
Subpoena of:

The Complex Litigation Division of the
Washington State Office of the
Attorney General,

                              Petitioner.

NO.

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

## I.    INTRODUCTION

The Washington State Office of the Attorney General (AGO) has opened an investigation into allegations that the Catholic Church has facilitated and attempted to cover up decades of pervasive sexual abuse of children by Church leaders in Washington State. This includes investigating, under the Charitable Trusts Act, RCW 11.110.010 *et seq.* (CTA), whether the Church misused its religious and charitable trust funds and its secular corporate form for illegal, reprehensible, and obviously non-religious purposes, which would be an abuse of the protections afforded by state law for legitimate religious and charitable enterprises and trusts. The Church's grave abuses of trust—prioritizing the protection of sexual predators and its own reputation over the safety of its parishioners and the interests of the public at large—have been widely reported, but their full scope in Washington State remains unknown.

In the course of investigating these alleged abuses, the AGO issued a subpoena to the Archdiocese of Seattle. Instead of cooperating in the effort to offer much-needed transparency to the public, the Archdiocese has for months refused to produce documents that were not already

1

publicly available, and has invoked a statutory religious exemption as a shield against *any* meaningful investigation into its role in the sexual abuse crisis that has claimed thousands and thousands of victims nationwide and across the globe. Washington law does not countenance this invocation of a religious exemption to shield obviously non-religious conduct from public scrutiny. Accordingly, the AGO submits this petition to enforce its investigative subpoena and require the Archdiocese to respond in full.

The people of Washington have a compelling interest in learning the truth about the Church's complicity in sexual abuse and whether the Archdiocese's charitable trust funds were misused for that unlawful purpose. They deserve evidence-backed assurances—not empty promises—that going forward, those trust funds will never be used to harm children. If the investigation reveals any violation of the law, the AGO will take all steps within its power to seek justice and recompense, and to put in place any appropriate oversight and monitoring to ensure that children are not exposed to abuse in the future. The Archdiocese should be directed to comply with the AGO's valid subpoena.

## II.    FACTUAL AND PROCEDURAL HISTORY

### A.    The Catholic Church in Washington

The Catholic Church in Washington State is comprised of the Archdiocese of Seattle, the Diocese of Yakima, and the Diocese of Spokane. The secular legal embodiment of the Seattle Archdiocese is incorporated under Washington's Corporations Sole Act, RCW 24.12, as the "Corporation of the Catholic Archbishop of Seattle."[1] Currently, its officer and sole member is the Archbishop of Seattle, Paul D. Etienne.[2]

A corporation sole is a corporate form available under Washington law for a "bishop, overseer, or presiding elder of any church or religious denomination in this state," who "shall be held and deemed to be a body corporate, with all the rights and powers prescribed in the case of

---

[1] *See* Declaration of Nathan Bays in Support of Petition to Enforce (Bays Decl.), Ex. A (Secretary of State Corporations and Charities Filing System entry).

[2] *See* Bays Decl., Ex. B (2019 Amendment: Certificate of Appointment).

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

corporations aggregate; and with all the privilege provided by law for religious corporations." RCW 24.12.010. "All property held" by a religious leader incorporated as a corporation sole "shall be in trust for the use, purpose, benefit, and behoof of his or her religious denomination, society, or church." RCW 24.12.030. The purpose of a corporation sole is "to provide a device by which a religious organization could hold and acquire property as a separate perpetual legal entity," addressing difficulties that arose "when trustees or lay persons held title to church property" and their relatives or others sought to lay claim to it. *See, e.g.*, *In re Catholic Bishop of Spokane*, 329 B.R. 304, 326–27 (Bankr. E.D. Wash. 2005), *rev'd and remanded on other grounds by Comm. of Tort Litigs. v. Catholic Diocese of Spokane*, 364 B.R. 81 (E.D. Wash. 2006).

The Seattle Archdiocese was first incorporated under Washington's territorial law in 1861 as "The Corporation of the Catholic Bishop of Nisqually, in the Territory of Washington."[3] After Washington enacted its corporations sole statute in 1915, the Archdiocese in 1925 filed Amended Articles of Incorporation, becoming a corporation sole known as the "Corporation of the Catholic Bishop of Seattle."[4] The Amended Articles of Incorporation provide that the corporation is "**for the purpose and for the benefit of religion, for works of charity, and for public worship**," and that the corporation itself would be "without capital stock, **all property held by it being in trust** for the use, purpose, benefit and behoof of the Roman Catholic Church of the Diocese of Seattle[.]"[5] The Amended Articles of Incorporation thereby establish an express trust for the benefit of the Diocese, with the use of the trust funds limited to the religious and charitable purposes for which the corporation sole is organized.

---

[3] *See* Bays Decl., Ex. C (1861 Articles of Incorp).
[4] *See* Bays Decl., Ex. D (1925 Amended Articles of Incorporation, Art. I, III). In 1951, the corporate name was changed to the "Corporation of the Catholic Archbishop of Seattle," and the trust beneficiary was redesignated as the "Roman Catholic Church of the Archdiocese of Seattle." *See* Bays Decl., Ex. E (1951 Amended Articles of Incorporation).
[5] *Id.*, Art. III, VI (emphasis added).

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**B.      The Catholic Church Sex Abuse Crisis**

For decades, the Church was complicit in the widespread sexual abuse of children by priests and other religious leaders.[6] The issue first began to receive public attention in the 1980s, but it was thrust into the national spotlight in 2002, when the *Boston Globe* published a series of reports on Boston-area priests' sexual abuse of children entrusted to their care, and the Church's complicity in concealing their crimes and facilitating their access to victims.[7] As these revelations prompted further investigations and encouraged more victims to come forward, a pattern of cover-ups by dioceses across the United States came to public attention, resulting in settlement payouts of approximately $4 billion to thousands of U.S. victims.[8] Some state investigations have been resolved, while others remain ongoing.[9] Pope John Paul II, Pope Benedict XVI, and Pope Francis have all acknowledged and apologized for sexual abuse perpetrated by the Church and its leaders, taking increasing responsibility and making broader admissions as the scale of the crisis has revealed itself over time as not only national, but global, spanning decades, if not more.[10] Despite significant progress in pursuing accountability, the full extent of the crisis remains unknown, as a culture of secrecy persists within the Church.[11]

**C.      The Church's Response to Revelations of Pervasive Child Sexual Abuse in Washington**

In 2003, amid intense public scrutiny and pressure for transparency, Seattle Archbishop Brunett created the Archdiocesan Case Review Board, which was charged with assisting and

---

[6] *See generally* "Catholic Church sexual abuse cases," Wikipedia.org, https://en.wikipedia.org/wiki/Catholic_Church_sexual_abuse_cases.

[7] The 2003 Pulitzer Prize Winner in Public Service: The Boston Globe, *The Pulitzer Prizes*, https://www.pulitzer.org/winners/boston-globe-1.

[8] "Catholic Church sex abuse cases in the United States," Wikipedia.org, https://en.wikipedia.org/wiki/Catholic_Church_sex_abuse_cases_in_the_United_States.

[9] *See, e.g.*, Ruth Graham, *What the Latest Investigations Into Catholic Church Sex Abuse Mean*, The New York Times (Jun. 2, 2023), https://www.nytimes.com/2023/06/02/us/catholic-church-sex-abuse-investigations.html.

[10] *See* "Catholic Church sexual abuse cases," *supra* note 6.

[11] *See* Tara Isabella Burton, *New Catholic sex abuse allegations show how long justice can take in a 16-year scandal*, Vox (Aug. 24, 2018), https://www.vox.com/2018/8/20/17721292/catholic-sex-abuse-priest-scandals-pennsylvania-report-why-now.

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

advising the Archbishop on, among other things, cases involving allegations of child sexual abuse.[12] In June 2004, the Board issued a report making numerous recommendations, including greatly increased transparency with parishioners and the public, laicization for priests against whom credible allegations of child sexual abuse had been made, and implementation of improved policies and investigatory practices. For example, the Board noted that the Church had traditionally used inaccurate, incomplete, and ineffective "mental health assessments" to investigate the veracity of allegations of sexual abuse by priests, with many of those assessments failing even to "conform to the accepted standards of forensic evaluations and consist[ing] entirely of clinical interviews with the referred priests by a provider lacking any expertise in sexual abuse." *Supra* note 12. At the same time, however, the Board noted that the Church had resisted using such mental health assessments "when they might have been beneficial in diagnosing disorders and making treatment recommendations." *Id.* In short, the report described an investigative process that appeared designed to fail and intended not to discover the truth but to exculpate the priests against whom allegations were made.

In 2016, the Archdiocese of Seattle released a list of clergy and other religious leaders for whom allegations of sexual abuse of a minor have been "admitted, established or determined to be credible." An updated version of the list from March 2023 identifies 83 such individuals.[13] The list itself is deeply concerning, as it shows many of the individuals served in positions of power within the Church for decades and were frequently transferred between locations, thus concealing their past conduct and granting them access to new and unsuspecting child victims. For example, the Archdiocese permitted Barry Ashwell to work as a priest from 1963 to 2000 in

---

[12] *See June 2004 Archdiocesan Case Review Board Report.* 2004_06_Seattle_Archdiocesan_Case_Review_Board_Report_6268_RBFinalReport_Posted_2009_or_2010_Downloaded_2015_08_10.pdf (bishop-accountability.org).

[13] *See List of Clergy and Religious Brothers and Sisters for Whom Allegations of Sexual Abuse of a Minor Have Been Admitted, Established or Determined to be Credible* (March, 2023), Clergy-List-March2023.pdf (protect-seattlearchdiocese.org). The Diocese of Spokane published a public list containing 30 such individuals, *see* Catholic Diocese of Spokane, *Credibly Accused Clergy*, http://dioceseofspokane.org/credibly-accused-clergy, and the Diocese of Yakima released a similar list containing 21 individuals. *See* Diocese of Yakima, *Abuse Disclosure List* (Oct. 10, 2023), https://drive.google.com/file/d/1cjlmACSI-vg5vOakBx_qvoH27GHpT47m/view.

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

at least seven different locations, including Kenmore, Bellevue, Mountlake Terrace, Bremerton, Vancouver, Federal Way, and Oak Harbor; permitted Dennis Champagne to work as a priest from 1961 to 2002 in at least seven different locations, including Seahurst, Seattle, Tacoma, Snohomish, and Lakewood; and permitted David Linehan to work as a priest from 1956 to 1995 in at least six different locations, including Burlington, Bellingham, Seattle, Vancouver, and Castle Rock, during which time he also served as a chaplain to both the Boy Scouts and the Deaf Community.[14]

Beyond releasing this list and similarly limited information, however, the Archdiocese has refused to provide any meaningful transparency regarding the Church's complicity in the priests' sexual abuse of children; whether there are reports or evidence of other abusive priests (aside from those the Church has found to be "credibl[y]" accused), and why the Church deemed such evidence insufficient to find a credible accusation; when and how the Church learned of abuse in individual cases and what it did in response—including the extent to which trust funds were used to conceal or facilitate the abuse; whether the Church has adequate controls and procedures in place to address and prevent sexual abuse; and the extent to which those controls and procedures are being followed and implemented. Indeed, the Church has declined to produce *any* internal records related to sexual abuse that had not already been revealed through private lawsuits or disclosed voluntarily prior to this investigation. Bays Decl., ¶ 12.

**D.    The Limited Public Records Available Reveal the Church's Decades-Long Complicity in the Sexual Abuse of Children in Washington State**

Although the Church has released only limited records regarding the extent of its complicity in the sexual abuse of children by its clergy, these limited records make clear that the Archdiocese in Washington State not only failed to warn the public about serial child sex abusers within the Church's ranks, but actively protected such abusers and repeatedly ensured they would have access to new child victims by frequently allowing them to transfer locations. One

---

[14] *See* "Abuse Disclosure List", *supra* note 13.

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

especially illustrative example is Father Michael J. Cody, whom the Archdiocese allowed to minister in multiple parishes for over 15 years without ever warning the public, reporting his extensive history of sexually abusing children, or taking any meaningful action to protect the many vulnerable children he victimized.[15] In reviewing the facts of Father Cody's case, it is critical to keep in mind that these documents came to light only as a result of a lawsuit brought by a victim of Father Cody's abuse. The Church has released the names of many other priests who committed horrific acts of child sexual abuse, but has thus far refused to provide any meaningful transparency into their cases or the Church's role and complicity in their crimes, including the extent to which the Church used trust funds to conceal and facilitate their sexual abuse of children.

### 1.    The Seattle Archbishop knew as early as 1962 that Father Cody had sexually abused multiple young girls

Father Cody began as an Assistant Pastor with the Church in 1958 in Seattle.[16] In March 1962, Dr. A.M. Hurley, a psychiatrist, wrote to the Seattle Archbishop that Father Cody had by that time already "molested at least eight girls twelve years of age or younger."[17] Dr. Hurley shared his urgent belief that Father Cody "is dangerous both to himself and to others," "has talked about killing adults," and "is suffering from a form of sexual deviation (Pedophilia)." *Supra* note 17. Dr. Hurley implored the Seattle Archbishop that Father Cody must "be removed from parish work as soon as possible." *Id.*

Later that same month, Father Cody's supervisor, Father Ailbe McGrath, also wrote to the Seattle Archbishop to express his "regret that it is necessary for me to bring to your attention

---

[15] *See generally Selected Documents from the Archdiocesan Files of Rev. Michael J. Cody*, https://www.bishop-accountability.org/docs/seattle/cody/. Many of the historical documents cited below relating to Father Cody are stored on the www.bishop-accountability.org website. The Seattle Times has also extensively described Father Cody's history and the Church's role in facilitating his sexual abuse of children. *See* Lewis Kamb, "Seattle priest, a known pedophile, was moved parish to parish," SEATTLE TIMES, Mar. 5, 2016 (available at https://www.seattletimes.com/seattle-news/times-watchdog/priests-secret-file-details-trail-of-abuse/).

[16] *See November 5, 2004 Letter from Archbishop Brunett from Cardinal Ratzinger*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000324_402.pdf.

[17] *See March 19, 1962 Letter from Dr. A.M. Hurley to Seattle Archbishop Connolly*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000624.pdf.

once again the problems of Father Michael Cody."[18]According to Father McGrath, Father Cody was "pathological" and "mentally and emotionally seriously sick." *Supra* note 18. Father McGrath shared his fear that Father Cody's sexual misconduct "may cause a major scandal in this parish, and **if discovered, may result in a penitentiary sentence at Walla Walla.**" *Id.* (emphasis added). Father McGrath also expressed his serious concern that Father Cody was "a misogynist" with "an obvious hatred and contempt for all women." *Id.*

Less than two months later, in May 1962, Father McGrath wrote to the Seattle Archbishop again, urging him to act rapidly in removing Father Cody from the parish, as his "problem and sickness are really urgent" and "[h]e is deteriorating rapidly."[19] Father McGrath shared his belief that Father Cody's "suppressed rage, dislike, and hatred of all persons in this rectory may soon explode in a crime of violence." *Supra* note 19. As Father McGrath warned: "I do not want a murder, a suicide, or a [sexual] crime of violence in this rectory or in this parish. In my opinion and in the judgment of Doctor Hurley, this is not merely an academic possibility but a very real probability. When I read in the daily papers of crimes of murder and rape, I begin to wonder if Father Cody is involved." *Id.*

## 2. The Archbishop concealed Father Cody's criminal behavior and instead sent him for treatment in the hopes of returning him to active service

Rather than report the concerns to authorities or warn Father Cody's parishioners of the significant danger he presented to them and their children, the Seattle Archbishop instead sent Father Cody for "treatment" at a facility in Connecticut.[20] Over the course of that treatment, psychiatrists at the facility informed the Seattle Archbishop that Father Cody would require continued outpatient psychiatric care after his eventual discharge, as he had "a problem so deep

---

[18] *See March 29, 1962 Letter from Father Ailbe McGrath to Archbishop Connolly*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000620.pdf.

[19] *See May 14, 1962 Letter from Father Ailbe McGrath to Archbishop Connolly*, https://www.documentcloud.org/documents/2752848-Father-McGrath-Second-Letter-About-Cody.html.

[20] *See May 18, 1962 Letter from Archbishop Connolly to Dr. C. Gordon Edgren at the Institute of Living*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000613.pdf.

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   seeded [sic] and complicated, no one can make a definite statement about the prognosis," and he

2   should not be re-assigned to a parish.[21]

3       The Archbishop ignored these warnings, however, and upon Father Cody's discharge,

4   assigned him to a large parish to serve as Assistant Pastor.[22] And, contrary to the

5   recommendations of the numerous physicians who had observed Father Cody, the Archbishop

6   did not require him to participate in outpatient treatment and did not take any steps to limit his

7   access to additional potential child victims. Far from it: the Archbishop actually *facilitated* his

8   access to additional victims by repeatedly transferring him to new parishes where he could avoid

9   any consequences for his prior actions and where his sexual predation could continue.

10      **3.    Upon receiving additional warnings of Father Cody's inappropriate and
11      disturbing behavior with young children, the Archdiocese concealed the
        danger and facilitated his access to new victims**

12      In December 1967, Father John Duffy of the Holy Family Rectory in Auburn wrote to

13  the Seattle Archdiocese to warn him of new and serious concerns regarding Father Cody's

14  behavior toward parishioners there.[23] According to Father Duffy, the situation with Father Cody

15  had "deteriorated to such a state that . . . **the sisters and lay teachers are scandalized at his**

16  **undue familiarity with the sixth & seventh grade girls.**" *Supra* note 23 (emphasis added).

17  Father Duffy urgently warned the Seattle Archdiocese that Father Cody's "deviant behavior is a

18  danger to the good of souls." *Id.*

19      Without ever reporting these renewed concerns to authorities or warning Father Cody's

20  parishioners of the dangers he presented to them and their children, the Seattle Archbishop

21  instead engaged in a familiar pattern of concealment by moving Father Cody to a different

---

22      [21] *See October 12, 1962 Letter from Dr. William Lynch to Archbishop Connolly, https://www.bishop-
23  accountability.org/docs/seattle/cody/JH_ARCH000572.pdf* ("Father Cody will continue to require psychiatric
    supervision in order to help him make the transition and also to try to be sure that his symptoms remain under
24  control"); *see also March 13, 1963 Letter from Dr. Francis Braceland to Archbishop Connolly, https://www.bishop-
    accountability.org/docs/seattle/cody/JH_ARCH000349_350.pdf* ("[I]t is our feeling that Father Cody would do best
25  in some kind of special mission rather than being an assistant in a parish.").
        [22] *See* "November 5, 2004 Letter", *supra* note 16.
26      [23] *See December 7, 1967 Letter from Holy Name Rectory Pastor John Duffy to Archbishop Connolly*,
    https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000180.pdf.

STATE OF WASHINGTON'S PETITION                          9                ATTORNEY GENERAL OF WASHINGTON
TO ENFORCE INVESTIGATIVE                                                        Complex Litigation Division
SUBPOENA                                                                        800 Fifth Avenue, Suite 2000
                                                                                  Seattle, WA 98104-3188
                                                                                      (206) 464-7744

parish—this time, in Skagit County—where he was granted still *more* responsibility and virtually unfettered access to new and unsuspecting child victims, first as a parish administrator and then later as a pastor.[24] For example, from November 1970 to September 1972, Father Cody worked as a pastor in Burlington. Despite his well-documented history of sexually abusing children (which the Church concealed from his Burlington parishioners), Father Cody was inexplicably permitted to have girls as young as 9 or 10 years of age "sleep over" with him without supervision at his house or at a remote cabin in the woods, where he would often get into the same bed as the girls and touch them in sexual ways.[25] One survivor of Father Cody's abuse from that period later described how Father Cody would sexually abuse her and other girls at these "sleepovers."[26] As this survivor explained: "I not only blame Father Cody for the loss of my innocence, I blame the Church, the Archdiocese for . . . knowing he molested children . . . and then [in] 1970 assigning him to the Burlington Church with no effective monitoring system . . . . As far as I'm concerned, Father Cody and the Church murdered my soul . . . ." *Supra* note 26.

Incredibly, the Church's pattern of facilitating Father Cody's criminal behavior and concealing his sexual predation did not end *even there*. Church records reveal that in 1972, as serious concerns developed regarding Father Cody's conduct while in Burlington, he sought transfer to a still larger parish in Bellingham.[27] According to notes from the Church's Personnel Board, Father Cody specifically requested that he "not go to Bellingham as an administrator [but] as pastor **so that others will not think that anything is wrong.**" *Supra* note 27 (emphasis added). Remarkably, the Church appears to have fully acceded to Father Cody's request and permitted him to transfer as a "pastor," thus concealing the true reason for his re-assignment and ensuring that his new parishioners would be both unaware of his history of sexually abusing

---

[24] *See* "November 5, 2004 Letter", *supra* note 16.

[25] *See June 29, 2010 Archdiocese Intake Form*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000403_404.pdf.

[26] *See July 26, 2007 Statement from Survivor of Sexual Abuse*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000416_417.pdf.

[27] *See August 7, 1972 Meeting Notes of the Personnel Board of Our Lady of Lourdes Parish*, https://www.bishop-accountability.org/docs/seattle/cody/PPB000257.pdf.

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

children and unable to take reasonable precautions to protect their own children against his predation.[28]

### 4. Despite Father Cody's rampant sexual abuse of children, the Archdiocese permitted him to remain in the priesthood for another three decades

Father Cody remained a pastor in active service until 1975, when he was placed "in residence" at a parish in Seattle, although it is unclear from the documents that are publicly available (1) what specifically happened during his time as a pastor in Bellingham to prompt this change; and (2) whether he still had access to children in his new role.[29] In 1979, the Seattle Archdiocese placed Father Cody on "disability retirement," following which the Church continued to pay him a pension—despite having concluded it was unsafe to provide him with any actual assignment and later referring to him as one of the "unassignables."[30] Again, however, it is unclear whether any specific incident prompted this change of status.

In December 1988, Father Cody underwent a psychological evaluation at the Center for Prevention of Child Molestation. During the evaluation, Father Cody admitted that over a period of about 20 years he had sexually abused approximately 20 to 40 young girls between the ages of 8 and 12 and one young boy by "kissing, fondling and mutual[ly] masturbati[ng]" his victims.[31] Father Cody also admitted that, even at the time of his evaluation, "he currently fantisizes [sic] and masturbates to sexual fantasies of fondling young girls on a daily basis." *Supra* note 31. Officials at the Center urgently recommended that Father Cody "not be allowed

---

[28] *See August 23, 1972 Meeting Notes of the Personnel Board of Our Lady of Lourdes Parish*, https://www.bishop-accountability.org/docs/seattle/cody/PPB000259.pdf ("Cody is named as pastor at Assumption in Bellingham."); *see also Personal Record of Rev. Michael John Cody*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000001_000002.pdf (reflecting that in September 1972 Father Cody was transferred to Assumption Church in Bellingham as a "pastor").

[29] *See* "November 5, 2004 Letter", *supra* note 16.

[30] *See* "November 5, 2004 Letter", *supra* note 16.; *see also April 8, 1987 Memo to File by Father Espen*, https://www.bishop-accountability.org/docs/seattle/cody/PPB000993_994.pdf (discussing "unassignables" and wondering whether there was "any kind of insurance available for this sort of casualty?"; going on to question "what technique we used with [Father Cody]? I think we called it a 'medical retirement'").

[31] *See December 20, 1988 Psychiatric Evaluation Report*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000488_000491.pdf.

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA                                          11                    ATTORNEY GENERAL OF WASHINGTON
                                                                        Complex Litigation Division
                                                                        800 Fifth Avenue, Suite 2000
                                                                        Seattle, WA 98104-3188
                                                                        (206) 464-7744

unsupervised contact with children" and that he "enter and actively participate in a specialized sex offender treatment program." *Id.*

Soon after the evaluation, Father Cody *himself* wrote to Seattle Archbishop Hunthausen and stated it was in the "Church's best interest" for him to seek laicization.[32] Even though the Archbishop apparently agreed with Father Cody's request for laicization at the time, the Church—for unclear reasons—did not follow through with it.[33] Instead, almost five years later, the Church reached out to Father Cody to see if he was still interested in laicization.[34] By that time, however, Father Cody had changed his mind and considered his resignation from active ministry sufficient, as he believed laicization was "irrelevant" and part of the "internal business of the Catholic Church bureaucracy."[35]

Church records show that after Father Cody's change of heart, individuals within the Church wrote to the Seattle Archdiocese to question whether insisting on Father Cody's laicization would be "advantageous" for the Church or whether it would instead be "sufficient . . . to acknowledge the stability [he] is experiencing" and simply "restate the implications of his inactive status."[36] Perhaps because of such questioning of whether laicization was "advantageous" to the Church, the Seattle Archdiocese did not take any formal action to remove him from the priesthood for another *decade*, during which time more of Father Cody's

---

[32] *See January 20, 1989 Letter from Father Cody to Archbishop Hunthausen*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000258.pdf Laicization (or "defrocking") is the process by which a priest is officially removed from the priesthood. An Archbishop may petition Rome for a priest to "defrocked" for certain grave offenses, including sexual abuse of minors.

[33] *See February 13, 1989 Letter from Archbishop Hunthausen to Father Cody*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000259.pdf; *see also* "November 5, 2004 Letter", *supra* note 16.

[34] *See July 21, 1993 Letter from Canonical Consultant Bawyn to Father Cody*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000387.pdf

[35] *See July 31, 1993 Letter from Father Cody to Canonical Consultant Bawyn*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000388.pdf.

[36] *See August 13, 1993 Memo from Canonical Consultant Bawyn to Archbishop Murphy*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000469.pdf.

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    victims came forward to report that he had sexually abused them when they were young

2    children.[37]

3            In 2004, the Seattle Archbishop wrote a letter apologizing to a survivor whose sexual abuse

4    by Father Cody had apparently been reported to the Church in the early 1960s and who had recently

5    raised concerns regarding the Church's support of Father Cody following its receipt of that report.[38]

6    In his letter, the Archbishop falsely reassured the survivor and their family that, although the Church

7    had indeed permitted Father Cody to serve as a pastor in multiple different locations following the

8    reported abuse, **"the Archdiocese received no other complaints of abuse by Michael Cody"**

9    during the period after his "treatment" and before his "medical retirement." *Supra* note 38 (emphasis

10   added). This, despite Father McGrath's dire warning directly to the Archbishop that "the sisters and

11   lay teachers are scandalized at [Father Cody's] undue familiarity with the sixth & seventh grade

12   girls," and despite that, following a tenure in which he was permitted to have unsupervised

13   "sleepovers" with young girls at a cabin in the woods, the Archdiocese facilitated Father Cody's

14   transfer to a different parish as a "pastor" rather than as an "administrator" "so that others will not

15   think that anything is wrong." *Id.* Thus, in 2004, *the very same year the Review Board urged the*

16   *Church to increase transparency*, the Seattle Archbishop—the highest authority in the

17   Archdiocese—misrepresented and concealed the extent of the Archdiocese's complicity in and

18   support of sexual abuse, including its financial support for the abuser and his repeated transfers.

19           Finally, on June 17, 2005, more than 40 years after the Church first received notice

20   Father Cody had sexually abused numerous young girls, and over which period the Church

21   repeatedly concealed, enabled, and facilitated his ongoing sexual abuse of additional children,

22

23   _____

24   [37] *See May 2, 2003 Intake Form from Sister of Victim*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000393.pdf; *June 20, 2003 Intake Form from Victim*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000394.pdf; *July 2, 2003 Memo to File by Jessie Dye re: Meeting with Victim*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000396_397.pdf.

25

26   [38] *See February 3, 2004 Apology Letter from Archbishop*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000420.pdf.

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Father Cody was removed from the priesthood.[39] Even with everything the Church knew about his abuses, and even as Father Cody was living outside of Washington State, he had remained an incardinated priest of the Seattle Archdiocese and received a monthly stipend from the archdiocesan Priest Pension Fund.[40] He continued to receive these funds even after his laicization. *Supra* note 40.

**E.    The State's Investigation of the Archdiocese Under the Charitable Trusts Act**

For purposes of the CTA, a charitable trust is "any real or personal property right held by an entity or person that is intended to be used for a charitable purpose(s)." *In re Breast Cancer Prevention Fund*, 574 B.R. 193, 216 (Bankr. W.D. Wash. 2017) (quoting WAC 434-120-025). As described above, the corporation sole at issue here is the trustee of an express trust organized for charitable and religious purposes. *Supra* at 3.

The CTA's purpose is to "facilitate public supervision over the administration of public charitable trusts and similar relationships" by state officials. RCW 11.110.010. Accordingly, the CTA provides the AGO with broad authority to "investigate transactions and relationships of trustees and other persons subject to this chapter for the purpose of determining whether the trust or other relationship is administered according to law and the terms and purposes of the trust, or to determine compliance with this chapter in any other respect." RCW 11.110.100. The AGO may issue investigative subpoenas to obtain information relevant to an investigation, *id.*, and is authorized to "institute appropriate proceedings to secure compliance with this chapter," including to enforce compliance with an investigative subpoena. RCW 11.110.120.

The AGO has opened an investigation into the Archdiocese for potential violations of the CTA. On July 26, 2023, the Office issued a subpoena to the Archdiocese to produce records regarding the systemic cover-up of child sexual abuse in Washington. *See* Bays Decl., Ex. F. The subpoena sought 23 categories of documents related to the Church's past handling of reports

---

[39] *See* June 17, 2005 *Decree of Laicization*, https://www.bishop-accountability.org/docs/seattle/cody/JH_ARCH000307_308.pdf.
[40] *See* "November 5, 2004 Letter", *supra* note 16.

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

and allegations of sexual abuse, Church policies regarding individuals credibly accused of sexual abuse of a minor, and compensation paid to victims. *Id.* The Archdiocese objected to the subpoena and ultimately provided a small number of documents that were already available to the general public, but refused to provide additional responsive documents. *See* Bays Decl., ¶¶ 8–9.

On April 10, 2024, the State issued an Amended Subpoena that reiterated the original requests and sought additional detailed financial information regarding the Archdiocese's use of trust funds in connection with covering up sexual abuse by priests, including by transporting priests to other assignments or providing them with material support. *See* Bays Decl., Ex. H. The parties met and conferred, but the Archdiocese again refused to provide responsive records that were not already public, apart from limited, unspecified documents from prior litigation. *See* Bays Decl., ¶ 12. The State now makes this petition to enforce the subpoena pursuant to RCW 11.110.100 and RCW 11.110.120.

## III.    ARGUMENT

### A.    The CTA Authorizes the AGO to Issue the Subpoena

The AGO, as "the protector of the interests of the public," is the *only* proper party to institute proceedings for the enforcement of a charitable trust. *State v. Taylor*, 58 Wn.2d 252, 250, 362 P.2d 247 (1961); *accord Lundberg ex rel. Orient Found'n v. Coleman*, 115 Wn. App. 172, 179, 60 P.3d 595 (2002). The AGO may exercise that authority here.

A "Trustee" for purposes of the CTA is defined as:

(a)(i) Any person holding property in trust for a public charitable purpose; except the United States, its states, territories, and possessions, the District of Columbia, Puerto Rico, and their agencies and subdivisions;

(ii) A corporation formed for the administration of a charitable trust; and

(iii) Any person holding assets subject to limitations permitting their use only for charitable, religious, eleemosynary, benevolent, educational, or similar purposes.

RCW 11.110.020(2). This definition includes an exemption for religious organizations, which provides in relevant part:

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

(b) Unless they are described in (a)(i) or (ii) of this subsection, the term "trustee" does not apply to:

[. . .]

(ii) Religious corporations duly organized and operated in good faith as religious organizations, which have received a declaration of current tax exempt status from the government of the United States; their duly organized branches or chapters; and charities, agencies, and organizations affiliated with and forming an integral part of said organization, or operated, supervised, or controlled directly by such religious corporations nor any officer of any such religious organization who holds property for religious purposes. [. . .]

*Id.* As discussed in Section B below, this exemption is designed to respect religious freedom and maintain the separation of church and state, ensuring that churches' use of trust funds for religious purposes is not second-guessed by government officials. But this exemption cannot be used as a shield to prevent the AGO from investigating obviously *non-religious*, abhorrent conduct: facilitating and covering up the sexual abuse of children and other vulnerable Washingtonians. *Infra* at § III.B.

Here, the AGO properly served investigative subpoenas on the Seattle Archdiocese requesting information to determine whether the express trust established by the Archdiocese's Articles of Incorporation has been administered according to Washington law, the charitable and religious purposes of the trust, and in compliance with the CTA. RCW 11.110.100. To be clear, this is an investigation: to enforce its subpoena. The AGO need not prove that the Archdiocese has committed any violations of the CTA. It bears noting, however, that actions of the Archdiocese that have already been made public may themselves violate the fiduciary duties imposed on trustees by law.

For example, all trustees have a "duty to administer the trust, diligently and in good faith, in accordance with the terms of the trust and applicable law." Restatement (Third) of Trusts § 76; *see also id.* § 77 (trustee has a duty to administer the trust "in light of the purposes, terms, and other circumstances of the trust").[41] Here, the corporation sole—incorporated as such for the

---

[41] Washington courts look to the Restatement (Third) of Trusts as persuasive authority. *See, e.g.*, *Conservation Nw. v. Comm'r of Pub. Lands*, 199 Wn.2d 813, 824, 514 P.3d 174 (2022); *In re Wash. Builders Ben. Trust*, 173 Wn. App. 34, 292 P.3d 1206 (2013).

STATE OF WASHINGTON'S PETITION TO ENFORCE INVESTIGATIVE SUBPOENA

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

express purpose of holding property in trust for the Archdiocese—is limited to the religious and charitable purposes for which it is organized. *Supra* at 3. Covering up the sexual abuse of children or other vulnerable people is emphatically not a purpose of the trust; if it were, this would violate the principle that a trust is invalid if "its purpose is unlawful or its performance calls for the commission of a criminal or tortious act," or if "it is contrary to public policy." Restatement (Third) of Trusts § 29; *see also id*. § 72 (trustee has a duty not to comply with trust provisions that are unlawful or contrary to public policy).

Likewise, a trustee "has a duty to administer the trust solely in the interest of the beneficiaries, or solely in furtherance of its charitable purpose." *Id.* § 78. Again, covering up the sexual abuse of children is not in furtherance of any charitable purpose, nor can it be said to be in the interests of the Archdiocese's religious purposes or the interests of its constituent parishes and parishioners. In the case of Father Cody, for example, the Seattle Archdiocese not only ignored clear evidence he was sexually abusing vulnerable young children, but *affirmatively* concealed and financially supported his criminal conduct, repeatedly paying to transfer him to different locations where he could evade detection and prey upon new and unsuspecting child victims, as well as paying him a pension. The AGO is authorized to investigate these and other potential breaches of trust—and the CTA's religious exemption does not require a different conclusion.

**B.      The Archdiocese Is Not Exempt from This Investigation**

The State anticipates that the Church will invoke the CTA's "religious organizations" exemption, RCW 11.110.020(2)(b)(ii), to argue that it has no obligation to respond to the subpoena. This is mistaken: such an interpretation would stretch the exemption well beyond its purpose of respecting religious entities' self-governance and use of funds held in trust for religious purposes, and turn it into a blanket protection for institutional abuses of children's rights and the public's trust that the Legislature could not have intended. Indeed, if the Church were permitted to use the exemption as a shield against this investigation into the misuse of funds

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    held in trust for religious and charitable purposes to cover up sexual abuse, such an application

2    would violate the Washington Constitution's privileges and immunities clause. Const. art. I,

3    § 12; *cf. Woods v. Seattle's Union Gospel Mission*, 197 Wn.2d 231, 236, 481 P.3d 1060 (2021)

4    (holding that the privileges and immunities clause prohibits application of the Washington Law

5    Against Discrimination's (WLAD) religious exemption to bar non-ministerial employees'

6    claims of discrimination).

7         **1.     The CTA's religious exemption is not an exemption for sexual abuse**

8         Statutory interpretation begins with the statute's plain meaning. *Dep't of Ecology v.*

9    *Campbell & Gwinn,* LLC, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). Plain meaning is discerned from

10   the ordinary meaning of the language at issue, the context of the statute in which the provision

11   is found, related provisions, and the statutory scheme as a whole. *State v. Engel*, 166 Wn.2d 572,

12   578, 210 P.3d 1007 (2009). It is well-established that courts should go beyond the literal

13   language of a statute if reliance on that language would defeat the plain purpose of the statute.

14   *State v. Bergstrom*, 199 Wn.2d 23, 37, 502 P.3d 837 (2022) (courts avoid literal interpretation

15   of statutes if it will lead to "strained" results misaligned with statute's purpose and plain

16   meaning).

17        Here, RCW 11.110.020(2)(b)(ii) must be analyzed and construed within the larger

18   framework of the CTA and against the background of the Legislature's purpose in enacting the

19   CTA—and in including a religious exemption—to avoid a strained reading that puts religious

20   organizations beyond public scrutiny, even when their alleged conduct has nothing to do with

21   religion. The Washington Supreme Court has recognized that statutory religious exemptions can

22   be explained by "[o]ur state's protection of religion," *Woods*, 197 Wn.2d at 246, but

23   Washington's Constitution expressly *excludes* from such protection "acts of licentiousness" and

24   "practices inconsistent with the peace and safety of the state." Const. art. I, § 11. Furthermore,

25   the Washington Supreme Court has declined to enforce a literal reading of a religious exemption

26   that is not expressly limited to religious purposes. *See Woods*, 197 Wn.2d at 246 ("Because

STATE OF WASHINGTON'S PETITION        18        ATTORNEY GENERAL OF WASHINGTON
TO ENFORCE INVESTIGATIVE                            Complex Litigation Division
SUBPOENA                                       800 Fifth Avenue, Suite 2000
                                               Seattle, WA 98104-3188
                                                 (206) 464-7744

WLAD contains no limitations on the scope of the exemption provided to religious organizations, we seek guidance from the First Amendment as to the appropriate parameters of the provision's application."). The First Amendment precludes the government from interfering with matters of "faith," "doctrine," and "church government," *id.* at 248, but this investigation has nothing whatsoever to do with such religious issues. Instead, this investigation seeks to determine whether the Archdiocese has misused charitable trust funds to conceal and facilitate the sexual abuse of children—conduct that is so far outside the bounds of the law and public policy that it cannot possibly be consistent with the purpose of *any* trust. *See supra* at 17.

Enforcing a literal, unlimited reading of the CTA's religious exemption would be at odds with both the purpose of that exemption (protecting religion) and the purpose of the CTA as a whole (ensuring that trusts are administered in accordance with law and with their charitable and religious purposes). The Court can, and should, consider this in construing the statute.

## 2. A broad reading of the CTA's religious exemption here would violate the privileges and immunities clause

Even without applying the principles of statutory construction discussed above, the CTA cannot be read so broadly as to foreclose an investigation into a church's involvement in sexual abuse, because doing so would result in an as-applied violation of Washington's privileges and immunities clause. Article I, section 12 of the Washington Constitution provides: "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." This provision "was intended to prevent favoritism and special treatment to the few while disadvantaging others[.]" *Woods*, 197 Wn.2d at 242. To be sure, as the Washington Supreme Court has explained, the Legislature is "entitled to make distinctions and to carve out exceptions in its assessments of proper public policy, within the constraints of the state and federal constitutions." *Id.* at 236. And under appropriate circumstances, statutory carveouts for religious entities can be a valid type of exception and an appropriate means of respecting

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

religious free exercise. *See id.* at 245. However, the Legislature "may not treat differently persons who are similarly situated unless a rational basis exists to do so," and it "may not give persons immunity or privilege without a reasonable basis when a fundamental right is at stake." *Id.* at 236 (citing Const. art. I, § 12; U.S. Const. amend. XIV).

When a fundamental right of state citizenship is at stake, Washington courts apply an "independent analysis" under article I, section 12 that differs from its counterpart in the U.S. Constitution. *Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.*, 196 Wn.2d 506, 518-19, 475 P.3d 164, 171 (2020). The range of fundamental rights protected by Washington's privileges and immunities clause is "broad," and encompasses un-enumerated "other personal rights." *Id.* (quoting *Corfield v. Coryell*, 6 F. Cas. 546, 551 (E.D. Pa. 1823); *State v. Vance*, 29 Wash. 435, 458 (1902)).

Washington courts apply a two-step analysis to claims brought under article I, section 12. *Woods*, 197 Wn.2d at 242 (quoting *Schroeder v. Weighall*, 179 Wn.2d 566, 573, 316 P.3d 482 (2014)). The first inquiry is whether the law in question involves a privilege or immunity implicating a fundamental right. If so, the second inquiry is whether the exemption or distinction is based on "reasonable grounds." *Ockletree v. Franciscan Health Sys.*, 179 Wn.2d 769, 776, 317 P.3d 1009 (2014); *Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.*, 196 Wn.2d 506, 519, 475 P.3d 164, 171 (2020). Here, the CTA's religious exemption, if applied to shield the Archdiocese from the AGO's investigation into the misuse of trust funds to cover up child sex abuse, would implicate established fundamental rights to "pursue and obtain happiness or safety," and other personal rights guaranteed by Washington's Constitution. *Corfield*, 6 F. Cas. at 551–52 (quoted in *Martinez-Cuevas*, 196 Wn.2d at 522). And there are no reasonable grounds to allow for a distinction between religious and secular charities when the reason for the investigation is the concealment and facilitation of sexual abuse.

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

a.    **Washingtonians have a fundamental right to freedom from sexual abuse**

Washington courts have looked to early cases to identify what rights are deemed fundamental. For purposes of article I, section 12, the right must be "such a fundamental right of a citizen that it may be said to come within the prohibition of the constitution, or to have been in mind by the framers of that organic law." *State v. Vance*, 29 Wash. 435, 458-59 (1902). In *Vance*, the Supreme Court identified several specific fundamental rights of state citizenship, such as "the right to remove to and carry on business therein; the right, by usual modes, to acquire and hold property, and to protect and defendant [sic] the same in the law; the rights to the usual remedies to collect debts, and **to enforce other personal right** [sic]; and the right to be exempt, in property or persons, from taxes or burdens which the property or persons of citizens of some other state are exempt from." *Id.* at 458 (emphasis added). This list is not "comprehensive or limited to only those enumerated rights"; indeed, the Supreme Court has since gone on to recognize other fundamental rights, as discussed below. The *Vance* Court relied upon the venerable treatise by Thomas M. Cooley, which in turn cited the discussion of fundamental rights of state citizenship in *Corfield v. Coryell*, 6 F. Cas. 546 (E.D. Pa. 1823):

> Protection by the government; **the enjoyment of life and liberty**, with the right to acquire and possess property of every kind, and **to pursue and obtain happiness and safety**; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole. The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state…

*Id.* at 551–52 (emphasis added).

The Washington Supreme Court has relied upon *Vance* and *Corfield* in recognizing rights that are fundamental to Washington citizens for purposes of the state privileges and immunities clause. For instance, in *Martinez-Cuevas*, the Supreme Court held that the exemption for agricultural workers from Washington's overtime protection statute unconstitutionally granted

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   agricultural employers a privilege or immunity that violated workers' fundamental rights to

2   statutory protection of their health and safety—which in turn "contemplates the fundamental

3   'personal rights' of *Vance* and '[p]rotection by the government' in *Corfield*." 196 Wn.2d 506,

4   522, 475 P.3d 164 (2020).

5       Similarly, in *Woods*, the Supreme Court recognized as fundamental "the right to an

6   individual's sexual orientation and the right to marry," citing *Vance*'s recognition of the right to

7   enforce "'other *personal* rights'" (emphasis in original) and *Corfield*'s recognition of the right

8   "to pursue and obtain happiness and safety," in addition to federal case law such as *Obergefell*

9   *v. Hodges*, *Lawrence v. Texas*, and *Loving v. Virginia. Id.* at 242-43. This application of *Vance*

10  and *Corfield* comports with the "broad" protections Washington courts have long recognized

11  under the state privileges and immunities clause. In *Woods*, the Court applied these principles in

12  holding that the general statutory exemption for religious employers under the WLAD,

13  RCW 49.60, granted a privilege or immunity to religious employers that would be

14  unconstitutional as applied to a discriminatory refusal to hire a non-ministerial employee on the

15  grounds that he was in a same-sex relationship. *Id.* at 244.

16      The same fundamental rights to pursue happiness and safety recognized since *Corfield*

17  also prohibit the recognition of a privilege or immunity so broad that it prevents the State from

18  investigating sexual abuse—a horrific violation that causes profound and lasting damage to

19  health and wellbeing. Freedom from sexual abuse fits easily within the sphere of personal and

20  safety-related rights recognized as fundamental in other contexts. *Cf. Ingraham v. Wright*,

21  430 U.S. 651, 673 (recognizing "right to be free from . . . unjustified intrusions on personal

22  security"); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062–63 (6th Cir. 1998) (recognizing

23  right to "personal security and bodily integrity"; collecting cases); *Doe v. Claiborne Cnty.*,

24  103 F.3d 495, 507 (6th Cir. 1996) (recognizing "the right not to be sexually assaulted under color

25  of law"); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450–52 (5th Cir. 1994) (holding that

26  Fourteenth Amendment protects public school students from sexual abuse by school employees);

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 727 (3d Cir.1989) (same). These

2    fundamental rights foreclose the CTA's statutory exemption from being applied to prevent the

3    government from pursuing justice and accountability by investigating religious institutions that

4    perpetrate, condone, and cover up sexual abuse.

5        The recognition of a right to freedom from sexual abuse for purposes of the privileges

6    and immunities clause is consistent with Washington's longstanding "broad" view of the

7    fundamental rights of state citizenship, *Martinez-Cuevas*, 196 Wn.2d at 522, and comports with

8    Washington courts' recognition in other contexts that children, in particular, have fundamental

9    rights to health and safety. *See In re Dependency of R.H.*, 129 Wn. App. 83, 88 (2005) ("Ryan

10   forgets that R.H [a minor] has fundamental rights at stake as well—the fundamental rights to

11   health and safety.") (citing RCW 13.34.020); *State v. Parvin*, 184 Wn.2d 741, 758, 364 P.3d 94,

12   102 (2015) ("[A] child's fundamental right to health and safety is at stake in parental termination

13   proceedings, just as parents' fundamental right to the care and custody of their children is at

14   stake.") (citing *In re Dependency of R.H.*, 184 Wn. App. at 88). The State cannot be barred from

15   protecting and vindicating these rights against religious as well as secular perpetrators, nor was

16   the CTA's exemption ever intended to prevent it from doing so.

### b.    There is no "reasonable ground" for applying the CTA's religious exemption to prevent a sexual abuse investigation

18       The second part of Washington's article I, section 12 inquiry—whether there is a

19   "reasonable ground" to grant or enforce the privilege or immunity granted by the CTA's

20   religious exemption—also prohibits application of the exemption to an investigation concerning

21   sexual abuse. *Woods*, 197 Wn.2d at 242. The "reasonable ground test is more exacting than

22   rational basis review." *Schroeder v. Weighall*, 179 Wn.2d 566, 574, 316 P.3d 482 (2014). Under

23   this test, courts cannot "hypothesize facts to justify a legislative distinction," *id.* at 574, and

24   instead must "scrutinize the legislative distinction to determine whether it *in fact* serves the

25   legislature's stated goal." *Id.*

26

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

In *Woods*, the Supreme Court considered a challenge to the WLAD's religious exemption. 197 Wn.2d 231. Much as the CTA exempts religious institutions from the definition of a "trustee" subject to that statute, the WLAD exempts religious institutions from its definition of "employer" for purposes of that statute. *Id.* at 239 (citing RCW 49.60.040(11)). Woods, the plaintiff, applied for a staff attorney position at a legal clinic run by a religious nonprofit, the Seattle Union Gospel Mission (SUGM). *Id.* at 237. In the course of applying, Woods disclosed that he was in a same-sex relationship. *Id.* SUGM "informed Woods that it was contrary to biblical teaching for him to engage in a same-sex relationship" and did not hire him for the position. *Id.* When his application was denied, Woods filed a WLAD claim for employment discrimination, arguing that the statute's religious exemption should not apply because the staff attorney job duties were "'wholly unrelated to [SUGM's] religious practices or activities.'" *Id.* at 237-38 (brackets in original).

SUGM prevailed on summary judgment, and the Washington Supreme Court took direct review to determine "whether the legislature extended a privilege or immunity to religious and other nonprofit, secular employers and whether, in providing the privilege or immunity, the legislature affected a fundamental right without a reasonable basis for doing so." *Id.* at 236. The Court began by addressing the nature and scope of the privileges and immunities clause, the purpose of which "is to limit the type of favoritism that ran rampant during Washington State's territorial period." *Id.* (citing *Ockletree*, 179 Wn.2d at 775). The Court explained that, because the "text and aims" of the state provision differ from its federal counterpart, "our state's privileges and immunities clause can support an analysis independent of the Fourteenth Amendment." *Id.* at 242. Next, applying the "two-pronged test" for article I, section 12 claims, the Supreme Court first held—as discussed above—that the facts of the case implicated Woods's fundamental rights. *Supra* at 22. The Court then held that "reasonable grounds exist for WLAD to distinguish religious and secular nonprofits," because of "the critically important distinction between religious and secular nonprofits: religious organizations have the right to religious

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    liberty." *Id.* at 244–45; *see also id.* at 246 ("article I, section 11 [religious freedom] and

2    avoidance of state interference with religion constitute real and substantial differences between

3    religious and secular nonprofits, making it 'reasonable for the legislature to treat them differently

4    under WLAD'" (quoting *Ockletree*, 179 Wn.2d at 783)). Accordingly, the religious exemption

5    was not *facially* unconstitutional. *Id.*

6         However, the Supreme Court held that the exemption may be unconstitutional *as applied*

7    to Woods's specific case. The Court reasoned that, when competing constitutional rights are

8    implicated, the religious exemption's application must be limited to its purpose of protecting

9    religious freedom: "Because WLAD contains no limitations on the scope of the exemption

10   provided to religious organizations, we seek guidance from the First Amendment as to the

11   appropriate parameters of the provision's application." *Id.* at 246. Federal courts, the Supreme

12   Court noted, have likewise recognized "the need for a careful balance between the religious

13   freedoms of the sectarian organization and the rights of individuals to be free from discrimination

14   in employment," and have accordingly "fashioned the ministerial exception to the application of

15   antidiscrimination laws in accord with the requirements of the First Amendment." *Id.* at 250.

16   Under the ministerial exception, "a plaintiff's employment discrimination claim must yield

17   where the employee in question is a minister." *Id.* at 249. But *non*-ministerial employees *can*

18   assert claims based on violations of the privileges and immunities clause—and in Woods's case,

19   the factual record was insufficient to determine "whether staff attorneys can qualify as ministers

20   and, consequently, whether Woods' discrimination claim under WLAD must be barred." *Id.* at

21   252. The Supreme Court remanded the case for the trial court to determine these questions. *Id.*

22        Here, as in *Woods*, there is no question that the CTA's religious exemption is

23   constitutional on its face. Just like the WLAD's religious exemption, the CTA's religious

24   exemption has been part of the statute since its inception. *Woods*, 197 Wn.2d at 245; *see* Wash.

25   Leg. 1967 Ex.S. ch. 53, § 2. Just like the WLAD's religious exemption, the CTA's religious

26   exemption can be explained by "[o]ur state's protection of religion," which on its own is

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

"evidence for treating religious nonprofits differently." *Woods*, 197 Wn.2d at 245. And just like the WLAD's religious exemption, the CTA's religious exemption must be limited to its purpose of protecting the free exercise of religion when a broader application would otherwise interfere with fundamental constitutional rights: here, the right to pursue health and safety, which includes the right to freedom from sexual assault and the same access to justice afforded to other victims and communities affected by the misuse of charitable funds for unlawful ends.

Again, to be clear, the AGO does not seek to investigate the Archdiocese's use of funds for religious purposes, nor interfere in any way with the faith or doctrine of the Catholic Church, its religious governance, or its religious activities and practices. Rather, the AGO is exercising its powers under the CTA to investigate the Archdiocese's use of charitable trust funds in connection with conduct that the Church must concede is not a matter of faith or religious governance: the sexual abuse of children. Under these circumstances, the fundamental constitutional rights of children and their communities preclude application of the CTA's religious exemption to bar this investigation. The Court should order the Archdiocese to fully respond to the AGO's subpoena.

## C.     The First Amendment Does Not Shield the Archdiocese From Responding to the AGO's Subpoena

The Archdiocese may also argue that the First Amendment's free exercise clause precludes enforcement of the subpoena. Not so. The First Amendment does not prevent the application of a law, like the CTA, which is facially neutral and generally applied even if the application has an "incidental burden or effect on the exercise of religion." *In re Catholic Bishop of Spokane*, 329 B.R. 304, 323 (Bankr. E.D. Wash. 2005), *aff'd in part sub nom. Comm. of Tort Litigs. v. Catholic Diocese of Spokane*, CV-05-0274-JLQ, 2006 WL 211792 (E.D. Wash. Jan. 24, 2006), and *rev'd in part on other grounds sub nom. Comm. of Tort Litigants v. Catholic Diocese of Spokane*, 364 B.R. 81 (E.D. Wash. 2006).

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

In the context of the production of documents, such as in response to a subpoena or civil discovery request, courts have held that the First Amendment is no shield. In *N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints*, 175 Wn. App. 517, 307 P.3d 730 (2013), a church sought to limit discovery related to sexual abuse committed by a scout leader on the basis of the First Amendment. The Court of Appeals rejected this theory, holding that "[t]o the extent the church may be arguing that nonprivileged information in the [scouting volunteer] disciplinary files is shielded [from party discovery] by the First Amendment, we disagree." *Id.* at 543-44. The Court directed that, in considering discovery issues in further proceedings, the trial court should be guided by the principle that fact-gathering is not shielded by the First Amendment as long as the issue "is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs[.]'" *Id.* (quoting *C.J.C. v. Corp. of Catholic Bishop of Yakima*, 138 Wn.2d 699, 728, 985 P.2d 262 (1999)). Similarly, here, the AGO's subpoena seeks non-privileged information about the Archdiocese's conduct with regard to sexual abuse by its priests and other church leaders, including its use of funds to move or support priests engaging in sexual abuse, or to otherwise perpetuate sexual abuse and cover up the records of that abuse.

Nor have Washington courts countenanced the use of either the First Amendment or article I, section 11 of the Washington Constitution to shield churches from actual liability. In *C.J.C.*, 138 Wn.2d 699, the Supreme Court held that the "First Amendment does not provide churches with absolute immunity to engage in tortious conduct. So long as liability is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs, it does not offend constitutional principles." *Id.* at 728. Regarding the Washington Constitution, the Court held that "while art. I, § 11 of our state constitution protects '[a]bsolute freedom of conscience in all matters of religious sentiment,' that protection 'shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the

STATE OF WASHINGTON'S PETITION
TO ENFORCE INVESTIGATIVE
SUBPOENA

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  state.' Thus, the specific language of art. I, § 11 defeats the Church's state constitutional claims."

2  *Id.*

3  The State is aware of no instance in which a court has held that a state investigation into

4  the Church's involvement in sexual abuse is foreclosed by the First Amendment. To the contrary,

5  numerous states have opened investigations into their local dioceses, and several have resulted

6  in substantial new revelations—for example, the discovery of 451 child sex abusers in the Illinois

7  dioceses, when the Church had previously disclosed only 103.[42] Just as Washington's CTA does

8  not shield religious institutions from public accountability for their involvement in sexual abuse,

9  the First Amendment is no shield either. The AGO's investigation is lawful, serves a compelling

10  public interest in transparency and accountability, and must be permitted to proceed.

11  ### IV.   CONCLUSION

12  For the foregoing reasons, the State respectfully requests that the Court grant this petition;

13  declare that the AGO's investigation is not foreclosed by the CTA's religious exemption or the

14  First Amendment; and order the Seattle Archdiocese to produce all documents responsive to the

15  subpoena.

16

17

18

19

20

21

22

---

23  [42] Report on Catholic Clergy Child Sex Abuse in Illinois, available at

24  https://clergyreport.illinoisattorneygeneral.gov/ (finding 451 Church leaders who abused nearly 2,000 children—over four times the number of abusers voluntarily disclosed by the Church); *see also, e.g.*, Pennsylvania Diocese Victims Report, https://www.attorneygeneral.gov/report/ (Pennsylvania investigation yielded findings that over 300

25  priests abused over 1,000 children over 70 years, which the Church routinely covered up); *In re Investigation of the Roman Catholic Diocese of Brooklyn*, Assurance of Discontinuance, https://ag.ny.gov/sites/default/files/

26  settlements-agreements/brooklyn-diocese-aod-final-executed-ex.-1.pdf (New York settlement agreement imposing independent oversight after investigation revealed Church's pervasive mismanagement of sexual abuse cases).

1    DATED this 9th day of May 2024.

2                          ROBERT W. FERGUSON
                          Attorney General

3                          */s/ Kristin Beneski*
4                          KRISTIN BENESKI, WSBA No. 45478
                          First Assistant Attorney General
5                          NATHAN BAYS, WSBA No. 43025
                          JES M. ERICKSON, WSBA No. 43024
6                          JULY SIMPSON, WSBA No. 45869
                          Assistant Attorneys General
7                          Complex Litigation Division
                          800 Fifth Avenue, Suite 2000
8                          Seattle, WA 98104
                          (206) 464-7744
9                          kristin.beneski@atg.wa.gov
                          nathan.bays@atg.wa.gov
10                         jessica.erickson@atg.wa.gov
                          july.simpson@atg.wa.gov
11                         *Counsel for Petitioner State of Washington*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

STATE OF WASHINGTON'S PETITION            29
TO ENFORCE INVESTIGATIVE
SUBPOENA

1

<u>**DECLARATION OF SERVICE**</u>

2    I hereby declare that on this day I caused a copy of this document to be served via

3 Certified Mail and electronic mail on the following:

4    William Crowley
    Crowley Law Offices, P.S.
5    One Union Square
    600 University Street
6    Suite 1708
    Seattle, WA 98101
7    will@crowleylawoffices.com
    *Counsel for the Corporation of the Catholic Archbishop of Seattle*
8
    I declare, under penalty of perjury under the laws of the State of Washington, that the
9
 foregoing is true and correct.
10
    DATED this 9th day of May 2024, at Seattle, Washington.
11

12            */s/ Nathan Bays*
             NATHAN BAYS, WSBA No. 43025
13             Assistant Attorney General

14

15

16

17

18

19

20

21

22

23

24

25

26

STATE OF WASHINGTON'S PETITION    30    ATTORNEY GENERAL OF WASHINGTON
TO ENFORCE INVESTIGATIVE           Complex Litigation Division
SUBPOENA                 800 Fifth Avenue, Suite 2000
                      Seattle, WA 98104-3188
                        (206) 464-7744