The Honorable Chief Judge David G. Estudillo

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

| | |
|---|---|
| PAUL D. ETIENNE et al., <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT W. FERGUSON et al., <br><br> Defendants. | CASE No. 3:25-cv-05461-DGE <br><br> **UNITED STATES CONFERENCE OF CATHOLIC BISHOPS'** *AMICUS CURIAE* **BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

# TABLE OF CONTENTS

**Page(s)**

INTERESTS OF *AMICUS CURIAE* .................................................................................................. 1

INTRODUCTION ............................................................................................................................. 1

BACKGROUND .............................................................................................................................. 3

ARGUMENT .................................................................................................................................... 7

    I.    SB 5375 violates the Church's right to self-governance ................................................ 7

    II.   SB 5375 will have devastating impacts on the free exercise of religion by Catholics throughout the State of Washington ............................................................. 10

CONCLUSION .............................................................................................................................. 13

*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page i

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

# TABLE OF AUTHORITIES

## Cases

*Beggs v. State*,
   247 P.3d 421 (Wash. 2011)..................................................................................................8

*Catholic Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*,
   145 S. Ct. 1583 (2025)........................................................................................................8

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993)....................................................................................................10, 11

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   565 U.S. 171 (2012)........................................................................................................1, 9

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
   344 U.S. 94 (1952).....................................................................................................2, 8, 9

*Kennedy v. Bremerton School Dist.*,
   597 U.S. 507 (2022)..........................................................................................................10

*McClure v. Salvation Army*,
   460 F.2d 553 (5th Cir. 1972)..............................................................................................9

*Mockaitis v. Harcleroad*,
   104 F.3d 1522 (9th Cir. 1997)..........................................................................................11

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   591 U.S. 732 (2020).................................................................................................2, 7, 9

*People v. Phillips*,
   N.Y. Ct. Gen. Sess. (1813)...............................................................................................11

## Statutes

RCW § 9A.20.021..................................................................................................................8

RCW § 26.44.080..................................................................................................................8

S.B. 5375, 69th Leg., Reg. Sess. (Wa. 2025)...........................................................2, 10, 11

## Other Authorities

Anthony Cardinal Bevilacqua,
   *Confidentiality Obligation of Clergy from the Perspective of Roman Catholic Priests*,
   29 Loy. L.A. L. Rev. 1733 (1996) ..................................................................................5, 6

*The Bible*
   (New American Bible, Revised Edition) ................................................................ *passim*

Cardinal Mauro Piacenza et al.,
   *Note of the Apostolic Penitentiary on the Importance of the Internal Forum and the Inviolability of the Sacramental Seal* (June 21, 2019) ....................................5, 7, 8, 9

*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page ii

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

*Catechism of the Catholic Church*
   (2d ed.) ...................................................................................................................3, 4, 5, 6

Center for Applied Research in the Apostolate,
   *Frequently Requested Church Statistics* ...............................................................................12

*Codex Iuris Canonici*
   (*Code of Canon Law*) (1917) .................................................................................................4

*Codex Iuris Canonici*
   (*Code of Canon Law*) (1983) ......................................................................................... *passim*

Michael W. McConnell,
   *The Origins and Historical Understanding of Free Exercise of Religion*,
   103 Harv. L. Rev. 1409 (1990) ..............................................................................................11

Pope Francis,
   *Address of His Holiness Pope Francis to Participants at the Course Organized by
   the Apostolic Penitentiary* (Mar. 29, 2019)........................................................................6, 8

Pope Francis,
   *Vos Estis Lux Mundi* (Mar. 25, 2023) .....................................................................................2

Pope Saint John Paul II,
   *Apostolos suos* (1998) .............................................................................................................1

Pope Saint John Paul II,
   *Reconciliatio et Paenitentia* (Feb. 12, 1984) ..........................................................................4

Pope Saint John Paul II,
   *Sacrae Disciplinae Leges* (Jan. 25, 1983) ..............................................................................6

Pope Saint Paul VI,
   *Lumen Gentium: Dogmatic Constitution of the Church* (Nov. 21, 1964) ..............................5

Sophia Gates,
   *Whatcom Catholics Adjust to Church Consolidation as Priests, Parishioners
   Decline*,
   Cascadia Daily News (Mar. 17, 2025) ..................................................................................12

USCCB,
   2024 Annual Report: Findings and Recommendations ..........................................................3

USCCB,
   *Act of Contrition*.....................................................................................................................4

Washington State Department of Social and Health Services,
   *A Guide for Recognizing & Reporting Child Abuse & Neglect* (Revised April
   2018) ......................................................................................................................................12

*AMICUS CURIAE* BRIEF IN
SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION
No. 3:25-cv-05461-DGE
Page iii

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

**INTERESTS OF *AMICUS CURIAE***

The United States Conference of Catholic Bishops (USCCB) is the assembly of Catholic Bishops of the United States and the Virgin Islands who jointly exercise certain pastoral functions entrusted to them by the Lord Jesus of sanctifying, teaching, and governing. Its mission is to support the ministry of the bishops, including by offering appropriate assistance to each bishop in fulfilling his particular ministry in the local Church of his diocese. *See* Pope Saint John Paul II, *Apostolos suos* (1998), https://t.ly/6qW8r. As *amicus curiae*, the USCCB seeks to inform the Court of the drastic effects that Senate Bill 5375 will have on the mission and pastoral ministry of Catholic Bishops in Washington, including their relationships with the priests in their jurisdictions and their care for the souls of the Catholics in their dioceses.

**INTRODUCTION**

In the late fourteenth century in Bohemia (modern-day Prague), King Wenceslaus IV threw Father John Nepomucene into prison, then had the priest tortured and drowned in the river. The priest's crime? Refusing to reveal what the queen had said in confession. The priest chose to be martyred rather than break the seal of the confessional and face a consequence worse than death—automatic excommunication and the very real risk of eternal damnation. Nearly 700 years later, priests still take the sacramental seal—a core component of the Church's doctrine on the confession and forgiveness of sins—just as seriously. And the Church's penalty for breaking the seal remains the same. Yet Washington's new law, Senate Bill 5375 (SB 5375), forces priests to divulge what they hear in the confessional or else face civil and criminal liability, including possibly incarceration. This affront to a core tenet and essential practice of the Catholic faith blatantly violates the First and Fourteenth Amendments to the United States Constitution, as well as binding Supreme Court and Ninth Circuit precedent.

First, SB 5375 violates the church autonomy doctrine by significantly interfering with the ability of bishops to regulate and ensure the proper administration of the sacraments in their dioceses. The Constitution forbids such governmental interference in "strictly ecclesiastical" matters. *Hosanna-*

*AMICUS CURIAE* BRIEF IN
SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION
No. 3:25-cv-05461-DGE
Page 1

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

*Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 194–95 (2012) (citation omitted). Under the church autonomy doctrine, which flows from the Free Exercise and Establishment Clauses of the First Amendment, religious institutions such as the Catholic Church must be free "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). This is especially true "with respect to internal management decisions," including those concerning "faith and doctrine," "that are essential to the institution's central mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). As confession is central to the Church's teaching on and mission of healing and saving souls, Washington's new law squarely runs afoul of the church autonomy doctrine, at its core.

Second, if allowed to take effect, SB 5375 will also severely impair the free exercise of religion (at least for the Catholic religion, and other religions with practices similar to the Catholic Sacrament of Confession) throughout the State of Washington, harming both the priests and the parishioners they serve. The law subjects "members of the clergy" (S.B. 5375, § 2(1)) to a Hobson's choice of either suffering automatic excommunication or criminal and civil penalties (including incarceration in jail). Either way, there would be fewer priests who could care for the Catholic faithful—even though Washington, like other States and jurisdictions, already suffers from a significant and growing shortage of priests. Those who stand to lose the most are people in rural, impoverished, or low-population areas, who already struggle to find priests to provide pastoral care and administer the sacraments to them.

The USCCB's objections to SB 5375 do not stem from an unwillingness to deal resolutely and firmly with the scourge of child abuse, which the Church abhors. The USCCB and the broader Church condemn such abuse in the strongest terms possible, and have taken strong measures to eradicate that evil. *See* Pope Francis, *Vos Estis Lux Mundi* (Mar. 25, 2023), https://t.ly/y9gnP, (noting the "physical, psychological and spiritual damage to the victims and harm [to] the community of the faithful" caused by sexual abuse, and extending procedures for "prevent[ing] and combat[ting] these crimes"). The USCCB publishes an annual report of findings and recommendations on the implementation of its

*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page 2

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

Charter for the Protection of Children and Young People, *see* 2024 Annual Report: Findings and Recommendations, https://t.ly/6U8Ri, including cooperating with civil authorities, responding to and investigating allegations of abuse, and disciplining and removing offenders from ministry and from any positions of contact with youth. And the Essential Norms which accompany the Charter (and are binding ecclesial law in all dioceses throughout the United States) require each diocese to "comply with all applicable civil laws with respect to the reporting of allegations of sexual abuse of minors to civil authorities and [to] cooperate in their investigation." *Id.* at 68.

Even a cursory examination of SB 5375 and the devastating effects it will have on the free exercise and practice of the Catholic faith in the State of Washington reveals layer upon layer of constitutional defects that cannot be squared with the Constitution's broad protections for church autonomy and religious freedom. The Court should therefore grant the prayed-for preliminary injunction in full, safeguard the constitutional rights of Plaintiffs and those whom they serve, and enjoin Defendants from enforcing this newly enacted revision of a religious sacrament, and a giant carve-out from the time-honored priest-penitent privilege, both of which predate statehood and America's founding by several centuries.

## BACKGROUND

The Sacrament of Confession and the other six sacraments—baptism, confirmation, Eucharist, anointing of the sick, holy orders, and matrimony—play a central, foundational role in the Catholic faith and comprise the "whole liturgical life of the Church." *Catechism of the Catholic Church* ¶ 1113 (2d ed.), https://t.ly/-JdS7. Instituted by Jesus Christ himself, the sacraments "manifest and communicate to men . . . the mystery of communion with the God who is love, One in three persons." *Id.* ¶ 1118. The Roman Catholic Church has long affirmed that the sacraments are far more than mere symbols of God's grace; they "bear fruit in those who receive them with the required dispositions" and "are *necessary for salvation*." *Id.* ¶¶ 1129, 1131. Through the sacraments, the faithful receive "the grace of the Holy Spirit, given by Christ," so that they may be "faithful partakers in the divine nature" and united "in a living union with the only Son, the Savior." *Id.* ¶ 1129.

*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page 3

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

The Sacrament of Confession—also known as Penance or Reconciliation—carries out the Church's central mission of reuniting its congregants with Christ by allowing the faithful to repent and be forgiven by God of grievous sins that sever their communion with God and the Church. *Catechism*, *supra*, ¶¶ 1423–24. That forgiveness is administered through a priest, who works "*in persona Christi*" (in the person of Christ) to hear the confessions of contrite sinners and absolve them of their sins. During the sacrament, a contrite sinner privately confesses his or her sins to a priest, repents of those sins, and receives absolution from God through the priest—but only after promising "to sin no more and to avoid the near occasions of sin." USCCB, *Act of Contrition* (from the Order of Penance, nos. 45 and 92), https://t.ly/QB3tG.

While the ultimate authority to forgive sins rests with God, Jesus entrusted to His apostles the authority to forgive sins in His name when, following His resurrection, He "breathed on them and said to them, 'Receive the holy Spirit. Whose sins you forgive are forgiven them, and whose sins you retain are retained.'" *John* 20:21–23 (New American Bible, Revised Edition). In doing so, "Christ instituted the sacrament of Penance for all sinful members of his Church: above all for those who, since Baptism, have fallen into grave sin, and have thus lost their baptismal grace." *Catechism*, *supra*, ¶ 1446. Since the Sacrament of Confession was included in the first comprehensive codification in 1917 of the law of the Church, it has remained largely unchanged—a steadfast refuge for those seeking to redeem their souls and restore their unity with God. *See Codex Iuris Canonici* (*Code of Canon Law*), 1917 CIC cc.870–91.

"As was [Jesus's] intention from the beginning, He confers the same transmissible power to the apostles and also upon their successors"—the bishops—to "continue their work as announcers of the gospel and as ministers of the redemptive work of Christ." Pope Saint John Paul II, *Reconciliatio et Paenitentia* ¶ 29 (Feb. 12, 1984), https://t.ly/REDdq; *accord Codex Iuris Canonici* (*Code of Canon Law*), 1983 CIC c.375, § 1 ("Bishops . . . by divine institution succeed to the place of the Apostles through the Holy Spirit who has been given to them"), https://t.ly/leBAY. That understanding accords with the Church's longstanding view that She and Her members, "though many, are one body in

*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page 4

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856


Christ." *Romans* 12:4–5. Bishops carry the responsibilities entrusted to them by the successor to Saint Peter—the Apostle and first Pope to whom Jesus said, "you are Peter, and upon this rock I will build my church." *Matthew* 16:18.

"Since ancient times the bishop, visible head of a particular Church, has . . . rightfully been considered to be the one who principally has the power and ministry of reconciliation." *Catechism*, *supra*, ¶ 1462. As "moderators of the penitential discipline," bishops oversee the administration of confession within their respective dioceses. Pope Saint Paul VI, *Lumen Gentium: Dogmatic Constitution of the Church* ¶ 26 (Nov. 21, 1964), https://t.ly/_8dNt. They entrust priests with their shared mission to "fulfill[] the ministry of the Good Shepherd who seeks the lost sheep, of the Good Samaritan who binds up wounds, of the Father who awaits the prodigal son and welcomes him on his return, and of the just and impartial judge whose judgment is both just and merciful." *Catechism*, *supra*, ¶¶ 1461, 1465; *accord* 1983 CIC c.978, § 1 ("In hearing confessions the priest is to remember that he is equally a judge and a physician and has been established by God as a minister of divine justice and mercy, so that he has regard for the divine honor and the salvation of souls.").

This delegation of authority is not without limits—the ability to hear confessions may be granted to those found by a bishop "to be suitable through an examination or whose suitability is otherwise evident." 1983 CIC c.970; *see also id.* c.969, § 1 ("The [diocesan bishop] alone" may confer "the faculty to hear the confessions of any of the faithful"). Only those to whom bishops give the ability to hear confessions (confessors) may "forgive all sins 'in the name of the Father, and of the Son, and of the Holy Spirit,'" *Catechism*, *supra*, ¶ 1461; *see also* Cardinal Mauro Piacenza et al., *Note of the Apostolic Penitentiary on the Importance of the Internal Forum and the Inviolability of the Sacramental Seal* (June 21, 2019), https://t.ly/NGROS.

Bishops also entrust priests to uphold the integrity of the Sacrament of Confession in all respects—including by not breaking or violating "the sacramental seal of confession." Anthony Cardinal Bevilacqua, *Confidentiality Obligation of Clergy from the Perspective of Roman Catholic Priests*, 29 Loy. L.A. L. Rev. 1733, 1734 (1996); *see also* 1983 CIC c.392, § 2 (bishops must "exercise


*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page 5

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

vigilance so that abuses do not creep into . . . the celebration of the sacraments"). The sacramental seal binds confessors to "keep absolute secrecy regarding the sins that his penitents have confessed to him" and to "make no use of knowledge that confession gives him about penitents' lives." *Catechism*, *supra*, ¶ 1467. "The sacramental seal is inviolable," meaning "it is absolutely forbidden for a confessor to betray in any way a penitent in words or *in any manner* and *for any reason*." 1983 CIC c.983, § 1 (emphases added). Confessors are also "prohibited completely from using knowledge acquired from confession to the detriment of the penitent." *Id.* c.984, § 1. The seal of confession has been recognized throughout the Catholic Church's history—for example, by Pope Saint Leo I in the fifth century and in Gratian's original compilation of the laws of the Church in the twelfth century—and was codified into canon law in 1215 by the Fourth Lateran Council (well before America's founding). *See* Pls.' Compl. ¶ 54; Bevilacqua, *supra*, 1734 n.4. The seal is currently codified in Canon 983 of the *Codex Iuris Canonici* (Code of Canon Law), 1983 CIC c.983, § 1, which is "the principal legislative document of the Church." Pope Saint John Paul II, *Sacrae Disciplinae Leges* (Jan. 25, 1983), https://t.ly/w7JyA. The Code of Canon Law is an "indispensable instrument to ensure order . . . in the Church's activity" and contains "the fundamental elements of the hierarchical and organic structure of the Church as willed by her divine Founder, or as based upon apostolic . . . tradition." *Id.*

With "deep historical roots in the theology, canon law, pastoral practice, and tradition of the Church," Bevilacqua, *supra*, 1734, the sacramental seal has long been considered "indispensable." Pope Francis, *Address of His Holiness Pope Francis to Participants at the Course Organized by the Apostolic Penitentiary* (Mar. 29, 2019), https://t.ly/KSeKn. "Although it is not always understood by the modern mentality, [the sacramental seal] is indispensable for the sanctity of the sacrament and for the freedom of conscience of the penitent, who must be certain, at any time, that the sacramental conversation will remain within the secrecy of the confessional." *Id.* "[N]o human power has jurisdiction over it," nor can human power "lay any claim to it." *Id.*; *see also* 1983 CIC c.750, § 2 (teachings of the Church "concerning the doctrine of faith and morals" must be "firmly embraced and retained," and "one who rejects" them "is opposed to the doctrine of the Catholic Church"). Indeed,

*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page 6

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

the "inviolable secrecy of Confession comes directly from the revealed divine right and is rooted in the very nature of the Sacrament, to the point of not admitting any exception in the ecclesial sphere, nor, least of all, in the civil one." Cardinal Piacenza, *supra*. For that reason, "the defence of the sacramental seal by the confessor . . . represents not only an act of dutiful 'allegiance' towards the penitent," but also a "martyrdom" that is "rendered directly to the uniqueness and salvific universality of Christ and the Church." *Id.*

Given the seal's sacrosanctity, violating it carries grave consequences. "A confessor who directly violates the sacramental seal incurs a *latae sententiae* [i.e., automatic] excommunication." 1983 CIC c.1386, § 1. Excommunication cuts one off from full communion with the Church and the sacraments, imperiling one's salvation, and a priest who has been excommunicated is not only forbidden from "celebrating the Sacrifice of the Eucharist and the other sacraments," but also from even "*receiving* the sacraments" himself. *Id.* c.1331, §§ 1–2 (emphasis added). Bishops are required to ensure that all those performing the sacraments within their dioceses have the proper faculties to validly do so. *E.g.*, 1983 CIC c.392, § 2, c.969, § 1.

Just as Jesus entrusted the apostles, the apostles passed down to the bishops the primary responsibility of administering the holy Sacrament of Reconciliation, so that whatever they "bind on earth shall be bound in heaven," and whatever they "loose on earth shall be loosed in heaven." *Matthew* 18:18.

## ARGUMENT

### I. SB 5375 violates the Church's right to self-governance.

Born of "the Religion Clauses" of the First Amendment, the church autonomy doctrine "protect[s] the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). The doctrine is fundamental to a cohesive and enduring relationship between civil courts and religious institutions because it preserves for those institutions "an independence from secular control or manipulation" and the "power to decide for themselves, free from state interference, matters of

*AMICUS CURIAE* BRIEF IN
SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION
No. 3:25-cv-05461-DGE
Page 7

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). Because the "structure of the Church is a matter of faith, not mere administrative convenience," *Catholic Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*, 145 S. Ct. 1583, 1600 (2025) (Thomas, J., concurring), the church autonomy doctrine safeguards from governmental interference the right of Catholic bishops to freely and fully exercise the authority and solemn responsibilities bestowed on them by the Church's Canon Law.

SB 5375 falls squarely within this constitutional prohibition by fundamentally altering the authority of bishops on core matters of faith and doctrine. From the Church's beginnings two millennia ago, bishops have exercised the authority to regulate the administration of the sacraments within their dioceses, 1983 CIC c.392, § 2, including the Sacrament of Confession, *id.* c.969, § 1, c.974, § 2. This authority includes determining which priests are "suitable" to hear confessions, *id.* c.969, § 1, c.970, and "exercis[ing] vigilance so that abuses do not creep into . . . the celebration of the sacraments," *id.* c.392 § 2. But now, through its new law, the State of Washington purports to override that episcopal authority by imposing a new qualification for suitable confessors—that they be willing to break the sacramental seal in circumstances prescribed by SB 5375. By imposing criminal and civil penalties for failing to comply with SB 5375, the State effectively exerts some measure of control, as a practical matter, over which priests may hear confessions and which may not. *See* RCW §§ 26.44.080, 9A.20.021(c)(2) (authorizing incarceration of up to 364 days in jail or a fine of up to $5,000 for each violation, or both); *see also Beggs v. State*, 247 P.3d 421, 425 (Wash. 2011) (holding that Washington's mandatory reporting law has an implied civil remedy).

Worse, SB 5375 demands that the Catholic Church administer one of its core sacraments in clear violation of its theology and the requirements of Canon Law. The sacramental seal is not incidental to the Sacrament of Confession, but "indispensable for the sanctity of the sacrament and for the freedom of conscience of the penitent," *Address of His Holiness Pope Francis*, *supra*. It "is rooted in the very nature of the Sacrament," such that it cannot be changed without changing the Sacrament altogether. Cardinal Piacenza, *supra*. That is why it admits of no "exception[s] in the ecclesial sphere,

*AMICUS CURIAE* BRIEF IN
SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION
No. 3:25-cv-05461-DGE
Page 8

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

nor, least of all, in the civil one." *Id.* And it is why Canon Law protects the sacramental seal with the most severe form of canonical punishment—automatic excommunication. 1983 CIC c.1386, § 1.

Such interference by the State of Washington has no place in our constitutional design. The Constitution provides religious institutions, like the Catholic Church, with "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe*, 591 U.S. at 747. The changes in the teachings, doctrine, and governance of the Church wrought by SB 5375—including the bishops' regulation of the administration of the sacraments within their dioceses and the Church's provision of the Sacrament of Confession to the Catholic faithful in Washington—fall squarely within these recognized categories. *See id.* "Legislation that regulates" these matters—such as SB 5375—is anathema to the Constitution's promises of free exercise and freedom from government-established religion. *Kedroff*, 344 U.S. at 107; *see also Our Lady of Guadalupe*, 591 U.S. at 746.

The State Defendants' insistence (at 22–23) that the law doesn't implicate church governance is directly refuted by the very cases they say are distinguishable: By forcing priests to break the sacramental seal or face criminal and civil penalties, the State arrogates to itself the authority to alter or regulate the administration of the Sacrament of Confession and to change its core features. Even under the State Defendants' description of the church autonomy doctrine—explaining that it "is based on the principle that churches must be able to make internal management decisions 'essential to' their 'central mission'"—the law gives rise to textbook interference with religion. State Defendants' Response to PI Mot. 23 (quoting *Our Lady of Guadalupe*, 591 U.S. at 746); *see also Hosanna-Tabor*, 565 U.S. at 189–90.

SB 5375 both purports to fundamentally alter how and by whom a core sacrament of the Catholic faith is administered, and also directly intrudes upon the "relationship between an organized church and its ministers"—a vital component of Christ's Mystical Body on Earth. *See McClure v. Salvation Army*, 460 F.2d 553, 559 (5th Cir. 1972); *see also* 1 *Corinthians* 12:27 ("Now you are Christ's body, and individually parts of it."). Because SB 5375 violates centuries of precedent protecting

*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page 9

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

religious institutions such as the Catholic Church from such governmental interference, it should be declared unconstitutional and its enforcement enjoined.

**II.     SB 5375 will have devastating impacts on the free exercise of religion by Catholics throughout the State of Washington.**

As Plaintiffs explain, SB 5375 substantially burdens the free exercise of religion by Catholic clergy and laity throughout the State of Washington.  "Members of the clergy" (S.B. 5375, § 2(1)) will be presented with an impossible choice:   changing their faith to abide by SB 5375's demands, administering a new sacrament contrary to their faith, and facing automatic excommunication and the risk of eternal damnation*, or* staying true to a faith and to sacraments that long predate statehood and America's founding and risking incarceration in jail, as well as other criminal and civil liability.  *See* Pls.' PI Mot. 11–12.  Either result—which will deprive priests of their constitutional rights—would also be catastrophic for parishioners, who will be left with fewer clergy to administer the Sacrament of Confession to them and deprived of their rights under the Constitution.  Parishioners will also face another obstacle:  the fear that their priest will break the seal of the confessional, chilling their access to sacraments necessary for their salvation.  Neither result is tolerable as a matter of faith or constitutional law.

The Supreme Court has left no doubt that the First and Fourteenth Amendments protect religious institutions not only from outright prohibitions on the free exercise of religion, but also from substantial burdens on religion and religious practices imposed through laws or policies targeted at religion.  *See Kennedy v. Bremerton School Dist.*, 597 U.S. 507, 524–25 (2022).  It is just as constitutionally infirm for a law to make a "sincere religious practice" significantly more difficult to engage in as it is for a law to ban the religious practice outright.  *See id.* at 525; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 543–46 (1993).  By ensuring that fewer priests may validly administer the Church's sacraments, SB 5375 does just that—and on a much larger scale than the State Defendants admit.

*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page 10

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

SB 5375 will have the deleterious effect of discouraging Catholics from taking part in the Sacrament of Confession altogether. *See* Cardinal Bevilacqua, *supra*, at 1736. "An obvious purpose of the sacramental seal is the good of the penitent," because there is "an implicit contract of silence between confessor and penitent not to expose the reputation of the penitent to detraction." *Id.* "Were the Sacrament rendered difficult or odious to the faithful they would be deterred from approaching it, thereby undermining the Sacrament itself to the great spiritual harm of the faithful, as well as to the entire Church." *Id.* Thus, as one of the earliest religious liberty cases in the country recognized, "[s]ecrecy is of the essence of penance. The sinner will not confess, nor will the priest receive his confession, if the veil of secrecy is removed." *People v. Phillips*, N.Y. Ct. Gen. Sess. (1813), *as reprinted in Privileged Communications to Clergymen*, 1 Catholic Lawyer 199, 207 (1955). It did not matter that the government may have "had a legitimate need" for the testimony because "that need did not outweigh the interference with the relationship between priests and penitents in the Roman Catholic Church" that would occur if the priest was forced to violate the confidentiality of confession. Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1411–12 (1990).

The Ninth Circuit has recognized as much. In *Mockaitis v. Harcleroad*, 104 F.3d 1522 (9th Cir. 1997), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court of Appeals explained that the sacramental seal is vital to the Sacrament of Confession itself, because "the knowledge, belief, or suspicion that freely-confessed sins would become public would operate as a serious deterrent to participation in the sacrament and an odious detriment accompanying participation." *Id.* at 1530. By "decid[ing] that the [priest] shall promulgate what he receives in confession," SB 5375 effectively "declare[s] that there shall be no penance; and this important branch of the Roman catholic religion would be thus annihilated." *Id.* at 1532.

Yet enforcement of SB 5375 will have this soul-crushing effect. That is because it is not just "members of the clergy" (S.B. 5375, § 2(1)) who face a Hobson's choice here (excommunication or jail). Parishioners face a similarly impossible dilemma. Because Jesus told *everyone*—from murderers

*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page 11

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

to those "angry with [a] brother"—that they "will be liable to judgment," *Matthew* 5:21-22, the circumstances that move people to confess their sins are many. Penitents will be forced to think twice before communicating their sins fully and freely in the confessional, given SB 5375's broad scope and vague parameters.

For instance, SB 5375's newly imposed duty on priests to report, without exception, neglect could encompass reporting anything from "sudden changes in [a child's] behavior or school performance," "learning problems (or difficulty concentrating) that cannot be attributed to specific physical or physiological causes," and even "com[ing] to school or other activities early [or] stay[ing] late." Washington State Department of Social and Health Services, *A Guide for Recognizing & Reporting Child Abuse & Neglect* 3 (Revised April 2018), https://t.ly/Oug_T. So children's caretakers must now decide whether partaking in the Sacrament of Confession—and encouraging their children to do likewise—is worth the risk of the State's investigatory and prosecutorial arms reaching into the confessional and the home and forcing the disclosure of matters bearing on their conscience that they have confessed to God, through priests acting *in persona Christi*. Such a risk may chill many from practicing their religion freely by confessing their sins fully and freely, and seeking absolution, healing, and guidance from God and his ministers here on Earth.

SB 5375 will also make the Sacrament difficult to obtain by limiting the already dwindling number of priests who can validly administer it. The United States (like many other countries) faces a well-documented and growing shortage of priests. Between 2000 and 2024, the total number of priests decreased by 26%, while the number of parishes without a resident priest has increased by 22%. *See* Center for Applied Research in the Apostolate, *Frequently Requested Church Statistics*, https://t.ly/mbNjb (last accessed July 16, 2025). The shortage has forced parishes in western Washington, in particular, to consolidate from 136 to 60 "parish families." Sophia Gates, *Whatcom Catholics Adjust to Church Consolidation as Priests, Parishioners Decline*, Cascadia Daily News (Mar. 17, 2025), https://t.ly/1-sD7. Regrettably, the Catholic faithful in more rural or remote parts of Washington State will bear the brunt of SB 5375's devastating effects. Rural or remote parishes cannot

*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page 12

The Helsdon Law Firm, PLLC
12419 6th Ave. Ct. NW
Gig Harbor, WA 98332
(253)564-1856

combine as easily with other parishes as urban parishes can, and even then, such combinations are only a stopgap or band-aid measure that makes it more burdensome on congregants to practice their faith and receive the sacraments. And rural Catholics' access to the Sacrament of Confession, as well as the other six sacraments, including the Eucharist and baptism, will only dwindle more, if SB 5375 is allowed to go into effect.

Thus, whether by stripping the Sacrament of Confession of its essential, centuries-old attributes or by making it more difficult to validly receive, SB 5375 will have outsized adverse impacts on the free exercise of religion by Catholics (laity and clergy) and others throughout the State of Washington. Because those dire consequences can only be avoided by ensuring that the law does not go into effect, the Court should grant Plaintiffs' motion in full, declare SB 5375 unconstitutional, and enjoin the enforcement of SB 5375.

## CONCLUSION

SB 5375 interferes with Catholic bishops' ability to regulate and ensure the proper administration of the sacraments to the Catholic faithful entrusted to their care, forces the Catholic Church to administer its centuries-old Sacrament of Confession in violation of its theology and Canon Law, and will devastate the free exercise of religion by Catholics and others throughout the State of Washington. This Court should grant Plaintiffs' motion for injunctive relief in full and enjoin the State from enforcing this blatantly unconstitutional mandate.

Dated: July 16, 2025                                                Respectfully submitted,

*/s/ Jeffrey Paul Helsdon*
Jeffrey Paul Helsdon, WSBA# 17479
THE HELSDON LAW FIRM, PLLC
12419 6th Ave. Ct. NW
Gig Harbor, WA 98332
(253) 564-1856
jhelsdon@thehelsdonlawfirm.com

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page 13

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

Julian W. Poon (admitted *pro hac vice*)
Varant Anmahouni (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
jpoon@gibsondunn.com

Cristina M. Squiers (admitted *pro hac vice*)
Jessica Lee (admitted *pro hac vice*)
Jaime Barrios (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 75201

Aly Cox (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036

*Counsel for Amicus Curiae United States Conference of Catholic Bishops*

*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page 14

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856

# CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to those attorneys of record registered on the CM/ECF system.

Executed on July 16, 2025.

                                              */s Jeffrey Paul Helsdon*
                                              Jeffrey Paul Helsdon, WSBA# 17479

*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
No. 3:25-cv-05461-DGE
Page 15

THE HELSDON LAW FIRM, PLLC
12419 6TH AVE. CT. NW
GIG HARBOR, WA 98332
(253)564-1856