1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

11      PAUL D. ETIENNE et al.,                    CASE NO. 3:25-cv-05461-DGE

                          Plaintiffs,             ORDER ON MOTION FOR
12                                                PRELIMINARY INJUNCTION
              v.                                  (DKT. NO. 65)
13      ROBERT W. FERGUSON et al.,

14                          Defendants.

15

16

17          At present, Washington clergy who learn of child abuse or neglect while acting within

18   their official supervisory capacity are required to report such abuse to public authorities.  Wash.

19   Rev. Code. § 26.44.030(1)(b).  Only information obtained "as a result of a privileged

20   communication" is exempted from this mandatory reporting requirement.  *Id*.  Effective July 27,

21   2025, however, Washington law will require clergy to report child abuse or neglect regardless of

22   how they learn about such information.  *See* SB 5375, 2025 Wash. Sess. Laws ch. 197, § 2.

23          Plaintiffs are Roman Catholic clergy.  (Dkt. No. 1 at 5.)  Three Plaintiffs—Paul D.

24   Etienne, the Roman Catholic Archbishop of Seattle, Joseph J. Tyson, the Roman Catholic Bishop

of Yakima, and Thomas A. Daly, the Roman Catholic Bishop of Spokane—lead the dioceses which, when combined, cover the entire state of Washington. They ask the Court to enter a preliminary injunction preventing SB 5375 from going into effect to the extent it applies to information learned by Roman Catholic priests through the Sacrament of Confession. (Dkt. No. 65 at 30.) Plaintiffs argue that SB 5375 violates the Free Exercise and Establishment Clauses of First Amendment of the United States Constitution because the law eliminates the privilege communication exception *as to clergy* but maintains it for others and does not establish a general mandatory reporting requirement. (*Id*. at 65.)

The Court concludes Plaintiffs are likely to succeed on the merits of their Free Exercise Clause challenge and otherwise meet the requirements for the issuance of a preliminary injunction. Accordingly, Plaintiffs' motion for a preliminary injunction (Dkt. No. 65) is GRANTED. The Court does not reach Plaintiff's Church Autonomy Doctrine and Establishment Clause claims at this juncture.

# I    BACKGROUND

## A.    Reporting Law

Washington law provides a framework for reporting child abuse and neglect cases to the appropriate public authorities and directs that, after receiving a report, "protective services shall be made available in an effort to prevent further abuses, and to safeguard the general welfare of such children." Wash. Rev. Code § 26.44.010. It also requires certain professionals,[1] when they

---

[1] These individuals include: "any practitioner, county coroner or medical examiner, law enforcement officer, professional school personnel, registered or licensed nurse, social service counselor, psychologist, pharmacist, employee of the department of children, youth, and families, licensed or certified child care providers or their employees, employee of the department of social and health services, juvenile probation officer, placement and liaison specialist, responsible living skills program staff, HOPE center staff, state family and children's

have reasonable cause to believe a child has suffered abuse or neglect, to file a report with law

enforcement or the Department of Children, Youth, and Families ("the Department").  Wash.

Rev. Code § 26.44.030(1)(a).  Any other person who has reasonable cause to believe that a child

has suffered abuse or neglect *may* report such an incident but is not required to do so.  Wash.

Rev. Code § 26.44.030(3).  Additionally, any person acting "in his or her official supervisory

capacity with a nonprofit or for-profit organization, [who] has reasonable cause to believe that a

child has suffered abuse or neglect caused by a person over whom he or she regularly exercises

supervisory authority" must report the abuse.  Wash. Rev. Code § 26.44.030(1)(b).  However,

the individuals subject to mandatory reporting under § (1)(b) who do not fall under the umbrella

of § (1)(a) need not file a report if they learned about the abuse through a privileged

communication recognized by Washington Revised Code § 5.60.060.  *Id*.

Persons who are required to report under § 26.44.030 but fail to do so are guilty of a

gross misdemeanor.  Wash. Rev. Code § 26.44.080.  In Washington, a gross misdemeanor is

punishable by a maximum of 364 days in county jail and a fine of up to $5,000.  Wash. Rev.

Code § 9A.20.021(c)(2).  Those who fail to report may also be subject to civil liability.  *See*

*Evans v. Tacoma Sch. Dist. No. 10*, 380 P.3d 553, 562 (Wash. Ct. App. 2016) ("Because [Wash.

Rev. Code §] 26.44.030 imposes a duty to report suspected child abuse for certain professionals,

chapter 26.44 [Wash. Rev. Code] supports an implied cause of action against a professional for

the failure to fulfill that duty.").

---

ombuds or any volunteer in the Ombud's office, or host home program[.]"  Wash. Rev. Code §
26.44.030(1)(a).

Plaintiffs are currently subject to the reporting requirements of § (1)(b) but not § (1)(a).[2] Accordingly, they are not required to report possible abuse if it was learned through "any confession or sacred confidence made to him or her in his or her professional character, in the course of discipline enjoined by the church to which he or she belongs." Wash. Rev. Code § 5.60.060(3). Effective July 27, 2025, SB 5375 adds clergy[3] to the list of mandatory reporters under § 26.44.030(1)(a) and, at the same time, redundantly includes language *removing* clergy from the privileged communication exception in § 26.44.030(1)(b).

**B.    Plaintiffs and the Sacrament of Confession**

The Catholic Church views Confession as "both an act of mercy and an act of Church discipline where the priest acts in persona Christi (in the person of Christ)." (Dkt. No. 75 at 5.) A priest hearing confession must "impose salutary and suitable penances in accord with the quality and number of sins, taking into account the condition of the penitent," and a penitent is "obliged to fulfill" this penance. (*Id.*) A penitent's confession is protected by the sacramental seal, which "absolutely forbids" a priest from "betraying in any way a penitent in words or in any manner and for any reason." (*Id.* at 6.) The sacramental seal prevents a priest from speaking of the content of the confession to the penitent himself outside of the sacrament. (*Id.*) The seal even binds the priest to the point that he is "forbidden to remember voluntarily the confession

---

[2] Counsel for Defendants Robert Ferguson and Nicholas Brown confirmed this interpretation at the hearing held on July 14, 2025.

[3] The law defines a "'[m]ember of the clergy' as: any regularly licensed, accredited, or ordained minister, priest, rabbi, imam, elder, or similarly situated religious or spiritual leader of any church, religious denomination, religious body, spiritual community, or sect, or person performing official duties that are recognized as the duties of a member of the clergy under the discipline, tenets, doctrine, or custom of the person's church, religious denomination, religious body, spiritual community, or sect, whether acting in an individual capacity or as an employee, agent, or official of any public or private organization or institution." SB 5375, 2025 Wash. Sess. Laws ch. 197, § 1.

and he is obliged to suppress any involuntary recollection of it." (*Id.*)  The Church views the sacramental seal as so inviolable that, once the sacrament has been celebrated, not even the penitent may relieve the priest of the obligation of secrecy.  (*Id.*)  Any priest who directly violates the sacramental seal is subject to automatic excommunication and risks eternal damnation.  (*Id.* at 6–7.)  Priests are required to defend the sacramental seal, if necessary, "through the shedding of blood."  (*Id.* at 6.)

Thus, to Plaintiffs, breaching the seal of Confession entails automatic excommunication and the risk of eternal damnation.  Accordingly, they will not comply with SB 5375 to the extent that it conflicts with Church teachings on the Sacrament of Confession—even if such non-compliance results in civil or criminal penalties.  (Dkt. Nos. 67; 68; 69; 70; 71; 72; 73; 74; 75; 76; 77.)  Additionally, Plaintiffs believe that SB 5375 will induce the faithful in their archdioceses to "not seek the Sacrament of Confession," which would "interfere with [their] pastoral duties" and impede the mission of the Church to "reconcile sinners to God and His Church and save souls." (Dkt. No. 75 at 8.)

### C.     Procedural History

Plaintiffs filed a complaint on May 29, 2025.  (Dkt. No. 1.)  They assert nine causes of action under the First and Fourteenth Amendments to the United States Constitution and Article I, Section 11 of the Washington Constitution.  (*Id.* at 32–43.)  On June 5, 2025, Plaintiffs filed a motion for a preliminary injunction to enjoin Defendants from enforcing SB 5375 at it pertains to the Sacrament of Confession.  (Dkt. No. 65.)  The motion is based on their Free Exercise claim (First Cause of Action), First Amendment Church Autonomy Doctrine claim (Fourth Cause of Action), and First Amendment Establishment Clause claim (Sixth Cause of Action).  (*Id.*)

1

## II    JUSTICIABILITY

2

### A.    Standing and Ripeness

3       Article III of the Constitution empowers the federal courts to decide only "live cases or

4  controversies"; a court may not "issue advisory opinions [or] declare rights in hypothetical

5  cases." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000).

6  "From this bedrock constitutional principle, two related justiciability doctrines flow": standing

7  and ripeness. *Nat'l Shooting Sports Found. v. Bonta*, 718 F. Supp. 3d 1244, 1249 (S.D. Cal.

8  2024).  To establish standing, a plaintiff must show he suffered an injury in fact that is fairly

9  traceable to the challenged conduct of the defendant and likely redressable by a favorable

10 decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992).  In the context of

11 injuries that have not happened yet, a plaintiff must show the injury is "actual or imminent, not

12 conjectural or hypothetical." *Id.* at 560.  Relatedly, ripeness is a justiciability doctrine that asks

13 "whether the case presents a *live* case or controversy." *Clark v. City of Seattle*, 899 F.3d 802,

14 808 (9th Cir. 2018) (emphasis added).  It is derived from both Article III limitations on judicial

15 power and prudential considerations about premature adjudication of hypothetical disputes.

16 *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1151, 1153 (9th Cir. 2017) ("A proper

17 ripeness inquiry contains a constitutional and a prudential component"); *Thomas,* 220 F.3d at

18 1138.  "For a case to be ripe, it must present issues that are 'definite and concrete, not

19 hypothetical or abstract.'" *Bishop Paiute Tribe*, 863 F.3d at 1153 (quoting *Thomas*, 220 F.3d at

20 1139).

21       "Pre-enforcement injury is a special subset of injury-in-fact," where "the injury is the

22 anticipated enforcement of the challenged statute in the future." *Peace Ranch, LLC v. Bonta*, 93

23 F.4th 482, 487 (9th Cir. 2024).  In this context, the Supreme Court has long held that "it is not

24

necessary [for a plaintiff to] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Instead, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Driehaus*, 573 U.S. at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *see also Peace Ranch,* 93 F.4th at 487.[4] A "state's refusal to disavow enforcement . . . is strong evidence that [the plaintiff] face[s] a credible threat." *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021). The constitutional component of the ripeness inquiry often "coincides squarely with standing's injury in fact prong" in the context of pre-enforcement litigation because ripeness is "primarily temporal in scope." *Thomas*, 220 F.3d at 1138. For this reason, the Ninth Circuit has considered constitutional ripeness and injury-in-fact together. *See, e.g., Clark,* 899 F.3d at 809; *Thomas*, 220 F.3d at 1139; *Bishop Paiute Tribe*, 863 F.3d at 1153.

As for prudential ripeness, courts assess "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Wolfson v. Brammer*, 616 F.3d 1045, 1058, 1060 (9th Cir. 2010). "A claim is fit for decision if the issues raised are primarily

---

[4] In *Peace Ranch*, the Ninth Circuit analyzed pre-enforcement standing using the *Driehaus* factors but acknowledged that it has "toggled between" the *Driehaus* formulation and a slightly different framework requiring a "genuine threat of imminent prosecution." *Clark*, 899 F.3d, at 813. In *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, the Ninth Circuit further explained: "Though our circuit has toggled between the *Thomas* and *Driehaus* formulations, we have adopt[ed] the Supreme Court's framework in *Driehaus*." 122 F.4th 825, 836 (9th Cir. 2024) (internal citations and quotations omitted). As the Ninth Circuit has relied on *Driehaus* in its more recent opinions and the Parties believe the outcome is the same under either formulation, the Court relies primarily on the *Driehaus* standard here. *See also Palsgaard v. Christian*, No. 1:23-CV-01228-KES-CDB, 2025 WL 318716, at *7–*8 (E.D. Cal. Jan. 28, 2025) (discussing the tests and applying the *Driehaus* version).

1  legal, do not require further factual development, and the challenged action is final." *US West*

2  *Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999). "To meet the hardship

3  requirement, a litigant must show that withholding review would result in direct and immediate

4  hardship." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (internal quotation

5  marks omitted). In evaluating hardship, courts "consider whether the regulation requires an

6  immediate and significant change in plaintiffs' conduct of their affairs with serious penalties

7  attached to noncompliance." *Id.*

8      **B.    Discussion**

9      Defendants[5] argue that Plaintiffs lack standing and their claims are not ripe because "they

10  cannot show any genuine threat of imminent prosecution" based on "reporting . . . information

11  learned via confession." (Dkt. No. 175 at 12.) "Plaintiffs simply allege that they take

12  confession, plan to continue to do so, and . . . are willing to face penalties for noncompliance

13  with SB 5375," Defendants state. (*Id.*) This is not sufficiently specific, Defendants claim, to

14  properly plead intent to engage in a course of conduct that violates the law. (*Id.* at 12–13.)

15  Plaintiffs respond "it would be perverse" to require Plaintiffs to establish standing by describing

16  when and where they will refuse to disclose information in confession, as this would also violate

17  the sacramental seal. (Dkt. No. 192 at 8.) Defendants further suggest "[t]he mere existence of

18  penalties under [this] statute does not suffice [to create standing] where there is no specific threat

19  of enforcement against the plaintiff[s]." (*Id.* at 13.) Defendants do not, however, disavow their

20  intent to enforce the statute.[6] Plaintiffs respond "[i]t is difficult to imagine a more imminent

---

[5] The Defendants opposing the present motion for preliminary injunction are Defendants
Ferguson and Brown. The remaining defendants agreed not to oppose Plaintiffs' request for
injunctive relief during this litigation or on appeal. All claims against the remaining defendants
have been stayed. (*See* Dkt. No. 224.)

[6] The State of Washington confirmed this at the hearing held on July 14, 2025.

ORDER ON MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 65) - 8

threat to the Sacrament of Confession than SB 5375, which added only members of the clergy to the list of mandatory reporters and consciously intruded upon the sacramental seal." (Dkt. No. 192 at 9.)

1. Standing and Constitutional Ripeness

To establish standing, *Driehaus* first requires each Plaintiff to show "an intention to engage in a course of conduct" that is "arguably proscribed by statute" and "arguably affected with a constitutional interest." *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 59 (9th Cir. 2024) (*quoting* Driehaus, 573 U.S. at 161–162). As clergy who have declared their intention to adhere to the Catholic Church's prohibition on disclosing information gained in confession, Plaintiffs' actions are "plainly affected with First Amendment interests." *Id*. (citing *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020)). The real question is whether Plaintiffs have alleged, "with some degree of concrete detail," that they intend to engage in conduct proscribed by SB 5375. *Unified Data Servs., LLC v. Fed. Trade Comm'n*, 39 F.4th 1200, 1210 (9th Cir. 2022).

In past cases, the Ninth Circuit has emphasized that the intent to engage in proscribed conduct must rise above vaguely described "someday intentions." *Thomas*, 220 F.3d at 1139 (*San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996)); *see also Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010). Defendants make much of this language, (Dkt. No. 175 at 12), but it does not represent an inflexible requirement that all plaintiffs specifically explain when and how they plan to violate a law in order to achieve pre-enforcement standing. Indeed, "'[a] plaintiff need not plan to break the law' to show an 'intention to engage in a course of conduct' under *Driehaus*." *Planned Parenthood Great Nw,* 122 F.4th at 837

1    (quoting *Peace Ranch*, 93 F.4th at 488).  Instead, the court "must ask whether the plaintiff would

2    have the intention to engage in the proscribed conduct, were it not proscribed."  *Id.*

3        Here, Plaintiffs have "articulated a concrete intention" to engage in proscribed conduct

4    because they have affirmed that they will *continue* to hear confessions and will *continue* to

5    refuse to report such information after SB 5375 goes into effect.  *Project Veritas v. Schmidt*, 125

6    F.4th 929, 942 (9th Cir. 2025).  In factually distinguishable cases, courts have required further

7    specifics resembling the "when and where" because it was otherwise impossible to discern

8    whether the plaintiffs actually intended to engage in the proscribed conduct at all.  *See, e.g,*

9    *Lopez*, 630 F.3d at 792 ("[Plaintiff] has not proposed an interpretation of the policy that would

10   arguably apply to his intended speech and has not given any details about what he intends to say.

11   Therefore, he has failed to prove his intent to violate the policy."); *Thomas*, 220 F.3d at 1139

12   (plaintiff landlords "[could not] say when, to whom, where, or under what circumstances they

13   [would] refuse to" violate the law and accordingly failed to establish intent to violate the law);

14   *Unified Data Servs., LLC.*, 39 F.4th at 1211 (complaint "failed to state to what extent [p]laintiffs

15   currently use soundboard technology, to what extent they use it in connection with charitable

16   activity, and whether they plan to use it in the future" and therefore plaintiffs failed to establish

17   intent to violate law involving use of the technology).  Here, Plaintiffs attest that their job and

18   faith *require them* to engage in actions that violate the statute.  *C.f. Seattle Pac. Univ. v.*

19   *Ferguson*, 104 F.4th 50 (9th Cir. 2024) ("[plaintiff] has evidenced a sufficient intention to

20   *continue* its employment practices") (emphasis added).  It is not Plaintiffs' actions that will

21   change, but the law itself.  And there is no dispute that the law proscribes Plaintiff's intended

22   future conduct: continued refusal to report any information, including information about child

23   abuse or neglect, learned during confession.

24

Moreover, as Catholic priests are "absolutely forbid[den]" from "betraying in any way a penitent in words or in any manner and for any reason," Plaintiffs cannot feasibly provide the Court with more specific information—nor do they need to do so.  (Dkt. No. 75 at 6.)  At bottom, courts may not "speculate" about the kinds of actions plaintiffs might take to engage in proscribed conduct or violate the statute in question.  *Lopez,* 630 F.3d at 787.  But here, Plaintiffs have adequately shown concrete intent: no speculation is required.

Second, Plaintiffs must demonstrate a "substantial threat" of enforcement.  *Driehaus*, 573 U.S. at 164.  "This final prong often rises or falls with the enforcing authority's willingness to disavow enforcement." *Peace Ranch,* 93 F.4th at 487.  As the Ninth Circuit put it in *Matsumoto v. Labrador*, "[i]n challenging a new law whose history of enforcement is negligible or nonexistent, either a 'general warning of enforcement' or a 'failure to *disavow* enforcement' is sufficient to establish a credible threat of prosecution in pre-enforcement challenges on First Amendment grounds."  122 F.4th 787, 797 (9th Cir. 2024) (quoting *Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022)).  Here, the State of Washington affirmed that it would enforce the law at the hearing held on July 14, 2025.  As the statue is set to go into effect within the month, specifically adds clergy to the list of mandatory reporters under Wash. Rev. Code § 26.44.030(1)(a), *and* removes clergy from the privileged communication exception in § 26.44.030(1)(b), it appears clear there is a "credible threat" of imminent enforcement against Plaintiffs.  *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021).  Accordingly, Plaintiffs have pre-enforcement standing and their claims satisfy the constitutional component of ripeness.[7]

---

[7] Although "overlap between [standing and constitutional ripeness] has led some legal commentators to suggest that the doctrines are often indistinguishable," *Thomas*, 220 F.3d at

1

2. <u>Prudential Ripeness</u>

2

Plaintiffs' claim is also ripe in a prudential sense.  It is undisputed that "the issues raised

3

are primarily legal, do not require further factual development, and the challenged action is

4

final." *US West Commc'ns*, 193 F.3d at 1118.  The Plaintiffs must also show that withholding

5

review would result in direct and immediate hardship.  *Selecky*, 586 F.3d at 1126.  "We consider

6

whether the 'regulation requires an immediate and significant change in the plaintiffs' conduct of

7

their affairs with serious penalties attached to noncompliance." *Id*. (quoting *Ass'n of Am. Med.*

8

*Colls. v. United States*, 217 F.3d 770, 783 (9th Cir. 2000)).  Here, the law forces Plaintiffs to

9

weigh "[t]he penalty of automatic excommunication" against violating the law and facing

10

possible jail time.  (Dkt. No. 75 at 7.)  Thus, "[t]his factor is certainly met, because unless

11

[Plaintiffs] prevail in this litigation, they will suffer the very injury they assert—they will be

12

required to [breach the seal of confession if faced with a confession of child abuse or neglect]

13

over their religious . . . objections." *Selecky*, 586 F.3d at 1126.  Plaintiffs' claims are ripe for

14

review.

15

16

17

1138, legal scholars have also advanced the theory that standing focuses on "the right plaintiffs" whereas ripeness "control[s] the timing of when those plaintiffs may pursue their suit."  Curtis

18

Bradley and Ernest Young, *Standing and Probabilistic Injury*, 122 MICH. L. REV. 1557, 1616 (2024). The Ninth Circuit has also utilized this interpretation: "[w]hile standing is primarily

19

concerned with who is a proper party to litigate a particular matter, ripeness addresses *when* that litigation may occur." *Planned Parenthood Great Nw,* 122 F.4th at 839 (quoting *Lee v. Oregon*,

20

107 F.3d 1382, 1387 (9th Cir. 1997) (emphasis in original).  In this way, standing asks: 1) whether plaintiffs themselves are subject to a challenged action and, 2) if they are, whether they

21

are likely to be harmed. *Id*.  The second part of the standing inquiry—whether and when the harm will cause injury to the proper plaintiffs—can also be formulated in terms of constitutional

22

ripeness. *Planned Parenthood Great Nw,* 122 F.4th at 839; Bradley and Young at 1616. Understood in these terms, Plaintiffs clearly have standing because they are the "right" Plaintiffs;

23

if the alleged harm will happen to anyone, it will be them—priests who take confession. Accordingly, the critical question is whether the harm is arguably imminent, *i.e.*, whether this

24

litigation is ripe.  As discussed *supra*, the Court finds that it is.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### III    LEGAL STANDARD

Governed by Federal Rule of Civil Procedure 65(a), a "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id*. at 20.  "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id*. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)).  In so doing, a court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id*. (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  The Ninth Circuit has adopted a sliding scale test for preliminary injunctions in which "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Thus, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. at 1135 (internal quotations removed).

### IV    FREE EXERCISE CLAIM

Plaintiffs argue that "[a]s applied to the Sacrament of Confession, Senate Bill 5375 impermissibly burdens Plaintiffs' exercise of their sincerely held religious beliefs in violation of the Free Exercise Clause." (Dkt. No. 65 at 17.)  Contrastingly, Defendants suggest the law is a "neutral, generally applicable" statute "subject to rational basis review." (Dkt. No. 175 at 14.)

Recall SB 5375 modifies Washington law in two ways.  First, the law amends Wash. Rev. Code § 26.44.030(1)(a) to add members of the clergy to the list of individuals required to report suspected abuse or neglect with no exception for privileged communication.  Curiously, the law also explicates that "[e]xcept for members of the clergy, no one shall be required to report under this section when he or she obtains the information solely as a result of a privileged communication."  Wash. Rev. Code § 26.44.030(1)(b).  At the hearing on July 13, 2025,[8] the State of Washington confirmed "it is undisputed between the Parties that this language is superfluous," as § 26.44.030(1)(b) does not accomplish "anything additional" that § 26.44.030(1)(a) "already doesn't do."[9]

## A.    Likelihood of Success on the Merits

The Free Exercise Clause, which is applied to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. CONST. AMEND. I.  *See Kennedy v. Bremerton Sch. Dist*., 597 U.S. 507, 524 (2022).  "To avoid strict scrutiny, laws that burden religious exercise must be both neutral and generally applicable."  *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ*., 82 F.4th 664, 683 (9th Cir. 2023).  "Supreme Court authority sets forth three bedrock requirements of the Free Exercise Clause that the government may not transgress, absent a showing that satisfies strict scrutiny."  *Id*.  First, a law is "not neutral and generally applicable, and therefore trigger[s] strict scrutiny . . . [if it] treat[s] *any* comparable secular activity more

---

[8] As of the date of this Order, an official transcript of the hearing has been ordered (*see* Dkt. No. ___) but not yet produced.

[9] The summary of the bill in the senate report is similarly duplicative: "Members of the clergy are mandated reporters of child abuse and neglect. Except for members of the clergy, no one shall be required to report child abuse or neglect when that information is obtained solely as a result of a privileged communication."  (Dkt. No. 66-1 at 4.)

favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (emphasis in original).  Second, "[a] law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021) (internal quotations removed).  "Third, the government may not act in a manner hostile to religious beliefs or inconsistent with the Free Exercise Clause's bar on even subtle departures from neutrality." *Fellowship of Christian Athletes,* 82 F.4th at 686 (internal quotations omitted).

    1.  <u>Senate Bill 5375 Burdens Religious Exercise</u>

       There is no question that SB 5375 burdens Plaintiffs' free exercise of religion.  In situations where Plaintiffs hear confessions related to child abuse or neglect, SB 5375 places them in the position of either complying with the requirements of their faith or violating the law. In this way, the statute "affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972).  The consequences for violating the law are serious and, as Plaintiffs assert, the implications of violating the Sacramental Seal are more serious still.  As Plaintiff Etienne stated, any priest who directly violates the sacramental seal incurs automatic excommunication and thereby risks eternal damnation. (Dkt. No. 75 at 6–7.) *C.f. N. Valley Baptist Church v. McMahon*, 696 F. Supp. 518, 526 (E.D. Cal. 1988), *aff'd*, 893 F.2d 1139 (9th Cir. 1990) ("[T]he record demonstrates that the [statute] presents plaintiffs with a Hobson's choice: in order to lawfully operate . . . they must submit . . . to [] a condition they believe to be sinful.  Literally and figuratively, the plaintiffs are damned if they do and damned if they don't.").  Thus, the key question is whether SB 5375 is neutral and generally applicable.  The Court turns to this inquiry next.

1

      2.  <u>Senate Bill 5375 Is Not Neutral and Generally Applicable</u>

      To determine whether the law treats "*any* comparable secular activity more favorably than religious exercise," the Court must first determine what constitutes comparable secular activity. *Tandon*, 593 U.S. at 62. To find the proper comparator, courts analyze the government interest that justifies the regulation at issue. *Id.* Thus, "[a] law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. As the Sixth Circuit put it in *Monclova Christian Academy v. Toledo Lucas County Health Department*:

> Whether conduct is analogous (or "comparable") for purposes of this rule does not depend on whether the religious and secular conduct involve similar forms of activity. Instead, comparability is measured against the interests the State offers in support of its restrictions on conduct. Specifically, comparability depends on whether the secular conduct "endangers these interests in a similar or greater degree than" the religious conduct does.

984 F.3d 477, 480 (6th Cir. 2020) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993)). Ultimately, "[c]omparability is concerned with the risks various activities pose." *Tandon*, 593 U.S. at 62. Here, the government's proffered interest is in protecting children from abuse. (Dkt. No. 175 at 18.) A comparable secular activity can be defined as non-clergy reporting (or not reporting) information about child abuse.

      SB 5375 modifies existing law solely to make members of the clergy mandatory reporters with respect to child abuse or neglect. SB 5375, 2025 Wash. Sess. Laws ch. 197, § 2. However, other groups of adults who may learn about child abuse are not required to report. Parents and caregivers, for example, are not mandatory reporters. Moreover, the Washington legislature passed Substitute House Bill 1171 ("SHB 1171")—"AN ACT Relating to *exempting attorney higher education employees* from mandated reporting of child abuse and neglect as it relates to information gained in the course of providing legal representation to a client"—around the same

time as it passed SB 5375.  Sub. H.B. 1171, 2025 Wash. Sess. Laws ch. 192, § 2 (emphasis added).  SHB 1171 is also set to go into effect on July 27, 2025.  *Id.*  SHB 1171 amends § 26.44.030(1)(f) to exempt from the statute's reporting requirement attorneys employed by an institution of higher education who have reasonable cause to believe that a child has suffered abuse or neglect when that cause "relates to information related to the representation of a client." *Id.*  It also exempts any employee working under the supervision or direction of such an attorney if the information they learn concerning child abuse or neglect is related to the representation of a client.  *Id.*  The twin passage of SHB 1171 and SB 5375 appears to be a textbook example of "permitting secular conduct that undermines the government's asserted interests in a similar way" to religious conduct that *is* regulated.  *Fulton*, 593 U.S. at 534.  The government interest at issue in both statutes—protecting children from abuse and neglect—is the same.  Nevertheless, one law eliminates the privilege for clergy while the other expands the privileges available to secular professionals.  "The underinclusion is substantial, not inconsequential" here.  *Lukumi*, 508 U.S. at 543.

Thus, SB 5375 is neither neutral nor generally applicable because it treats religious activity less favorably than comparable secular activity.  *Tandon*, 593 U.S. at 62.  The State has not presented compelling evidence that the exemption for law professors and those they supervise is not comparable in terms of the "risk" posed to children by a communications privilege exception to the mandatory reporting requirement.  *C.f., We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 286 (2d Cir.), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021).  As Plaintiffs point out, multiple law schools in Washington have clinics and programs that *directly serve children*.  (Dkt. No. 192 at 7.)  (*See, e.g.,* Dkt. No. 193-3 at 1–2 ("Today the Gonzaga University School of Law, the Washington State Office of Civil Legal Aid (OCLA) and the Washington

1    State Office of Public Defense (OPD) signed a memorandum of understanding to create the

2    Children and Parents Rights and Justice Initiative (CRJI), designed to fill the need for attorneys

3    specifically trained to represent and advocate for children and parents in dependency proceedings

4    and across other areas of law"); Dkt. No. 193-3 at 3 ("Students in the Immigration Law Clinic

5    have represented . . . young people seeking Special Immigrant Juvenile Status.")).  Moreover, the

6    exemption for university attorneys applies to *all* attorneys employed by higher education

7    institutions—not just clinical professors.  Sub. H.B. 1171, 2025 Wash. Sess. Laws ch. 192,

8    § 2(1)(f). ("[T]he reporting requirement applies to . . . an attorney who is employed by an

9    institution of higher education . . . unless it relates to information related to the representation of

10   a client; and . . . [a]n employee working under the supervision or direction of [such] an

11   attorney . . . unless it relates to information related to the representation of a client.").[10]

12          Accordingly, the Court need not analyze the second and third "bedrock requirements" of

13   the Free Exercise Clause because the law fails under the first.  *Fellowship of Christian Athletes,*

14   82 F.4th at 683.  However, the Court briefly considers the third requirement—whether the SB

15   5375 "targets religious conduct for distinctive treatment or advances legitimate governmental

16   interests only against conduct with a religious motivation." *Lukumi*, 508 U.S. at 546.  A law is

17   not neutral if the government "proceeds in a manner intolerant of religious beliefs or restricts

18   practices because of their religious nature." *Fulton*, 593 U.S. at 533.  Here, clergy were

19   explicitly singled out.  The law itself is titled "AN ACT Relating to the duty of clergy to report

20   child abuse and neglect[.]"  SB 5375, 2025 Wash. Sess. Laws ch. 197.  At the hearing on July 14,

21

22   [10] Defendants argue that, in passing the SHB 1171, the legislature was focused on allowing
     "legal clinics to continue to provide critically needed legal services." (Dkt. No. 175 at 20–21.)

23   However, the plain text of the statute is not limited to clinical professors and their staff; instead,
     it encompasses *all* attorneys employed at higher education institutions whether or not they are a

24   clinical professor.  *See* Sub. H.B. 1171, 2025 Wash. Sess. Laws ch. 192, § 2(1)(f).

1   2025, the Defendants suggested that the law "doesn't demonstrate legislative animus," but were

2   unable to explain why the language in § 1(b) of the bill doubled down on singling out clergy

3   when § 1(a) had already added clergy to the list of mandatory reporters who could not invoke a

4   communication privilege.  *See* Wash. Rev. Code § 26.44.030(1)(a) and (b).

5          The targeted exception for clergy raises concerns, as the text of the bill and its legislative

6   history arguably evince the intentional abrogation of a practice that the legislature understood to

7   be religiously sacrosanct.  *See Fellowship of Christian Athletes*., 82 F.4th at 690 ("As part of

8   evaluating the neutrality of government actions, we must . . . examine the historical background

9   of the decision under challenge, the specific series of events leading to the enactment or official

10  policy in question, and the legislative or administrative history, including contemporaneous

11  statements made by members of the decisionmaking body.") (internal quotations removed).  For

12  example, one of SB 5375's co-sponsors stated that: "We as a state do not have to be complicit

13  when religious communities choose to cover up abuse and neglect of children.  We can establish

14  our laws, they can have the rules.  And if they are in conflict, I believe they can change their

15  rules."  (Dkt. No. 66-1 at 11.)  As the Ninth Circuit recently noted, "government actions coupled

16  with 'official expressions of hostility to religion . . . [are] inconsistent with what the Free

17  Exercise Clause requires . . . [and] must be set aside.'"  *Fellowship of Christian Athletes*., 82

18  F.4th at 690 (quoting *Masterpiece Cakeshop*, 584 U.S. at 639).  The fact pattern at hand is

19  readily distinguishable from cases where courts have found that a law's *lack* of religious

20  exception does not necessarily give rise to a free exercise claim.  *Hochul*, 17 F.4th at 280.  In this

21  case, clergy were the only professionals whose pre-existing exception was eliminated by the

22  legislature.

23

24

1    Accordingly, the legislative history and plain text of this bill arguably provide Plaintiffs

2    with a direct avenue to strict scrutiny on the grounds that the statute targets religious conduct.

3    The Court will not address this question in full until the record is fully developed, however.  For

4    now, the Court notes that "[a] law that targets religious conduct for distinctive treatment or

5    advances legitimate governmental interests only against conduct with a religious motivation will

6    survive strict scrutiny only in rare cases."  *Lukumi*, 508 U.S. at 546.

7        3.  <u>Senate Bill 5375 Fails Strict Scrutiny</u>

8    When a plaintiff's religious exercise is burdened by a law that is either not neutral or not

9    generally applicable, the burden shifts to the defendants to demonstrate that the challenged action

10   survives strict scrutiny.  *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1165 (9th Cir.

11   2024).   "A government policy can survive strict scrutiny only if it advances 'interests of the

12   highest order' and is narrowly tailored to achieve those interests.'"  *Fulton*, 593 U.S. at 541

13   (quoting *Lukumi*, 508 U.S. at 546).  Here, Plaintiffs have raised a serious question as to whether

14   SB 5375 would survive strict scrutiny.  Plaintiffs do not dispute that the State has a significant

15   interest in preventing child abuse and neglect and in implementing measures to further that

16   interest.  Nor do Plaintiffs dispute that members of the clergy can be designated mandatory

17   reporters in most contexts in a manner consistent with the First Amendment.  (Dkt. No. 1 at 5.)

18   However, strict scrutiny requires "that a law inhibiting religious belief or practice go only as far

19   as necessary to further the government interest."  *Bacon v. Woodward*, 104 F.4th 744, 747 (9th

20   Cir. 2024).  States cannot "justify an inroad on religious liberty" without first "showing that it is

21   the least restrictive means of achieving some compelling state interest."  *Id.*, quoting *Thomas v.*

22   *Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981).

23

24

1    The State arguably could have chosen a less restrictive means of advancing its interest in

2    protecting children from abuse and neglect by adding members of the clergy to the list of

3    mandated reporters while also permitting a narrow exception for the confessional, as

4    approximately 25 other states have done.[11]  There is also the possibility that the State could have

5    worked alongside clergy to determine where state intervention is needed to further this interest

6    within the context of the different religious communities in Washington and worked backwards

7    from gaps identified to formulate a narrowly tailored remedy.  As Etienne states, "the

8    Archdiocese of Seattle has adopted and implemented policies that go further in the protection of

9    children than the current requirements of Washington law on reporting child abuse and neglect,"

10   which include "reporting to proper law enforcement agencies or the department of children,

11   youth, and families whenever church personnel—defined to include clergy and lay faithful

12   working for the diocese, its parishes, schools, or agencies—have reasonable cause to believe

13   child abuse or neglect has occurred."  (Dkt. No. 75 at 8.)  Etienne further suggests that:

> [B]ecause absolution given by a priest requires true contrition for all confessed sins, I,
> and the priests within the Archdiocese of Seattle to whom are confessed sins of child
> abuse or neglect by the penitent, could help counsel the penitent to self-report and obtain
> the necessary temporal intervention and held.  I, and the priests within the Archdiocese of
> Seattle who suspect based on what is disclosed during confession that the penitent is
> suffering from abuse or neglect, the penitent has engaged in abuse or neglect, or some
> third party has engaged in abuse or neglect, could invite the penitent for counseling
> outside of the Sacrament of Confession. If the penitent were to agree to such counseling
> and I or a priest within the Archdiocese of Seattle were to learn information in that non-
> sacramental counseling providing reasonable cause to believe abuse or neglect has been
> committed, I or the priest is obligated to report that suspected abuse or neglect to proper
> law enforcement agencies or the department of children, youth, and families."

---

[11] *See Clergy as Mandatory Reporters of Child Abuse and Neglect*, CHILD WELFARE
INFORMATION GATEWAY, (May 30, 2023), https://www.childwelfare.gov/resources/clergy-
mandatory-reporters-child-abuse-and-
neglect/#:~:text=This%20publication%20discusses%20State%20laws%20that%20require%20cle
rgy,a%20reason%20for%20not%20reporting%20also%20is%20discussed.

1    (Dkt. No. 75 at 9.)  Daly and Tyson declare the same.  (Dkt. Nos. 72 at 9, 77 at 9.)

2           Ultimately, Washington's failure to demonstrate why it has an interest of the highest

3    order in denying an exemption to clergy while making such exemptions available to other

4    professionals who work with underserved children—as discussed *supra*—is likely fatal to SB

5    5375.  *See Tandon*, 593 U.S. at 62; *Fulton*, 593 U.S. at 541.  As in *Lukumi*, the law is

6    "underinclusive to a substantial extent with respect to . . . the interest[] that [the state] has

7    asserted."  *Lukumi*, 508 U.S. at 547.  The state, in removing the privileged communication

8    exception for clergy but expanding it for other professionals, cannot demonstrate the narrow

9    tailoring strict scrutiny requires.  *Id*. at 546 ("The absence of narrow tailoring suffices to

10   establish the invalidity of the ordinances.").

11          **B.        Irreparable Harm**

12          "The loss of First Amendment freedoms, for even minimal periods of time,

13   unquestionably constitutes irreparable injury."  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592

14   U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *see*

15   *also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("A colorable First Amendment claim is

16   irreparable injury sufficient to merit the grant of relief.") (internal quotation marks omitted).  As

17   the Ninth Circuit has explained, "'[i]rreparable harm is relatively easy to establish in a First

18   Amendment case' because the party seeking the injunction 'need only demonstrate the existence

19   of a colorable First Amendment claim.'"  *Fellowship of Christian Athletes*, 82 F.4th at 694–95

20   (quoting *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th

21   Cir. 2022)).  For the reasons discussed *supra*, the Court finds Plaintiffs have put forward a

22   colorable claim that SB 5375 impermissibly burdens their Free Exercise rights, and that

23

24

1    Defendants will prosecute Plaintiffs for exercising those rights absent injunctive relief.

2    Accordingly, this factor tips sharply in Plaintiffs' favor.

3           **C.**       **Balance of the Equities and the Public Interest**

4           "Where, as here, the party opposing injunctive relief is a government entity, the third and

5    fourth factors—the balance of equities and the public interest—'merge.'" *Fellowship of*

6    *Christian Athletes*, 82 F.4th at 695 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Because

7    Plaintiffs have raised serious First Amendment questions, the balance of hardships tips sharply in

8    their favor. *Id.*; *see also Am. Bev. Ass'n v. City & County of San Francisco*, 916 F.3d 749, 758

9    (9th Cir. 2019). Moreover, "it is always in the public interest to prevent the violation of a party's

10   constitutional rights."  *Am. Bev. Ass'n v. City & County of San Francisco*, 916 F.3d at 758

11   (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).  The third and fourth factors

12   therefore tip in Plaintiffs' favor.

13          Accordingly, the Court finds Plaintiffs have met the necessary requirements for a

14   preliminary injunction based on their Free Exercise Claim.

15          **D.**       **Scope of Relief**

16          In the recent decision *Trump v. CASA*, the Supreme Court held that injunctions "asserting

17   the power to prohibit enforcement of a law or policy against anyone . . . likely exceed the

18   equitable authority that Congress has granted to federal courts."  *Trump v. CASA, Inc*., No.

19   24A884, 2025 WL 1773631, at *4 (U.S. June 27, 2025).  The Court suggested equitable relief

20   must be "[n]o broader than necessary to provide complete relief to each individual plaintiff with

21   standing to sue."  *Id*. at *15.  In light of *CASA*, the Court asked Plaintiffs whether any relief must

22   be limited to the individual Plaintiffs and not any other clergy in the state of Washington.  (Dkt.

23   No. 205 at 2.)

24

Plaintiffs responded that they "are not seeking a universal injunction, nor have Plaintiffs sought an injunction applicable to faith traditions other than their own." (Dkt. No. 213 at 7.) Instead, the injunction they seek is "only so broad as necessary to afford Plaintiffs complete relief," Plaintiffs affirm.  (*Id.*)  Plaintiffs explain that, because Etienne is the Archbishop of Seattle and Daly and Tyson are the bishops of the Spokane and Yakima dioceses, "they have responsibility for the administration of the sacraments across their dioceses and the discipline of priests within their dioceses, including ensuring the sacramental seal is maintained by the priests in their dioceses." (*Id.* at 8.)   Accordingly, absent an injunction that applies to the administration of the Sacrament of Confession across the three dioceses that Etienne, Daly, and Tyson administer, they—as individuals—cannot fulfill *their* religious responsibility of ensuring that the priests within their dioceses maintain the sacramental seal.  *Id.*  Likewise, they will not be able to fulfill their responsibility to ensure that "the faithful within their dioceses have access to the Sacrament of Confession." (*Id.* at 7.)  The Court agrees that, to afford complete relief in this instance, the injunction will apply to all Roman Catholic priests in Washington who fall directly under the administration of Etienne, Daly, and Tyson.

## V      REMAINING CLAIMS

Having concluded Plaintiffs meet the requirements for the issuance of a preliminary injunction based on their Free Exercise claim, the Court need not analyze whether their Church Autonomy Doctrine and Establishment Clause claims might independently support equitable relief.  It is sufficient to remark that there are serious questions going to the merits of those claims, as the Court indicated at the hearing held on July 14, 2025.

ORDER ON MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 65) - 24

1

# VI    ORDER

For the reasons discussed above, the Court finds Plaintiffs have met the necessary

requirements for a preliminary injunction.  Accordingly, Plaintiffs' motion (Dkt. No. 65) is

GRANTED.  Defendants are HEREBY ENJOINED from enforcing SB 5375 as to the Sacrament

of Confession against the Plaintiffs in this action and all Roman Catholic priests in Washington

who fall directly under the administration of Plaintiffs Etienne, Daly, and Tyson.

Dated this 18th day of July, 2025.

David G. Estudillo
United States District Judge